UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

PHYSICIANS MUTUAL INSURANCE COMPANY and )    CIVIL ACTION
PHYSICIANS LIFE INSURANCE COMPANY,        )    NO. 07 CV 10490 (NRB)
                                          )
                      Plaintiffs,         )
                                          )
          v.                              )
                                          )
GREYSTONE SERVICING CORPORATION, INC.,    )
GREYSTONE & CO., INC., STEPHEN ROSENBERG  )
ROBERT R. BAROLAK, and CURTIS A POLLOCK,  )
                                          )
                      Defendants.         )
-------------------------------------------------------------------------X

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO STAY

Stephen L. Saxl
William A. Wargo
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
(212) 801-9200

and

José A. Isasi, II
GREENBERG TRAURIG, LLP
77 W. Wacker Drive
Suite 2500
Chicago, IL 60601
(312) 456-8400

*Attorneys for Defendants Greystone*
*Servicing Corporation, Inc., Greystone &*
*Co., Inc., Stephen Rosenberg, Robert R.*
*Barolak and Curtis A. Pollock*

## TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................1

II.     FACTUAL HISTORY..................................................................................1

III.    PROCEDURAL HISTORY.........................................................................3

IV.     ARGUMENT.................................................................................................7

      A.    Because Collateral Estoppel Has Not Yet Attached, Defendants' Motion to Stay Is The Correct Procedural Mechanism In The Present Case ...................7

      B.    Under Illinois Law, Collateral Estoppel Does Not Attach Until All Appeals In The Asset Allocation Litigation Have Been Exhausted......................................9

      C.    The Issue Of Whether Plaintiffs Suffered Legally Cognizable Damages, Decided In The Asset Allocation Litigation, Is Identical To The Defense Raised By The Defendants In The Present Action ...........................................10

      D.    This Court Should Stay This Litigation Pending Resolution Of The Asset Allocation Appeal..................................................................................................12

            1.    The standard for granting a stay of these proceedings. ........................12

            2.    A stay is entirely appropriate given the procedural history and posture of the present case. ...................................................................13

V.      CONCLUSION ...........................................................................................18

## Table of Authorities

**Federal Cases**

*Cerbone v. County of Westchester*
  508 F. Supp. 780 (S.D.N.Y. 1981) ............................................................................8

*Disher v. Information Resources, Inc.*
  691 F. Supp. 75 (N.D. Ill. 1988) ..............................................................................5

*Goldstein v. Time Warner N.Y. Cable Group*
  3 F. Supp. 2d 423 (S.D.N.Y. 1998) ........................................................................16

*Kappel v. Comfort*
  914 F. Supp. 1056 (S.D.N.Y. 1996) ......................................................................13

*LaSala v. Needham & Co., Inc.*
  399 F. Supp. 2d 421 (S.D.N.Y. 2005) ..............................................................13, 15

*Levya v. Certified Grocers of California, Ltd.*
  593 F.2d 857 (9th Cir. 1979) ..................................................................................16

*Mario Valente Collezioni, Ltd. v. AAK, Ltd.*
  280 F. Supp 2d 244 (S.D.N.Y. 2003) ......................................................................9

*NAS Elecstronics, Inc. v. Transtech Elecstronics PTE Ltd.*
  262 F. Supp. 2d 134 (S.D.N.Y. 2003) ......................................................................9

*Phoenix Canada Oil Company Ltd. v. Texaco Inc.*
  749 F. Supp. 525 (S.D.N.Y. 1990) ..........................................................................8

*Semtek Int'l Inc. v. Lockheed Martin Corp*
  531 U.S. 497, 121 S.Ct. 1021 (2001) ......................................................................9

**State Cases**

*Ballweg v. The City of Springfield*
  114 Ill. 2d 107 (1986) ............................................................................................10

*People v. One 1984 Pontiac Parisienne Sedan, VIN 2G2AK69H3E9729554*
  323 Ill. App. 3d 717, 754 N.E.2d 358 (Ill. App. 2001) ........................................10

## I.    **INTRODUCTION**

The Defendants respectfully request that this Court enter an order staying these

proceedings until the resolution of the appeal in the related case brought by Plaintiffs, *Physicians*

*Mutual Insurance Company and Physicians Life Insurance Company v. Asset Allocation and*

*Management Company, LLC*, No. 06 C 5124 (U.S. Dist. Ct., N.D. Ill., Conlon, Judge)

(hereinafter, the "Asset Allocation Litigation," or the "Asset Allocation Appeal").  Plaintiffs

have appealed the decision of the trial court that they suffered no legally cognizable damages

related to the alleged premature redemption of their interests in certain mortgage loans.  These

same damages allegedly arising from the same loans are sought by Plaintiffs in the present

lawsuit.  Should the Seventh Circuit affirm the trial court decision, Plaintiffs in this action would

be precluded from asserting they were damaged under the doctrine of collateral estoppel.  Thus,

the outcome of the Asset Allocation Appeal may end or fundamentally alter this litigation.

Because the claims at issue in the Asset Allocation Litigation and the present litigation arise

from the same nucleus of facts and because the Asset Allocation Appeal would resolve a

controlling point of law in this litigation, Defendants respectfully request that this Court enter the

requested stay.

## II.    **FACTUAL HISTORY**

The following facts are undisputed by Plaintiffs unless otherwise noted.[1]  Greystone

Servicing Corporation, Inc. ("Greystone Servicing") provides loan servicing for large portfolios

of real estate loans, including the collecting of mortgage payments and remitting of payments to

proper parties.  Plaintiffs' First Amended Complaint ("First Amended (Greystone) Compl."), at

---

[1] The sources for these factual allegations come from both the Asset Allocation Litigation and the present
litigation.  A distinction will be drawn between pleadings in the present case and pleadings from the Asset
Allocation litigation.

¶ 3. Greystone & Co. Inc. is a financial services company. *Id.,* at ¶ 4. Defendants Rosenberg, Barolak and Pollock all maintain positions with these Greystone entities. *Id.,* at ¶¶ 5-8. Greystone Funding Corporation ("Greystone Funding"), no longer a defendant in the present litigation, is in the business of making investments in debt instruments, primarily mortgage loans. Plaintiffs' Complaint ("Original (Greystone) Compl.") at ¶ 4.

During 1995 and 1996, Greystone Funding acquired various mortgage loans issued for the purposes of financing the construction of multi-family, low income housing projects in New York under Section 8 of HUD's Housing Assistance Program. Amended (Greystone) Compl., at ¶¶ 14-15. The various loans at issue, covering several different projects, were grouped into three separate Loan Pools by Greystone. *Id.* These Loan Pools were known as Greystone Pools 1995-4, 1996-1, and 1996-6. *Id.,* at ¶ 14.

Asset Allocation and Management Company, LLC ("Asset Allocation") is a registered investment advisor specializing in the management of insurance company assets. Second Amended Complaint in Asset Allocation litigation (hereinafter "Second Amended (Asset Allocation) Compl.") at ¶ 7.[2] Asset Allocation entered into a series of Investment Management Agreements with the Plaintiffs pursuant to which Asset Allocation acted as an investment advisor to the Plaintiffs. *Id.*, at ¶¶ 8-10. Plaintiffs allege that at the recommendation of and in reliance on representations of Asset Allocation, they purchased various mortgage-backed securities, including participation interests in each of the three Greystone Loan Pools at issue in the present litigation. *Id.*, at ¶¶ 12, 16; *see also* First Amended (Greystone) Compl. at ¶ 14.

---

[2] Copies of all pleadings and materials not of record in this case and referenced herein are attached to the accompanying Declaration of José A. Isasi, II, dated May 5, 2008, in Defendants' Appendix of Materials in Support of their Motion to Stay.

Plaintiffs' investments in the Loan Pools occurred on three different dates in 1996, with an additional investment in the year 2000. *Id.*, at ¶ 16.

Plaintiffs' participation interests in the Loan Pools were redeemed on three dates:

| | |
|---|---|
| Greystone 1996-1 | September 25, 2002 |
| Greystone 1995-4 | May 27, 2003 |
| Greystone 1996-6 | May 27, 2003 |

First Amended (Greystone) Complaint, at ¶ 24.  However, Plaintiffs have admitted that upon redemption, they received the remaining principle balance, or par value, of their participation interest in each of the underlying loans. *Id.*, at ¶ 27.  Indeed, Plaintiffs have previously admitted that their underlying loans remained in place long enough so that Plaintiffs were able to recover 100% of par, plus all of the "premium" they paid, plus enough of the high interest coupon such that Plaintiffs earned an additional return of between 5.83% and 6.22% (depending on the Pool). *See* Plaintiffs' Response to Defendant's Rule 56.1 Statement of Facts, including Statement of Additional Facts, in Asset Allocation Litigation, at ¶ 40.[3]

## III.    PROCEDURAL HISTORY

On September 21, 2006, Plaintiffs filed suit against Asset Allocation in the United States District Court for the Northern District of Illinois.  In addition to a claim for professional negligence against Asset Allocation due to its alleged failure to accurately inform Plaintiffs of the prepayment rights and provisions in the underlying mortgages making up the Loan Pools (Second Amended (Asset Allocation) Compl. at ¶ 19), Plaintiffs also brought counts for breach of fiduciary duty, breach of contract, and fraud, all related to the "early" payment of the

---

[3] Indeed, Judge Conlon in her Memorandum Opinion and Order, lists annualized returns of between 5.83% and 6.22% that surpassed treasury security yields over the same time period. *See* Opinion of Conlon, J., September 28, 2007, at ¶ 5.

mortgages in the Loan Pools. *See generally,* Second Amended (Asset Allocation) Compl.

Plaintiffs described their losses due to these "early" payments as falling into several categories 1)

overpaid premiums for Plaintiffs' investment in the Loan Pools; 2) lost income from the overpaid

premiums; 3) lost income allegedly caused by Plaintiffs' reinvestment of its interests in the Loan

Pools through 2007, and 4) the net present value of the income loss from reinvesting the

principle returned at the time Plaintiffs' interest in the Loan Pools were redeemed from 2007

until the stated maturity dates for the loans. *See,* Opinion of Conlon, J. in Asset Allocation

Litigation, September 28, 2007, at 6.  ("Conlon Opinion")

Plaintiffs characterize their damages in the <u>present litigation</u> also as those arising from

the deprivation of their right to receive future payments under the terms of the high interest

mortgage notes in the Loan Pools continuing to the date of maturity, and due to the fact that

Plaintiffs were forced to reinvest the return par value at interest rates lower than the interest rates

of the underlying loans—thus, they seek the same damages in the present litigation as they were

seeking in the Asset Allocation Litigation.  First Amended (Greystone) Compl. at ¶ 27.

On September 28, 2007, Judge Conlon, granted defendant Asset Allocation's motion for

summary judgment.  While Asset Allocation sought summary judgment on various grounds,

Judge Conlon was only required to reach one of these issues to grant the requested summary

relief—the question of damages.  In summary, Judge Conlon found that because Plaintiffs had

received all of their principal, or par, back upon redemptions of the loans, and in fact had

received a positive return on their investment exceeding the Treasuries yields during the

applicable time periods, Plaintiffs had not suffered legally cognizable damages.

Judge Conlon granted summary judgment for Asset Allocation, finding that "Plaintiffs

have not suffered any legally compensable loss" because "they have not suffered any net

4

damages." Conlon Opinion at 7, 8. Judge Conlon found that without any actual loss a plaintiff has no damages; in particular, in cases where the plaintiff actually profited from the underlying investment. *Id.* at 9 (citing *Disher v. Information Resources, Inc.*, 691 F. Supp. 75, 84 (N.D. Ill. 1988) (no loss or damages arising out of federal securities claim and breach of fiduciary duty claim where plaintiff actually profited from the underlying investment).

The court then analyzed each individual cause of action to determine if there could be quantifiable damages. For fraud claims, Judge Conlon applied "benefit-of-the-bargain" damages: the difference between the actual value of the property sold and the value the property would have had if the representations had been true at the time of the sale. Conlon Opinion at 9. The fact that Plaintiffs received 100 percent par value of the investment, the premium amount, and profitable returns had to be taken into account as they served to mitigate any net loss sustained by Plaintiffs. *Id.* at 10.

First, with respect to the alleged overpayment, any loss of excess premium was not a compensable loss because the entire premium payment was recovered by Plaintiffs. If Plaintiffs recovered nothing at all on these investments, the compensatory damages would have been the purchase price of the instruments, that is, the difference between the value of the investments and their represented value. Conlon Opinion at 11. Plaintiffs, however, recovered the purchase price (which includes the price of the premiums) and profited more than they would have if they invested in Treasury notes over the same time period. *Id.*

Second, with respect to alleged lost income from the alleged overpayment, whatever yield Plaintiffs could have realized on the excess premium until the call date was recovered in the profits returned on the entire value of the investments. Plaintiffs' investments in the Loan Pools yielded an annualized return of between 5.88 and 6.22 percent, exceeding the yield for

Treasury securities over the same time period, and, therefore, received income from the overpayment at a rate of interest commensurate to any reasonable alternative investment Plaintiffs could have made with that sum. Conlon Opinion at 12.

Finally, with respect to whether Plaintiffs were entitled to lost income from the premature call of the investments because Plaintiffs allegedly had to reinvest the returned principal at lower prevailing interest rates, the court found that Plaintiffs could not recover the alleged lost income because the investments were not guaranteed to make the stated yields, but rather the risk of the investment being called prior to maturity was contemplated. Conlon Opinion at 13. The court also rejected Plaintiffs' characterization of the income as a "lost alternative use" since the investment yielded a return up to the call date that exceeded those of Treasury securities. *Id.* at 13-14. In addition, the court found such damages after the call date as speculative. *Id.* at 14.

For the same reason that the court found that Plaintiffs had not suffered any actual loss for fraud, the Court found that Plaintiffs did not suffer any actual loss on their claims of professional negligence, breach of contract, and breach of fiduciary duty, which were based on the same facts and injury as the fraud claim. Conlon Opinion at 14-15.

On August 29, 2007, Plaintiffs initiated the present lawsuit when they filed a Summons with Notice against the Defendants in the Supreme Court for the State of New York. *However,* the Summons was not served until November 5, 2007, a complaint was not filed until November 20, 2007 and the present first amended complaint was not filed until March 27, 2008. Given the existence of a federal question, the Defendants timely removed this matter to this Court. On January 11, 2008, the Defendants served their letter requesting a pre-motion conference to discuss, *inter alia*, the filing of a motion to stay these proceedings.

6

## IV.   ARGUMENT

This Court possess the inherent power to stay this litigation. The exercise of this power is commended to the sound discretion of the District Courts. As will be argued below, the Court is well within its discretion to stay a case to await the outcome of another proceeding. All that this Court must find, to support the exercise of this discretion, is that the other proceeding (the Asset Allocation Appeal) "bears upon" the case before the Court. This Court need not find the other proceeding is controlling in order to enter a stay. Thus, while Defendants will argue that the outcome of the Asset Allocation Appeal has the potential to control significant aspects of the present case (on the question of damages) through the application of collateral estoppel, a stay is warranted even if this Court believes only that the Asset Allocation Litigation bears on this case.

Given the relatively low standard for entry of a stay, Plaintiffs have attempted to change the procedural terrain on which this issue is being fought. Plaintiffs have argued that nothing prevents the Defendants from presenting their "no damages" collateral estoppel defense to the present lawsuit in a motion to dismiss. Therefore, before addressing the legal authority supporting this Court's entry of a stay of these proceedings, the Defendants will first address why the collateral estoppel question cannot be resolved by the Court at the present time.

### A.   Because Collateral Estoppel Has Not Yet Attached, Defendants' Motion to Stay Is The Correct Procedural Mechanism In The Present Case.

As a threshold matter, Plaintiffs have argued that the Defendants' claims of collateral estoppel are ripe for adjudication now and could be presented in a motion to dismiss—thus a motion to stay is inappropriate. While arguing before the Seventh Circuit that Judge Conlon's decision that Plaintiffs suffered no legally cognizable damages should be reversed, Plaintiffs simultaneously argue to this Court that "The pendency of the Seventh Circuit Appeal is not an obstacle to the Court considering the issue [of collateral estoppel] at this time." *See* Letter of

7

James Frost, April 21, 2008, to Hon. Naomi Buchwald, at 3 ("Plaintiffs' April 21, 2008 Letter").

Thus, Plaintiffs argue, a stay is not necessary as this Court can decide the merits of the question

of whether Plaintiffs' claims here are barred by the doctrine of collateral estoppel. Therefore,

Defendants' collateral estoppel arguments could presumably be presented in a Rule 12(b)(6)

motion to dismiss. Plaintiffs support this argument by relying on inapplicable or outdated

caselaw. When controlling authority is considered, it is clear that until Plaintiffs exhaust their

appeals in the Asset Allocation Appeal, collateral estoppel does not attach to Judge Conlon's

decision; thus a motion to stay is proper.

Plaintiffs' argument that this Court can consider the merits of Defendants' collateral

estoppel argument is succinctly set forth in Plaintiffs' April 21, 2008 Letter:

> The pendency of the Seventh Circuit Appeal is not an obstacle to
> the Court considering the issue at this time. *See Zerbone v. County
> of Westchester*, [sic] 508 F. Supp. 780, 784 (S.D.N.Y. 1981)
> (pendency of an appeal does not suspend collateral estoppel effect
> of an otherwise final judgment"). Moreover, the issue will be
> governed by Federal law not Illinois law. *See Phoenix Canada Oil
> Company Ltd. v. Texaco Inc.,* 749 F. Supp. 525 (S.D.N.Y. 1990)
> ("the preclusive effect of a prior judgment in a federal action
> predicated on diversity jurisdiction is governed by federal law").

Plaintiffs' April 21, 2008 Letter at 3. However, the *Cerbone* decision was rendered in the

context of a federal question jurisdiction case, not (as in the Asset Allocation litigation) a court

sitting in a diversity case. Thus, it is inapplicable here.

Further, the *Phoenix Oil* decision is outdated and an incorrect statement of the current

law. As has been recognized by the trial courts of the Southern District of New York, in 2001

the United States Supreme Court resolved the question of which jurisdiction's law on collateral

estoppel applies in the context of a diversity case. "The Supreme Court has held that the

preclusive effect of any decision by a federal court, sitting in a diversity action, is to be

determined by the applicable preclusion law of the state <u>in which the district court sat</u>." *Mario*

*Valente Collezioni, Ltd. v. AAK, Ltd.,* 280 F. Supp 2d 244, 252 (S.D.N.Y. 2003) (quoting *Semtek*

*Int'l Inc. v. Lockheed Martin Corp,* 531 U.S. 497, 508-09, 121 S.Ct. 1021 (2001) (emphasis

added)). "The rule in *Semtek* 'applies to the situation ... where the preclusive effect of a federal

decision in a diversity case is being litigated in federal court.'" *Id.* (quoting *NAS Electronics,*

*Inc. v. Transtech Electronics PTE Ltd.*, 262 F. Supp. 2d 134, 143 (S.D.N.Y. 2003) (extending the

rule from *Semtek* that "when a federal court sitting in diversity applies state substantive law as

the rule of decision in a case, the preclusive effect of any decision by the federal court in that

case is to be determined by the state preclusion law of the state in which the district court sits" to

cases in which a federal court is determining the preclusive effect of an earlier federal court

diversity judgment)).

The Asset Allocation Litigation was a diversity case controlled by the substantive law of

Illinois. *See generally,* Conlon Opinion. Under controlling authority, this Court should utilize

Illinois law on when collateral estoppel attaches to determine if it can be properly raised by

Defendants at this time (in a motion to dismiss) or if the parties must await the outcome of the

Asset Allocation Appeal, thus necessitating a stay.

### B.    Under Illinois Law, Collateral Estoppel Does Not Attach Until All Appeals In The Asset Allocation Litigation Have Been Exhausted.

Under Illinois law, Defendants' assertion of collateral estoppel on the question of

Plaintiffs' damages cannot be raised any earlier than the resolution of the Asset Allocation

Appeal before the Seventh Circuit. The Illinois Supreme Court has held that the factors for

collateral estoppel are: "(1) whether the issue decided in the prior adjudication is identical with

the one presented in the case in question; (2) whether there has been a final judgment on the

merits; and (3) whether the party against whom estoppel is asserted is a party or in privity with a

party to the prior adjudication." *See Ballweg v. The City of Springfield*, 114 Ill. 2d 107, 113 499 N.E.2d 1373 (1986). "For purposes of applying the doctrine of collateral estoppel, however, finality under Illinois law requires that the potential for appellate review must have been exhausted." *See Ballweg*, 114 Ill. 2d at 113 (finding that because the prior verdict was appealed and that appeal had not concluded when the motion for collateral estoppel was filed, denial of collateral estoppel due to lack of finality was proper); *People v. One 1984 Pontiac Parisienne Sedan, VIN 2G2AK69H3E9729554*, 323 Ill. App. 3d 717, 754 N.E.2d 358, 362 (Ill. App. 2001) ("Under settled Illinois law, a judgment is not final for collateral estoppel purposes until the potential for appellate review has been exhausted.").

It cannot be reasonably disputed by Plaintiffs that this Court must await the resolution of the Asset Allocation Appeal before potentially applying the doctrine of collateral estoppel to dismiss their claims. It also cannot be argued by Plaintiffs that the Asset Allocation Litigation and the present case before this Court fail to satisfy the third factor identified by the Illinois Supreme Court in *Ballweg*: identity of parties. The Plaintiffs against whom Defendants would seek to apply collateral estoppel are identical to the Plaintiffs in the Asset Allocation Litigation. Therefore, if the "issue decided" in the Asset Allocation Litigation is identical to the defense to be raised by Defendants in this action, collateral estoppel would apply. Since that issue— whether Plaintiffs suffered legally cognizable damages due to the alleged "early redemption" of the loans in the Loan Pools at issue—is identical, collateral estoppel would apply.

## C.    The "Issue" Of Whether Plaintiffs Suffered Legally Cognizable Damages, Decided In The Asset Allocation Litigation, Is Identical To The Defense Raised By The Defendants In The Present Action.

Plaintiffs concede that all the Loan Pools at issue in the present litigation were at issue in the Asset Allocation Litigation, subject to the same terms, interest rates, and maturity dates. The

10

redemption dates of Plaintiffs' interests in the Loan Pools, the payments they received from their redemptions—all are identical. The same damage calculations are at issue in the Asset Allocation Litigation and the present litigation. Indeed, Plaintiffs appear to have retreated from their initial, flawed position that the Asset Allocation Litigation and the present lawsuit "do not share the same factual basis for the claims asserted or even similar legal issues."[4] Now, in order to argue that Judge Conlon's decision would not serve as collateral estoppel in the preset lawsuit, Plaintiffs have engaged in a transparent effort to redefine what the "issue" is in this case. Plaintiffs argue that in the Asset Allocation Litigation the "issue" was whether Plaintiffs were properly advised of, and whether Asset Allocation properly considered, the risk of "prepayment" of the underlying loans. The theory is that Plaintiffs overpaid for their participation interests in the Loan Pools because of the absence of the prepayment guarantees Plaintiffs thought were in place. *See* Plaintiffs' April 21, 2008 Letter, at 1-2. In the present litigation, Plaintiffs argue, the "issue" is whether the Defendants improperly and unlawfully redeemed Plaintiffs' participation interests—thus, the issues in the two cases are different.[5]  *Id.* at 2-3.

Plaintiffs' attempts to shift the Court's focus from the actual issue in Judge Conlon's opinion (and the issue which Defendants contend would collaterally estop Plaintiffs' claims here) are both patently obvious and doomed to failure. For the purpose of Defendants' Motion To Stay, the "issue" is not the mechanism by which Plaintiffs claim they were wrongfully deprived of future payments from their participations in the Loan Pools—whether due to bad investment

---

[4] *See* Letter of James Frost to Hon. Naomi Buchwald, January 22, 2008 at 1.

[5] While acknowledging these allegations for the purposes of this motion to stay, the Defendants wish to make clear that they completely reject Plaintiffs' allegations as false and nothing within this Memorandum should be construed either as an admission of, or acceptance of, these allegations. Should this matter proceed to a defense on the merits, the Defendants intend to vigorously contest and defend this meritless lawsuit.

11

advice from Asset Allocation or improper redemptions by Defendants. Instead, the "issue" is assuming these "improper" redemptions occurred, can Plaintiffs seek to recover lost profits for the future payments they claim they were entitled to. There is no dispute that Plaintiffs suffered absolutely no out of pocket losses arising from these investments. They received all payments due to them during the time their participation interests were outstanding. They received the par value of their initial investment as well. Judge Conlon's opinion squarely rejected the claim that Plaintiffs suffered <u>any</u> legally cognizable damages, given the absence of any out of pocket losses and the significant return Plaintiffs received on their investment. A comparison of the categories of damages sought in both the Asset Allocation Litigation and the present lawsuit bears out the identity of the damages sought by Plaintiffs.[6] See *infra* at 4.

If Plaintiffs suffered no legally cognizable damages arising from the alleged overpayments for, and premature redemption of, their participation interests in the Loan Pools (as Judge Conlon ruled), then they cannot recover from these Defendants any more than they could recover from Asset Allocation. This issue of legally cognizable damages is the true "issue' for the purposes of a collateral estoppel analysis, and it is plainly identical in both the present case and the Asset Allocation Litigation.

**D.    This Court Should Stay This Litigation Pending Resolution Of The Asset Allocation Appeal.**

1.    The standard for granting a stay of these proceedings

In a recent decision, Judge Scheindlin of the Southern District of New York set forth a fairly detailed discussion regarding staying a federal civil litigation pending the outcome of another federal civil proceeding:

---

[6] Indeed, during the March 19, 2008 teleconference hearing before this Court, Plaintiffs' counsel James Frost conceded upon questioning by the Court that the two lawsuits sought the "same dollars" from both Asset Allocation and the Greystone defendants.

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes in its own docket with economy of time and effort for itself, for counsel, and for litigants. It follows that the decision to stay is firmly within a district court's discretion. There are several reasons why a court might decide to stay proceedings in a lawsuit. *For example, a court might, in the interest of judicial economy, enter a stay pending the outcome of proceedings which bear upon the case, even if such proceedings are not necessarily controlling of the action to be stayed.* To be sure, the movant bears the burden of establishing its need for such a stay. In particular, if there is even a fair possibility that the stay for which he prays will work damage to some one else, the movant must make out a clear case of hardship or inequity in being required to go forward."

*LaSala v. Needham & Co., Inc.*, 399 F. Supp. 2d 421, 427 (S.D.N.Y. 2005) (citations and internal quotation marks omitted) (emphasis added).

Judge Scheindlin identified five factors that should be considered in deciding whether to grant a stay (citing *Kappel v. Comfort*, 914 F. Supp. 1056 (S.D.N.Y. 1996)): "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; (5) the public interest." *LaSala,* 399 F. Supp. 2d at 427. Under these factors a federal action may be stayed "in light of a concurrently pending federal action (either because the claims arises from the same nucleus of facts or because the pending action would resolve a controlling point of law.)" *Id.* (citation omitted). Further, in balancing these factors on case by case basis the basic goal is to avoid prejudice. *Id.*

> 2.    <u>A stay is entirely appropriate given the procedural history and posture of the present case.</u>

When the *Kappel* factors are applied to the facts and history of the present case, they weigh overwhelmingly in favor of the entry of a stay. First, while Plaintiffs may now claim an

13

interest in proceeding expeditiously in this litigation, their conduct in this case would belie this claim. Plaintiffs claim that they first learned of the allegedly wrongful redemptions of their participation interest during a May 4, 2007 deposition. First Amended (Greystone) Complaint at ¶ 26. While this "fact" was plainly pled in an attempt to avoid fatal limitations issues for most of Plaintiffs' claims, even taking this statement at face value, Plaintiffs waited six months after this deposition to serve the Defendants with the Summons with Notice—a simple, one and one-half page document. It took Plaintiffs almost an additional five months to serve their First Amended Complaint, which could have been served at any time without leave of this Court, as a responsive pleading had not yet been filed by Defendants. Thus, Plaintiffs are solely responsible for a nearly <u>one year delay</u> in the present litigation—which is the best evidence of what Plaintiffs themselves believe is the true importance of proceeding expeditiously.

Additionally, Plaintiffs have not argued that they would be prejudiced by a stay. Plaintiffs conducted extensive third-party discovery on the Greystone entities (and others) during the Asset Allocation Litigation. This included the production of thousands of pages of records related to the transaction at issue in the present litigation, and hours of testimony in depositions of Greystone designees to Rule 30(b)(6) deposition notices. Plaintiffs already have much of the information they would be entitled to should the Court allow this litigation to proceed.

In contrast, the interests of the Defendants and this Court weigh substantially in favor of the stay. Judge Conlon's opinion, if affirmed, fundamentally alters the landscape and issues in this case. She carefully considered a large quantity of evidence on damages, including the reports of Plaintiffs' damages expert, before reaching her decision. *See* Conlon Opinion at 6. Defendants maintain they have established in this Memorandum that if affirmed, Judge Conlon's decision would serve as collateral estoppel to Plaintiffs' claims in the present litigation. To

14

litigate the present lawsuit while such an impactful and significant legal decision is being appealed invites a waste of scarce judicial resources, not to mention the substantial costs and burdens it will place on the Defendants.

Additionally, the public interest and the interests of third parties weigh in favor of a stay. Plaintiffs have given notice of their intention to depose numerous individuals who are neither Defendants or employees of the Defendants, including conducting depositions of third-parties in several other states. *See generally* Report of Rule 26(f) Conference; *see also* subpoenas issued by Plaintiffs to USGI, Inc., Jet Premier, LLC, and Bank of America, on March 16, 2008. This discovery would impose significant burdens and costs on third parties which would be entirely unnecessary should the Seventh Circuit affirm Judge Conlon's opinion on Plaintiffs' damages.

Significantly, in order to grant Defendants Motion to Stay, this Court need not determine whether Judge Conlon's decision, if affirmed, would end this case—though Defendants maintain it will. "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its own docket with economy of time and effort for itself, for counsel, and for litigants." *LaSala v. Needham & Co., Inc.*, 399 F. Supp. 2d at 427. It is well within this Court's discretion to enter a stay simply on the basis that Judge Conlon's opinion, if affirmed, would "bear upon" these proceedings. *Id.* In other contexts less case-impactful than the collateral estoppel of all of plaintiffs' damages, courts have exercised that discretion and entered stays.

Two examples supporting the proposition that a court many enter a stay pending the outcome of proceedings which bear upon the case relied upon by Judge Scheindlin in *LaSala* were *Levya v. Certified Grocers of California, Ltd.*, 593 F.2d 857 (9th Cir. 1979) and *Goldstein v. Time Warner N.Y. Cable Group*, 3 F. Supp. 2d 423 (S.D.N.Y. 1998) (citing *Levy*). In

15

*Goldstein*, the District Court stayed an action between producers of cable television programming and the operator of a cable television system pending the outcome of a pending appeal in the D.C. Circuit concerning a challenge to certain FCC regulations. (The D.C. Circuit appeal did not involve the parties to the *Goldstein* action). These FCC regulations were relevant to part of the dispute between the parties (which involved the terms of leasing channel capacity on the cable television system's network). The District Court concluded that a decision by the D.C. Circuit might "guide this Court in ruling on one of the key issues in this litigation" and accordingly stayed the action pending the outcome of the appeal. The *Goldstein* court noted as significant the fact that that the parties before it had not yet briefed the issues being considered by the D.C. Circuit. 3 F. Supp. 2d at 438.

In *Levya*, the Ninth Circuit determined that certain claims at issue in the action were subject to arbitration and certain claims were not. As to the claims that were not subject to arbitration, the Ninth Circuit remanded them to the District Court to determine whether judicial efficiency required that the non-arbitrable claims be stayed pending the outcome of the arbitration on the arbitrable claims. The Ninth Circuit noted that even if the District Court was not bound by the arbitrator's conclusions, the arbitrator would likely make factual findings that "may be of valuable assistance to the court" in resolving the nonarbitrable claims. 593 F.2d at 863-64.

Additionally, in *Kappel*, Judge Mukasey stayed, at the request of the defendants, an action for breach of contract and fraud pending the resolution of various actions before the federal Western District of Pennsylvania because "without progress toward resolution of the issues underlying those actions, this case cannot be conclusively resolved." *Kappel*, 914 F. Supp. at 1058. The defendants in *Kappel* had been defendants in one of the Pennsylvania cases but had

16

been dismissed for lack of personal jurisdiction. At issue in the various actions in Pennsylvania, which had been consolidated and all stayed pending a global resolution of certain common issues, was the actual value of certain assets that plaintiffs alleged they had tried to buy. This valuation question went to the issue of plaintiffs' damages in the case before Judge Mukasey. In staying the action before him, Judge Mukasey found that plaintiffs had been dilatory in pursuing litigation in Pennsylvania, and that defendants would be prejudiced by plaintiffs conducting discovery against them as a party in New York and as third-parties in the Pennsylvania actions. *Id.* at 1058-59.

Obviously, decisions on whether to grant a stay pending the outcome of related litigation are case and fact-specific. But what these decisions discussed above establish is that when facts and factors align as they have in the present litigation, where significant legal issues will be addressed in other litigation and when costs and burdens to the parties, the Court, and third parties may be potentially avoided, federal districts courts avail themselves of the discretion properly granted to them and issue orders staying proceedings. The Defendants urge this Court to do the same and enter an order staying this litigation until the Asset Allocation Appeal is concluded.

## V.    CONCLUSION

For the forgoing reasons, Defendants respectfully request that this Court enter an order which stays the present case until such time as 1) Plaintiffs have exhausted all appeals of Judge Conlon's September 28, 2007 Memorandum Opinion and Order dismissing the Plaintiffs' suit, or 2) the Seventh Circuit enters an order reversing Judge Conlon's Opinion and remands the case to the trial court.

Date:  May 5, 2008

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: /s/ William A. Wargo
     Stephen L. Saxl (SS-1028)
     William A. Wargo (WW-9417)
     200 Park Avenue
     New York, NY  10166
     (212) 801-2100
     (212) 801-6400 (fax)
     saxls@gtlaw.com
     wargow@gtlaw.com

     and

     José A. Isasi, II (*pro hac vice*)
     77 West Wacker Drive
     Suite 2500
     Chicago, IL  60601
     (312)456-8400
     (312)456-8435 (fax)
     isasij@gtlaw.com

     *Attorneys for Defendants Greystone Servicing*
     *Corporation, Inc., Greystone & Co., Inc., Stephen*
     *Rosenberg, Robert R. Barolak and Curtis A. Pollock*

18