UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------X

PHYSICIANS MUTUAL INSURANCE COMPANY and )   CIVIL ACTION
PHYSICIANS LIFE INSURANCE COMPANY,      )   NO. 07 CV 10490 (NRB)
                                        )
                Plaintiffs,             )
                                        )
        v.                              )
                                        )
GREYSTONE SERVICING CORPORATION, INC.,  )
GREYSTONE & CO., INC., STEPHEN ROSENBERG )
ROBERT R. BAROLAK, and CURTIS A POLLOCK, )
                                        )
                Defendants.             )
------------------------------------------------------------------------------X

## DEFENDANTS' APPENDIX OF MATERIALS
## IN SUPPORT OF THEIR MOTION TO STAY

Stephen L. Saxl (SS-1028)
William A. Wargo (WW-9417)
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
(212) 801-9200

and

José A. Isasi, II (*pro hac vice*)
GREENBERG TRAURIG, LLP
77 W. Wacker Drive
Suite 2500
Chicago, IL 60601
(312) 456-8400

*Attorneys for Greystone Servicing
Corporation, Inc., Greystone & Co., Inc.,
Stephen Rosenberg, Robert R. Barolak
and Curtis A. Pollock*

## DECLARATION OF José A. Isasi, II

I, Jose A. Isasi, II, having first been duly sworn, hereby state and depose as follows:

1.      My name is José A. Isasi, II.  I am above the age of eighteen years.  If called to testify, I would as set forth below under penalty of perjury.

2.      I am counsel of record for the defendants in the matter of *Physicians Mutual Insurance Company and Physicians Life Insurance Company v. Greystone Servicing Corp., et al.* Civil Action No. 07 CV 10490 (NRB), pending in the United States District Court for the Southern District of New York.

3.      Attached to the Declaration as Exhibit A-E are true and correct copies of the following:

Exhibit A:          Second Amended Complaint in *Physicians Mutual Insurance Company and Physicians Life Insurance Company v. Asset Allocation and Management Company, LLC*, Case No. 06-C-5124

Exhibit B:          Physicians Mutual Insurance Company and Physicians Life Insurance Company's Response to Asset Allocation and Management Co., LLC's Local Rule 56.1 Statement of Facts in Case No. 06-C-5124

Exhibit C:          Memorandum Opinion and Order of Conlon, J., 06-C-5124 (September 28, 2007)

Exhibit D:          Letter of James J. Frost to Hon. Naomi R. Buchwald (April 21, 2008)

Exhibit E:          Letter of James J. Frost to Hon. Naomi R. Buchwald (January 22, 2008)

**FURTHER AFFIANT SAYETH NAUGHT**

José A. Isasi, II

Subscribed and sworn before me
this 5th day of May, 2008

Notary Public

"OFFICIAL SEAL"
Donna Moy
Notary Public, State of Illinois
My Commission Exp. 10/31/2009

*CHI 57,203,176v2 5/5/2008*

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

PHYSICIANS MUTUAL INSURANCE )
COMPANY AND PHYSICIANS LIFE )
INSURANCE COMPANY, )
                          ) CASE NO.:  06CV5124
            Plaintiffs, ) JUDGE CONLON
                          ) MAGISTRATE JUDGE SCHENKIER
vs. )
                          )
ASSET ALLOCATION AND )
MANAGEMENT CO., LLC, )
                          )
           Defendants. )

## SECOND AMENDED COMPLAINT

Plaintiffs, Physicians Mutual Insurance Company ("Physicians Mutual") and Physicians Life Insurance Company ("Physicians Life") (collectively referred to as "Plaintiffs") complain against the Defendant, Asset Allocation and Management Co., LLC ("LLC") and allege as follows:

## PARTIES

1.      Physicians Mutual is a mutual insurance company organized and existing by virtue of the laws of the State of Nebraska with its principal place of business located in Omaha, Nebraska.  Physicians Mutual is a citizen of the State of Nebraska and no other state.

2.      Physicians Life is an insurance company organized and existing by virtue of the laws of the State of Nebraska with its principal place of business located in Omaha, Nebraska. Physicians Life is a citizen of the State of Nebraska and no other state.  Physicians Life is a wholly owned subsidiary of Physicians Mutual.

3.      LLC is a limited liability company organized and existing by virtue of the laws of the State of Delaware with its principal place of business located in Chicago, Illinois.  LLC is a

citizen of the State of Illinois and no other state.  LLC is sued herein individually and as successor-in-interest to the Asset Allocation and Management Company a Partnership (hereinafter "Partnership").  (LLC and Partnership will hereinafter be collectively referred to as "Asset Allocation").

      4.    The following corporations, none of which are citizens of the State of Nebraska, are the members of the LLC:

      a.    ANBAR, Inc. is a corporation organized and existing by virtue of the laws of the State of Illinois with its principal place of business located in Chicago, Illinois.  ANBAR, Inc. is a citizen of the State of Illinois and no other state.

      b.    Mavco, Inc. is a corporation organized and existing by virtue of the laws of the State of Illinois with its principal place of business located in Chicago, Illinois.  Mavco, Inc. is a citizen of the State of Illinois and no other state.

      c.    Nodgo, Inc. is a corporation organized and existing by virtue of the laws of the State of Illinois with its principal place of business located in Chicago, Illinois.  Nodgo, Inc. is a citizen of the State of Illinois and no other state.

      d.    Guyco, Inc. is a corporation organized and existing by virtue of the laws of the State of Illinois with its principal place of business located in Chicago, Illinois.  Guyco, Inc. is a citizen of the State of Illinois and no other state.

e.     Emstead, Inc. is an Illinois corporation with its principal place of business located in Chicago, Illinois.  Emstead, Inc. is a citizen of the State of Illinois and no other state.

f.     Ryco, Inc. is an Illinois corporation with its principal place of business located in Chicago, Illinois.  Ryco, Inc. is a citizen of the State of Illinois and no other state.

g.     Gacyma, Ltd. is a corporation organized and existing by virtue of the laws of the State of Illinois with its principal place of business located in Chicago, Illinois.  Gacyma, Ltd. is a citizen of the State of Illinois and no other state.

h.     Secural Capital, Inc. is a corporation organized and existing by virtue of the laws of the State of Wisconsin with its principal place of business located in Appleton, Wisconsin.  Secural Capital, Inc. is a citizen of the State of Wisconsin and no other state.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as it is brought between citizens of different states and the amount in controversy, exclusive of interests and costs, exceeds the sum of $75,000.00.

6.     Venue is proper in this district as it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## BACKGROUND

7.     Asset Allocation, founded in 1982, is a registered investment advisor specializing in the management of insurance company assets.  At all times relevant herein, Asset Allocation represented itself to Plaintiffs, as well as the public, as having specialized knowledge and

expertise in the area of managing investment grade fixed income and convertible bond portfolios exclusively for insurance companies.

8.    Asset Allocation entered into separate but identical Investment Management Agreements with each Plaintiff dated October 1, 1983 pursuant to which Asset Allocation acted as an investment advisor to each Plaintiff.  True and correct copies of the respective Investment Management Agreements are attached hereto as *Exhibits "A"* and *"B"* and incorporated herein by this reference.

9.    On January 1, 2000, Asset Allocation entered into new Investment Management Agreements with Plaintiffs.  True and correct copies are attached hereto as *Exhibits "C"* and *"D"* and incorporated herein by this reference.

10.    The October 1, 1983 and January 1, 2000 Agreements are hereinafter collectively referred to as the "Investment Management Agreements."

11.    In accordance with the terms of the Investment Management Agreements, Asset Allocation recommended to Plaintiffs the purchase and sale of securities and other transactions which Asset Allocation represented to be in the best interest of Plaintiffs.  Under the terms of the Investment Management Agreements, it was agreed by the parties that Asset Allocation would be liable to the Plaintiffs for the negligent acts and/or omissions of its agents, employees and professional consultants.

12.    At the recommendation of and in reliance on representations of Asset Allocation, Plaintiffs purchased various mortgage backed securities.  More specifically, Plaintiffs purchased participating interests in four (4) separate pools of mortgage loans insured by the Federal Housing Administration ("FHA").  The underlying mortgage loans were for the purpose of financing construction of multi-family, low income or elderly housing projects under the

4

National Housing Act.  Plaintiffs' participating interests represented a direct ownership in the underlying mortgage loans and entitled Plaintiffs to their proportionate share of the principal and interest payments made on the underlying mortgage loans.

13.    In connection with Plaintiffs' initial investment in Greystone 95-4, Lawrence R. Zeno of Asset Allocation represented in writing to Plaintiffs on or about February 14, 1996 that:

  a.    That FHA Project mortgage loans were typically 40-year final maturity amortizing loans.

  b.    That "prepayment lockouts were in place on all loans for the life of the loans" which would serve to eliminate the risk of prepayment of the loans in the event of falling interest rates.

  c.    That historically there was a "very low incidence" of default on FHA Project Loans.

With each subsequent investment, Mr. Zeno orally reaffirmed that there existed "call protection" or "prepayment lockouts" in place for either the full or a substantial part of the life of the underlying loans.  Mr. Zeno's representations were made by telephone to Jerry Coon, Plaintiffs' Senior Vice President and Assistant Treasurer, on or near the dates of Plaintiffs' investment purchases as identified in Paragraph 22 herein.

14.    Because the contractually fixed rate of return on each security exceeded the then prevailing market rate, and in reliance on the recommendations and representations of Asset Allocation, Plaintiffs paid a substantial premium over and above the par value of each security.

15.    Contrary to the representations of Asset Allocation, and unbeknownst to Plaintiffs, the underlying mortgage loans had little or no remaining prepayment protection at the time of each Plaintiffs' investments and/or were materially different than represented to

Plaintiffs. Consequently, at all relevant times, the underlying loans were at substantial risk of being prepaid or "called" prior to maturity. Moreover, at the time of Plaintiffs' investments, regulatory changes were expected. The regulatory changes which were being proposed for HUD's Section 8 subsidy program presented significant risk of default and/or prepayment of the mortgage loans underlying Plaintiffs' investments. Had the Plaintiffs been informed of the absence of call protection and/or the risk of prepayment or default due to expected changes in HUD's Section 8 subsidy program, they would not have purchased the securities and/or paid a premium for the subject securities. As a result of the actions and omissions of Asset Allocation, Plaintiffs purchased the securities and paid a purchase price for each security which far exceeded the market value of the security. Moreover, as of the date of the filing of Plaintiffs' Complaint, the loans in three of the four FHA Projects have been called resulting in substantial losses to Plaintiffs. On the remaining Project (Union Plaza), the prepayment lockout expired April 1, 2006.

16.     The particulars of each of Plaintiffs' investments, including settlement date of purchase, par value, purchase price, stated maturity date of each loan and call date are set forth below:

| Settlement Date | Purchaser | Project | Par Value | Purchase Price | Stated Maturity | Date Called |
|---|---|---|---|---|---|---|
| 02/20/1996 | Physicians Mutual | Greystone 95-4 | 4,993,281.50 | 6,983,572.30 | 06/01/2024 | 05/29/2003 |
| 02/28/1996 | Physicians Life | Greystone 96-1 | 2,000,000.00 | 2,291,250.00 | 05/01/2018 | 09/25/2002 |
| 02/28/1996 | Physicians Mutual | Greystone 96-1 | 5,000,000.00 | 5,728,125.00 | 05/01/2018 | 09/25/2002 |
| 11/26/1996 | Physicians Life | Greystone 96-6 | 4,000,000.00 | 5,475,000.00 | 06/01/2024 | 05/28/2003 |
| 11/26/1996 | Physicians Mutual | Greystone 96-6 | 1,000,000.00 | 1,368,750.00 | 06/01/2024 | 05/28/2003 |
| 02/26/1999 | Physicians Life | Union Plaza | 2,956,641.39 | 3,585,389.66 | 07/01/2026 | Prepayment Lockout Expired |

| *Settlement Date* | *Purchaser* | *Project* | *Par Value* | *Purchase Price* | *Stated Maturity* | *Date Called* |
|---|---|---|---|---|---|---|
| | | | | | | 4/1/06 |
| 02/26/1999 | Physicians Mutual | Union Plaza | 6,898,829.91 | 8,365,909.23 | 07/01/2026 | Prepayment Lockout Expired 4/1/06 |
| 09/28/2000 | Physicians Mutual | Greystone 95-4 | 2,163,040.79 | 2,551.177.90 | 06/01/2024 | 05/29/2003 |

**COUNT I**
**(Professional Negligence)**

17.     Plaintiffs incorporate paragraphs 1 through 16 as if fully set forth herein.

18.     In its capacity as an investment advisor to Plaintiffs, Asset Allocation had a duty to use reasonable care, skill and diligence ordinarily possessed and exercised by investment advisors in similar circumstances.

19.     Asset Allocation breached its duty to exercise reasonable care, skill and diligence in its services rendered to Plaintiffs in the following particulars:

      a.     By failing to competently investigate and discover the prepayment terms and provisions of the mortgage loans and/or related documents underlying each of Plaintiffs' investments prior to making purchase recommendations to Plaintiffs.

      b.     By misrepresenting to Plaintiffs that there existed call protection or prepayment lockouts for the life or substantially all the life of the mortgage loans underlying each of Plaintiffs' investments.

      c.     By failing to accurately inform the Plaintiffs of the prepayment rights and provisions of the mortgage loans and/or related documents underlying each of Plaintiffs' investments.

7

d.    By making investment recommendations to Plaintiffs without knowledge and/or recklessly not knowing the prepayment rights and provisions of the mortgage loans and/or related documents underlying each of Plaintiffs' investments.

e.    By failing to investigate, discover and/or inform Plaintiffs of the prepayment risk resulting from proposed revisions to HUD's Section 8 rent subsidy program dubbed the "mark to market" program.

20.    The acts and/or omissions of Asset Allocation as alleged herein were willful and wanton and in deliberate disregard of the rights of Plaintiffs.

21.    As a direct and proximate result of Asset Allocation's breach of duty, Plaintiffs have suffered damages in an amount to be determined at trial but in excess of $75,000.00.

## COUNT II
### (Breach of Fiduciary Duty)

22.    Plaintiffs incorporate by reference paragraphs 1 through 21 as if fully set forth herein.

23.    At all times relevant herein, Plaintiffs reposed complete confidence and trust in Asset Allocation to thoroughly investigate, evaluate and recommend appropriate fixed term and other investments to Plaintiffs in accordance with its role as investment advisor.  As Plaintiffs' investment advisor, Asset Allocation had fiduciary obligations to Plaintiffs which included the duties to exercise good faith, loyalty, honesty and fairness in all dealings with the Plaintiffs and to fully and completely disclose all material facts relating to investment recommendations given to Plaintiffs.

24.    The acts and/or omissions of Asset Allocation as alleged herein constitute a breach of its fiduciary duty.

8

25.    The acts and/or omissions of Asset Allocation as alleged herein were willful and wanton and in deliberate disregard of the rights of Plaintiffs.

26.    As a direct and proximate result of Asset Allocation's breach of fiduciary duty, Plaintiffs have suffered damages in an amount to be determined at trial but in excess of $75,000.00.

## COUNT III
### (Breach of Contract)

27.    Plaintiffs incorporate by reference herein paragraphs 1 through 26 as if fully set forth herein.

28.    The acts and/or omissions of Asset Allocation as alleged herein constitute a material breach of the Investment Advisor Agreements.

29.    As a direct and proximate result of Asset Allocation's breach of the Investment Advisor Agreements, Plaintiffs have suffered damages in an amount to be determined at trial but in excess of $75,000.00.

## COUNT IV
### (Fraud)

30.    Plaintiffs incorporate by reference herein paragraphs 1 through 29 as if fully set forth herein.

31.    In connection with each of Plaintiffs' investments, Asset Allocation falsely, fraudulently, and with intent to deceive represented to Plaintiffs that there existed "prepayment lockouts" and/or "call protection" on all of the mortgage loans underlying their investments for the life or a substantial part of the life of the loans.

32.    In connection with each of Plaintiffs' investments, Asset Allocation failed to disclose the true prepayment rights and provisions of the underlying mortgage loans, including the risks of prepayment resulting from proposed revisions to HUD's Section 8 subsidy program.

33.    The prepayment rights and provisions of the underlying mortgage loans were material to Plaintiffs' investment decisions and caused Plaintiffs to pay a substantial premium over and above par value.

34.    In reliance on the misrepresentations and omissions of Asset Allocation, Plaintiffs purchased the subject securities.

35.    The acts and/or omissions of Asset Allocation as alleged herein were willful and wanton and in deliberate disregard of the rights of Plaintiffs.

36.    As a direct and proximate result of Asset Allocation's acts and/or omissions, Plaintiffs have suffered damages in an amount to be determined at trial but in excess of $75,000.00.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendant as follows:

a.    For compensatory, consequential and any other damages to the full extent allowed by law.

b.    For punitive or exemplary damages as permitted by law;

c.    For attorneys fees, costs and other expenses as permitted by law.

d.    For the costs of this action.

e.    For such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a jury trial.

**DATED** this 26th day of June, 2007.

**PHYSICIANS MUTUAL INSURANCE
COMPANY and PHYSICIANS LIFE
INSURANCE COMPANY,** Plaintiffs

By: s/ Arthur F. Radke_____
  Arthur F. Radke
  Dykema Gossett PLLC
  10 South Wacker Drive, Suite 2300
  Chicago, IL 60606
  (312)876-1700
  (312)627-2302 (fax)
  aradke@dykema.com

   and

  James J. Frost
  McGrath, North, Mullin & Kratz, PC LLO
  Suite 3700, First National Tower
  1601 Dodge Street
  Omaha, NE 68102
  (402)341-3070
  (402)341-0216 (fax)
  jfrost@mcgrathnorth.com

  ATTORNEYS FOR THE PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on **June 26, 2007,** I electronically filed the foregoing with the Clerk

of the Court using the ECF system, which sent notification of such filing to counsel set forth

below:

> James E. Hanlon, Jr. (hanlonj@howrey.com)
> Howrey Simon Arnold & White, LLP
> 321 North Clark Street
> Suite 3400
> Chicago, IL 60610
> (312) 595-1239

> s/ Candace Mandel

CHICAGO\2341712.1
ID\CAM1

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PHYSICIANS MUTUAL INSURANCE COMPANY AND PHYSICIANS LIFE INSURANCE COMPANY, | ) ) ) | |
| | ) | CASE NO.: 06CV5124 |
| Plaintiffs, | ) | JUDGE CONLON |
| | ) | MAGISTRATE JUDGE SCHENKIER |
| v. | ) ) | |
| ASSET ALLOCATION AND MANAGEMENT CO., LLC, | ) ) ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S RULE 56.1**
**STATEMENT OF FACTS INCLUDING STATEMENT OF ADDITIONAL FACTS**

Physicians Mutual Insurance Company and Physicians Life Insurance Company

("Physicians"), and respectfully submit their Local Rule 56.1 Response to Defendant Asset

Allocation and Management Co., LLC's ("AAM") Local Rule 56.1 Statement of Facts.

**RESPONSE TO AAM'S STATEMENT**

1.    Physicians Mutual Insurance Company is a mutual insurance company organized and existing by virtue of the laws of the State of Nebraska with its principal place of business located in Omaha, Nebraska.  Physicians Mutual is a citizen of the State of Nebraska and no other state.  (SAC ¶ 1)

**RESPONSE**:

**Admitted.**

2.    Physicians Life Insurance Company is an insurance company organized and existing by virtue of the laws of the State of Nebraska with its principal place of business located in Omaha, Nebraska.  Physicians Life is a citizen of the State of Nebraska and no other state. Physicians Life is a wholly owned subsidiary of Physicians Mutual.  (SAC ¶ 2)

**RESPONSE**:

**Admitted.**

3.      AAM is a limited liability company organized and existing by virtue of the laws of the State of Delaware with its principal place of business located in Chicago, Illinois.  (SAC ¶ 3.)

**RESPONSE**:

**Admitted.**

4.      The entities and persons listed in Tab 4, Ex. A were members of the AAM at the time the action was filed.   The corporate entities are all Illinois corporations and, with the exception of Cencorp, Inc., have their principal place of business in Illinois.   Cencorp, Inc.'s principal place of business is in Massachusetts.   The members of CenCo Investments LLC, a Delaware LLC with its principal place of business in Massachusetts, are listed in Tab 4, Ex. B.

**RESPONSE**:

**Admitted.**

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as it is brought between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00.  (SAC ¶ 5)

**RESPONSE**:

**Admitted.**

6.      Venue is proper in this district as it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.  (SAC ¶ 6)

**RESPONSE**:

**Admitted.**

7.      AAM entered into separate but identical Investment Management Agreements with each Plaintiff dated October 1, 1983 pursuant to which AAM acted as an investment advisor to each Plaintiff.   On January 1, 2000, AAM entered into new Investment Management Agreements with Physicians.   The October 1, 1983 and January 1, 2000 Agreements are hereinafter collectively referred to as the "Investment Management Agreements."  (SAC ¶ 8-9)

**RESPONSE**:

**Admitted.**

8.      In accordance with the terms of the Investment Management Agreements, AAM recommended to Physicians the purchase and sale of securities and other transactions which AAM deemed to be in the best interest of Physicians.  (SAC ¶ 11)  Although AAM made

2

recommendations, Physicians made all of the investments decisions.  (Coon Dep. at p. 22-25, 32-33 (Tab 5)), Mavrogenes Dep. at 45 (Tab 7).)

**RESPONSE:**

**Physicians admits the first sentence.  In further response, Physicians admits that the relationship between the parties was "non-discretionary" meaning that AAM did not have authority to execute trades without Physicians' approval.**

9.    Physicians purchased participating interests in four (4) separate pools of mortgage loans insured by the Federal Housing Administration ("FHA") on Asset Allocation's recommendation.  The underlying mortgage loans were for the purpose of financing construction of multi-family, low income (HUD Section 8) or elderly housing projects under the National Housing Act.  Physicians' participating interests represented a direct ownership in the underlying mortgage loans and entitled Physicians to their proportionate share of the principal and interest payments made on the underlying mortgage loans.  (SAC ¶ 12)

**RESPONSE:**

**Admitted.**

10.    The loans in the Greystone pools were originated in the early 1980s.  (GFC Dep. at 141 (Tab 13).)  At that time, HUD's Section 8 housing assistance program provided rent subsidies sufficient to assure that the property owner could pay the project's operating expenses and mortgage while permitting the owner to earn a capped rate of return on the project.  The rent subsidies were provided through Housing Assistance Program (HAP) contracts.  The HAP contracts were structured so that any reduction of the operating expenses or mortgage payments would cause a reduction in the rent subsidies (in order to assure that the project owner's return stated within the agreed upon level).  (GFC Dep. at 126-27 (Tab 13), Sher Report (Ex. 34 to Tab 2).)

**RESPONSE:**

**Disputed.  Not all of the loans in the Greystone Pools were originated in the early 1980's.  The loans in the Greystone 1996-1 Pool were originated in 1978.  (*Tab 24 at A-1.*)  Physicians admits that subsidies were paid pursuant to HAP contracts.  The HAP contracts have not been produced in discovery and, consequently, Physicians is without sufficient knowledge of their financial terms.  The evidence cited by the Defendant does not address the terms of the subject HAP contracts.**

11.    The structure of HUD's Section 8 rent subsidy program and the HAP contracts left the project owners with no incentive to refinance their mortgage, despite that the mortgages carried above market interest rates.  (GFC Dep. at 125-30, 185-86 (Tab 13); Sher Report (Ex 34 to Tab 2).)

**RESPONSE**:

**Disputed.  The HAP contracts related to the housing projects have not been produced in discovery.  Accordingly, Physicians is not sufficiently knowledgeable as to the financial terms of any of the HAP contracts.  Moreover, other circumstances may incent property owners to refinance such as a sale of the property or refinancing to pull equity out of the property. (*Sanders Dep. at 153:18-156:15 (Tab 46)*.)**

12.    Those mortgages had 40 year terms, but the HAP generally contracts had 20 year terms. (GFC Dep. at 141 (Tab 13).)  Most of the mortgages in the pools at issue were originated in the early to mid-1980s.  That meant that the HAP contracts associated with those projects would expire in the early to mid-2000s.  *Id.*

**RESPONSE**:

**Physicians admits that most of the underlying mortgage notes had 40-year terms. As indicated previously, however, not all the loans were originated in the early to mid-1980's.  For example, the loans in the 1996-1 Pool were originated in 1978. (*Tab 24 at A-1.*)  In further response, Physicians states that it generally understands that HAP contracts are typically for 20 year terms, however, as the HAP contracts relating to loans of issue have not been produced in discovery, Physicians is not knowledgeable as to their specific terms.  The evidence cited by the Defendant does not establish the expiration dates of any of the HAP contracts for the subject FHA projects.**

13.    In 1995, Greystone Funding Corporation (GFC) bought certain loans and pooled them for re-sale to investors.  (GFC Dep. at 123-24 (Tab 13))  The Greystone pools consisted of the following loans:

95-4 Pool:

| Project | Maturity | Original Principal | Loan Balance as of 9/27/95 | Interest Rate |
|---------|----------|--------------------|-----------------------------|---------------|
| Aldus Phase I | 3/1/2024 | $5,240,600.00 | $5,144,470.51 | 13.200% |
| Malcolm X II Phase A | 5/1/2024 | $4,938,600.00 | $4,852,535.39 | 13.200% |
| Mid Bronx Phase II | 3/1/2024 | $8,833,500.00 | $8,671,467.56 | 13.200% |
| Paul Robeson Apts | 6/1/2024 | $4,603,000.00 | $4,522,074.71 | 13.200% |

4

| Sebco IV Apts | 2/1/2024 | $4,077,600.00 | $4,001,743.86 | 13.200% |
| Southern Blvd Apts | 2/1/2024 | $4,999,200.00 | $7,906,201.80 | 13.200% |
| Woodycrest Apts | 4/1/2024 | $6,531,800.00 | $6,413,663.14 | 13.200% |

(Tab 17 at A-1 to A-7)

96-1 Pool:

| Project | Maturity | Original Principal | As of 9/27/95 | Interest Rate |
|---|---|---|---|---|
| Sebco I | 10/1/2011 | $6,099,700.00 | $4,499,705.25 | 8.950% |
| Sebco II | 4/1/2018 | $5,628,400.00 | $4,508,894.21 | 8.950% |

(Tab 24 at B-3)

96-6 Pool:

| Project | Maturity | Original Principal | As of 9/27/95 | Interest Rate |
|---|---|---|---|---|
| Macombs Village I | 5/1/2024 | $10,075,600.00 | $9,857,420.69 | 13.200% |
| Fairmont Place | 6/1/2024 | $1,586,400.00 | $1,552,511.63 | 13.200% |

(Tab 27 at A-1)

**RESPONSE**:

**Admitted.**

14.    The notes and mortgages relating to these loans had prepayment restrictions that lasted through approximately 1995.  Thereafter, the borrowers had a right to prepay the mortgage on two days per year.  (GFC Dep. at 84-86.)

**RESPONSE**:

**Admitted as to the prepayment restrictions contained in the notes and mortgages. In further response, Physicians states that the prepayment provisions under the mortgage notes are reflected in the Pooling & Servicing Agreement. (*See e.g. Tab 24 at A-1.*)**

15.    Greystone Funding Corporation entered into an Agreement Not to Prepay Mortgage Loan (or similarly titled agreements) with each property owner with respect to each loan in the Greystone loan pools (95-4, 96-1 and 96-6 series).  (GFC Dep. at 36.)  Those agreements included a covenant that the property owner would not prepay the mortgage prior to maturity.  Copies of those agreements are at Tabs 15-16; 18-23; 26-26 and 28-29.  Each of those agreements provided that any holders of participation interests in the loans were third party beneficiaries of the covenant not to prepay.  (Id.)

**RESPONSE**:

**Admitted.  In further response, Physicians states that additional provisions within the Agreements rendered the prepayment protection illusory because control of the prepayment and refinancing decision was given to Greystone without restrictions. (*Weiner Rep. (Tab. 39) at 7-8; Mavrogenes Dep. at 99:10-102:9 (Tab 47); Zeno Dep. at 126:11-127:5 (Tab 51).*)**

16.    Greystone paid consideration to the project owners/borrowers in exchange for the covenants not to prepay their mortgages in order to "solidify" the value of those loans to investors.  (GFC Dep. at 125-28.)

**RESPONSE**:

**Physicians admits that Greystone paid consideration to the borrowers as stated in the Agreements Not to Prepay including the "additional consideration" which the borrower and Greystone agreed to keep confidential.  Physicians denies that the Agreements provided any "value" to the investors.  Rather, the Agreements were intended to "enhance Greystone's ability to market interests in the loans." (*Barolak Dep.(5/4/07) at 128:5-129:1 (Tab 48).*)**

17.    GFC pooled the loans and entered into a Pooling and Servicing Agreement with its sister company, Greystone Servicing Corporation (GSC).  (Tabs 17, 24 & 27)  GSC's role was to collect the mortgage payments (principal and interest) and remit those amounts to the investors that bought interests in the loan pools.  (GSC Dep. at 17, 94)  Those interests were evidenced by Participation Certificates.  The Certificates entitled the investor to its pro rata share of the principal and interest payments.  (GFC Dep. at 168 & Tab 32 (a Sample PC))

**RESPONSE**:

**Admitted.**

18.    The Pooling and Servicing Agreements included a provision by which GSC agreed that it would not "assign, convey or otherwise transfer any beneficial interest in any of the Mortgage Loans (or any portion thereof) and shall not issue any security backed by any of the Mortgage Loans . . . at any time when the Participation Interest shall be outstanding." (*See, e.g.,* Ex. 12 at page 14)   That provision served to protect investors from having the loans sold out from their pool.  (GSC Dep. at 153-54)

**RESPONSE**:

**Physicians objects to paragraph 18 for reason that it is a legal conclusion.  Further, that it is factually unsupported.**

19.    The Union Plaza loan was sold to Physicians by Warburg Dillon Read LLC (Warburg) on February 26, 1999, through Blair.  As Greystone had done, Warburg had entered into an agreement (d. October 9, 1998) with the owner of the Union Plaza project.  By that agreement, the owner of Union Plaza agreed not to prepay its mortgage prior to April 2013. (Tab 16)

**RESPONSE**:

**Admitted.  In further response, Physicians states that Union Plaza's Agreement Not to Prepay does not provide prepayment protection as it suffers from the same defect as the Greystone Agreements. (*Weiner Rep. (Tab 39) at 9.*)**

20.    There was no credit risk associated with these investments.  (Weiner at 5.)  The principal balance of each loan was insured by the FHA.  But a default would result in the FHA paying the remaining principal balance (less one percent), so that a default would have the same economic effect on the investor as a prepayment by the borrower:  the return of remaining par to the investor prior to maturity.  (Sanders at p. 8; Weiner at p. 4; Coon at 177-78; Mavrogenes Dep. at 169.)

**RESPONSE**:

**Denied.  Although the loans were insured by the FHA, in the event of default investors would only receive 99% of the remaining principal balance owed under the notes.  In the event of default, the premium paid by Physicians would be lost.  Thus, a substantial default risk existed.  A prepayment would return 100% of the remaining principal balance but would similarly result in the loss of the premium paid. (*Weiner Rep. (Tab 39) at 1.*)**

21.    The loans in the Greystone 95-4 and 96-6 pools provided the investor with the right to exercise a put option exercisable in a one year window upon the 20th anniversary of the FHA endorsement of the loan.  (Tab 39 at p. 5 (Weiner Rep.); Tabs 17 & 27 at p. 5)  For those loans, those dates were in the 2004 to 2005 time frame and are commonly referred to as the "Put Date." (Mavrogenes Dep. at 26.)

**RESPONSE**:

**Physicians admits the Greystone 95-4 and 96-6 Pools provided the investor with a put option. Further that, generally, where a put option exists, it is exercisable during a one year window commencing with the expiration of the HAP contract. The HAP contracts for the loan in the 95-4 and 96-6 pools have not been produced in discovery and Physicians is consequently without knowledge as to dates of the put window for the loan in those programs. The evidence cited by the Defendant does not establish the put dates for the 95-4 and 96-6 Pools.**

22.     The HAP contracts and the Put Dates on the Greystone loans roughly coincide with each other. (Mavrogenes Dep. at 26, 210.)

**RESPONSE**:

**Denied.** *See* **Response to paragraph 21. Further, there is no put provision for the loans in the 96-1 Pool.**

23.     For mortgage-backed securities (as the loans at issue are), the average life is a calculation of the date by which one half of the principal balance of the loans are expected to have been paid. (Mavrogenes Dep. at 210.)

**RESPONSE**:

**Admitted.**

24.     At the time AAM recommended the investments to Physicians, there was an effort under way in Congress to change HUD's Section 8 program. (Mavrogenes at 71-73.) AAM's analysis of that was that any change would not affect the existing term of the HAP contracts. (Mavrogenes Dep. at 71, 207.) Because the time horizon AAM viewed these investments as roughly equivalent to the term of the existing HAP contracts, AAM did not view the prospect of changes to HUD's Section 8 program as posing significant risk to the investments.

**RESPONSE**:

**Physicians admits that, at the time AAM recommended the investments to Physicians, Congress was considering substantial reforms to HUD's Section 8 loan subsidy program that presented serious risk implications to investments in Section 8 loans. Physicians denies that AAM's due diligence in any way considered the prospect of changes to the Section 8 Program. AAM was, in fact, unaware of the changes being considered and believed that "it was business as usual at HUD." (***Mavrogenes Dep. at 32:5-33:2; 69:18-71:20 (Tab 47)***.) Finally, there is no factual support for the final statement within paragraph 24. AAM believed that the HAP contracts would be renewed and represented to Physicians that prepayment**

protection existed to the maturity dates of each loan. (*See Statement of Additional Facts, 4, 6, 11.*)

25.    In connection with Physicians' initial investment in Greystone 95-4, Jerry Coon, Physicians' Senior Vice President of Finance and Assistant Treasurer, and the person who had sole authority to make investment decisions for Physicians' accounts, made the decision to invest in the loan pools during a telephone call from Lawrence R. Zeno of Asset Allocation. (Coon Dep. at 69, 75.) With each subsequent investment, Mr. Coon made the decisions to invest during telephone calls with Mr. Zeno on the trade dates for each of Physicians' investment purchases as identified in Paragraph 32 herein. (*Id.* at 133, 136, 155, 165.)

**RESPONSE:**

**AAM admits that Jerry Coon authorized the purchase of the initial investment in the Greystone 95-4 Pool following a telephone discussion with Mr. Zeno. In further response, Physicians states that Mr. Zeno represented to Mr. Coon that "no prepayment" of the underlying loans was allowed. (*Coon Dep. at 66:14-67:22; 73:15-74:12 (Tab 50); Ex. 105 at Tab 41*.) Subsequent to the initial phone call, Mr. Zeno provided Mr. Coon with written materials which confirmed his earlier oral representations stating that "prepayment lockouts are in place on all loans for the life of the loans." (*Coon Dep. at 107:25-108:9 (Tab 50); Dep. Ex. 3 (Tab 60)*.) With each subsequent investment, Zeno confirmed the existence of prepayment lockouts. (*Coon Dep. at 131:20-132:5; 134:12-135:10 (Tab 50); Exh. 109 at Tab 42*.)**

26.    In each of those calls, AAM made the recommendation on the basis of a projected yield that was regarded as attractive compared to the yield over a similar time period then available of Treasury securities. (Mavrogenes Dep. at 74) For each investment, Mr. Coon took notes of his call with AAM. Those notes reflect the yield quoted by AAM. (Coon Dep. at 66-69, 131-36, 140-49, 163-64; Tabs 41 through 45.)

**RESPONSE:**

**Physicians admits that "worst case" yields were communicated by AAM to Physicians for each investment. (*Mavrogenes Dep. at 205:19-206:8; 207:9-18 (Tab 47); Zeno Dep. at 106:4-108:16 (Tab 51)*.) Those yields discussed are reflected in Mr. Coon's notes (*Tabs 41 through 45*), AAM trade tickets and AAM confirmations.**

27.    The yields quoted to Mr. Coon (and reflected on the trade tickets) was a mathematical calculation of the return the investment would provide based on the purchase price, the interest rate and an assumption about the period of time that the loans would remain in place. (Mavrogenes Aff. ¶ 4).

**RESPONSE:**

**Physicians admits that yields reflected on AAM trade tickets and confirmations are a mathematical calculation based on the purchase price, interest rate and time.**

28.    The period of time used by AAM to calculate the yields quoted to Mr. Coon was based on an assumption about when the loans might prepay. Those dates were either the Put Dates (on the 95-4 and 96-6 pools) or the average life (on the 96-1 pool). Those dates ranged from the end of 2004 to the end of 2007:

| Trade | Pool | Ave Life | Date | Yield to Ave Life |
|-------|------|----------|------|-------------------|
| 1/31/1996 | 95-4 | 8.76 | Dec '04 | 7.114 |
| 2/15/1996 | 96-1 | 11.83 | Dec '07 | 7.03 |
| 11/22/1996 | 96-6 | 8.08 | Dec '04 | 7.21 |
| 9/22/2000 | 95-4 | 4.28 | Jan '05 | 7.72 |

(Mavrogenes Aff. ¶¶ 5-8 & Ex. A to D.)

**RESPONSE:**

**Denied. In further response, Physicians states that for the 1995-4 Pool, AAM quoted a yield to the put and to maturity. The actual AAM Trade Confirmation reported a yield to maturity. (*Mavrogenes Aff. (Tab 1) at Ex. A.*) For the 1995-4 and the 1996-6 Pools, the yield to the put was the "worst case scenario" and predicated on the assumption that Physicians may exercise its put option. (*Mavrogenes Dep. at 205:19-208:19 (Tab 47); Zeno Dep. at 104:2-108:20; 111:13-112:10; 130:9-134:9 (Tab 51).*) All of the loans in the Greystone Pools prepaid prior to the dates reflected in paragraph 28. (*AAM Answer at ¶ 23.*) In none of the Pools was the "worst case" yield realized. (*Coker Report (Tab 40).*)**

29.    AAM believed that the protection against prepayments (by default or voluntary prepayments) of the loans was strong to the Put Date and less certain thereafter. (Mavrogenes Dep. at 30-31, 169.) Accordingly, AAM made its investment recommendation based on prices that would provide a yield to the Put Date or average life that was attractive compared to the yields over a similar time horizon available on Treasury securities. (*Id.* at 74; Zeno Dep. at 122, 167, 182-84.)

**RESPONSE:**

**Denied. AAM believed that the prepayment protections extended to the maturity date of each loan. (*Mavrogenes Dep. at 89:8-15 (Tab 47).*) *See also* Response to paragraph 28.**

30.    The yield calculated to those dates was higher by 136 to 154 basis points than the yields on Treasury securities of a like time horizon. (See Exs. A–D to Mavrogenes Aff. at Tab 1.)

**RESPONSE**:

**Physicians admits that the yields reflected on the AAM trade tickets were in excess of yields on Treasury securities available at the time for similar durations.**

31.    Because the contractually fixed rate of return on each security exceeded the then existing market rate, Physicians paid a premium over and above the par value of each security. (SAC ¶ 14)  For example, the first pool purchased by Physicians, the Greystone 95-4 pool, paid 13.2 percent interest (plus regular monthly amortization of the principal amount of the underlying loans).  At the time of these investments, US Treasury securities were paying five to six percent.  (Appendix to Coker Rep. at Tab 40.)  As a result, the price for the 95-4 pool was $139,859375, which meant that for every $100 of par value (remaining loan balance), Physicians paid $139.859375.  (Weiner Rep. at 1 & 7 at Tab 39.)

**RESPONSE**:

**Physicians admits that based on AAM's recommendation and representations of the existence of prepayment lockouts to maturity for each loan, it paid a premium over and above par for its interest in each Loan Pool.  The premiums paid by Physicians are accurately reflected in paragraph 32 by the difference in the par value and total purchase price and total approximately $7 million.**

32.    The trade dates for each of Physicians' investments, par value and purchase price are set forth below:

| Trade Date | Purchaser | Project | Par Value | Total Purchase Price | Purchase Price (per $100 of par) |
|---|---|---|---|---|---|
| 01/31/1996 | Physicians Mutual | Greystone 95-4 | 4,993,281.50 | 6,983,572.30 | 139.859375 |
| 02/28/1996 | Physicians Life | Greystone 96-1 | 2,000,000.00 | 2,291,250.00 | 114.5625 |
| 02/28/1996 | Physicians Mutual | Greystone 96-1 | 5,000,000.00 | 5,728,125.00 | 114.5625 |
| 11/26/1996 | Physicians Life | Greystone 96-6 | 4,000,000.00 | 5,475,000.00 | 136.875 |
| 11/26/1996 | Physicians Mutual | Greystone 96-6 | 1,000,000.00 | 1,368,750.00 | 136.875 |
| 02/26/1999 | Physicians Life | Union Plaza | 2,956,641.39 | 3,585,389.66 | 121.265625 |
| 02/26/1999 | Physicians Mutual | Union Plaza | 6,898,829.91 | 8,365,909.23 | 121.265625 |
| 09/28/2000 | Physicians Mutual | Greystone 95-4 | 2,163,040.79 | 2,551,177.90 | 117.9440495 |

(SAC 16 & Ex. A to D to Mavrogenes Aff. at Tab 1)

RESPONSE:

**Admitted.**

33.    The loan pools were protected against the risk of borrower defaults. (Weiner Rep. at 4-5 at Tab 39.)  The principal balance of each loan was insured by the FHA.  (*Id.*)  But a default would result in the FHA paying the remaining principal balance (less one percent), so that a default would have the same economic effect on the investor as a prepayment by the borrower: the return of remaining par to the investor prior to maturity.  (Sanders Rep. at p. 8 at Tab 38; Weiner Rep. at p. 4 at Tab 39)

RESPONSE:

**Physicians admits that each loan was insured by the FHA.  In further response, Physicians states that in the event of default, it understood that the FHA would pay 99% of the remaining outstanding principal balance but not any of the premium paid for the investments. (*Tab 39 at 1.*)  In the event of a prepayment, 100% of the remaining principal balance would be paid.  The economic effects between a default and a prepayment are therefore not the same.**

34.    Mr. Coon acknowledged that these investments had default risk and that a default would have the same economic effect as a prepayment. (Coon Dep. at 177-78.)

RESPONSE:

**Physicians admits that Mr. Coon acknowledged that the investments had a default risk. *See also* Response to paragraph 33.**

35.    The price at which the securities were offered for sale to Physicians was determined by Wm Blair & Company, LLC, (Blair), the broker that actually sold the securities to Physicians. (Philosophos Dep. at 35-37).  Mr. Philosophos quoted a price that would provide what he believed would be an attractive yield calculated to the Put Date or average life.  (*Id.* at 45-51; GSC Dep. at 239-40.)

RESPONSE:

**Denied.  The price at which the securities were offered to Physicians was the result of negotiation between William Blair and Company ("Blair") and AAM. (*Philosophos Dep. at 36:19-37:13 (Tab 52).*)  In further response, Physicians states that the prices negotiated by AAM were predicated, in part, on the existence of prepayment protections or "lockouts."  The prepayment protections were "critical" to the investment decision and AAM would not have recommended that Physicians pay the premiums absent the existence of prepayment protection or, alternatively that "we would have invested at a much lower price." (*Mavrogenes Dep. at 88:12-***

*89:2 (Tab 47); Zeno Dep. at 93:17-94:9 (Tab 51).*) *See also* **Response to paragraph 28.**

36.    AAM recommended the investments at the prices determined by reference to the yield to the Put Dates or average life date. (Mavrogenes Dep. at 50, 60 & 172.)  The yield to those dates were higher than other investments with similar credit and liquidity characteristics. (Mavrogenes Dep. at 74)

**RESPONSE:**

**Denied.  *See* Responses to paragraphs 28 and 35.**

37.    AAM was not a party to the transactions by which Physicians bought the Participation Certificates.  AAM did not receive any compensation for the transaction (by way of commission or otherwise).  AAM's arrangement with Physicians was to be paid an advisory fee that was based on the value of Physicians' portfolios as a whole.  (Mavrogenes Aff ¶ 3.)

**RESPONSE:**

**Denied.  In further response, Physicians states that AAM was a party to Purchase Agreements pursuant to which the interests in the Loan Pools were acquired.  (*Dep. Ex. 1 (Tab 59); Mavrogenes Dep. at 62:13-63:12 (Tab 47).*)  Physicians admits that AAM's compensation was based on the value of Physicians' portfolio.**

38.    Physicians is a "sophisticated institutional investor" and made representations to GSC that it had the knowledge and experience in financial business matters that is "[was] capable of evaluating the merits and risks of investment in the Participation Certificates." (Coon Dep. at 65 & Tab 31.)

**RESPONSE:**

**Physicians admits that it has sufficient assets to meet the general definition of a "sophisticated institutional investor."  In further response, Physicians states that it contracted with AAM for investment advice and portfolio management.  (*AAM Answer at ¶¶ 14-19.*)  It was AAM's responsibility to conduct proper due diligence prior to making investment recommendations to Physicians.  (*Zeno Dep. at 33:16-34:3 (Tab 51).*)**

39.    The return of these investments would depend on how long the underlying mortgage loans remained outstanding.  (Weiner Dep. at 4 at Tab 39.)  The longer the loans remained in place, the higher the return would be.  (*Id.*)

**RESPONSE:**

**Admitted.**

40.    The underlying loans remained in place long enough such that Physicians was able to recover 100 percent of par, plus all of the premium it had paid, plus enough of the high interest coupon such that it earned an annualized return of between 5.83 and 6.22 percent (depending on the pool). (Appendix to Coker Rep. at Tab 40.)

**RESPONSE**:

**Admitted.  In further response, Physicians states that, notwithstanding that its return exceeded cost, because of the absence of prepayment protection, it overpaid for the interests in each of the subject Loan Pools. (*Coker Report (Tab 40)*.) *See also* Response to paragraph 35. Further, that Physicians did not even realize the "worst case" yields reported by AAM. (*Mavrogenes Dep. at 205:19-206:20 (Tab 47), Zeno Dep. at 106:15-108:10 (Tab 51)*.)**

41.    Physicians did not lose money on any of the investments at issue.  Physicians made money on each of these investments.  In fact, Physicians made more money on these investments than it would have made in alternative investments in Treasuries over the same time (Sanders Rep. at 15 at Tab 38)  Physicians could not identify any alternative investment it would have made with the funds used to make these investments.  (Tab 34 at p. 7)

**RESPONSE**:

**Denied.  Physicians overpaid for the Participation Interests and consequently suffered an economic loss. *See also* Response to paragraph 35.  In further response, Physicians states that it paid a substantial premium for the interests in the Loan Pools and reasonably expected a yield above Treasuries. (*Sanders Dep. at 145:17-146:3 (Tab 46)*.)  Further, that AAM did not present Physicians with any alternative investment recommendations to the interests in the Loan Pools. (*Tab 34 at 7.*)**

42.    Physicians still owns the Union Plaza investment and is earning an above market interest rate of 8.95 percent.  The Union Plaza loan has not prepaid or otherwise terminated. (Scanlan Dep. at 26 (Tab 6).)

**RESPONSE**:

**Physicians admits that it still owns an interest in the Union Plaza loan which has not as yet prepaid.   In further response, Physicians states that all prepayment restrictions on the Union Plaza mortgage note have expired and that the loan could prepay at any time contrary to AAM's representations at the time of purchase. (*Scanlan Dep. at 22:1-26:7 (Tab 53)*.)  Further, that Physicians has tried to sell its interest in the Union Plaza loan and has been informed that it would be difficult to sell above remaining par. (*Scanlan Dep. at 26:15-27:25 (Tab 53)*.)**

43.    Despite the attractive returns Physicians realized on these investments, Physicians contends that it would not have made the investments had it known of the risks of prepayment

Physicians believes was posed by the Agreements Not To Prepay and the prospect of changes to HUD's Section 8 program.  (SAC ¶ 15)

**RESPONSE:**

**Physicians admits that had AAM properly evaluated and informed it of the prepayment risks it would not have purchased the loan participation interests at the stated prices.  (*Mavrogenes Dep. at 75:2-13; 181:18-182:5 (Tab 47); Zeno Dep. at 94 (Tab 51); Coon Dep. at 101:2-102:17 (Tab 50)*.)**

44.    GSC assigned each of these loans to USGI on the dates indicated (although the dates the Assignments were recorded varies) at a time when Physicians' Participation Interests were outstanding:

| 95-4 Pool | Date | Assignee |
|---|---|---|
| Aldus Phase I | May 1, 2003 | USGI, Inc. |
| Malcolm X II Phase A | May 1, 2003 | USGI, Inc. |
| Mid Bronx Phase II | May 1, 2003 | USGI, Inc. |
| Paul Robeson Apts | May 1, 2003 | USGI, Inc. |
| Sebco IV Apts | May 1, 2003 | USGI, Inc. |
| Southern Blvd Apts | May 1, 2003 | USGI, Inc. |
| Woodycrest Apts | May 1, 2003 | USGI, Inc. |

| 96-1 Pool | Date | Assignee |
|---|---|---|
| Sebco I | August 30, 2002 | USGI, Inc. |
| Sebco II | August 30, 2002 | USGI, Inc. |

| 96-6 Pool | Date | Assignee |
|---|---|---|
| Macombs Village I | May 1, 2003 | USGI, Inc. |
| Fairmont Place | December 30, 2002 | USGI, Inc. |

(Sher Aff. & Ex. 1 to 33 (Tab 2).)

**RESPONSE:**

**Physicians admits that assignments from GSC to USGI occurred on the dates indicated.  Physicians objects to the remainder of paragraph 44 as it states a legal conclusion.   In further response, Physicians states that Greystone Servicing Corporation ("GSC") testified that the assignments were in connection with refinancings. (*Barolak Dep. (5/24/07) at 112:5-113:12 (Tab 49)*.)  Further, that USGI certified pursuant to New York laws that it was "a party to a refinancing" of the underlying loans. (*Ex. 1 at Tabs 1, 6, 10, 14, 18, 21, 25, 28, 31, 32, 33*.)**

45.    In addition, GSC took back an assignment of many of these loans from USGI, Inc. on that same day, May 1, 2003.  (Sher Aff. & Ex. 1 to 33.)  Specifically, on May 1, 2003, USGI assigned back to GSC the following loans:  Aldus I, Malcolm X Phase II, Mid-Bronx

Phase II, Paul Robeson Apartments, Sebco IV Apartments, Southern Boulevard Apartments and Woodycrest Apartments. (Sher Aff. & Ex. 1 o 27.)

**RESPONSE**:

**Admitted.**

46.    GSC resold interests in the Greystone loans that are the subject of this lawsuit. (GSC Dep. at 90-91, Tab 14)  GSC sold Participation Certificates to Jet Premier Investments, LLC (Jet) representing 100 percent of the interests in the following loans:  Aldus I (GSC Dep. at 30-32), Malcolm X Phase II, Mid-Bronx Phase II, Paul Robeson Apartments, and Southern Boulevard Apartments. (Sher Aff. & Ex. 7 to 24.)

**RESPONSE**:

**Physicians admits that Participation Certificates appear to have been issued to Jet Premier.  Physicians objects to the remainder of paragraph 46 as stating a legal conclusion.    In further response, Physicians states that Greystone Funding Corporation ("GFC") testified that it consented to prepayment of the loans in accordance with the terms of the Agreements Not to Prepay. (*Barolak Dep. (5/4/07) at 40:22-41:5; 48:19-49:20; 53:25-55:14 (Tab 48)*.)**

47.    GSC received the loan balances in connection with these transactions and remitted those sums to the investors in the pools. (GSC Dep. at 102-03 (Tab 14).)

**RESPONSE**:

**Physicians admits that it received the remaining principal balances on the loans within the Greystone Pools on or about the call dates identified in its Complaint. Physicians denies the remainder of paragraph 47.**

48.    Attached as Exhibits 30, 35 & 36 are the Participation Certificates Registers that show Physicians' Participation Certificates held in the name of its Nominee, Ell & Co., as having been cancelled on dates subsequent to GSC assignment of the loans to USGI, and subsequent to GSC's sale of Participation Certificates on certain loans to Jet. (for example, the 95-4 pool, one of Physicians' (Ell & Co.) Participation Certificates (No. 52 which is at Tab 32) was cancelled on June 11, 2003 (Ex 30 at p. 2).  That is over a month *after* GSC assigned that 95-4 loans to USGI, took an assignment back from USGI, and sold to Jet Participation Certificates for five of the seven loans formerly in the 95-4 pool. (Sher Aff & Exs. 1-24)

**RESPONSE**:

**Physicians admits that the Registers purport to show the date when the Participation Certificates were administratively returned and formally cancelled. Physicians objects to the remainder of paragraph 48 as argumentative and stating a legal conclusion.**

16

49.    The Greystone loan pools were terminated and Physicians' Participation Certificates cancelled in 2002 (96-6) and 2003 (95-4 and 96-1) when GSC remitted to Physicians the remaining par value of the loans.  (GFC Dep. at 177-78)

**RESPONSE**:

**The cited transcript of the GFC deposition does not address the termination of the Greystone Pools.  Physicians admits that the remaining principal balance of the loans in each of the Greystone Pools was remitted to it on or about the dates indicated in its Complaint.**

50.    The reason the Greystone pools terminated was because GSC sold the loans out of the pools to other investors.  The borrowers did not prepay.  (Sher Aff & Ex. 34 thereto at ¶ 2.)

**RESPONSE**:

**In response to paragraph 50, Physicians states that factual disputes exist.  GFC testified that it consented to prepayments by the borrowers.  (Barolak *Dep. (5/4/07) at 39:1-40:35; 48:14-49:20 (Tab 48)*.)  GFC further testified that Greystone had the right to accept the borrower's prepayment pursuant to the terms of the Agreements Not to Prepay.  (Barolak *Dep. (5/4/07) at 184:17-185:16 (Tab 48)*.)  Further, USGI certified that it was a party to a refinancing transaction.  *See* Response to paragraph 44.**

51.    Changes were eventually made to HUD's Section 8 program.  The new program was known as the Mark-to-Market program.  (GSC Dep. at 68-69.)  Under that program, at the end of a property's HAP contract, HUD would lower the rent subsidies and restructure the mortgage into a new first mortgage that the project could afford with the new rent subsidy levels.  (*Id.* 193-94)  HUD would take back a second mortgage representing the difference between the balance of the original mortgage and the lower balance of the new first mortgage.  (*Id.*)

**RESPONSE**:

**Physicians admits that HUD implemented significant reforms to the Section 8 Program.  *See also* Response to paragraph 24.  Physicians denies the remaining provisions of paragraph 51 as it is not a universal statement and that different possibilities exist as to how a loan might be restructured.**

52.    The Mark-to-Market program did not cause the borrowers to default or prepay.  (Sher Aff & Ex. 34 thereto.)  While some of these loans were eventually restructured under that program (but only after GSC had sold those loans to others), some did not.  (Tab 37)

**RESPONSE**:

**Disputed.  In further response, Physicians states that AAM has testified that the Mark-to-Market program was the cause of the prepayments.  (*Schaefer Dep. at 58:5-59:5 (Tab 55)*.)  GSC testified that the loans restructured "in anticipation" of the Mark-to-Market Program.  (*Barolak Dep. (5/24/04) at 32:4-10 (Tab 49)*.)**

53.    Physicians seeks damages that it believes would compensate it for the loss of the opportunity to earn the yields it expected and for the loss of an investment that Physicians expected would remain in place to their maturities in 2018 to 2024.  Physicians' damages expert broke the computation into four pieces.  *See* Tab 4 (Coker Report).

**RESPONSE**:

**Denied.  Physicians does not seek damages as if the loans performed to maturity.  Physicians seeks damages measured by the amount that it "overpaid" for the investments because of the absence of prepayment protection plus consequential losses.  (*Coker Rep., Tab 40 at 4*.)  (*See Statement of Additional Facts, ¶¶ 21-23*.)**

54.    First, Mr. Coker would reduce the purchase price paid by Physicians by an amount sufficient to make Physicians' actual return on the lower investment cost equal to what he refers to as the "AAM stated yield."  (Coker Rep. at p. 5.)  Mr. Coker assumed that what he referred to as the "AAM Stated Yield" was a guaranteed yield.  (Coker Dep. at 80)

**RESPONSE**:

**In response to paragraph 54, Physicians states that the first component of its damage claim is the "excess premium" or "overpayments" for each loan participation interest.  The excess premium was calculated based on the difference in the price actually paid for the investments and the price that should have been paid to realize the stated yields to the actual repayment dates.  (*Coker Dep. at 86:2-88:18 (Tab 54)*.)**

55.    Second, Mr. Coker would give Physicians a return on the amount of money he says Physicians overpaid, calculated from the date of purchase to the date the loan balances were returned to Physicians.  Mr. Coker used the yield available in 1996 on a 30 year Treasury security to make that second calculation.  (Coker Rep. at p. 5.)

**RESPONSE**:

**Denied.  In response to paragraph 55, Physicians states that the second component of its damage claim is the lost earnings on the "excess premium" or "overpayment" calculated from date of purchase to present at a conservative Treasury rate.  (*Coker Rep. at 4-5; Coker Dep. at 88:9-18 (Tab 54)*.)**

56.    Third, Mr. Coker took the loan balances returned to Physicians in 2003 that were then available for reinvestment. Because the yields on Treasury securities were lower then than at the time of the investments, Mr. Coker would award Physicians additional return to compensate for the lower yields available in 2003. He based that additional damage calculation on the difference in Treasury yields in 2003 and 1996. He calculated those returns from 2003 to June 11, 2007, the date of his report. (Coker Rep. at p. 5.)

**RESPONSE**:

**In response to paragraph 56, Physicians states that the third component of its damage claim is the consequential loss resulting from the prepayment of the underlying loans. As a result of the early payoff of the loans, Physicians was required to reinvest the returned principal at a lower rate than was available at the time of the original investment. (*Coker Rep. at 5; Coker Dep. at 95:17-97:13 (Tab 54)*.) Mr. Coker conservatively calculated the loss based on the decline in the Treasury rates over two separate time periods (1) the date of purchase to the actual repayment date and (2) the net present value of the reduced earnings from the repayment dates to the maturity dates for each of the Loan Pools. (*Coker Rep. at 5-7*.) Physicians denies any remaining provisions of paragraph 56.**

57.    Finally, Mr. Coker took all of the proceeds from the redemptions and calculated the additional return Physicians would have received from reinvestment of those funds from the date of his report to the final maturity of the loans (2018 to 2024). The additional return he assumed was again the difference between the yields available in 1996 versus the Treasury yields available on June 11, 2007. Mr. Coker then calculated the net present value (as of June 11, 2007) of those additional returns from June 11, 2007 to 2018 to 2024. (Coker Rep. at p. 5)

**RESPONSE**:

**Denied. *See* Response to paragraph 56.**

58.    Mr. Coker's analysis assumes that the return Physicians would earn in the future (to 2024) on the reinvested sums will be approximately three percent lower than the returns available to Physicians in 1996. (Coker Dep. at 96-96.)

**RESPONSE**:

**Admit. In further response to paragraph 58, Physicians states that the decline in Treasury rates between the purchase date and the repayment dates reflects the lower earning power of money and properly represents the consequential loss to Physicians resulting from the prepayment of the subject loans. The actual decline in the rates from the purchase date and repayment date of each investment are reflected in the schedule attached to the Coker Report.**

59.    Mr. Coker then added the four sums to calculate the total damages he believes necessary to compensate Physicians for having made the investments at issue. (Coker Dep. at 103-06.)

**RESPONSE**:

**Physicians admits that the aggregate of Coker's calculations represent the damages suffered by Physicians for the overpayment on the subject loan participation interests and the consequential losses from early payoff of the underlying loans.**

60.    In calculating the damages for the Union Plaza loan, Mr. Coker assumed that the loan was paid off, or redeemed, as of a date one week prior to the date of his report. He then calculated the "lost" yield on that investment in the same manner as he did the Greystone pools. (Coker Dep. at 79-80.)

**RESPONSE**:

**Physicians admits that Mr. Coker calculated damages on the Union Plaza loan based on the assumption that the loans prepaid one week prior to his report and in the same manner as the damages on the Greystone Pools. *See also* Response to paragraph 42. Physicians denies any remaining provisions of paragraph 60.**

61.    If you reduce the purchase price of the investments to the levels suggested by Mr. Coker, add all of the cash flows Physicians received under the investments (including the loan balances paid to Physicians in 2003) and add the various categories of damages Mr. Coker says should be added, the return to Physicians on these investments as of the date of Mr. Coker's report would range from 7.93 percent (on Union Plaza) to 14.06 percent (on the second purchase of the 95-4 pool). (Sanders Dep. at 39-47 & Tab 33.)

**RESPONSE**:

**Denied. In further response, Physicians states that AAM's logic is seriously flawed. Nowhere does AAM consider the "excess premium" actually paid by Physicians in its return calculations. Moreover, Physicians would not be seeking to recover the overpayment or lost earnings on the overpayment if the investments were correctly priced. In short, the returns calculated by AAM are grossly overstated.**

62.    Physicians' liability expert, Mr. Weiner, opined that AAM misunderstood the adequacy of the agreements not to prepay the mortgages. (Weiner Rep. at 2 & 14.) Mr. Weiner also says that AAM failed to "fully appreciate the significance of the changes that were then looming for the HUD Section 8 housing program." (*Id.*)

**RESPONSE**:

**Admitted.**

63.    Mr. Coon does not believe that AAM guaranteed or promised that the investments would achieve a particular yield or return. (Coon Dep. at 95-98.) Mr. Coon also testified that he did not believe that AAM was trying to deceive him with respect to the recommendations to purchase the securities at issue. (*Id.* at 95.)

**RESPONSE**:

**Physicians admits that Mr. Coon did not believe that AAM guaranteed a particular yield or return. Physicians further admits that Mr. Coon testified that he did not believe that Mr. Zeno was trying to defraud Physicians.**

64.    Physicians' damages expert, Mr. Coker, certainly says in his report that, in his opinion, the "actions and inactions of [AAM] were the proximate cause of the economic damages sustained by Physicians." (Coker Rep. at p. 4, Tab 40) Yet in his deposition, Mr. Coker reiterated that the actual life of the investments were less than maturity and could offer but no reason why the loan balances were paid to Physicians. (Coker Dep. at pp. 68-74) Mr. Coker testified that he did not know the circumstances by which the remaining loan balances were paid to Physicians in 2002 and 2003. (*Id.* at 110-11.) Mr. Coker was not able to say whether the return of par was a result of a prepayment by the borrower, a restructuring under HUD's Mark-to-Market program, or because GSC sold the loans out of the pools. (*Id.*)

**RESPONSE**:

**Physicians admits that Mr. Coker will not offer any opinions as to the nature of the transactions pursuant to which the loans were paid off.**

65.    Physicians' liability expert, Mr. Weiner, testified that he did not know if GSC's sale of the loans could be linked to any failure by AAM to do adequate due diligence. (Weiner Dep. at 66-76( Nor could Mr. Weiner identify what AAM could have done to anticipate that GSC might sell the loans out of the pools in violation of the Pooling and Servicing Agreements. (*Id.*) Mr. Weiner admitted that he had never heard of a loan servicer selling the loans out of a pool. (*Id.*) Mr. Weiner had never even looked at the Pooling and Servicing Agreements which expressly prohibit GSC from assigning or selling the loans (in whole or in part). (*Id.*)

**RESPONSE**:

**Denied. *See* Supplemental Expert Report of Lawrence Weiner (Tab 56) wherein Mr. Weiner concludes that AAM failed to adequately investigate the transactions and take steps to protect the interest of investors like Physicians.**

## PHYSICIANS' STATEMENT OF ADDITIONAL FACTS WHICH REQUIRE THE DENIAL OF SUMMARY JUDGMENT

Pursuant to Local Rule 56.1(b)(3)(C), Physicians sets forth the following additional facts that require the denial of AAM's Motion for Summary Judgment.

1.    At the recommendation of AAM, Physicians purchased participating interests in four (4) separate pools of mortgage loans insured by the FHA. (*AAM Answer at ¶ 19.*) In total, Physicians paid a premium above par value for the loan participation interests of approximately $7 million. (*AAM Answer at ¶ 23.*)

2.    The particulars of each of Plaintiffs' investments, including date of purchase, par value, purchase price, stated maturity date of each loan and repayment date (date called) are set forth below:

| *Settlement Date* | *Purchaser* | *Project* | *Par Value* | *Purchase Price* | *Stated Maturity* | *Date Called* |
|---|---|---|---|---|---|---|
| 02/20/1996 | Physicians Mutual | Greystone 95-4 | 4,993,281.50 | 6,983,572.30 | 06/01/2024 | 05/29/2003 |
| 02/28/1996 | Physicians Life | Greystone 96-1 | 2,000,000.00 | 2,291,250.00 | 05/01/2018 | 09/25/2002 |
| 02/28/1996 | Physicians Mutual | Greystone 96-1 | 5,000,000.00 | 5,728,125.00 | 05/01/2018 | 09/25/2002 |
| 11/26/1996 | Physicians Life | Greystone 96-6 | 4,000,000.00 | 5,475,000.00 | 06/01/2024 | 05/28/2003 |
| 11/26/1996 | Physicians Mutual | Greystone 96-6 | 1,000,000.00 | 1,368,750.00 | 06/01/2024 | 05/28/2003 |
| 02/26/1999 | Physicians Life | Union Plaza | 2,956,641.39 | 3,585,389.66 | 07/01/2026 | Prepayment Lockout Expired 4/1/06 |
| 02/26/1999 | Physicians Mutual | Union Plaza | 6,898,829.91 | 8,365,909.23 | 07/01/2026 | Prepayment Lockout Expired 4/1/06 |
| 09/28/2000 | Physicians Mutual | Greystone 95-4 | 2,163,040.79 | 2,551.177.90 | 06/01/2024 | 05/29/2003 |

(*AAM Answer at ¶ 23.*)

3.     The loans in the three Greystone pools were for low income multi-family housing projects subsidized under Section 8 of HUD's Housing Assistance Program.  The loans were originated in the late 1970s and early 1980s and had 40-year maturities.  (*See Loan Summaries attached as Exhibit A to Pooling and Servicing Agreements at Tabs 17, 24, 27.*)  However, the Housing Assistance Contract ("HAP Contract") through which the rent subsidies were paid to the property owners was generally only for 20 years.  (*Tab 39 at 5.*)

4.     In its evaluation of the Greystone pools, AAM concluded that there was little risk associated with the expiration of the HAP contracts.  AAM concluded that it was "unlikely" that the HAP contracts would not be renewed "because this was a valuable service needed by low income people, and as most government programs, don't go away."  (*Mavrogenes Dep. at 27:7-28:22 (Tab 47).*)

5.     Two of the Greystone pools (95-4 and 96-6) had a "put" feature.  The put feature provided a one year window where owners of the loans (investors like Physicians) had the option to "put" the loans back to HUD in exchange for a government debenture.  Investors would not have any economic motivation to exercise their put right unless then current interest rates rose to a level which exceeded the yields realized on the investment in the underlying loan pools. (*Mavrogenes Dep. at 26:1-27:2 (Tab 47).*)

6.     In presenting the initial investment to Physicians, AAM reported a yield to both "put" and "maturity."  (*Tab 1, Ex. A.*)  The yields reflected a "worst case yield and the best case yield."  (*Mavrogenes Dep. at 205:19-206:8 (Tab 47); Zeno Dep. at 104:2-108:20 (Tab 51).*) AAM believed that borrowers were prohibited from prepaying their loans prior to maturity but, nevertheless, also reported a yield to the put date because it was "the earliest opportunity for repayment" if "interest rates were to rise."  (*Mavrogenes Dep. at 208:9-19 (Tab 47); Zeno Dep.*

*at 111:13-112:10 (Tab 51).*)  The put was an option that was controlled by the investor and, if interest rates rose significantly, it would be in the investor's best interest to exercise the put option.  (*Zeno Dep. at 111:13-112:10 (Tab 51).*)  If the investor elected not to exercise the put option, he had the ability to continue to receive the income stream from the loans to maturity because of the prepayment protections within the Agreements Not to Prepay.  (*Zeno Dep. at 130:9-134:9 (Tab 51).*)

7.    The Greystone 1995-4 and 1996-6 Pools had put options.  Neither the Greystone 96-1 Pool nor the Union Plaza loan had a put option.  For the 96-1 Pool and Union Plaza, AAM reported yields which were based on pricing to "average lifes" calculated to be in December 2007 (Greystone 1996-1) and 2012 (Union Plaza).  (*Tab 38 at 10; Dep. Ex. 114 (Tab 62).*)

8.    One of the primary risks to an investor in any mortgage-backed security is that borrowers on the underlying mortgages will refinance or prepay resulting in an early return to the investor of the remaining principal balance (par value) of the mortgage loan and an abrupt end of the coupon interest.  This "prepayment risk" is particularly acute for securities purchased at a premium because investors suffer a loss of any premium paid over par value which can no longer be offset by the above market coupon rate of interest.  (*Tab 39 at 1.*)

9.    Greystone (or WDR in the case of Union Plaza) negotiated an "Agreement Not to Prepay" (or similarly titled document) with each borrower in each of the four loan pools.  In exchange for a fee, the borrowers agreed not to prepay their loans prior to maturity without the consent of Greystone (or WDR in the case of Union Plaza).  The Agreements provided that Greystone (or WDR in the case of Union Plaza) can consent or not consent to prepayment in its "unconditional and sole discretion" and "shall not be subject to any standard of good faith or reasonableness."  (*Tabs 15, 16, 18-23, 25, 26, 28-29.*)  In addition, the Agreements had a

"Special Prepayment Right" which required the borrower to "promptly prepay and refinance" upon demand of Greystone and, in such circumstance, "employ Greystone to manage and process the prepayment and refinancing" at a cost of 3.5% of the principal amount of the refinanced loan. (*Id. except Tab 16.*)

10.    It was AAM's responsibility to review the Agreements for adequacy of prepayment protection prior to making an investment recommendation to Physicians. (*Mavrogenes Dep. at 86:16-88:10 (Tab 47); Zeno Dep. at 95:22-97:2 (Tab 51).*)    The prepayment protection was "critical" to the investment decision and AAM would not have recommended that Physicians pay the large premium it paid for the investments absent the existence of prepayment protection. (*Mavrogenes Dep. at 88:12-89:6 (Tab 47).*)    Absent the Agreements Not to Prepay, AAM would either not have recommended the investment or, if they did, would have recommended at a much lower price. (*Zeno Dep. at 93:17-94:9 (Tab 51).*)    In its review and evaluation of the Agreements, AAM concluded that the Agreements were "reliable prepayment protection" which continued to maturity. (*Mavrogenes Dep. at 89:8-15 (Tab 47).*)

11.    AAM concluded that the "primary risk" associated with the investments was a default risk. (*Zeno Dep. at 90:14-94:9 (Tab 51).*)    AAM communicated the default risk to Physicians as being "very low." (*Zeno Dep. at 159:4-160:11 (Tab 51).*)    In making the investment recommendations, AAM did not believe that there existed prepayment risk because of the existence of the Agreements Not to Prepay. (*Zeno Dep. at 93:17-94:9 (Tab 51).*)    Based on the Agreements Not to Prepay, AAM represented in writing to Physicians that "prepayment lockouts are in place on all loans for the life of the loans." (*Coon Dep. at 107:25-108:9 (Tab 50); Dep. Ex. 3 (Tab 60).*)    With each investment, AAM also orally represented to Physicians

25

that borrowers were prohibited from prepaying the underlying loans. (*Coon Dep. 73:15-74:12; 134:12-135:10; 153:19-25 (Tab 50)*.)

12.     Today, after further review of the Agreements, Mavrogenes acknowledges that there exists no restrictions on Greystone's rights to consent to prepayment and that the Special Prepayment Rights under which Greystone can cause the borrower to refinance present opportunity for "mischief." (*Mavrogenes Dep. at 99:10-102:9 (Tab 47)*.)   Similarly, Zeno now recognizes that the Agreements are not reliable prepayment protection because "control" of the prepayment decision is in the hands of Greystone. (*Zeno Dep. at 126-127; 142 (Tab 51)*.) Physicians' expert has concluded that Agreements "did not prohibit borrowers from prepaying or refinancing their loans," and that "AAM failed to perform adequate due diligence on the prepayability of the securities." (*Tab 31 at 1-2*.)

13.     As early as 1995, regulatory reforms to HUD's Section 8 program were expected. "The changes were well-telegraphed in 1995 by numerous articles in both the popular press and the investment community."   Analysts in the investment community were "sounding alarms" as to the likely impact on investors like Physicians.   Analysts concluded that "HUD's plan for scaling back the Section 8 rent subsidy program will probably prompt massive redemptions of multi-family bonds." (*Tab 39 at 11*.)

14.     Ordinary due diligence expected of an investment advisor would include evaluation of the risk of regulatory changes. (*Zeno Dep. at 155:13-24 (Tab 51); Mavrogenes Dep. at 73:8-22 (Tab 47)*.)   Prior to making its investment recommendations to Physicians, AAM did not make any investigation into the regulatory climate at HUD insofar as it might implicate the underlying loans.   Notwithstanding the fact that it possessed a December 18, 1995 article from a well-known financial publication which warned of the possibility of

discontinuation of HUD subsidies, AAM was completely unaware of the reforms that were being considered to the Section 8 Program and believed that "it was business as usual at HUD." (*Mavrogenes Dep. at 32:5-33:2; 69:18-71:20; 188:16-190:5 (Tab 47); Dep. Ex. 15 (Tab 61)*.) Even AAM's expert suggested that an investment advisor would be "highly ineffectual" to have been unaware of the discussion of reforms to HUD's Section 8 Program (*Sanders Dep. at 185:1-187:19 (Tab 46)*.)

15.    Physicians' expert has concluded that another defect in AAM's due diligence "was its failure to pay sufficient heed to the likely impact of coming changes to the HUD low-income multifamily subsidiary program." (*Tab 39 at 11*.) AAM's expert similarly testified that, prior to making an investment recommendation, AAM should have considered the risks to the investment from the expected changes to the Section 8 loan program. (*Sanders Dep. at 117:14-124:4 (Tab 46)*.)

16.    Notwithstanding AAM's representations that "prepayment lockouts are in place on all loans for the life of the loans," the subject loans prepaid in September of 2002 (96-1 Pool) and March 2003 (95-4 and 96-6 Pools). (*AAM Answer at ¶ 23*.)

17.    AAM reported that "the loans were paid off in connection with the expiration of the HUD contracts with the owners of the mortgaged properties and/or a change in HUD's Section 8 program that made refinancing of these properties financially attractive to the owners of the properties." (*Response to Plaintiff's First Set of Interrogatories, No. 9 (Tab 57)*.)

18.    AAM testified that the underlying loans prepaid because "there was a change in the regulatory environment which resulted in the change in the underlying economics which made either a default or an early prepayment inevitable." (*Schaeffer Dep. at 58:15-59:5*.) Further, AAM asserts that it advised Physicians that the reason for the "repayment was due to

HUD's OHMAR Program." (*Supplemental Response to Plaintiff's Second Set of Interrogatories, No. 15 (Tab 58)*.)

19.    GFC testified that it consented to prepayments by the borrowers in accordance with the terms of the Agreements Not to Prepay.

"Q.    Did any of the Greystone entities consent to the prepayment of the loans that are the subject matter of our lawsuit in these three pools?

A.    Yes."

(*Barolak Dep. (5/4/07) at 40:22-41:5; 49:8-20; 53:25-54:12 (Tab 48)*.) GSC similarly testified that it received notices of the borrowers' intentions to prepay and accepted the prepayments as it believed it was contractually entitled to do.  (*Barolak Dep. (5/24/07) i.e. 28:21-29:18; 36:7-37:14 (Tab 49)*.)

20.    AAM was still managing Physicians' portfolio at the time of the prepayments. (*Mavrogenes Dep. at 17:1-18:3 (Tab 47)*.) AAM investigated the transactions which lead to the early payoff.  (*Mavrogenes Dep. at 84:8-86:15; 148:1-150:16 (Tab 47)*.) AAM advised Physicians that the reason for the "repayment was due to HUD's OHMAR program." (*See Supplemental Response to Plaintiff's Second Set of Interrogatories, No. 15 (Tab 58)*.) Given that Physicians paid a substantial premium for the Participation Interests and that the underlying loans prepaid significantly prior to expectations, it was incumbent on AAM to fully investigate the circumstances of the underlying transactions.  Such an investigation should have required at a minimum that AAM review and evaluate the documents underlying the transactions to verify that the prepayments were authorized.  If the payoffs result from unauthorized sales as AAM now asserts, an adequate investigation would have revealed the nature of the actual transactions and steps could have been taken to protect interests of investors like Physicians.  (*See Supplemental Expert Report of Lawrence P. Weiner (Tab 56)*.)

21.    The purchase price for Participation Interests were predicated, in part, on the existence of prepayment protection.  Because of the absence of effective prepayment protection, Physicians overpaid for the investments in the amount of $2,223,222.34.  (*Tab 40 at 5.*)  Mr. Coker calculated the "overpayment in the original price of the investment (excess premium)." (*Tab 40 at 4-5.*)  The overpayment was calculated based on the difference in the price paid for the Participation Interests and the price that should have been paid to realize the stated yields to the actual repayment dates.  (*Coker Dep., 86:2-88:18 (Tab 54).*)

22.    Physicians further suffered a loss of income on the overpayment in the sum of $1,422,859.14.  (*Tab 40 at 5.*)  Mr. Coker calculated the lost earnings on the overpayment from the "Settlement Date to the present."  (*Tab 40 at 5.*)  Mr. Coker used a "conservative" treasury rate and calculated the lost earnings only to the present date as opposed to maturity as might otherwise be appropriate under a benefit of the bargain measure.  (*Coker Dep., 93:14-94:18 (Tab 54).*)

23.    As a result of the prepayment of the underlying loans, Physicians was forced to reinvest the returned principal balance of the loans at a lower rate than was available at the time of the original investment.  (*Tab 40 at 5; Coker Dep. at 95:17-97:13 (Tab 54).*)  Mr. Coker used the decline in treasury rates as the surrogate for the lower earning power of the reinvested dollars.  (*Tab 40 at 5; Coker Dep. at 95:17-97:13 (Tab 54).*)  Mr. Coker then calculated the consequential loss to Physicians over two separate time frames.  The first being the period from the date of the prepayments to the present date representing the "lost alternative use" of Physicians' monies during the time frame.  Second, from the present date to the stated maturity (discounted back to present value) representing the decline in the earning power of Physicians'

funds over the remaining duration of the period of the original investment.  (*Tab 40 at 5; Coker*

*Dep. at 97:14-101:3 (Tab 54).*)

        **DATED:**  August 27, 2007.

                             Respectfully submitted,

                             **PHYSICIANS MUTUAL INSURANCE
COMPANY and PHYSICIANS LIFE
INSURANCE COMPANY,** Plaintiffs

                             By:_____/s/ Arthur F. Radke_____
                                 Arthur F. Radke
                                 Kathleen Elizabeth Surowiec
                                 Dykema Gossett PLLC
                                 10 South Wacker Drive, Suite 2300
                                 Chicago, IL  60606
                                 (312)876-1700
                                 (312)627-2302 (fax)
                                 aradke@dykema.com

                                 and

                               James J. Frost
                               McGrath, North, Mullin & Kratz, PC LLO
                               Suite 3700, First National Tower
                               1601 Dodge Street
                               Omaha, NE  68102
                               (402)341-3070
                               (402)341-0216 (fax)
                               jfrost@mcgrathnorth.com

                             ATTORNEYS FOR THE PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2007, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to counsel set forth below:

James E. Hanlon, Jr.
Howrey, LLP
321 North Clark Street, Suite 3400
Chicago, IL  60610

James J. Frost
McGrath, North, Mullin & Kratz, PC LLO
Suite 3700, First National Tower
1601 Dodge Street
Omaha, NE  68102


_/s/ Arthur F. Radke_____

CHICAGO\2359859.1
ID\KESU

31

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PHYSICIANS MUTUAL INSURANCE COMPANY and PHYSICIANS LIFE INSURANCE COMPANY, | ) ) ) | |
| | ) | Civil Action No.: 06 C 5124 |
| Plaintiffs, | ) | |
| | ) | Suzanne B. Conlon, Judge |
| v. | ) | |
| | ) | |
| ASSET ALLOCATION AND MANAGEMENT CO., LLC, | ) | |

Defendant.

## MEMORANDUM OPINION AND ORDER

Physicians Mutual Insurance Company and Physicians Life Insurance Company ("Physicians") sue Asset Allocation and Management Co., LLC ("AAM") in this diversity case for injuries sustained as a result of AAM's alleged (i) professional negligence; (ii) breach of fiduciary duty; (iii) breach of contract; and (iv) fraud. AAM moves for summary judgment. For the reasons set forth below, AAM's motion is granted.

## BACKGROUND

The following facts are undisputed unless otherwise noted. This action arises out of purported losses relative to mortgage-backed investments that were recommended to Physicians by AAM, their former investment advisor. Physicians retained AAM as its investment advisor from October 1, 1983 through the relevant time period pursuant to consecutive Investment Management Agreements. Def. Facts ¶ 7. Under these agreements, AAM recommended securities for Physicians to purchase and sell, which AAM represented to be in Physicians' best interest. *Id.* ¶ 8. Physicians retained ultimate authority to execute trades. *Id.* Physicians claim

that AAM failed to conduct adequate due diligence on the investments and misrepresented the risks associated with them, thereby resulting in a loss of excess premium paid and income.

On AAM's recommendation, in 1996, 1999, and 2000, Physicians purchased participating interests in four separate pools of mortgage loans insured by the Federal Housing Administration ("FHA"). Def. Facts ¶ 9. The underlying mortgage loans were for the purpose of financing construction of multi-family, low income (HUD Section 8) or elderly housing projects under the National Housing Act. Physicians' interests represented direct ownership of the underlying mortgage loans, entitling them to a proportionate share of the principal and interest payments on those loans. The particulars of Physicians' investments are set forth in the following table:

| Settlement Date | Purchaser | Project | Par Value | Purchase Price | Stated Maturity | Date Called |
|---|---|---|---|---|---|---|
| 2/20/1996 | Physicians Mutual | Greystone 95-4 | 4,993,281.50 | 6,983,572.30 | 6/1/2024 | 5/29/2003 |
| 2/28/1996 | Physicians Life | Greystone 96-1 | 2,000,000.00 | 2,291,250.00 | 5/1/2018 | 9/25/2002 |
| 2/28/1996 | Physicians Mutual | Greystone 96-1 | 5,000,000.00 | 5,728,125.00 | 5/1/2018 | 9/25/2002 |
| 11/26/1996 | Physicians Life | Greystone 96-6 | 4,000,000.00 | 5,475,000.00 | 6/1/2024 | 5/28/2003 |
| 11/26/1996 | Physicians Mutual | Greystone 96-6 | 1,000,000.00 | 1,368,750.00 | 6/1/2024 | 5/28/2003 |
| 2/26/1999 | Physicians Life | Union Plaza | 2,956.641.39 | 3,585,389.66 | 7/1/2026 | Prepayment Lockout expired 4/1/06; extended again to 4/1/2013 |

| 2/26/1999 | Physicians Mutual | Union Plaza | 6,898,829.91 | 8,365,909.23 | 7/1/2026 | Prepayment Lockout expired 4/1/06; extended again to 4/1/2013 |
| 9/28/2000 | Physicians Mutual | Greystone 95-4 | 2,163,040.79 | 2,551.177.90 | 6/1/2024 | 5/29/2003 |

Pl. Facts ¶ 2.  As noted in the table, Physicians purchased these mortgage-backed securities at a

premium above par value.  Physicians claims that it did so because AAM represented that "there

existed 'call protection' or 'prepayment lockouts'. . . for either the full or a substantial part of the

life of the underlying loans," which served to hedge risk that the investments would be paid off

prior to stated maturity dates.  Pls.' Second Amended Complaint ¶¶ 13-14 ("Compl.").  Each of

the Greystone loans contained prepayment lockouts for the lifetime of the loans; the Union Plaza

loans also contained prepayment lockouts until 2006 (later extended to 2013).  Def. Facts ¶¶ 15,

19.  The lockout covenants for the three Greystone pools were obtained by Greystone Funding

Corporation, the organizer of the pools, with the loan borrowers.  Id. ¶ 15.  Greystone Funding

Corporation's sister company, Greystone Servicing Corporation, serviced the loans in those

pools.  Id. ¶ 17.  The Union Plaza prepayment lockout covenants were obtained by the owner of

Union Plaza and Warburg Dillon Read LLC, the entity that sold Physicians the Union Plaza

loans.  Def. Facts ¶ 19.

Notwithstanding the existence of the prepayment lockouts, the three Greystone pools

were each called prior to their stated maturity, resulting in a payment to Physicians for their

participating interests at par value.  Pl. Facts ¶ 2.  It is Physicians' contention that this payment

prior to maturity resulted from the ineffectual prepayment lockouts investigated by AAM at the

3

outset of the transaction. Compl. ¶¶ 15-16. According to Physicians, the true nature of the

prepayment lockouts was never properly disclosed by AAM. Had the true nature of the

prepayment lockouts been disclosed, Physicians asserts that they would not have paid such a

high premium for their participation interests, or would have never invested in the securities.

Def. Facts ¶ 43. Physicians recovered all of its original investment, par value of the investment,

and enough of the high interest coupon so that the investments (depending on the pool) earned an

annualized return of between 5.83 and 6.22 percent. Def. Facts ¶ 40. Physicians claim a loss

deriving from their overpayment on the participation interests and other consequential losses.

### Details Of The Greystone Pools

When Greystone Funding Corporation pooled the underlying mortgage loans, they paid

an undisclosed amount to the borrowers for covenants not to prepay on their mortgages, which

"enhanced Greystone's ability to market interests in the loans." Def. Facts. ¶ 16. These

covenants were integral to the original pricing scheme of the investments. Peter Mavrogenes

Dep. at 88:12-89:6.

In addition, when the Greystone pools originated, HUD's Section 8 housing assistance

program provided rent subsidies sufficient to assure that the property owner could pay the

mortgage. Def. Facts ¶ 10. These rent subsidies were paid pursuant to Housing Assistance

Program (HAP) contracts, which typically lasted approximately twenty years. *Id.* ¶ 11. Loans in

the Greystone 95-4 and 96-6 pools provided investors the right to a put option exercisable in a

one year window upon the expiration of the HAP contracts, which AAM believed to be in the

2004 to 2005 time frame ("the put date"). *Id.* ¶ 21. The put feature gave Physicians the option to

"put" the loans back to HUD in exchange for a government debenture, which would have been

attractive if the current interest rates rose to a level exceeding the yields on the underlying loan

pools. Pl. Facts ¶ 5. This was significant because prior to Physicians' investment, yields on the

investment up until the put date were quoted to Jerry Coon, Physicians' Senior VP of Finance

during a telephone call with Lawrence Zeno of AAM. Def. Facts ¶¶ 25-27. Coon nevertheless

acknowledged that the investments had a default risk and did not believe that AAM guaranteed a

particular yield or return. *Id.* ¶¶ 33, 63.

From the record, it is unclear whether the investments could have been negotiated for a

lower price than Physicians paid. Pl. Facts ¶ 10. AAM purportedly made its investment

recommendation based on prices that would provide a yield up to the put date (for the 95-4 and

96-6 loans) or average life (for the 96-1 loans) of the loans, ranging from the end of 2004 to the

end of 2007. Def. Facts ¶¶ 28-29. These quoted yields exceeded the yields over a similar time

period on Treasury securities. However, because the investments were called prior to the put

date, Physicians did not realize these yields. Instead, Physicians recovered a return of the

original investment, 100 percent par value, and an annualized return of between 5.83 and 6.22

percent, which surpassed Treasury security yields over the same time period. *Id.* ¶¶ 40-41.

**Circumstances Leading Up To the Call of Physicians' Investments in 2002 and 2003**

Just prior to paying Physicians out on its investment, Greystone Servicing Corporation

assigned each of the underlying loans to USGI, Inc.; some loans were then reassigned again to

Greystone Servicing Corporation. *Id.* ¶ 45. Greystone Servicing Corporation issued

participation certificates for some of the underlying loans to another entity, Jet Premier

Investments, LLC. *Id.* ¶ 46. Each of these transactions occurred while Physicians' interests were

still outstanding. Based on these transactions, AAM's expert Douglass Sher opined that

5

Physicians' interests were actually terminated due to a sale of the underlying mortgage loans to another entity, rather than prepaid by borrowers due to HUD's new Section 8 program ("the Mark-to-Market program"). *Id.* ¶¶ 50-52. Sher's report did not address conflicting testimony by Greystone witness Robert Barolak that Greystone consented to prepayments by borrowers who indicated an intent to prepay. Pl. Facts ¶ 19. Barolak testified that assignments to USGI, Inc. were conducted in connection with a refinancing of the underlying loans. Robert Barolak Dep. (5/24/07) at 112:5-113:12.

### Physicians' Damages Calculation

Based on the allegation that AAM failed to investigate and apprise Physicians of the true nature of the prepayment risks in the underlying loans, Physicians' expert Don Coker quantified Physicians' losses to be (1) $2,223,222.34 in overpaid premiums for the original investments; (2) $1.422,859.14 in lost income from the overpaid premium from the purchase date to the date of his report (June 11, 2007); (3) $2,110,608.46 in lost income (from reinvesting the returned principal in 2002/2003) from the date the investments were called to the date of the report; and (4) $5,634,232.83 as the net present value of lost income (from reinvesting the returned principal in 2002/2003) from the date of the report until the stated maturity dates. Pl. Facts ¶¶ 21-23.

AAM argues that (1) Physicians' have not suffered any actual loss as a matter of law; (2) Physicians cannot prove that AAM caused any loss; (3) the breach of contract and breach of fiduciary duty claims should be dismissed because they are duplicative of the professional negligence claim; and (4) the fraud claim should be dismissed because there is no evidence of fraudulent intent. Physicians respond that (1) they have suffered a loss by virtue of their premium overpayments and consequential damages; (2) there is a genuine issue of fact as to

whether AAM caused Physicians' loss; (3) Fed. R. Civ. P. 8(e)(2) permits alternative theories of

liability; and (4) there are still genuine issues of fact regarding whether AAM acted with

fraudulent intent. Both parties submit affidavits and deposition transcripts of witnesses and

experts, as well as volumes of exhibits, including documents pertaining to the underlying

investments.

Physicians have not suffered any legally compensable loss. Accordingly, summary

judgment is appropriate. The remaining arguments need not be addressed.

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.

R. Civ. P. 56(c); *Cox v. Acme Health Serv., Inc.*, 55 F.3d 1304, 1308 (7th Cir. 1995). A genuine

issue of material fact exists for trial when, in viewing the record and all reasonable inferences in

a light most favorable to the non-moving party, a reasonable jury could return a verdict for the

non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986); *Hedberg v. Indiana*

*Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995). The movant has the burden of establishing there

is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the

movant satisfies this burden, the non-movant must set forth specific facts demonstrating a

genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. Rule 56(c) mandates the

entry of summary judgment against a party "who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and in which that party will bear the

7

burden of proof at trial." *Celotex*, 477 U.S. at 322; *Waldridge v. American Hoechst Corp.*, 24

F.3d 918, 920 (7th Cir. 1994). A scintilla of evidence in support of the non-moving party's

position is not sufficient to defeat a summary judgment motion; "there must be evidence on

which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 250.

## II. Physicians' Purported Losses

AAM asserts that because Physicians have not suffered any actual loss from the

underlying investments, they are precluded from recovery. Their principal contention is that

Physicians have actually profited from the investments, and Physicians' claim for additional

benefit-of-the-bargain/expectation damages are unrecoverable under any of their liability

theories. Physicians counter that their losses are not in the form of benefit-of-the-

bargain/expectation damages, but are losses deriving from overpaying on premiums and other

consequential damages stemming from the loss of income due to the premature call of the

investments. Physicians' claims fail under Illinois law because they have not suffered any net

damages.

As this is a diversity case, Illinois substantive law applies to Physicians' claims. *Erie R.R.*

*Co. v. Tompkins*, 304 U.S. 64 (1938). Physicians must show they have incurred an actual loss on

each of their claims. *Avery v. State Farm Mut. Auto Ins. Co.*, 216 Ill. 2d 100, 149, 835 N.E.2d

801, 832 (Ill. 2005) (citing *Econ. Fire & Casualty Co. v. GAB Bus. Servs, Inc.*, 155 Ill. App. 3d

197, 201, 507 N.E.2d 896 (Ill. App. Ct. 1987).[1]  Without actual loss, a plaintiff has no damages.

_____

[1]The economic loss doctrine, known in Illinois as the Moorman doctrine, precludes tort
liability if the plaintiff suffers purely economic losses. *Moorman Mfg. Co. v. National Tank Co.*, 435
N.E.2d 443 (Ill. 1982). However, the doctrine does not apply because Physicians' purported
damages are alleged to have been caused by AAM's intentional false representations, fraud, or
negligent misrepresentation in supplying investment information to Physicians.  *In re Chicago*

*See Disher v. Information Resources, Inc.,* 691 F. Supp. 75, 84 (N.D. Ill. 1988) (Hart, J.) (no loss or damages arising out of federal securities claim and breach of fiduciary duty claim where plaintiff actually profited from underlying investment).

Physicians assert common law claims. However, the parties principally rely on federal securities law. *Madigan, Inc. v. Goodman,* 498 F.2d 233 (7th Cir. 1974) does not have a direct bearing on whether Physicians have suffered any damages under Illinois law. *Id.* at 237 (declining to address plaintiff's Illinois common law fraud count because the parties did not brief the issue).[2]  In assessing damages for common law fraud claims, Illinois courts generally apply "benefit-of-the-bargain" damages: the difference between the actual value of the property sold and the value the property would have had if the representations had been true at the time of sale. *Giammanco v. Giammanco,* 253 Ill. App. 3d 750, 758-62, 625 N.E.2d 990, 998-1000 (Ill. App. Ct. 1993); *Gerill Corp. v. Jack L. Hargrove Builders, Inc.,* 128 Ill. 2d 179, 196, 538 N.E.2d 530, 537-38 (Ill. 1989); *but see Lee v. Heights Bank,* 112 Ill. App. 3d 987, 998, 446 N.E.2d 248, 256 (Ill. App. Ct. 1983) (applying out-of-pocket loss rule); *Brown v. Broadway Perryville Lumber Co.,* 156 Ill. App. 3d 16, 25, 508 N.E.2d 1170, 1176-77 (Ill. App. Ct. 1987) (same); *Bear Stearns & Co., v. Sitlington III,* No. 97 C 4878, at *2, 3 (N.D. Ill. Sept. 29, 2000) (Levin, M.J.) (same).

─────────────────

*Flood Litig.,* 176 Ill.2d 179, 199, 680 N.E.2d 265, 275 (Ill. 1997) (citations and emphasis omitted).

[2]Nonetheless, application of Illinois law results in the same outcome as under federal securities law and *Madigan,* 498 F.2d at 233. Under *Madigan,* a plaintiff is not entitled to the full benefit of his bargain, that is, the profitable yields promised in a security transaction. Out-of-pocket losses (plus interest or the "lost alternative use" of the funds proved to a good deal of certainty) incurred by the plaintiff in the purchase a security are recoverable. Physicians have suffered no legally cognizable losses because they recovered their out-of-pocket losses through the course of their investment, and they have recovered the lost alternative use of the investment by virtue of the yields that they realized up to the date the investments were called.

The rule is based on the theory that a defrauded party is entitled to the benefit of his bargain in a transaction and should be placed in the same position that he would have occupied had the false representations on which he acted been true. *Schwitters v. Springer*, 236 Ill. 271, 274 86 N.E. 102 (Ill. 1908); *Johnson v. Niles Invisible Door Check Co.*, 222 Ill. App. 65 (Ill. App. Ct. 1921). Notably, this rule has been applied to the purchase of investment instruments such as stocks and notes. *Id.* (notes); *Chesrown v. Black*, 155 Ill. App. 422 (Ill. App. Ct. 1910) (stocks); *Hazelton v. Carolus*, 132 Ill. App. 512 (Ill. App. Ct. 1907) (stock); *Stewart v. Clark*, 194 Ill. App. 2 (Ill. App. Ct. 1915) (notes).

Physicians contend their losses – regardless of any profits they received – stem from three different theories: (1) an overpayment on the investments due to AAM's misrepresentation regarding the prepayment lockouts; (2) lost income on the lost overpayment; and (3) lost income on alternative yields that they could have been realized during the same period AAM "promised" the investments would remain intact. The issue is whether these purported losses are recoverable under Illinois law.

Physicians' undisputed recovery of 100 percent par value of the investment, the premium amount, and profitable returns have a significant bearing on the analysis of whether their purported losses are recoverable, as they serve to mitigate any net loss sustained by Physicians. *See, e.g., Disher*, 691 F. Supp. at 79, 84 ("all profits and losses occur[ing] after the fraud [and breach of fiduciary duty] must be netted against each other"); *see generally FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 623 (7th Cir. 1989) (damages must take into account payments already received by the plaintiff). Therefore, each of Coker's damages calculations must be analyzed with respect to the amount that Physicians gained from the investments.

10

First, with respect to the alleged overpayment, estimated by Coker to be in the sum of $2,233,222.34, any loss of an excess premium is not a compensable loss (for a fraud claim) under Illinois law because the entire premium payment was recovered by Physicians. Particularly instructive is *Schwitters*, 236 Ill. at 274, where the Illinois Supreme court affirmed (and applied) the benefit-of-the-bargain rule to a plaintiff's fraud claim on notes he acquired from the defendant. The notes were sold for $1,000 each to the plaintiff, and bore an interest of 7% after maturity. *Id.* The notes were later found worthless, yielding no profit or income whatsoever. The court held that the investor was entitled to the difference between the real value of the instrument and the represented value when it was sold to the investor. *Id.* Significantly, the court noted that although the notes promised a 7% interest rate after maturity, the plaintiff could not recover this unrealized promised interest; as the compensable loss pertained only to the loss at the time of sale, with interest accruing until trial. *Id.*

If Physicians recovered nothing at all on their investments as in *Schwitters*, the compensatory damages Physicians would be entitled to recover for fraud would be the purchase price of the instruments, that is, the difference between the value of the investments and their represented value. *Id.* Physicians have recovered the purchase price (which includes the price of the premiums) *and* profited more than they would have if they invested in Treasury notes over the same time period. Def. Facts ¶ 41.

Second, with respect to Physicians' argument that they lost income from the alleged overpayment, approximately $1,422,859.14 – calculated by Coker from the settlement date to the date of his report, also is unpersuasive. Whatever yield Physicians could have realized on the excess premium until the call date was recovered in the profits returned on the entire value of the

11

investments. Any lost income after the call date constitutes speculative losses. Prior to the call date, Physicians argues that it lost income from the overpayment until the call date. However, the underlying loans remained in place long enough so that the high interest coupon yielded an annualized return of between 5.83 and 6.22 percent, exceeding the yield for Treasury securities over the same time period. Def. Facts ¶ 41. Physicians received income from the overpayment at a rate of interest commensurate to any reasonable alternative investment Physicians could have made with that sum.

As for income lost on the alleged overpayment after the call date, the question is whether those sums constitute consequential losses. Physicians contend they are entitled to income as a consequential loss because it represents "additional earnings" that could have been realized if the overpayment was invested differently. *See* Pl. Mem. at 8. The problem with this assertion is that it assumes that earnings were guaranteed after the call date, but there is no record supporting such a conclusion. The investment essentially contemplated the loss from the outset. "Nearly all securities, save federal government debt securities, contain a certain degree of risk." *Master, Mates & Pilots Pension Plan v. USX Corp.*, 900 F.2d 727, 734 & n.6 (4th Cir. 1990). Here, the securities themselves had an inherent risk that Physicians would not recover the yields promised by Physicians. Physicians' Jerry Coon testified that AAM did not guarantee a particular yield or return, Def. Facts ¶ 63, nor did he contest that the underlying investments had a default risk. *Id.* ¶ 34. The spread between the yields on the investment and other hedged investments reflect that a risk of a premature call was contemplated. Thus, Physicians' contention that it is entitled to lost income from an overpayment after the call date is premised on the theory that they lost income that was not guaranteed to them. Common law fraud claims involving investments do

not extend liability based on "the expected fruits of an unrealized speculation." *Smith v. Bolles*, 132 U.S. 125, 129-30 (1889); *see also Madigan*, 498 F.2d at 239 (citing *Smith*). Although it was not expected at the outset that Physicians' investments would be called prematurely, that risk was clearly contemplated. Therefore, any loss of income after the call date constitutes "expected fruits of unrealized speculation" unrecoverable for claims of common law fraud. *See generally Schwitters*, 236 Ill. at 274 (refusing to award damages for the promised interest rate that was unrealized after the underlying notes matured); *Wafra Leasing Corp. v. Prime Capital Corp., et al.*, 339 F. Supp. 2d 1051, 1055-56 (N.D. Ill. 2004) (St. Eve, J.) (disallowing plaintiff investors damages of future, expected income from defendant auditors for federal securities law claims and negligent misrepresentation claim).

Third, the same analysis is pertinent to whether Physicians is entitled to lost income deriving from the premature call of the investments, estimated by Coker to be $7,744,841.29. Physicians claim they are entitled to "consequential loss resulting from having to reinvest its returned principal at lower prevailing interest rates," because the investments were intended to be "long term and provide a cash flow to the maturity date of each of the underlying loans." Pl. Mem. at 8. However, whether this amount can be considered a consequential loss depends on whether the investments were guaranteed to make the stated yields. There is no evidence in the record to support this contention. But there is evidence that risk of the investment being called prior to maturity was contemplated by Physicians. Def. Facts ¶¶ 34, 63. Thus, any losses from reinvestment of the returned principal at a lower rate is not a compensable nor a consequential loss, as the early call was inherent in the investment risk. Physicians' characterization of the income as a "lost alternative use" of the investments is also unavailing. The investments yielded

a return up to the call date that exceeded those of Treasury securities. Def. Facts ¶ 41. And, as discussed more fully above, purported losses sustained after the call date are merely unrecoverable "fruits of unrealized speculation." *Smith*, 132 U.S. at 129-30; *see also Schwitters*, 236 Ill. at 274.

Physicians have not suffered an actual loss on their claims of professional negligence, breach of contract, and breach of fiduciary duty, which are based on the same facts and injury as the fraud claim. Nevertheless, compensable losses under these claims would render the same result. For example, damages available for claims of negligent misrepresentation are based on the difference between the value received in the transaction and its purchase price or other value given, and consequential damages. Restatement (Second) of Torts § 552B (1977); *see also* Restatement (Second) of Torts § 903 ("[w]hen there has been harm only to the pecuniary interests of a person, compensatory damages are designed to place him in a position substantially equivalent in a pecuniary way to that which he would have occupied had no tort been committed").

Under this out-of-pocket loss rule, Physicians would be entitled to recover overpayment losses. However, that amount has been recovered, because Physicians has recovered the entire purchase price of their original investment plus interest. Additionally, Physicians' argument that they are entitled to lost income from the entire purchase price as a consequential loss is also unavailing. The claimed lost income is based on future expectation rather than consequential losses, as the underlying investments were not guaranteed investments. *See, e.g., Wafra*, 339 F. Supp. 2d at 1055-56. Physicians admit they profited from their investments up until the call date. Def. Facts ¶ 40. Any claim for subsequent losses are based on Physicians' unrealized

14

expectation that the investments would yield more money and stay in place for a longer duration.

However, the stated yields were not guaranteed as a contractual right.    Therefore, Physicians'

claim for lost income after the call date would constitute expectation damages that are

unavailable for securities claims involving negligent misrepresentation. *See, e.g., Wafra*, 339 F.

Supp. 2d at 1055-56 (expectation of receiving future payments unavailable to plaintiffs under

federal securities law and negligent misrepresentation claims because plaintiffs did not bargain

for future payments from defendant auditors).

Finally, the out-of-pocket loss rule is applicable to claims for professional negligence and

breach of fiduciary duty.  *See, e.g., Congregation of the Passion, Holy Cross Province v. Touche

Ross & Co.*, 224 Ill. App. 3d 559, 609 586 N.E.2d 600 (Ill. App. Ct. 1991), *affirmed*, 159 Ill. 2d

137, 636 N.E.2d 503 (Ill. 1994) (professional negligence); *Bear Stearns*, 2000 WL 1468740, at

*2, 3 (breach of fiduciary duty and fraud); *Disher*, 691 F. Supp. at 84 (breach of fiduciary duty).

Because Physicians recovered all of their purchase price and profited at a favorable alternative

interest rate, they have not suffered an actual loss under these claims.    Additionally, Physicians

contention that they are entitled to lost income after the call date is also unavailing as these

amounts would be considered unrealized profits that are unrecoverable.  *See, e.g., Bear Stearns*,

2000 WL 1468740, at *2, 3; *Disher*, 691 F. Supp. at 84.

## CONCLUSION

Because Physicians recovered the entire purchase price and interest on their original

investment, they have not suffered a legally cognizable loss under any of their liability theories.

Accordingly, AAM's motion for summary judgment is granted.

ENTER:

_Suzanne B. Conlon_
Suzanne B. Conlon
United States District Judge

September 28, 2007

16

# EXHIBIT D

# McGrath
# North

### ATTORNEYS AT LAW

JAMES J. FROST

Phone  (402) 341-3070
Fax  (402) 952-1810
E-mail  jfrost@mcgrathnorth.com

April 21, 2008

**_VIA FACSIMILE_**
**_(212)805-7927_**

The Honorable Naomi R. Buchwald
United States District Judge
United States Courthouse
500 Pearl Street, Room 2270
New York, NY  10007

Re:  **_Physicians Mutual Insurance Company, et al. v. Greystone Servicing_**
     **_Corporation, et al., CA No. 07 CV 10480 (NRB)_**

Dear Judge Buchwald:

Please allow this letter to update the Court as to the proceedings in the Seventh Circuit against Physicians' investment advisor as well as to address the letter of April 15, 2008 of counsel for Defendants in which Defendants request a stay of these proceedings.

1.    Seventh Circuit Appeal - Attached hereto is the April 17, 2008 Order of the Seventh Circuit Court of Appeals directing that Asset Allocation and Management Company ("AAM") file a further status report on or before April 30, 2008.

2.    Defendants Request for a Stay - The summary judgment Order entered in the Illinois action has no preclusive effect on any issue before this Court.  In the Illinois action, Physicians sued their investment advisor asserting claims for professional negligence, breach of fiduciary duty, breach of contract and fraud.  Physicians' claims were predicated on allegations that "AAM failed to conduct adequate due diligence on the investments and misrepresented the risks associated with them, thereby resulting in a loss of excess premium and income." _Memorandum and Order at 2._[1]  In the Illinois action, Physicians alleged that, as a result of the conduct of its investment advisor, Physicians paid too much for their loan participation interests.  It sought to recover the overpayment and consequential losses including reinvestment losses resulting from the premature return of principal.  _Memorandum and Order at 6._  Importantly, insofar as the consequential losses after the call dates, Physicians sought to recover the difference between the treasury rates available on long term investments as of the dates that it acquired the loan participation interests and the rates available as of the call dates. _Memorandum and Order at 13_ (characterizing Physicians' claim as a "consequential

---

[1] The Illinois Court's Memorandum and Order was attached to defense counsel's letter of January 11, 2008.

McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700   1601 Dodge Street   Omaha, NE 68102   www.mcgrathnorth.com

The Honorable Naomi R. Buchwald
April 21, 2008
Page 2

loss resulting from having to reinvest its returned principal at lower prevailing interest rates").

The Illinois Court found that Physicians had not suffered any loss because it recovered the overpayment and a market rate of interest through the "call dates" (dates on which the loan participation interests were redeemed). *Memorandum Opinion at 11-12.* Insofar as the claim for the consequential reinvestment loss, the Illinois Court determined that recovery "depends on whether the investments were guaranteed to make the stated yields." *Memorandum and Order at 13.* Because there existed a risk that the investments could be called prior to maturity, the Court concluded that the claimed consequential loss was speculative. The Illinois Court characterized Physicians' claim of consequential losses after the call dates as "fruits of unrealized speculation." *Memorandum and Order at 13-14.*

In this case, Physicians' claims have nothing to do with the issue of whether Physicians overpaid for the loan participation interests, whether the investments were guaranteed to provide stated yields, and/or whether there existed a risk that the investments could be called prior to maturity. Physicians' claims against these Defendants are predicated on allegations that Defendants unlawfully redeemed Physicians' loan participation interests. *First Amended Complaint ("FAC"), ¶¶ 19-23.* Physicians alleges that the loans did <u>not</u> prepay or refinance (the risk that the Illinois Court found was contemplated when the investments were made). Instead, Physicians alleges that the investments were unlawfully redeemed by Defendants by making it appear as if the loans had refinanced when in fact no such refinancing or prepayment by the borrower occurred. As a result of the unlawful conduct of the Defendants, Physicians lost its interest in promissory notes bearing interest rates as high as 13.25%. Physicians seeks to recover the difference between the note rates and the rates at which it reinvested the returned principal after the call dates. *FAC, ¶ 27.*

In order for the Illinois judgment to have any preclusive effect on this action, "the issues in both proceedings must be identical." <u>Eavzan v. Polo Ralph Lauren Corp.</u>, 40 F. Supp. 2d 147, 150 (S.D.N.Y. 1998). Although both the Illinois and New York suits involve Physicians' loan participation interests in the Greystone pools, the similarities end there. The issue in the Illinois action was whether Physicians recovered the principal amount that it overpaid for the securities and particular consequential losses. The Court found that the reinvestment losses sought by Physicians (difference in treasury rates between purchase dates and call dates) for the time period subsequent to the call dates were speculative because the investments were not guaranteed in the first instance.

There is no issue in this litigation "identical" or even similar to the issues which were before the Illinois Court. This action presents the issue of whether Physicians' loan participation interests were unlawfully taken by Greystone. If Physicians can establish that Defendants unlawfully redeemed its loan participation interests, it will be

The Honorable Naomi R. Buchwald
April 21, 2008
Page 3

entitled to recover regardless of whether or not the investments were "guaranteed," and regardless of whether or not there existed prepayment risk. Moreover, its damages will be measured by the difference in earnings it would have realized under the terms of the promissory notes and the rate that it earned upon reinvestment of the principal (which is an entirely different measure than the reinvestment losses sought in Illinois).

To sum up, the Illinois Court found that the reinvestment losses sought after the call dates were not recoverable because the investments were not guaranteed to perform to the maturity dates of the promissory notes. In other words, the Illinois Court found that there existed prepayment risk. In this case, Physicians specifically alleges that the loans did not prepay or refinance. Instead, Defendants are alleged to have converted Physicians' loan participation interests. The fact that an investment may not come with a guarantee does not absolve subsequent actors from liability from an unlawful taking of an investment.

Physicians respectfully urges this Court to reject any request to stay these proceedings. Physicians is entitled to pursue its claims against the Defendants in a timely manner and should not be burdened with substantial delays particularly where there can be no preclusive effect from the Illinois judgment. If the Court is seriously considering entertaining Defendants' request, Physicians strongly urges this Court to require Defendants to file a proper motion and give the parties a full and fair opportunity to present their respective positions in the forms of briefs and argument to the Court.

The pendency of the Seventh Circuit Appeal is not an obstacle to the Court considering the issue at this time. *See* Zerbone v. County of Westchester, 508 F. Supp. 780, 785 (S.D.N.Y. 1981) ("pendency of an appeal does not suspend the collateral estoppel effect of an otherwise final judgment"). Moreover, the issue will be governed by Federal law not Illinois law. *See* Phoenix Canada Oil Company Ltd. v. Texaco Inc., 749 F. Supp. 525 (S.D.N.Y. 1990) ("the preclusive effect of a prior judgment in a federal action predicated on diversity jurisdiction is governed by federal law").

Thank you for your consideration.

Respectfully submitted,

James J. Frost

JJF:jr
cc via email:  Richard Carmen
José A. Isasi
Stephen L. Saxl
William A. Wargo

# United States Court of Appeals
### For the Seventh Circuit
### Chicago, Illinois 60604

April 17, 2008

**By the Court:**

| | |
|---|---|
| PHYSICIANS MUTUAL INSURANCE COMPANY<br>and PHYSICIANS LIFE INSURANCE<br>COMPANY,<br>      Plaintiffs-Appellants, | ] Appeal from the United<br>] States District Court for<br>] the Northern District of<br>] Illinois, Eastern Division.<br>] |
| No. 07-3523      v. | ] No. 06 C 5124<br>] |
| ASSET ALLOCATION AND MANAGEMENT<br>CO., LLC,<br>      Defendant-Appellee. | ] Suzanne B. Conlon, Judge.<br>]<br>] |

## O R D E R

On consideration of the "STATUS REPORT" filed by appellee Asset Allocation and Management Co., LLC, on April 15, 2008,

IT IS ORDERED that appellee Asset Allocation and Management Co., LLC, file, on or before April 30, 2008, a further status report.

Briefing shall continue to be SUSPENDED pending further court order.

# EXHIBIT E

BRIEF CARMEN & KLEIMAN, LLP

ATTORNEYS AT LAW
805 THIRD AVENUE
NEW YORK, NEW YORK 10022

MATTHEW J. BRIEF
RICHARD E. CARMEN
IRA KLEIMAN*

ADRIA DE LANDRI
OF COUNSEL
* ALSO ADMITTED IN THE DISTRICT OF COLUMBIA

TELEPHONE
(212) 758-6160
(212) 832-5570

FACSIMILE
(212) 832-1747
(212) 832-7221

www.briefjustice.com

January 22, 2008

The Honorable Naomi R. Buchwald
United States District Judge
United States Courthouse
500 Pearl Street, Room 2270
New York, NY 10007

VIA FACSIMILE

Re:  *Physicians Mutual Insurance Company, et al. v. Greystone Servicing Corporation*, et al., CA
No. 07 CV 10490 (NRB)

Dear Judge Buchwald:

Physicians Mutual Insurance Company and Physicians Life Insurance Company (collectively "Physicians") provide this letter in response to Defendants' January 11, 2008, letter to the Court.

Initially, Defendants misdirect the Court's attention to a prior lawsuit Physicians filed in the U.S. District Court for the Northern District of Illinois ("the Illinois lawsuit").[1]  The Illinois lawsuit, against Physicians' former investment advisor, Asset Allocation and Management Co., LLC ("AAM"), is predicated on misrepresentations which led to the acquisition of the loan participation interests in the Greystone Loan Pools. Physicians alleged that AAM negligently and/or fraudulently misrepresented that Physicians interests in the underlying mortgage loans were protected from prepayment prior to maturity. (Complaint, ¶19.)  As a result of AAM's misrepresentation, Physicians paid a substantial premium over and above the par value for its loan participation interests. In the Illinois lawsuit, Physicians seeks to recover the amount that it overpaid for the loan participation interests.  In contrast, Physicians' claims here are predicated on Greystone's unlawful *redemption* of Physicians' participation interests.  Greystone's unlawful redemption occurred years after AAM rendered its investment advice.  The two cases do not share the same factual basis for the claims asserted, or even similar legal issues.  Regardless of any decision in the Illinois lawsuit, there would be no collateral estoppel effect here.  Thus, there are no grounds to support a motion to stay.

## RESPONSE TO GROUNDS IDENTIFIED BY DEFENDANTS FOR MOTION TO DISMISS

### Counts I and II - Breach of Contract/Implied Covenant of Good Faith and Fair Dealing.  Defendants
urge dismissal because the Complaint allegedly does not adequately identify a contract.  The Complaint satisfies the pleading requirements of Federal Rule of Civil Procedure 8(d) and this Court's requirements. *Window Headquarters, Inc. v. MAI Basic Four, Inc.*, 1993 WL 312899 (S.D.N.Y. 1993), does not help Defendants.  *Window Headquarters* makes clear that "a plaintiff is not required to attach a copy of the contract or plead its terms verbatim."  *Id.* at *3.  A plaintiff need only "set forth the terms of the agreement upon which liability is predicated."  *Id.*  Plaintiffs have done so.  The Complaint alleges that for each Loan Pool "Greystone executed a Pooling and Servicing Agreement ('Servicing Agreement')."  (Complaint, ¶22.) The Complaint also alleges that Physicians was a "party to the Servicing Agreements and beneficial owner of the mortgage loans within the Loan Pools."  (Complaint, ¶22.)  The Complaint goes on to identify the provisions of the Servicing Agreement which were breached.  (Complaint, ¶22.)

Defendants also contend that Count II, breach of the covenant of good faith and fair dealing, duplicates the breach of contract count.  Not so.  The Federal Rules explicitly permit a party to plead causes of action in the alternative, 'regardless of consistency.'"  Here, the Complaint describes how, separately from the alleged breach, Defendants engaged in conduct designed to deprive Physicians of the benefits of their contracts. (*See* Complaint, ¶¶18, 29, 20, 22-28, Attachment A.)[2]

---

[1]  The *AAM* lawsuit is currently on appeal to the Seventh Circuit Court of Appeals.  However, a factual issue impacting subject matter jurisdiction has arisen, and the matter may be dismissed for lack of subject matter jurisdiction, depending on the outcome of matters relating to the citizenship of certain limited partnerships that own AAM.

[2]  *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp.2d 258, 272 (S.D.N.Y. 2004) (denying motion to dismiss breach of good faith and fair dealing claim where breach of contract also pled; plaintiff is "free to litigate both"); *see also M-101 LLC v. iN Demand LLC*, 2007 WL 4258191 (S.D.N.Y. 2007) (denying motion to dismiss breach of good faith and fair dealing claim because breach of contract claim might be subject to technical defenses which would fail to defeat the alternative claim).

s:\rec\litig\physiciansmut\wsd3pg\rc012208.doc

BRIEF CARMEN & KLEIMAN, LLP
ATTORNEYS AT LAW

The Honorable Naomi R. Buchwald
January 22, 2008
Page 2

**Counts III and IV – Breach of Fiduciary Duty/Aiding and Abetting Breach of Fiduciary Duty.** Physicians has plead facts sufficient to impose a fiduciary duty. The Complaint alleges that Greystone Servicing Corporation, as "the mortgagee of record and Servicer for the loan pools," was responsible "for collecting payments due pursuant to the underlying mortgage notes and remitting the appropriate share to the owners of participation interests" and otherwise protecting Physicians' loan participation interests. (Complaint, ¶22.) As mortgagee of record and holder of funds for the beneficial owners of the participation interests, Greystone Servicing owed a fiduciary duty of trust to holders of loan participation interests within the Loan Pools, such as Physicians. (Complaint ¶¶43, 44.) In other words, Greystone Servicing held legal title to the underlying mortgages in trust for the benefit of certificate holders. Physicians alleges that Greystone Servicing abused that trust and unlawfully misappropriated the participation interests for its own benefit.[3] The remaining Defendants are liable for breach of fiduciary duty as alter-egos of Greystone Servicing or as aiders and abettors. (Complaint ¶¶6, 10 and 49.)

**Count V – Conversion.** Defendants contend that the Complaint does not identify which asset Defendants converted. The Complaint could not be more specific: "Defendants exercised unauthorized control and wrongfully converted Physicians' loan participation interests in each of the Loan Pools." (Complaint, ¶54, emphasis added.)[4] The Complaint also specifies that "All Defendants" are subject to the allegations of Count V. (Complaint, p. 14.) The loan participation interests at issue here are specifically identifiable as the certificates received by Physicians. Physicians were the beneficial owners of the loan participation interests. Greystone Servicing held legal title to the underlying mortgagees for the benefit of Physicians and other certificate holders and was responsible for protection of Physicians' interests in the underlying mortgage loans. (Complaint, ¶22.) Instead, Greystone Servicing, acting with the other Defendants, orchestrated a scheme to convert the participation interests for their own gain. That scheme and the role of each Defendant is detailed in Physicians Complaint at Paragraphs 23-30.[5]

**Count VI – Fraud.** Defendants contend that the allegations of Count VI of the Complaint fail to satisfy the specificity required by Fed. R. Civ. P. 9(b). Defendants cite *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986), to support their claim that specific defendants are not identified. But *Luce* involved over five defendants, only two of whom were alleged to be alter egos. When the plaintiff in *Luce* referred to "defendants," the court could not determine the defendant allegedly at fault. Here, *all* Defendants are alleged to be alter egos of one another. *All* Defendants are alleged to be part of the fraudulent scheme.

The Complaint satisfies the particularity requirement of Rule 9(b). The Complaint sets forth specific facts that identify the fraudulent practices engaged in by Defendants to implement the unlawful scheme: (1) in connection with each of the three redemptions, Greystone prepared and delivered a "remittance statement" falsely representing that the loans "paid off" and concealed the true facts underlying the redemptions, (Complaint, ¶28); (2) Richard Heyman, a Greystone representative, made false representations orally and by email on or about May 16, 2003 to Physicians' investment advisor that the loans prepaid in connection with restructurings under HUD's Mark to Market Program (Complaint, ¶29); (3) Physicians alleged the manner in which Defendants engaged in "circular transaction" with USGI to make it appear as if the borrowers had refinanced their mortgage loans in order to unlawfully redeem and misappropriate Physicians' loan participation interests. (Complaint ¶¶23-27.) Exhibit "A" to the Complaint identifies by date, author, recipient, subject matter and instrumentality the documents prepared and utilized to implement the fraudulent scheme. Physicians has alleged that, in the Illinois lawsuit, testimony was adduced that the Individual Defendants were the "decision makers" behind the scheme to defraud. (Complaint ¶24.)

Defendants argue that damages sought by Plaintiffs are not recoverable, relying on *Three Crown Ltd. Partnership v. Salomon Bros.*, 906 F. Supp. 876 (S.D.N.Y. 1995). *Three Crown* was decided on summary judgment and based on antitrust and securities fraud, specifically, Rule 10b-5. *Three Crown* does not apply here. Physicians is not required to plead a damages theory. At this stage of the pleadings, Physicians is required only to allege that it has sustained damages as a result of Defendants' unlawful conduct. It has done so.

**Count VII – Constructive Trust.** Plaintiffs seek monetary *and* equitable damages in the form of an accounting, making a constructive trust appropriate. (Complaint, pp. 17-18.) An accounting is appropriate

---

[3] *See Standard Fed. Bank v. Healy*, 7 A.D.3d 610, 777 N.Y.S.2d 499 (2d Dept. 2004) (escrow holder of funds may be held liable on a theory of breach of fiduciary duty).

[4] *See Thyroff v. Nationwide Mut. Ins.*, 8 N.Y.3d 283 (Ct. App. 2007) (intangible property rights are subject to claims for conversion).

[5] *See Moses v. Martin*, 360 F. Supp.2d 533, 541 (S.D.N.Y. 2004).

## BRIEF CARMEN & KLEIMAN, LLP
### ATTORNEYS AT LAW

The Honorable Naomi R. Buchwald
January 22, 2008
Page 3

here because Defendants wrongfully took the proceeds from Physicians' loan participation interests for their own, thus profiting at Physicians' expense. Physicians is entitled to an accounting of the ill-gotten gains Defendants wrongfully acquired. There is no basis for a motion to dismiss.[6]

    **Count VII - RICO.** Defendants contend, incorrectly, that Physicians' RICO claim violates the particularity requirement of Rule 9(b) as well as RICO's "distinctness" requirement. As with Count VI - Fraud (above), the Complaint and Attachment A thereof detail Defendants' predicate acts and the manner in which Defendants carried out their scheme.

    Physicians have pled both an alter ego theory and a RICO violation. That fact does not vitiate Physicians' RICO claim. At the pleading stage, "a plaintiff may plead two or more statements of a claim, even within the same count, regardless of consistency."[7] Any other result would gut Rule 8(d)(3), which provides: "Inconsistent Claim or Defenses. A party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(2). Indeed, the Second Circuit has held that a party can "properly submit a case on alternative theories" whether the inconsistency lies in the facts or legal theories.[8]

    **Statute of Limitations - Counts III, IV, V, and VI.** Defendants err in their analysis of the applicable statutes of limitations. Counts III and IV, breach of fiduciary duty and aiding and abetting breach of fiduciary duty, are subject to a six (6) year limitations period where, as here, equitable is relief is sought or where actual fraud is the basis for the breach.[9] Here, the Complaint alleges both. Defendants hold Physicians' participation interests with respect to which they owe Plaintiffs a duty of accounting. (Complaint, pp.17-18.) Plaintiffs also allege Defendants actions were based on fraud, which the Complaint and Attachment A set forth with proper specificity. In any event, the breach of fiduciary duty claim is subject to a discovery rule;[10] it was not until May 4, 2007, when Physicians took the deposition of a Greystone representative in the Illinois lawsuit, that Physicians learned of Defendants' wrongful conduct. (Complaint, ¶30.)

    Count V - Conversion, is generally subject to a three (3) year statute of limitations. "While 'accrual [normally] runs from the date the conversion takes place * * * and not from discovery or the exercise of diligence to discover' * * *, where the original possession is lawful, conversion does not occur until after a demand and refusal to return the property."[11] Here, Physicians knew there had been redemptions but Defendants concealed their wrongdoing, making it impossible for Physicians to know that the redemptions were wrongful until the May 4, 2007 deposition of Greystone's representative in the Illinois lawsuit.

    Finally, Count VIII - RICO, is subject to a four year statute of limitations.[12] The period does not begin to run, however, until "the plaintiff discovers or should have discovered the RICO injury."[13] Physicians did not know and could not have known of Greystone's wrongful activities until the May 4, 2007 deposition of a Greystone representative in the Illinois lawsuit. The RICO count was timely filed.

    The detailed allegations of the Complaint and the acts laid out in Attachment A satisfy the pleading requirements of the Federal Rules. Plaintiffs' Complaint was timely filed and raises serious issues of fraud, misconduct and breach of contract by Defendants. A motion to dismiss the Complaint is not warranted.

Respectfully,

Richard E. Carmen, Esq.

cc:    Stephen L. Saxl, Esq.
       William A. Wargo, Esq.
       José A. Isasi, II, Esq.

---

[6] See Maric Piping, Inc. v. Maric, 271 A.D.2d 507, 705 N.Y.S.2d 684 (2d Dept. 2000).
[7] Moses, supra at 547-48 (allowing plaintiff to plead that two entities were alter egos or, alternatively, legally distinct entities for purposes of RICO claim).
[8] See Henry v. Daytop Village, Inc., 42 F.3d 89, 95 (2d Cir. 1994).
[9] Goldberg v. Schuman, 289 A.D.2d 8, 733 N.Y.S.2d 356 (1st Dept. 2001); Leonard v. Santa Fe Indus., Inc., 70 N.Y.2d 262, 267 (Ct. App. 1987).
[10] Whitney Holdings, Ltd. v. Givitovsky, 988 F. Supp. 732, 744 (S.D.N.Y. 1997).
[11] D'Amico v. First Union Nat'l Bank, 285 A.D.2d 166, 728 N.Y.S.2d 146 (1st Dept. 2001) (citations omitted).
[12] Klehr v. A.O. Smith Corp., 521 U.S. 179, 188-89 (1997).
[13] In re Merrill Lynch Ltd. Partnerships Litig., 154 F.3d 56, 58 (2d Cir. 1998).