UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------X

PHYSICIANS MUTUAL INSURANCE COMPANY and ) CIVIL ACTION
PHYSICIANS LIFE INSURANCE COMPANY,            ) NO. 07 CV 10490 (NRB)
                                              )
            Plaintiffs,                       )
                                              )
      v.                                      )
                                              )
GREYSTONE SERVICING CORPORATION, INC.,        )
GREYSTONE & CO., INC., STEPHEN ROSENBERG      )
ROBERT R. BAROLAK, and CURTIS A POLLOCK,      )
                                              )
            Defendants.                       )

-------------------------------------------------------------------------------X

**DECLARATION OF JOSÉ A. ISASI, II IN SUPPORT OF DEFENDANTS'
MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**

Stephen L. Saxl (SS-1028)
William A. Wargo (WW-9417)
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
(212) 801-9200

and

José A. Isasi, II (*pro hac vice*)
GREENBERG TRAURIG, LLP
77 W. Wacker Drive
Suite 2500
Chicago, IL 60601
(312) 456-8400

*Attorneys for Greystone Servicing
Corporation, Inc., Greystone & Co., Inc.,
Stephen Rosenberg, Robert R. Barolak
and Curtis A. Pollock*

## DECLARATION OF José A. Isasi, II

I, José A. Isasi, II, having first been duly sworn, hereby state and depose as follows:

1.     My name is José A. Isasi, II.  I am above the age of eighteen years and am otherwise competent to testify.  If called to testify, I would as set forth below based upon personal knowledge and under penalty of perjury.

2.     I am counsel of record for the defendants in the matter of *Physicians Mutual Insurance Company and Physicians Life Insurance Company v. Greystone Servicing Corp., et al.* Civil Action No. 07 CV 10490 (NRB), pending in the United States District Court for the Southern District of New York.

3.     Attached to this Declaration as Exhibit A-D are true and correct copies of the following:

Ex. A    Pooling and Servicing Agreement between Greystone Servicing Corporation, Inc., and Greystone Funding Corporation, dated September 27, 1995.

Ex. B    Pooling and Servicing Agreement between Greystone Servicing Corporation, Inc., and Greystone Funding Corporation, dated February 1, 1996

Ex. C    Pooling and Servicing Agreement between Greystone Servicing Corporation, Inc., and Greystone Funding Corporation, dated November 26, 1996

Ex. D    Letter of Richard E. Carmen, Esq., counsel for Physicians Mutual Insurance Company and Physicians Life Insurance Company to the Honorable Naomi R. Buchwald, dated January 22, 2008

**FURTHER AFFIANT SAYETH NAUGHT**

Dated:  August 28, 2008

José A. Isasi, II

# EXHIBIT A

## TO DECLARATION OF JOSÉ A. ISASI, II IN SUPPORT OF DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS

## PART 1

Pool 95-4

---

# POOLING AND SERVICING AGREEMENT

between

## GREYSTONE SERVICING CORPORATION, INC.

and

## GREYSTONE FUNDING CORPORATION

Dated as of September 27, 1995

---

# TABLE OF CONTENTS

Page

Parties ........................................................................................... 1
Recitals........................................................................................... 1
Section 1.    Definitions................................................................... 1
Section 2.    Receipt of Loan Documents........................................... 3
Section 3.    Retention of Loan Documents........................................ 3
Section 4.    Grant of Participation Interest....................................... 4
Section 5.    Obligations of Other Parties.......................................... 4
Section 6.    Representations of the Servicer...................................... 4
Section 7.    Servicing of Mortgage Loans......................................... 6
Section 8.    Collections Under the Mortgage Loans............................ 6
Section 9.    Remittances................................................................ 7
Section 10.   Hazard Insurance......................................................... 8
Section 11.   Inspections................................................................. 8
Section 12.   Escrows...................................................................... 8
Section 13.   Reports....................................................................... 9
Section 14.   Defaults Under the Mortgage Loans................................ 9
Section 15.   Compensation of Servicer; Reimbursement of Servicer....... 10
Section 16.   Issuance, Assignment and Transfer of Participation Certificates................ 11
Section 17.   Notices....................................................................... 12
Section 18.   Assignment of the Mortgage Loans.................................. 13
Section 19.   Servicer's Status as FHA-Approved Mortgagee................... 13
Section 20.   Fidelity Bond; Errors and Omissions Insurance.................. 13
Section 21.   Indemnification........................................................... 13
Section 22.   Termination by Participant............................................. 14
Section 23.   Termination by Servicer; Delegation of Servicing Obligations................. 14
Section 24.   Amendment of Agreement.............................................. 15
Section 25.   Participants' Rights to Examine Loan Documents and Servicer's Records.... 16
Section 26.   Liability of Servicer...................................................... 16
Section 27.   Relationship Between Servicer and Participants................. 16
Section 28.   Optional Assignment to HUD.......................................... 16
Section 29.   Miscellaneous............................................................. 17
Execution........................................................................................ 18
Exhibit A - Project Summary.............................................................. A-1
Exhibit B - Form of Participation Certificate......................................... B-1
Exhibit C - Form of Assumption Agreement........................................... C-1
Exhibit D - Form of Custodial Agreement.............................................. D-1

## POOLING AND SERVICING AGREEMENT
### respecting
### SERIES GREYSTONE 95-4

This **POOLING AND SERVICING AGREEMENT** dated as of September 27, 1995 (the "Agreement") is made between **GREYSTONE SERVICING CORPORATION, INC.**, a Georgia corporation (the "Servicer"), having an office at 98 Alexandria Pike, 5th Floor, Warrenton, Virginia 22186 and **GREYSTONE FUNDING CORPORATION** a Virginia corporation (as initial holder of the Participation Interests defined below, the "Participant"), having an office at 98 Alexandria Pike, 4th Floor, Warrenton, Virginia 22186.

## R E C I T A L S :

**WHEREAS**, the Servicer, as of the date hereof, is the mortgagee of record for each of the FHA-insured mortgage loans as identified on Exhibit A attached hereto (the "Mortgage Loans"); and

**WHEREAS**, Participant wishes to acquire an undivided 100% participation interest in the each of the Mortgage Loans under and pursuant to the terms of this Agreement.

**NOW, THEREFORE**, to set forth their respective rights and obligations with respect to the Mortgage Loan and the participation in the Mortgage Loans and in consideration of the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Servicer and the Participant hereby agree as follows:

1.    **Definitions**.  Unless the context shall otherwise require, capitalized terms used in the foregoing recitals shall have the meanings specified therein, and the following words and terms shall have the meanings specified in this Section:

**"Borrower"** shall mean the owner of each Project and the obligor on the Mortgage and Mortgage Note respecting each Mortgage Loan.

**"Business Day"** shall mean any day which is not a Saturday or a Sunday or a day on which banks are required or authorized to be closed under the laws of the State of New York or in the city in which the principal offices of the Servicer are located.

**"Custodial Agreement"** shall mean the agreement, attached hereto as Exhibit D, dated as of September 27, 1995, executed and made a part of this Pooling and Servicing Agreement, by and between Servicer, Participant, and Custodian, and incorporated herein.

**"Custodian"** shall mean First Tennessee Bank National Association, a national

banking association, and any successor Custodian which shall have assumed the duties of Custodian under the Custodial Agreement.

"**FHA Insurance Contract**" shall mean the contract of mortgage insurance with HUD respecting each of the Mortgage Loans.

"**FHA Insurance Proceeds**" shall mean all amounts received under any of the FHA Insurance Contracts.

"**HUD**" or "**FHA**" shall mean the United States Department of Housing and Urban Development, acting through the Federal Housing Commissioner.

"**Loan Documents**" shall mean, collectively, the Mortgage Note, the Mortgage, all intervening endorsements or assignments of the Mortgage Note or the Mortgage, the title insurance and hazard insurance policies related thereto, and the other documents evidencing, securing or otherwise relating to each of the Mortgage Loans.

"**Majority of Participants**" shall mean Participants holding more than 50% of all outstanding Participation Interests.

"**Mortgage**" shall mean, with respect to each Mortgage Loan, the insured first mortgage, deed of trust or other similar security instrument, from the Borrower and assigned to the Servicer, recorded in the land records of the jurisdiction in which the Project is located, and securing the obligation of the Borrower under the Mortgage Note for such Mortgage Loan, as such Mortgage is from time to time amended, supplemented and assigned.

"**Mortgage Note**" shall mean, with respect to each Mortgage Loan, the mortgage note issued by the Borrower and endorsed to the Servicer, which Mortgage Note is secured by the Mortgage for such Mortgage Loan, as such Mortgage Note is from time to time amended, supplemented and endorsed.

"**Participant**" and "**Participants**" shall mean Greystone Funding Corporation as initial Participant, and any Transferee.

"**Participation Certificate**" shall mean any certificate, issued by the Servicer pursuant to Section 16 hereof, to evidence the Participation Interest of a Participant in the Mortgage Loans.

"**Participation Interest**" shall mean the undivided percentage of the entire beneficial ownership interest in all of the Mortgage Loans, in the Loan Documents and in all proceeds and profits therefrom (including, without limitation, any and all FHA Insurance Proceeds and other benefits received pursuant to any of the FHA Insurance Contracts) granted to the Participants collectively pursuant to Section 4 of this Agreement and evidenced by a Participation Certificate.

2

"**Project**" shall mean, with respect to each Mortgage Loan, the multifamily housing facility owned by the Borrower, financed by the Mortgage Loan and encumbered by the Mortgage.

"**Servicer**" shall mean Greystone Servicing Corporation, Inc., a Georgia corporation, and any successor which shall have assumed the duties of servicer of the Mortgage Loans in accordance with the terms of this Agreement.

"**Transfer**" shall mean the sale, transfer, pledge, assignment or other disposition of all or any portion of a Participant's interest in the Participation Interest.

"**Transferee**" shall mean each person, firm or entity to which a Participant transfers and assigns all or any portion of its interest in the Participation Interest, any Participation Certificate or this Agreement.

2.    **Receipt of Loan Documents.** The Servicer represents that it has received all Loan Documents for each Mortgage Loan, and it has delivered to the Custodian with respect to each Mortgage Loan, the following Loan Documents:

i)    The original Mortgage Note, including all prior modifications, endorsements and allonges thereto, endorsed and payable to the Servicer;

ii)    An original or true copy of the Mortgage, including all prior modifications and assignments thereof, now assigned to and in the name of the Servicer as mortgagee;

iii)    An original policy of title insurance, insuring the Servicer as the holder a first priority lien on the Project pursuant to the Mortgage;

iv)    An original or true copy of the FHA Regulatory Agreement respecting the Mortgage Loan, including all prior modifications thereof; and

v)    Copies of any and all security agreements and related financing statements respecting a Mortgage Loan.

In addition, the Servicer represents that it has executed and delivered to the Custodian all other documents required to be delivered pursuant to the Custodial Agreement, including an endorsement of each Mortgage Note and an assignment of each Mortgage and other Loan Documents, complete in all respects except as the name of the assignee or transferee and (as applicable) in a form acceptable for recording in all appropriate public offices for real property records in the jurisdiction in which the mortgaged property recited in such assignment is situated.

3.    **Loan Documents to be Held by Custodian.**    (a)  Except as otherwise

3

permitted by this Agreement and by the Custodial Agreement, Servicer will cause all Loan Documents to be held by the Custodian under the terms of the Custodial Agreement. The Servicer acknowledges that all Loan Documents, whether held by the Custodian or by the Servicer, are held for the benefit of the Participants, and that any Loan Documents held by the Servicer are so held for the sole purpose of permitting the Servicer to perform its obligations hereunder. Except as required by the Custodial Agreement or upon the written instructions of a Majority of Participants, or in connection with the performance of its obligations hereunder, the Servicer, will not sell, convey, pledge, mortgage or assign any interest in the Mortgage Loans or the Loan Documents, will not release the Loan Documents from its custody and will segregate the Loan Documents from the other books and records of the Servicer.

(b) The Servicer will administer the Custodial Agreement for the benefit of the Participants and will pay all fees and expenses of the Custodian payable pursuant to the terms of the Custodial Agreement.

(c) The Servicer shall not be liable, responsible or accountable for the Custodian's obligation to provide for and maintain fidelity insurance, theft of document insurance, forgery insurance, and/or errors and omissions insurance, as required by Section 11 of the Custodial Agreement. The Servicer shall not be responsible for any impairment of the FHA Insurance Contracts, any delay or diminution in the payment of benefits under the FHA Insurance Contracts or other loss or damage which any Participant may sustain as a result of any acts or omissions of the Custodian.

4. **Grant of Participation Interest.** The Servicer hereby grants, conveys, transfers, sells and assigns to the Participant, a 100% Participation Interest in each and all of the Mortgage Loans, constituting the entire beneficial ownership interest in the Mortgage Loans, in the Loan Documents and in all proceeds and profits therefrom (including, without limitation, any and all FHA Insurance Proceeds and other benefits received pursuant to the FHA Insurance Contract with respect to any Mortgage Loan), subject to the terms and conditions of this Agreement and evidenced by the issuance to the Participant of a Participation Certificate pursuant to Section 16 hereof.

5. **Obligations of Other Parties.** HUD shall have no obligation to recognize or deal with anyone other than the Servicer, in its capacity as mortgagee of record, with respect to the rights, benefits and obligations of the mortgagee under any of the FHA Insurance Contracts. The Borrowers shall have no obligation to recognize or do business with anyone other than the Servicer of the Mortgage Loans or its agents, in its capacity as mortgagee of record, with respect to the rights, benefits and obligations of the Borrowers or the mortgagee under the Mortgages.

6. **Representations of the Servicer.** The Servicer represents and covenants in favor of the Participants as follows:

(a) The Servicer is duly organized, validly existing and in good

4

standing under the laws of the State of Georgia, has all requisite power and authority to enter into this Agreement, to grant, convey, transfer, sell and assign the Participation Interest, to issue the Participation Certificates and to perform its obligations hereunder, and has duly authorized and validly executed and delivered this Agreement. The Servicer is qualified to do business in the state in which the mortgaged properties are located or is exempt from such qualification.

(b)     The Servicer is duly qualified and shall remain duly qualified as an FHA-approved mortgagee in good standing to hold and service mortgage loans. The Servicer shall comply with the provisions of the National Housing Act and all regulations issued thereunder in order that the benefits under the FHA Insurance Contracts are fully protected.

(c)     The Servicer holds, and shall continue to hold, legal and record title to the Loan Documents for the benefit of the Participants, free of any liens, charges, encumbrances, participation (other than the Participation Interests) or other interests (except as permitted hereunder or as consented to by a Majority of Participants).

(d)     As of the date hereof, the grant of the Participation Interest to non-FHA mortgagees as contemplated herein, is in compliance with the HUD regulations set forth at 24 C.F.R. Section 207.261 or an applicable waiver thereof and with all other applicable HUD regulations.

(e)     All information shown in Exhibit A (including, without limitation, the principal amount of the Mortgage Loans) is true, correct and complete.

(f)     No advance or advances by the Servicer under any of the Mortgage Loans (other than the principal amount of the Mortgage Loans) are outstanding. The Mortgage Loans have all been fully disbursed.

(g)     The Servicer has received and holds all escrows for taxes, insurance, mortgage insurance premiums and replacement reserves required to be maintained for each of the Mortgage Loans pursuant to the Loan Documents respecting such Mortgage Loans and applicable HUD requirements.

(h)     The Mortgage Loans are not subject to any servicing or subservicing agreement or arrangement, except as permitted by Section 23(c) hereof, with any servicer other than the Servicer.

(i)     Each of the Mortgage Loans is insured by FHA under Section 221(d)(4) of the National Housing Act, is not subject to any defect which would prevent recovery in full under the FHA Insurance Contract for such Mortgage Loan, and each FHA Insurance Contract is the valid and binding obligation of FHA, without offset, counterclaim or defense. FHA insurance proceeds, in the event of an insurance claim,

5

are payable in cash, in debentures, or in a combination of both, as determined by the Mortgagee at the time of payment.

(j)     A valid and enforceable policy of title insurance or endorsement to title insurance has been issued in connection with the origination, reinstatement or assignment of each Mortgage Loan in an amount acceptable to HUD and such insurance is presently in full force and effect and is otherwise acceptable to HUD.

(k)     Each Mortgage is prior to any liens filed against the applicable Project, except as may be approved in writing by HUD.

(l)     Each building or other improvement located on the Projects covered by the Mortgage Loans is insured under customary property insurance policies against insurance risks and hazards as required by HUD and such insurance is in amounts which are not less than the amount necessary to meet FHA requirements and comply with any co-insurance provision of the policies, with all premiums for such policies having been paid as required under the FHA Insurance Contract.

(m)     As of the date hereof, none of the buildings or other improvements on any Project has been affected in any substantial manner or suffered any material loss as a result of any fire, explosion, accident, riot, war, or act of God or the public enemy.

(n)     If current on the twentieth anniversary of the date of final endorsement specified in Exhibit A, each Mortgage Loan will be eligible for assignment under Section 221 (g) (4) of the National Housing Act.

7.     **Servicing of Mortgage Loans.** (a) The Servicer, as independent contract servicer, shall service and administer the Mortgage Loans in accordance with customary mortgage servicing practices of prudent lending institutions and in compliance with the National Housing Act and all applicable rules and regulations thereunder, carrying out all obligations of the mortgagee under the Loan Documents and maintaining the FHA Insurance Contracts in full force and effect. Subject to the provisions of Section 14 hereof, the Servicer shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which it may deem necessary or desirable, including consent to any modification of the Mortgage Loans, provided that the Servicer may not, unless a Mortgage Loan is in default or such default is imminent and the Servicer shall have obtained the prior written consent of a Majority of the Participants, permit any modification of the Mortgage Loans that would change the interest rate, change the amount of the scheduled monthly principal and interest payment, reduce the outstanding principal amount (except for actual payment of principal) or extend the final maturity date of the Mortgage Loans, terminate or otherwise reduce the benefits of the FHA Insurance Contracts or waive any claim against the Borrowers and provided further, that the Servicer shall, prior to acting hereunder, be permitted to notify and request instructions from the Participants as to any matter of enforcement or otherwise that arises outside of the ordinary course of servicing the Mortgage Loans, and to rely on the instructions of a Majority

6

of Participants.

      (b)    The Servicer shall not, without the prior approval of a Majority of Participants:

      (i)    waive, or consent to a postponement of, compliance on the part of any Borrower with any material term or provision of the Loan Documents or in any other manner grant a material indulgence to Borrower; or

      (ii)    grant to any Borrower any consents or approvals which the Borrower is required to obtain under the Loan Documents not described in paragraph (a) above, including consent to subordinate liens or transfer of the mortgaged property, provided that the Servicer may approve or disapprove the Borrower's request for approval if the approval of a Majority of Participants is not forthcoming within 30 days following written notification to Participants and provided further, that the Servicer may approve transfers of physical assets or other routine items approved by HUD.

      (iii)    accept or permit prepayments of the Mortgage Loans except as expressly permitted in the Loan Documents and then only if such prepayments include any applicable prepayment penalty or other premium.

      8.    **Collections Under the Mortgage Loans**. (a) The Servicer shall proceed diligently to collect all payments due under the Loan Documents as such payments come due. All payments collected by the Servicer under the Mortgage Loans shall be deposited by the Servicer and held in trust in a depository of the Servicer's choosing that satisfies the requirements of the Government National Mortgage Association for depositories of principal and interest accounts (including depositories with whom the Servicer or its affiliates may maintain banking relationships), whose accounts are fully insured by the Federal Deposit Insurance Corporation ("FDIC") in specifically designated accounts indicating the custodial nature thereof (such account or accounts referred to hereafter as the "Trust Account"). The Trust Account shall be held by the Servicer in compliance with any and all applicable HUD requirements. The Servicer will maintain such records as are necessary to secure and obtain the maximum insurance for the beneficiary thereof in accordance with the rules and regulations of the FDIC. The Servicer will disburse such funds for the payment of charges due and accruing under the Mortgage Loans, for remittances to the Participant, or otherwise in accordance with this Agreement or the Loan Documents. Initially, the Trust Account shall be established by Servicer with NationsBank, N.A., and Servicer will provide prompt written notification to Participants stating the identification of any change in this depository institution.

      (b) The Servicer shall keep a complete and accurate account of all sums collected by the Servicer from each Borrower and applied to mortgage insurance premiums, ground rents, water rates, taxes, assessments and other public charges, insurance premiums for hazard insurance policies, servicing fees, principal, premiums and interest payments on the Mortgage Loans and any other escrows or funds required by HUD or the Loan Documents.

7

9.    **Remittances**.  (a)  The Servicer shall remit to the Participants on the 25th day of each month (commencing October 25, 1995), or if such day is not a Business Day, the following Business Day, their respective proportionate shares of all payments of principal, prepayment premiums and interest (after deducting the amounts described in Section 15 hereof) on the Mortgage Loans, all permitted prepayments of principal, all proceeds of fire or other insurance or any award for condemnation (to the extent applied to prepay the principal of the Mortgage Loans) and all FHA Insurance Proceeds which the Servicer has received respecting any of the Mortgage Loans through the 20th day of such month (or if such day is not a Business Day, the next preceding Business Day) and which are not subject to collection on the date of distribution to the Participants.  The first remittance due October 25, 1995, shall represent interest from September 27, 1995 through September 30, 1995.  Each Participant holding Participation Certificates representing an interest of more than $1,000,000 of the outstanding principal balance of the Mortgage Loans shall be entitled to receive such remittances by wire transfer in immediately available funds, in accordance with written wiring instructions provided to the Servicer by such Participant.

(b)    With respect to any remittance made by the Servicer after the Business Day on which such payment was due, the Servicer shall pay to each affected Participant interest on any such late payment at an annual rate equal to the rate of interest as is publicly announced from time to time at its principal office by Chemical Bank, New York, New York, as its prime lending rate, adjusted as of the date of each change, plus three percentage points, but in no event greater than the maximum amount permitted by applicable law.  Such interest shall be paid by the Servicer on the date such late payment is made and shall cover the period commencing with the Business Day on which such payment was due and ending with the Business Day on which such payment is made, both inclusive.  The payment by the Servicer of any such interest shall not be deemed an extension of time for payment or a waiver of any event of default by the Servicer.

(c)    Upon making remittances, the Servicer will have no further obligation with respect to the application of such funds.  The Servicer shall have no obligation to remit principal or interest payments or any other sums payable by any Borrower, HUD or any third party unless and until such payments or sums are received by the Servicer.

(d)    Any reasonable, customary and necessary advances by the Servicer of its own funds to cure defaults by any Borrower or to preserve or protect the Mortgage Loans or to enforce remedies, other than advances to pay the mortgage insurance premiums, taxes, assessments, water rates and other public charges, premiums on hazard insurance policies and other similar payments required under the Loan Documents and/or the applicable HUD Regulations, shall be reimbursed by the Participants on demand following receipt by Participants from Servicer of an accounting detailing the reasons for and the amount of sums advanced.  As a condition to making such advances, the Servicer may require that at least a Majority of Participants furnish indemnification or other evidence of ability to honor their reimbursement obligations hereunder on a timely basis, which is satisfactory to the Servicer.  Nothing in this paragraph shall be deemed to imply an obligation on the Servicer's part to make such advances.

8

**10.    Hazard Insurance**.  The Servicer shall proceed diligently and take all reasonable actions to cause each Borrower to perform its covenants under the applicable Loan Documents to keep each Project insured against fire and other hazards, casualties, and contingencies as provided in the Loan Documents.  All policies and renewals thereof shall be held by the Servicer in trust for the Participants and shall be issued by carriers that meet the rating requirements of the Federal National Mortgage Association for carriers of hazard insurance.  Unless otherwise required by law, coverage shall be in amounts not less than those necessary to comply with the applicable co-insurance clause percentage, but in no event shall the amounts of coverage be less than the lesser of (i) eighty percent (80%) of the insurable value or (ii) the unpaid principal balance of the applicable Mortgage Loan.  Such policies shall be endorsed with standard mortgagee clauses, with losses payable to the Servicer and FHA as their interests may appear.  In the event that a Borrower fails to obtain insurance coverage as hereinbefore provided, the Servicer shall notify HUD and shall proceed as required in order to preserve the benefits of the FHA Insurance Contract.

**11.    Inspections**.  The Servicer shall, on an annual basis, cause each Project to be inspected and shall promptly notify each Participant of any material change in the condition of any Project and of any waste committed thereon or any failure on the part of a Borrower to keep its Project in good condition and repair, as disclosed by such inspection.  The Servicer shall not be responsible for the management duties normally and customarily performed by Borrowers or their management agents.  The Servicer's obligation to notify each Participant of adverse conditions discovered during the inspections performed hereunder shall not be deemed to include an obligation on the part of the Servicer to take any action to effect repairs and correct such conditions, except that the Servicer shall make such advances as are required to be made by FHA requirements as necessary to preserve the security of the mortgage or the FHA Insurance.

**12.    Escrows**.  (a) The Servicer shall hold and appropriately monitor any and all escrows required by HUD as required in Section 8(b).  The Servicer shall not pay the Borrowers interest on escrowed funds except to the extent required by law, FHA or the Loan Documents.

(b)    The Servicer shall ascertain and estimate with due diligence annual taxes, assessments, water rates, fire and hazard insurance premiums, mortgage insurance premiums and all other similar charges of which the Servicer reasonably should have notice as provided in the Loan Documents, to the end that the monthly installments payable by the Borrowers on account of the foregoing will be sufficient to pay the foregoing as and when they become due and payable.

(c) From the funds held by it in escrow or other amounts provided by the Borrowers, the Servicer shall pay promptly to the proper parties when due the mortgage insurance premiums, taxes, assessments, water rates and other public charges, premiums on hazard insurance policies and other similar payments required under the Loan Documents and/or the applicable HUD regulations respecting the Projects.  In the event that sufficient funds for

9

the payment of all amounts required to be paid under this Section are not available respecting any Project and to the extent that the lien of the applicable Mortgage provides security for advances to pay such amounts and such payments are reimbursable under the FHA Insurance Contract or necessary to maintain the FHA Insurance Contract, the Servicer shall (on behalf of the Participants) advance moneys for the payment of such amounts, and shall be entitled to reimbursement of such advances from any FHA Insurance Proceeds received.

13.    **Reports**.    (a)    On a monthly basis, the Servicer shall provide each Participant with a statement respecting the Mortgage Loans and such Participant's Participation Interest setting forth (i) the outstanding principal balance of the Mortgage Loans after recordation of the current month's financial activity, including itemization of principal, interest and any other payments collected thereunder, (ii) any delinquency in payments under the Loan Documents, (iii) any advances made by the Servicer, and (iv) amounts held by the Servicer and payable to the Participants.

(b)    The Servicer shall provide any Participant, at the written request of such Participant, with an annual certification respecting each Mortgage Loan as to the (i) status of payment of mortgage insurance premiums, taxes, assessments or other public charges and hazard insurance premiums; (ii) the escrow account balances with respect to mortgage insurance premiums, taxes, assessments, other public charges and hazard insurance premiums; (iii) any release from any reserve fund for replacements (and the purpose of such release); and (iv) the continuing effectiveness of all insurance policies respecting the mortgaged property or specify the action being taken by the Servicer to require the applicable Borrower to satisfy all HUD regulations regarding insurance policies.

(c)    If requested by any Participant in writing, the Servicer shall provide the requesting Participant within 120 days of the close of its fiscal year with a copy of its audited financial statements for the prior year.

(d)    The Servicer shall provide to each Participant an I.R.S. Form 1099 or such other information as may be required to enable the Participant to prepare its federal income tax return.

14.    **Defaults under the Mortgage Loans**.    (a) In the event of a payment default under a Mortgage Loan which remains uncured for 30 days, or in the event the Servicer obtains actual knowledge of a default under a Mortgage Loan which is not a payment default, the Servicer shall file notice of such default with HUD as required by the FHA Insurance Contract within five (5) Business Days after obtaining knowledge of the default (with a copy to each Participant).  Thereafter, the Servicer shall promptly give or serve all notices and otherwise act or refrain from acting as necessary or appropriate, in accordance with the National Housing Act and any and all applicable regulations and HUD requirements, in order that the insurance benefits under the FHA Insurance Contract shall be fully protected.

(b)    Following the delivery of the notice described in subparagraph (a) above,

10

the Servicer shall confer with the Participants as to the most appropriate manner of either resolving any such default or making a claim for mortgage insurance benefits. At the option of, and if requested by, a Majority of Participants, the Servicer shall immediately file a claim for mortgage insurance benefits, which benefits shall be paid to the Participants in cash or debentures, as directed by such Majority of Participants in accordance with FHA regulations. The Servicer may suggest to the Participants a work-out proposal for the curing of such default as an alternative to immediate filing of a claim for mortgage insurance benefits. If requested by a Majority of Participants, the Servicer shall diligently proceed with the work-out proposal (or a mutually acceptable modification thereof), subject to the reimbursement of costs pursuant to subparagraph (c) hereof. If, within five working days after receipt by the Participants of a written memorandum of such a work-out proposal, a Majority of Participants has not instructed the Servicer to proceed with the proposal (or a mutually acceptable modification thereof), the Servicer shall continue to service the applicable Mortgage Loan in accordance with the terms of this Agreement; provided, however, that if the Mortgage Loan is in default and the Participants have not instructed the Servicer to proceed otherwise, the Servicer shall assign the Mortgage Loan to HUD and (if the FHA Insurance Contract permits) request the payment of mortgage insurance benefits in cash. The Servicer shall promptly deliver to the Participants any debentures issued as payment of insurance benefits and the Participants shall reimburse the Servicer as provided in Section 12(c).

(c) The Servicer shall have no obligation to the Participants to advance its own funds to cure defaults under the Mortgage Loans, or to protect or preserve the mortgaged properties or to pay the costs of enforcing remedies (including reasonable attorneys' fees), or for any other purpose; provided, however, the preceding clause shall not apply to the normal and customary escrow advances identified in Section 12(c) hereof. In the event that, pursuant to paragraph (b) above, the Participants shall request the Servicer to take steps that will cause the Servicer to incur costs and expenses, the Servicer may require, as a precondition, that the Participants provide reasonable indemnification against such costs and expenses, including reasonable attorneys' fees. In any event, any costs or expenses incurred by the Servicer at the request of the Participants pursuant to paragraph (b) above, excluding ordinary and necessary expenses of customary servicing pursuant to Section 7 hereof, and which are paid by the Servicer from its own funds, will be reimbursed by the Participants on demand as provided in Section 9(d) hereof. The liability of each Participant for the indemnification and reimbursement obligations set forth above in this paragraph will be limited to such Participant's percentage Participation Interest as set forth in the Participation Certificate(s) registered in the name of such Participant.

15. **Compensation of Servicer; Reimbursement of Servicer**. (a) The Servicer shall retain as its servicing fee, from each monthly installment payment actually collected by the Servicer on each Mortgage Loan, 1/12th of a per annum amount equal to 0.05 of the principal amount upon which the monthly Mortgage Loans interest is computed, but only out of Mortgage Loan interest and only if and when sufficient Mortgage Loan interest has been paid by the Borrowers. This servicing fee is paid in addition to the other compensation of the Servicer set forth in this Agreement. The Servicer shall be responsible for the ordinary annual fees of the

11

Custodian, and shall not be entitled to reimbursement for such fees.

(b)  The Servicer shall be entitled to retain (i) any payments received from the Borrowers as late charges due and payable pursuant to the Loan Documents, (ii) fees for processing transfers of physical assets or secondary financing paid by the Borrowers and (iii) profits realized from the use of FHA debentures in connection with paying FHA mortgage insurance premiums.

**16.    Issuance, Assignment and Transfer of Participation Certificates**.  (a) In order to evidence the ownership of the Participation Interests by the Participants, the Servicer shall, upon the request of any Participant, issue to such Participant a Participation Certificate in substantially the form attached hereto as Exhibit B evidencing such Participant's proportionate share of the Mortgage Loans; provided that no Participation Certificate shall evidence a share equivalent to less than $1,000,000 of the original combined principal balance of the Mortgage Loans.

(b)    The Servicer shall maintain books for the registration and transfer of the Participation Certificates in accordance with the provisions of this Agreement.  Subject to the provisions of this Agreement, each Participant shall have the right to Transfer its Participation Certificate in whole, or in part, provided that no Transfer shall become effective for any purpose (including the right to receive remittances under Section 9 hereof) except upon the full satisfaction of the following conditions:

(1)    The Participation Certificate then held by the Participant and which is to be transferred must be presented to the Servicer, duly endorsed for transfer.

(2)    The Transferee must represent that it considers itself a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Participation Interest and the Participation Certificate.

(3)    The transferring Participant and the Transferee must execute, and the Servicer must receive, a written assumption agreement, in the form attached hereto as Exhibit C (each an "Assumption Agreement"), which shall notify the Servicer of the Transfer to the new Participant and shall include (i) the Transferee's representations, covenants and warranties as set forth in Exhibit C to this Agreement and (ii) the Transferee's acknowledgement and agreement that the Transferee assumes the duties and obligations of a Participant under this Agreement.

Upon compliance with each such condition, the Servicer shall execute and deliver to the Transferee a new Participation Certificate (of like tenor and in the amount transferred) registered in the name of the designated Transferee, and, if less than all of the Participant's interest in the Participation Certificate has been transferred, a new Participation Certificate (of like tenor and in the amount retained) registered in the name of the transferring Participant.  The Servicer shall

not charge any fee as a condition to the issuance of any Participation Certificate or the registration of any transfer of a Participation Certificate.

(c)     If (i) any mutilated Participation Certificate is surrendered to the Servicer, or the Servicer receives evidence to its satisfaction of the destruction, loss or theft of any Participation Certificate, and (ii) there is delivered to the Servicer such security or indemnity as may be required by it to save it harmless, then, in the absence of notice to the Servicer that such Participation Certificate has been acquired by a bona fide purchaser, the Servicer shall execute and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Participation Certificate, a new Participation Certificate of like tenor and in the same amount. Upon the issuance of any new Participation Certificate under this subsection, the Servicer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses connected therewith.   Any duplicate Participation Certificate issued pursuant to this subsection shall constitute complete and indefeasible evidence of ownership in the Participation Interest, as if originally issued, whether or not the mutilated, destroyed, lost or stolen Participation Certificate shall be found at any time.

(d)     Prior to due presentation of a Participation Certificate for registration of transfer, the Servicer may treat the person or entity in whose name any Participation Certificate is registered as the owner of such Participation Certificate and the Participation Interest evidenced thereby for all purposes of this Agreement including receiving consents, approvals, notices or instructions from a Majority of Participants, distributing remittances pursuant to Section 9 hereof and giving notices pursuant to Section 17 hereof, and for all other purposes whatsoever, and the Servicer shall not be affected by any notice to the contrary.

(e)  The Servicer shall promptly notify the Custodian in writing as to the name, address and amount of Participation Interest of any new Participant.

17.   **Notices.**   Except as otherwise provided herein, all notices, demands, requests, instructions, certifications and any other form of communication required or permitted to be given hereunder in order to be binding on the recipient must be given in writing addressed as follows (or to such other address as any party hereto shall specify by notice to the other parties):

If to the Servicer:

Greystone Servicing Corporation, Inc.
98 Alexandria Pike, 5th Floor
Warrenton, Virginia  22186
Attention:  Carole J. Jurney

13

If to the initial Participant:

> Greystone Funding Corporation
> 98 Alexandria Pike, 4th Floor
> Warrenton, Virginia 22186
> Attention: Julie J. Delimba

If to any other Participant:

> To the address specified in the
> applicable Assumption Agreement.

If to the Custodian:

> First Tennessee Bank, National Association
> Oak Court Center
> 4385 Poplar Avenue
> Memphis, TN 38117
> Attention: Mr. Dennis Gillespie

**18.    Assignment of the Mortgage Loans.**    The Servicer hereby agrees and certifies that during the term of this Agreement, except as provided in this Agreement, it shall not assign, convey or otherwise transfer any beneficial interest in any of Mortgage Loans (or any portion thereof) and shall not issue any security backed by any of the Mortgage Loans (including, without limitation, any Project Loan Certificate guaranteed by the Government National Mortgage Association) at any time when the Participation Interest shall be outstanding.

**19.    Servicer's Status as FHA-Approved Mortgagee.**    If the Servicer shall be unable to maintain its status as an FHA-approved mortgagee, the Servicer shall, promptly after obtaining knowledge that it shall no longer be an FHA-approved mortgagee, notify the Participants and the Custodian of such status, and the Participants shall forthwith engage a replacement Servicer as provided in Section 23 hereof. The Servicer shall not be entitled to any termination fee as a result of the replacement of the Servicer pursuant to this Section.

**20.    Fidelity Bond; Errors and Omissions Insurance.**    The Servicer agrees to keep in full force and effect at all times, at no cost to the Participants, in such amounts (if any) as would be required by the Federal National Mortgage Association for approved seller-servicers, and shall make available for review by any Participant upon request:

> (a)    a fidelity bond of a surety company or association securing full protection and indemnity to the Participants against loss of any money or other property entrusted to the Servicer or the Servicer's officers, employees or agents or coming into their control, caused by any dishonest, fraudulent or criminal act, direct or indirect, of the Servicer or of its officers, employees or agents; and

14

(b)    a policy of errors and omissions insurance.

The Servicer agrees to deliver to any Participant upon request (and at the cost of such Participant) a certificate executed by said insurers to the effect that there will be no cancellation of coverage under said policies without at least thirty (30) days' prior written notification to the Participant and agrees to provide copies of such policies to any Participant upon written request therefor.  The Servicer may provide such fidelity and errors and omissions coverage by means of a blanket fidelity bond or a blanket errors and omissions insurance policy.

        **21.**    **Indemnification.**  Each Participant, by the execution of this Agreement or its Assumption Agreement (as the case may be) and its acceptance of its Participation Certificate, agrees to indemnify and hold harmless the Servicer against loss or damage, including reasonable attorneys fees and costs, which the Servicer may sustain as a result of any claim by any immediate successor or Transferee of such Participant based in whole or in part on a violation by such Participant of any federal or state securities laws.

        **22.**    **Termination by Participant.**

        (a)    A Majority of Participants shall have the right to terminate the Servicer's rights under this Agreement without payment of any premium, penalty or other amount, upon notice in writing to the Servicer, if the Servicer files a petition in bankruptcy or is adjudicated bankrupt in a court of competent jurisdiction, or if a receiver or trustee is appointed for the Servicer and is not discharged within 30 days, or should the Servicer become incapacitated by operation of law or otherwise under circumstances which would substantially impair its ability to faithfully perform its duties under this Agreement, or should the Servicer fail to remit to any Participant any payment required to be made under the terms of this Agreement which continues unremedied for a period of five business days after the due date for any such remittance (provided such remittance shall have been received by the Servicer).  This Agreement shall otherwise be terminable by a Majority of Participants if the Servicer has materially breached its duties and obligations under this Agreement and such breach has not been cured within 20 days of receipt by the Servicer from any Participant of a notice demanding such cure.  In the event of any termination of the Servicer's rights hereunder, the Servicer will assign and deliver to an FHA-approved mortgagee designated by a Majority of Participants the Mortgage Loans and all documents relating thereto and shall account for and pay over to such mortgagee all monies held by it as mortgagee under the Mortgage Loans.  In the event the Participants shall, pursuant to this Section 22(a), have the right to terminate the Servicer's rights under this Agreement, a Majority of Participants shall appoint a successor servicer selected by a Majority of Participants to succeed to the rights, duties and obligations of the Servicer hereunder and the Servicer shall execute such assignments of the Mortgage and collateral documents as well as such further documents as may be necessary to transfer title to the Mortgage Loans to such successor servicer.

        (b)    The Participants shall also have the right to terminate the Servicer's rights and obligations under this Agreement at any time during the term of this Agreement without

cause upon thirty (30) days' written notice, signed by a Majority of Participants, addressed to the Servicer, upon the payment to the Servicer of a sum equal to three percent (3%) of the then unpaid principal balance of the Mortgage Loans.

### 23.   Termination by Servicer; Delegation of Servicing Obligations.

(a)    With the prior written consent of each Participant, which consent shall not be unreasonably withheld, the Servicer shall have the right to appoint a successor Servicer, and to assign and transfer its rights and obligations as Servicer and mortgagee under this Agreement, to another FHA-approved servicer and mortgagee provided that (i) the Participants shall have been given five (5) days' prior written notice identifying the successor Servicer, and (ii) the successor servicer shall execute and deliver to each Participant its written agreement to assume and comply with the obligations of the Servicer under this Agreement.

(b)    The Servicer shall have the right, with the prior written consent of each Participant, which consent shall not be unreasonably withheld, to pledge, hypothecate or assign its rights hereunder to secure borrowings of the Servicer. Notwithstanding any other provision of this Agreement, any lender holding pursuant to such consent a security interest in rights of the Servicer under this Agreement shall be entitled at any time, with the prior written consent of each Participant, which consent shall not be unreasonably withheld, in the exercise of its remedies to appoint a successor Servicer (which may be such lender or a related entity), whether or not there shall have occurred an event which would entitle the Participants under Section 22 to terminate the rights of the Servicer under this Agreement.

(c)    With the prior written consent of each Participant, which consent shall not be unreasonably withheld, the Servicer may perform its servicing obligations under this Agreement through such entity as it may designate (each a "Sub-Servicer"), provided that such entity, at the time it is so designated, is an established servicer of multi-family, FHA-insured mortgage loans. Notwithstanding the fact that the Servicer may perform its servicing obligations under this Agreement through another entity, the Servicer shall at all times remain obligated and liable to the Participants without diminution by virtue of such servicing being performed by such other entity and to the same extent and under the same terms and conditions as if the Servicer alone were performing its obligations under this Agreement.

For purposes of this Agreement, the Servicer shall be deemed to have received payments on the Mortgage Loans when the Sub-Servicer has received such payments. The Servicer shall be entitled to enter into any agreement with a Sub-Servicer for indemnification of the Servicer by such Sub-Servicer and nothing contained in this Agreement shall be deemed to limit or modify such indemnification.

Any agreement between the Servicer and the Sub-Servicer (a "Sub-Servicing Agreement") that may be entered into and any transactions or services relating to the Mortgage Loans involving a Sub-Servicer in its capacity as such and not as an originator shall be deemed to be between the Sub-Servicer and the Servicer alone, and the Participants shall not be deemed

16

parties thereto and shall have no claims, rights, obligations, duties or liabilities with respect to the Sub-Servicer except as set forth in this Section 23(c).

In the event the Servicer shall for any reason no longer be the master servicer (including by reason of an event pursuant to this Section 23), the Participants shall, at their sole option, thereupon assume all of the rights and obligations of the Servicer under the Sub-Servicing Agreement that the Servicer has entered into, provided, however, that a Majority of Participants may elect to require the Servicer, at the Servicer's cost and expense, to terminate the Sub-Servicing Agreement in lieu of such assumption. If they so elect, the Participants or the successor servicer for the Participants shall assume all of the Servicer's interest therein and replace the Servicer as a party to the Sub-Servicing Agreement to the same extent as if the Sub-Servicing Agreement had been assigned to the assuming party, except that the Servicer shall not thereby be relieved of any liability or obligations under the Sub-Servicing Agreement arising prior to the date of such assumption.

The Servicer at its expense shall, upon request of a Majority of Participants, deliver to the assuming party all documents and records relating to the Sub-Servicing Agreement and the Mortgage Loans then being serviced and an accounting of amounts collected and held by it and otherwise use its best efforts to effect the orderly and efficient transfer of the Sub-Servicing Agreement to the assuming party.

24. **Amendment of Agreement.** This Agreement may not be amended except by a written instrument duly executed by the Servicer and each Participant.

25. **Participants' Right to Examine Loan Documents and Servicer's Records.** Each Participant shall have the right, at all reasonable times and as often as reasonably required, to inspect all Loan Documents and examine and audit any and all books, records or other information of the Servicer, whether held by the Servicer or by another on behalf of the Servicer, which may be relevant to the performance or observance by the Servicer of the terms, covenants or conditions of this Agreement. The Servicer will provide copies of the Loan Documents in reasonable quantities at the request, and at the expense, of any Participant.

26. **Liability of Servicer.** The Servicer shall be liable to the Participants under this Agreement only to the extent of the obligations expressly imposed upon and undertaken by the Servicer pursuant to the provisions hereof. Neither the Servicer nor any of the directors, officers, employees or agents of the Servicer shall be under any liability to the Participants for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement or the Custodial Agreement, or any instructions received from the Participants, or for errors in judgment; provided, however, that this provision shall not protect the Servicer or any such person against any breach of warranties or representations made herein or any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or negligence in the performance of duties or by reason of disregard of obligations and duties hereunder. The Servicer and any director, officer, employee or agent of the Servicer may rely

17

in good faith on any document of any kind prima facie properly executed and submitted by any person or entity respecting any matters arising hereunder.

27.    **Relationship Between Servicer and Participants.**    Nothing herein contained shall be deemed or construed to create a copartnership or joint venture between the parties hereto and the services of the Servicer shall be rendered as an independent contractor and not as agent for the Participants.

28.    **Optional Assignment to HUD.**    If a Mortgage Loan becomes eligible for assignment to HUD in exchange for debentures issued by HUD (the "FHA Debentures") in accordance with Section 221 (g) (4) of the National Housing Act and the regulations thereunder, then the Servicer shall, within three months after the Mortgage Loan becomes eligible, determine the principal amount of FHA Debentures into which the Mortgage Loan is convertible and the interest rate to be borne by such FHA Debentures. The Servicer will notify the Participants, in the next succeeding statement to the Participants pursuant to Section 13 of this Agreement, of the outstanding principal amount, of such Mortgage Loan, its interest rate, and the principal amount of FHA Debentures into which such Mortgage Loan is convertible, the interest rate on such FHA Debentures at the time of such notice and the estimated maturity date of such FHA Debentures. The Servicer will exchange the Mortgage Loan for FHA Debentures unless it receives, prior to the next succeeding statement, from a Majority of Participants, written notices requesting that such exchange should not be made.  As promptly as possible after such statement, the Servicer will assign such Mortgage Loan to HUD in exchange for FHA Debentures. Upon receipt of such FHA Debentures, the Servicer will notify each Participant in the next succeeding statement to Participants pursuant to Section 13 that it will solicit bids for such FHA Debentures from at least three dealers in FHA Debentures and sell such FHA Debentures to the dealer submitting the highest bid or, at the option of the Servicer, to itself at such highest bid. The Servicer will remit to the Participants the proceeds received on such sale, less the reasonable fees and expenses of the Servicer (including reasonable attorneys' fees) in assigning the applicable Mortgage Loan and, as applicable, selling or distributing the FHA Debentures. In the event HUD elects, pursuant Section 221 (g) (4) as amended, to auction the Mortgage Loan for cash rather than accept assignment in exchange for FHA Debentures, the Servicer shall follow the same notice and voting procedures as set forth above (except those procedures relating to disposition of the FHA Debentures) and unless written notification is received from a Majority of Participants that the Mortgage Loan should not be auctioned, the Servicer shall so notify HUD and upon sale at auction assign such Mortgage Loan to the party designated by HUD. The Servicer shall remit to Participants the proceeds of any such sale, less the reasonable fees and expenses of the Servicer (including reasonable attorneys' fees). In the event the Mortgage Loan is not sold at auction the Servicer will so notify each Participant in the next succeeding statement to the Participants pursuant to Section 13 and will follow the procedures set forth above as nearly as possible taking care to assure that all required HUD deadlines for elections are adhered to.

29.    **Miscellaneous.**    This Agreement sets forth the entire agreement of the parties with respect to the subject matter hereof. Except as otherwise provided herein, this

18

Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective permitted successors and assigns. Section headings in this Agreement are for convenience of reference only and shall not be used in interpreting this Agreement. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument. This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, GREYSTONE FUNDING CORPORATION and GREYSTONE SERVICING CORPORATION, INC. have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

GREYSTONE SERVICING CORPORATION, INC.

By: _____
Carole J. Jurney
Vice President

GREYSTONE FUNDING CORPORATION

By: _____
Julie J. Delimba
Vice President

20

## EXHIBIT A

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Aldus Phase I |
| Project Location: | New York, New York |
| FHA Project No.: | 012-57295 |
| Section of Act: | 221(d)4 |
| Maturity Date: | March 1, 2024 |
| Number of Units: | 97 |
| Original Principal Balance: | $5,240,600.00 |
| Amortized Balance for September 27, 1995: | $5,144,470.51 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of Amortization: | April 1, 1984 |
| Date of Final Endorsement: | July 6, 1984 |
| Monthly Principal and Interest on Mortgage: | $58,163.85 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

A-1

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Malcolm X II Phase A |
| Project Location: | New York, New York |
| FHA Project No.: | 012-57216 |
| Section of Act: | 221(d)4 |
| Maturity Date: | May 1, 2024 |
| Number of Units: | 89 |
| Original Principal Balance: | $4,938,600.00 |
| Amortized Balance for September 27, 1995: | $4,852,535.39 |
| Note Interest Rate Modified: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.750% |
| Date of Commencement of Amortization Modified: | January 1, 1985 |
| Date of Final Endorsement: | February 28, 1985 |
| Monthly Principal and Interest Modified: | $54,834.67 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

A-2

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Mid Bronx Phase II Apartments |
| Project Location: | Bronx, New York |
| FHA Project No.: | 012-57253 |
| Section of Act: | 221(d)4 |
| Maturity Date: | March 1, 2024 |
| Number of Units: | 159 |
| Original Principal Balance: | $8,833,500.00 |
| Amortized Balance for September 27, 1995: | $8,671,467.56 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of Amortization: | April 1, 1984 |
| Date of Final Endorsement: | February 22, 1984 |
| Monthly Principal and Interest on Mortgage: | $98,040.37 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

A-3

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Paul Robeson Apartments |
| Project Location: | New York, New York |
| FHA Project No.: | 012-57291 |
| Section of Act: | 221(d)4 |
| Maturity Date: | June 1, 2024 |
| Number of Units: | 80 |
| Original Principal Balance: | $4,603,000.00 |
| Amortized Balance for September 27, 1995: | $4,522,074.71 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.750% |
| Date of Commencement of Amortization: | July 1, 1984 |
| Date of Final Endorsement: | May 14, 1984 |
| Monthly Principal and Interest on Mortgage: | $51,087.32 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

A-4

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Sebco IV Apartments |
| Project Location: | Bronx, New York |
| FHA Project No.: | 012-57213 |
| Section of Act: | 221(d)4 |
| Maturity Date: | February 1, 2024 |
| Number of Units: | 25 |
| Original Principal Balance: | $4,077,600.00 |
| Amortized Balance for September 27, 1995: | $4,001,743.86 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of Amortization: | March 1, 1984 |
| Date of Final Endorsement: | June 19, 1984 |
| Monthly Principal and Interest on Mortgage: | $45,256.60 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

A-5

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Southern Boulevard Apartments |
| Project Location: | New York, New York |
| FHA Project No.: | 012-57192 |
| Section of Act: | 221(d)4 |
| Maturity Date: | February 1, 2024 |
| Number of Units: | 90 |
| Original Principal Balance: | $4,999,200.00 |
| Amortized Balance for September 27, 1995: | $4,906,201.80 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of Amortization: | March 1, 1984 |
| Date of Final Endorsement: | March 12, 1984 |
| Monthly Principal and Interest on Mortgage: | $55,484.62 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

A-6

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Woodycrest Apartments |
| Project Location: | New York, New York |
| FHA Project No.: | 012-57279 |
| Section of Act: | 221(d)4 |
| Maturity Date: | April 1, 2024 |
| Number of Units: | 115 |
| Original Principal Balance: | $6,531,800.00 |
| Amortized Balance for September 27, 1995: | $6,413,663.14 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of Amortization: | May 1, 1984 |
| Date of Final Endorsement: | November 7, 1984 |
| Monthly Principal and Interest on Mortgage: | $72,494.49 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

A-7

**EXHIBIT B**

**FORM OF PARTICIPATION CERTIFICATES**

THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR UNDER THE SECURITIES LAWS OF ANY STATE. ANY RESALE OR TRANSFER OF THIS CERTIFICATE WITHOUT REGISTRATION THEREOF UNDER SUCH LAWS MAY ONLY BE MADE IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS AND IN ACCORDANCE WITH THE PROVISIONS OF SECTION 16 OF THE POOLING AND SERVICING AGREEMENT REFERRED TO HEREIN.

**PARTICIPATION CERTIFICATE**

evidencing a proportionate interest in
the pool of project mortgage loans known as

**SERIES GREYSTONE 95-4**

insured by the Federal Housing Administration
and held and serviced by

**GREYSTONE SERVICING CORPORATION, INC.**

(not an interest in or obligation of
Greystone Servicing Corporation, Inc.)

---

THIS CERTIFIES THAT,

(the "Participant"), is the registered owner of an undivided _____ % participation interest in a pool of FHA-insured mortgage loans known as Series Greystone 95-4, such loans more fully described on Schedule A hereto (the "Mortgage Loans") held by GREYSTONE SERVICING CORPORATION, INC. (the "Servicer") as mortgagee of record and servicer, pursuant to the Pooling and Servicing Agreement (the "Pooling Agreement") dated as of September 27, 1995 between Greystone Funding Corporation as initial Participant, and the Servicer. This Certificate is issued under and is subject to the terms, provisions and conditions of the Pooling Agreement. This Certificate may not be assigned or transferred except in accordance with the Pooling Agreement, which provides that the

B-1

transferring Participant and the Transferee must execute, and the Servicer must receive, a written assumption agreement, in the form attached to the Pooling Agreement, which shall notify the Servicer of the transfer to the new Participant. The terms of the Pooling Agreement are binding upon any Transferee or assignee who expressly assumes the rights and obligations of the Participant thereunder by an assignment or transfer hereof.

The Servicer shall distribute on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following, commencing on October 25, 1995 to the Participant in whose name this Certificate is registered at the close of business on the last day (or if such last day is not a Business Day, the Business Day immediately preceding such last day) of the month next preceding the month of such distribution, the amount required to be distributed pursuant to Section 9 of the Pooling Agreement.

Distributions on this Certificate will be made by the Servicer to the Participant entitled thereto as shall appear on the Servicer's books without the presentation or surrender of this Certificate or the making of any notation thereon.

This Certificate does not represent an obligation of, or an interest in, the Servicer and is not insured or guaranteed by the Federal Housing Administration, the Government National Mortgage Association or any other government agency. This Certificate is limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth in the Pooling Agreement.

**IN WITNESS WHEREOF**, the Servicer has caused this Certificate to be duly executed.

GREYSTONE SERVICING CORPORATION, **INC.**

Dated: _____          By:_____
                                        Authorized Officer

B-2

## SCHEDULE A

to Participation Certificate

Project Name:                          Aldus Phase I

Project Location:                      New York, New York

FHA Project No.:                       012-57295

Section of Act:                        221(d)4

Maturity Date:                         March 1, 2024

Number of Units:                       97

Original Principal Balance:            $5,240,600.00

Amortized Balance
   for September 27, 1995:             $5,144,470.51

Note Interest Rate:                    13.25%

Servicing Fees:                        .05%

Net Rate to Participant:               13.20%

HUD Debenture Rate:                    12.875%

Date of Commencement of
   Amortization:                       April 1, 1984

Date of Final Endorsement:             July 6, 1984

Monthly Principal and
   Interest on Mortgage:               $58,163.85

Section 8 Units:                       100%

Prepayment Provisions:

     May 1, 1995 - April 30, 1996     .50%
     May 1, 1996 - thereafter         .00%

B-3

| | |
|---|---|
| Project Name: | Malcolm X II Phase A |
| Project Location: | New York, New York |
| FHA Project No.: | 012-57216 |
| Section of Act: | 221(d)4 |
| Maturity Date: | May 1, 2024 |
| Number of Units: | 89 |
| Original Principal Balance: | $4,938,600.00 |
| Amortized Balance for September 27, 1995: | $4,852,535.39 |
| Note Interest Rate Modified: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.750% |
| Date of Commencement of Amortization Modified: | January 1, 1985 |
| Date of Final Endorsement: | February 28, 1985 |
| Monthly Principal and Interest Modified: | $54,834.67 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

B-4

| | |
|---|---|
| Project Name: | Mid Bronx Phase II Apartments |
| Project Location: | Bronx, New York |
| FHA Project No.: | 012-57253 |
| Section of Act: | 221(d)4 |
| Maturity Date: | March 1, 2024 |
| Number of Units: | 159 |
| Original Principal Balance: | $8,833,500.00 |
| Amortized Balance for September 27, 1995: | $8,671,467.56 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of Amortization: | April 1, 1984 |
| Date of Final Endorsement: | February 22, 1984 |
| Monthly Principal and Interest on Mortgage: | $98,040.37 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

B-5

| | |
|---|---|
| Project Name: | Paul Robeson Apartments |
| Project Location: | New York, New York |
| FHA Project No.: | 012-57291 |
| Section of Act: | 221(d)4 |
| Maturity Date: | June 1, 2024 |
| Number of Units: | 80 |
| Original Principal Balance: | $4,603,000.00 |
| Amortized Balance for September 27, 1995: | $4,522,074.71 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.750% |
| Date of Commencement of Amortization: | July 1, 1984 |
| Date of Final Endorsement: | May 14, 1984 |
| Monthly Principal and Interest on Mortgage: | $51,087.32 |
| Section 8 Units: | 100% |
| Prepayment Provisions: | |
|     May 1, 1995 - April 30, 1996 | .50% |
|     May 1, 1996 - thereafter | .00% |

B-6

| | |
|---|---|
| Project Name: | Sebco IV Apartments |
| Project Location: | Bronx, New York |
| FHA Project No.: | 012-57213 |
| Section of Act: | 221(d)4 |
| Maturity Date: | February 1, 2024 |
| Number of Units: | 25 |
| Original Principal Balance: | $4,077,600.00 |
| Amortized Balance for September 27, 1995: | $4,001,743.86 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of Amortization: | March 1, 1984 |
| Date of Final Endorsement: | June 19, 1984 |
| Monthly Principal and Interest on Mortgage: | $45,256.60 |
| Section 8 Units: | 100% |
| Prepayment Provisions: | |
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

| Project Name: | Southern Boulevard Apartments |
|---|---|
| Project Location: | New York, New York |
| FHA Project No.: | 012-57192 |
| Section of Act: | 221(d)4 |
| Maturity Date: | February 1, 2024 |
| Number of Units: | 90 |
| Original Principal Balance: | $4,999,200.00 |
| Amortized Balance for September 27, 1995: | $4,906,201.80 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of Amortization: | March 1, 1984 |
| Date of Final Endorsement: | March 12, 1984 |
| Monthly Principal and Interest on Mortgage: | $55,484.62 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| May 1, 1995 - April 30, 1996 | .50% |
|---|---|
| May 1, 1996 - thereafter | .00% |

B-8

| | |
|---|---|
| Project Name: | Woodycrest Apartments |
| Project Location: | New York, New York |
| FHA Project No.: | 012-57279 |
| Section of Act: | 221(d)4 |
| Maturity Date: | April 1, 2024 |
| Number of Units: | 115 |
| Original Principal Balance: | $6,531,800.00 |
| Amortized Balance for September 27, 1995: | $6,413,663.14 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of Amortization: | May 1, 1984 |
| Date of Final Endorsement: | November 7, 1984 |
| Monthly Principal and Interest on Mortgage: | $72,494.49 |
| Section 8 Units: | 100% |
| Prepayment Provisions: | |

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

**EXHIBIT C**
**FORM OF ASSUMPTION AGREEMENT**

[Date]

Greystone Servicing Corporation, Inc.
Alexandira Pike Building, 5th Floor
98 Alexandria Pike
Warrenton, Virginia   22186

**Series Greystone 95-4**

Dear Sirs:

You are Servicer under a Pooling and Servicing Agreement dated as of September 27, 1995 in respect of Series Greystone 95-4 (the "Pooling Agreement") between yourself and Greystone Funding Corporation, as initial Participant. All capitalized terms used but not otherwise defined in this Assumption Agreement shall have the meanings ascribed to them in the Pooling Agreement.

1. _____ (the "Transferor") is the registered owner of the _____% Participation Interest issued under the Pooling Agreement. You are hereby notified that the Transferor has on this date assigned all of its right, title and interest in and to the Participation Interest, including related rights in respect of the Mortgage Loans and proceeds thereof, to:

(the "Transferee").

2. The Transferee hereby represents, covenants and warrants to the Servicer that:

(a) the Transferee considers itself a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Participation Certificate and the Participation Interest;

(b) the Transferee (i) has received from the Transferor (or the Servicer acting on behalf of the Transferor), and has reviewed to its satisfaction, a copy of the Pooling Agreement and all other information which may be material to its acquisition of

an interest in the Mortgage Loans and the Participation Interest and (ii) has had a reasonable opportunity to ask questions of and receive answers from such parties as it considers to be knowledgeable in matters relating to the Mortgage Loans and the Participation Interest and the offer and sale thereof, and all such questions have been answered to its satisfaction;

(c)    the Transferee is duly organized and validly existing under the laws of the jurisdiction of its formation and has all requisite power and authority to execute and deliver this Assumption Agreement and comply with the duties and obligations of the Participant under the Pooling Agreement; and

(d)    the Transferee has duly authorized and validly executed and delivered this Assumption Agreement, and this Assumption Agreement (and, therefore, the obligations of the Participant under the Pooling Agreement) constitute the legal, valid and binding obligations of the Transferee, enforceable against the Transferee in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws in effect from time to time affecting the enforcement of creditor's rights generally.

3.    Pursuant to Section 16 of the Pooling Agreement, the Transferee hereby assumes all of the duties and obligations, and makes for itself all of the representations, warranties, agreements and covenants, of the Participant under the Pooling Agreement.

4.    The Transferor hereby surrenders to the Servicer the Participation Certificate evidencing the interest which it has transferred to the Transferee, and represents, covenants and warrants to the Servicer that:

(a)    immediately prior to its assignment to the Transferee, the Transferor was the registered holder of such Participation Certificate; and

(b)    the Transferor is under no current obligation to sell, transfer, assign or otherwise dispose of the Participation Certificate being transferred to the Transferee to any person other than the Transferee.

5.    The Servicer shall remit all proceeds which the Transferee is entitled to receive to the Transferee at:

[insert wire transfer or other payment instructions]

The Transferee's address for receipt of notices under the Pooling Agreement is as follows:

C-2

This Assumption Agreement shall be effective immediately upon its delivery to you, without acknowledgment or execution by you of any counterpart hereof.

**[TRANSFEROR]**

By:_____

**[TRANSFEREE]**

By: _____

TRANSFEREE'S TRUE AND CORRECT
TAXPAYER IDENTIFICATION NUMBER:

_____

C-3

**EXHIBIT D**
**FORM OF CUSTODIAL AGREEMENT**

# EXHIBIT A

## TO DECLARATION OF JOSÉ A. ISASI, II IN SUPPORT OF DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS

## PART 2

## CUSTODIAL AGREEMENT

THIS AGREEMENT dated as of September 27, 1995, by and between **GREYSTONE FUNDING CORPORATION** a corporation organized and existing under the laws of Virginia having an address at 98 Alexandria Pike, 4th Floor, Warrenton, Virginia 22186 (the "Participant"), **FIRST TENNESSEE BANK NATIONAL ASSOCIATION**, a national banking association, having an address at 4385 Poplar Avenue, Memphis, Tennessee 38117 (the "Custodian") and **GREYSTONE SERVICING CORPORATION, INC.**, a Georgia corporation, having an address at 98 Alexandria Pike Building, 5th Floor, Warrenton, Virginia 22186 (the "Servicer").

### W I T N E S S E T H:

WHEREAS, the Participant (on behalf of itself and its successors, the "Participants") has agreed to purchase from the Servicer a Participation Certificate (the "Certificate") representing a 100% participation interest in a certain pool of project loans (the "Mortgage Loans") held and serviced by the Servicer, insured by the Federal Housing Administration ("FHA") and identified as Series Greystone 95-4, which Participation Certificate is issued pursuant to the terms and conditions of a Pooling and Servicing Agreement of even date herewith between the Participant and the Servicer (the "Servicing Agreement"); and

WHEREAS, the Custodian is a national banking association regulated by the Comptroller of the Currency; and

WHEREAS, the Participant desires to have the Custodian take possession of the Mortgage Notes for the Mortgage Loans, along with certain other documents specified herein, as the custodian for and bailee of the Participant, in accordance with the terms and conditions hereof;

NOW, THEREFORE, in consideration of the mutual undertakings herein expressed, the parties hereto hereby agree as follows:

1.      The Servicer has delivered and released to the Custodian the following documents pertaining to each of the Mortgage Loans identified in the Project Summaries (the "Project Summary") attached as Exhibit A hereto:

(a)     The original Mortgage Note containing the endorsement of FHA, and an allonge to such Mortgage Note being endorsed, in blank, "Pay to the order of _____, without recourse" and signed in the name of the Servicer by an authorized officer, with all intervening endorsements showing a complete chain of title from the originator to the Servicer, inclusive of original Notes.

(b)    The original recorded Mortgage (or if an original Mortgage is not yet available, a copy of such Mortgage) certified by the recorder's office to be a true and correct copy thereof.

(c)    An assignment of the Mortgage in recordable form, in blank;

(d)    The original policy of title insurance;

(e)    The original of each assumption, modification, written assurance or substitution agreement, if any;

(f)    Assignments of any collateral documents, in blank;

(g)    A copy of the Regulatory Agreement;

(h)    An original Security Agreement (or if an original is not available, a copy of the executed Security Agreement); and

(i)    All other documents as may be required by Participant with respect to the Mortgage Loan.

If the original Assignment of the Mortgage was not delivered pursuant to (b) above, the original title insurance policy endorsement was not delivered pursuant to (d) above or any other documents required and identified by Participant pursuant to (i) above, the Servicer shall deliver such originals or duplicate originals to the Custodian promptly upon the Servicer's receipt thereof. All Mortgage Loans documents held by the Custodian as to the Mortgage Loans are referred to herein as the "Custodian's Mortgage File".

      2.    Upon the issuance of the initial certificate (as described below), the Custodian shall deliver to the Participant and the Servicer a certificate ("Initial Certification") in the form annexed hereto as Exhibit B to the effect that the Custodian has received the Custodian's Mortgage File containing all documents listed in Paragraph 1 hereof with respect to the Mortgage Loans. Any of the documents enumerated in Paragraph 1 hereof which have not been delivered to the Custodian by the Servicer shall be noted by the Custodian in the Initial Certification.

      3.    With respect to the Custodian's Mortgage File, the Custodian is exclusively the custodian for and the bailee of the Participant; and provided, further, that the Custodian shall be the bailee of the Servicer to the extent required by, and this Custodial Agreement is subject to and subordinate to, the applicable rules and regulations of the FHA. The Custodian shall hold all documents constituting the Custodian's Mortgage File received by it for the exclusive use and benefit of the Participants, and shall make disposition thereof only in accordance with this Custodial Agreement and Servicing Agreement, or otherwise in accordance with instructions furnished by the a Majority of the Participants. Neither the Custodian nor the Servicer shall be

responsible or liable for any action taken by either of them in accordance with the written instructions of a Marjority of the Participants. Custodian shall segregate and maintain continuous custody of all documents constituting the Custodian's Mortgage File received by it in secure and fireproof facilities in accordance with customary standards for such custody. The Participants hereby agree whether or not any of the transactions contemplated in this Custodial Agreement shall be consummated, to assume liability for, and do hereby indemnify, protect, save and keep harmless the Custodian, in its individual capacity and as custodian, and its successors, assigns, agents, employees and servants, from and against any and all liability, obligation, losses, damages, penalties, taxes (excluding any taxes payable by the Custodian on or measured by any compensation received by the Custodian for its services under this Custodial Agreement), claims, actions, suits, costs, expenses or disbursements (including legal fees and expenses) of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Custodian, in its individual capacity or as custodian, (whether or not also agreed to be indemnified against by any other person under this Custodial Agreement or any other document) by any person in any way relating to or arising out of the action or inaction of the Participants, or their failure to perform any of their duties or obligations, under this Custodial Agreement, the Servicing Agreement, the Certificate or any other document contemplated in such documents. The indemnities set forth in this Paragraph 3 shall survive the termination of this Custodial Agreement.

4.    Within 10 days after the issuance of the initial Certificate, the Custodian shall ascertain that all documents required to be delivered to it pursuant to Paragraph 1 hereof are in its possession, and shall deliver to the Participants and the Servicer a certification ("Final Certification") of the Custodian in the form annexed hereto as Exhibit C to the effect that, as to the Mortgage Loans, (i) all documents required to be delivered to it pursuant to Paragraph 1 of this Custodial Agreement are in its possession, (ii) such documents have been reviewed by it and appear regular on their face and relate to the Mortgage Loans, (iii) based on its examination of such documents and only as to such documents, the information set forth in the Project Summary respecting the Mortgage Loans is correct and (iv) that the Mortgage Notes have been endorsed as provided in Paragraph 1. During the life of the Mortgage Loans, in the event the Custodian discovers any defect with respect to the Custodian's Mortgage File, the Custodian shall give written specification of such defect to the Servicer and the Participants.

5.    From time to time and as appropriate for the servicing of the Mortgage Loans, the Custodian is hereby authorized, upon written request and receipt of the Servicer in the form annexed hereto as Exhibit D, to release to the Servicer the Custodian's Mortgage File or the documents set forth in such receipt to the Servicer. All documents so released to the Servicer shall be held by it in trust for the benefit of the Participant. The Servicer shall return to the Custodian the Custodian's Mortgage File or such documents when the Servicer's need therefor in connection with such servicing no longer exists. The Participants shall be copied on any applicable correspondence from Servicer to Custodian in return of such documents.

6.    Upon the payment in full of the Mortgage Loans, and upon receipt by the Custodian of the Servicer's request for release, which request shall be accompanied by a request

3

in the form annexed hereto as Exhibit D and a certification to the effect that all amounts received or to be received by the Servicer in connection with such payment have been or will be credited to the Servicer's FHA custodial account maintained for the benefit of the Participants, the Custodian shall promptly release the Custodian's Mortgage File to the Servicer.

7.      It is understood that the Custodian will charge such fees for its services under this Custodial Agreement as are set forth in a separate agreement between the Custodian and the Servicer, the payment of which, together with the Custodian's expenses in connection herewith, shall be solely the obligation of the Servicer. Servicer hereby agrees, whether or not any of the transactions contemplated in this Custodial Agreement shall be consummated, to assume liability for, and does hereby indemnify, protect, save and keep harmless the Custodian, in its individual capacity and as custodian, and its successors, assigns, agents, employees and servants, from and against any and all liability, obligation, losses, damages, penalties, taxes (excluding any taxes payable by the Custodian on or measured by any compensation received by the Custodian for its services under this Custodial Agreement), claims, actions, suits, costs, expenses or disbursements (including legal fees and expenses) of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Custodian, in its individual capacity or as custodian, (whether or not also agreed to be indemnified against by any other person under this Custodial Agreement or any other document) by any person in any way relating to or arising out of the action or inaction of the Servicer, or its failure to perform any of its duties or obligations, under this Custodial Agreement, the Servicing Agreement, any Certificate or any other document contemplated in such documents. The indemnities set forth in this Paragraph 7 shall survive the termination of this Custodial Agreement.

8.      A Majority of the Participants, with or without cause, or following a resignation, removal or termination of the Servicer as servicer, or the occurrence of any event of default by Servicer as set forth in the Servicing Agreement, or upon a failure by the Custodian to perform or observe any term of this Custodial Agreement, may remove and discharge the Custodian from the performance of its duties under this Custodial Agreement by written notice to the Custodian, with a copy to Servicer. Having given notice of such removal, the Participant shall promptly appoint a successor Custodian to act on behalf of the Participants by written instrument, with a copy shall be delivered to the Servicer. In the event of any such removal, the Custodian shall promptly transfer to the successor Custodian, as directed, all of the Custodian's Mortgage File. The reasonable fees of any successor Custodian shall be paid by the Servicer if the Custodian is removed or discharged by the Participant with or without cause; provided, however, that if the Custodian is discharged without cause the Servicer shall not be obligated to pay fees to a successor Custodian in excess of the fees paid to the discharged Custodian.

9.      Upon reasonable prior written notice to the Custodian, the Servicer or the Participants will be permitted during normal business hours to examine the Custodian's Mortgage File, documents, records and other papers in possession of or under the control of Custodian relating to the Mortgage Loans.

4

10.    If the Custodian is furnished evidence satisfactory to it that the Servicing Agreement has been terminated, it shall upon written request of the Servicer or a Majority of the Participants and upon receipt of proof satisfactory to the Custodian of the ownership of the Mortgage Loans, release the Custodian's Mortgage File to such person and in such a manner as the requesting party shall designate.

11.    The Custodian shall, at its own expense, maintain at all times during the existence of this Agreement and keep in full force and effect, (1) fidelity insurance, (2) theft of documents insurance, (3) forgery insurance and (4) errors and omissions insurance. All such insurance shall be in amounts, with standard coverage and subject to deductibles, as are customary for insurance typically maintained by banks which act as custodian. A certificate of the respective insurer as to each such policy shall be furnished to the Participant, upon request, containing the insurer's statement or endorsement that such insurance shall not terminate prior to receipt by Participant, by registered mail, of 10 days notice thereof.

12.    This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed to be an original, and together such counterparts shall constitute and be one and the same instrument.

13.    This Agreement shall be construed in accordance with the laws of the State of Tennessee and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

14.    Upon the request of the Servicer or the Participant and at the cost and expense of the requesting party, Custodian shall provide such requesting party with copies of any documents in the Custodian's Mortgage File.

15.    By execution of this Agreement, the Custodian warrants that it currently holds and during the existence of this Agreement shall hold no adverse interest, by way of security or otherwise, in the Mortgage Loans and hereby waives and releases any such interest which it may have in the Mortgage Loans as of the date hereof.

16.    The Custodian may terminate its obligations under this Agreement upon at least 60 days notice to the Servicer and the Participants. In the event of such termination, the Servicer shall appoint a successor Custodian, subject to approval by a Majority of the Participants, which approval shall not be unreasonably withheld or delayed. The payment of such successor Custodian's fees and expenses shall be the sole responsibility of the Servicer. Upon such appointment, the Custodian shall promptly transfer to the successor Custodian, as directed by the Servicer, the Custodian's Mortgage File being administered under this Agreement. No such termination of the Custodian shall become effective until a successor custodian has assumed the rights and obligations of the Custodian under this Custodial.

17.    This Agreement shall terminate upon the final payment or other liquidation of the Mortgage Loans and the final remittance of all funds due the Participants under the

5

Servicing Agreement. The Servicer shall provide to the Custodian a certification which shall state that the foregoing events have occurred. In such event, and upon the Custodian's receipt of the foregoing certification, all documents remaining in the Custodian's Mortgage File shall be forwarded to the Servicer.

18.    All demands, notices and communications hereunder shall be in writing and shall be deemed to have been given if mailed, by registered or certified mail, return receipt requested, or, if by other means, when received by the other party at the address shown on the first page hereof, or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

19.    The Custodian and any of its agents, employees and servants may rely upon the genuineness of any notices, requests, consents, certificates, orders, telecopies, telexes or other papers or documents delivered to it pursuant to or as contemplated by this Agreement by authorized representatives of the Servicer or any Participant, as the case may be, without investigation as to the authenticity or legal effectiveness of such papers or documents.

20.    Capitalized terms not otherwise defined herein shall have the meanings given them in the Servicing Agreement.

6

IN WITNESS THEREOF, the Servicer, the Participant and the Custodian have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the date first written above.

**GREYSTONE FUNDING CORPORATION**
Participant


By:_____
    Julie J. Delimba
    Vice President


**GREYSTONE SERVICING CORPORATION, INC.,**
Servicer


By:_____
    Carole J. Jurney
    Vice President


**FIRST TENNESSEE BANK**
**NATIONAL ASSOCIATION,**
Custodian


By:_____
Name:
Title:

7

## EXHIBIT A

## PROJECT SUMMARIES

Project Name:                          Aldus Phase I

Project Location:                      New York, New York

FHA Project No.:                       012-57295

Section of Act:                        221(d)4

Maturity Date:                         March 1, 2024

Number of Units:                       97

Original Principal Balance:            $5,240,600.00

Amortized Balance
  for September 27, 1995:              $5,144,470.51

Note Interest Rate:                    13.25%

Servicing Fees:                        .05%

Net Rate to Participant:               13.20%

HUD Debenture Rate:                    12.875%

Date of Commencement of
  Amortization:                        April 1, 1984

Date of Final Endorsement:             July 6, 1984

Monthly Principal and
  Interest on Mortgage:                $58,163.85

Section 8 Units:                       100%

Prepayment Provisions:

      May 1, 1995 - April 30, 1996        .50%
      May 1, 1996 - thereafter            .00%

## PROJECT SUMMARIES

Project Name:                           Malcolm X II Phase A

Project Location:                       New York, New York

FHA Project No.:                        012-57216

Section of Act:                         221(d)4

Maturity Date:                          May 1, 2024

Number of Units:                        89

Original Principal Balance:             $4,938,600.00

Amortized Balance
  for September 27, 1995:              $4,852,535.39

Note Interest Rate
Modified:                               13.25%

Servicing Fees:                         .05%

Net Rate to Participant:                13.20%

HUD Debenture Rate:                     12.750%

Date of Commencement of
Amortization Modified:                  January 1, 1985

Date of Final Endorsement:              February 28, 1985

Monthly Principal and
  Interest Modified:                   $54,834.67

Section 8 Units:                        100%

Prepayment Provisions:

     May 1, 1995 - April 30, 1996      .50%
     May 1, 1996 - thereafter          .00%

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Mid Bronx Phase II Apartments |
| Project Location: | Bronx, New York |
| FHA Project No.: | 012-57253 |
| Section of Act: | 221(d)4 |
| Maturity Date: | March 1, 2024 |
| Number of Units: | 159 |
| Original Principal Balance: | $8,833,500.00 |
| Amortized Balance for September 27, 1995: | $8,671,467.56 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of Amortization: | April 1, 1984 |
| Date of Final Endorsement: | February 22, 1984 |
| Monthly Principal and Interest on Mortgage: | $98,040.37 |
| Section 8 Units: | 100% |
| Prepayment Provisions: | |
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

A-3

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Paul Robeson Apartments |
| Project Location: | New York, New York |
| FHA Project No.: | 012-57291 |
| Section of Act: | 221(d)4 |
| Maturity Date: | June 1, 2024 |
| Number of Units: | 80 |
| Original Principal Balance: | $4,603,000.00 |
| Amortized Balance for September 27, 1995: | $4,522,074.71 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.750% |
| Date of Commencement of Amortization: | July 1, 1984 |
| Date of Final Endorsement: | May 14, 1984 |
| Monthly Principal and Interest on Mortgage: | $51,087.32 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

A-4

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Sebco IV Apartments |
| Project Location: | Bronx, New York |
| FHA Project No.: | 012-57213 |
| Section of Act: | 221(d)4 |
| Maturity Date: | February 1, 2024 |
| Number of Units: | 25 |
| Original Principal Balance: | $4,077,600.00 |
| Amortized Balance for September 27, 1995: | $4,001,743.86 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of Amortization: | March 1, 1984 |
| Date of Final Endorsement: | June 19, 1984 |
| Monthly Principal and Interest on Mortgage: | $45,256.60 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

A-5

## PROJECT SUMMARIES

Project Name:                          Southern Boulevard Apartments

Project Location:                      New York, New York

FHA Project No.:                       012-57192

Section of Act:                        221(d)4

Maturity Date:                         February 1, 2024

Number of Units:                       90

Original Principal Balance:            $4,999,200.00

Amortized Balance
  for September 27, 1995:              $4,906,201.80

Note Interest Rate:                    13.25%

Servicing Fees:                        .05%

Net Rate to Participant:               13.20%

HUD Debenture Rate:                    12.875%

Date of Commencement of
  Amortization:                        March 1, 1984

Date of Final Endorsement:             March 12, 1984

Monthly Principal and
  Interest on Mortgage:                $55,484.62

Section 8 Units:                       100%

Prepayment Provisions:

     May 1, 1995 - April 30, 1996        .50%
     May 1, 1996 - thereafter            .00%

## PROJECT SUMMARIES

Project Name:                          Woodycrest Apartments

Project Location:                      New York, New York

FHA Project No.:                       012-57279

Section of Act:                        221(d)4

Maturity Date:                         April 1, 2024

Number of Units:                       115

Original Principal Balance:            $6,531,800.00

Amortized Balance
  for September 27, 1995:            $6,413,663.14

Note Interest Rate:                    13.25%

Servicing Fees:                        .05%

Net Rate to Participant:               13.20%

HUD Debenture Rate:                    12.875%

Date of Commencement of
  Amortization:                       May 1, 1984

Date of Final Endorsement:             November 7, 1984

Monthly Principal and
  Interest on Mortgage:               $72,494.49

Section 8 Units:                       100%

Prepayment Provisions:

     May 1, 1995 - April 30, 1996      .50%
     May 1, 1996 - thereafter          .00%

A-7

## EXHIBIT B

## INITIAL CERTIFICATION

[date]

[participant]

Re:    Custodial Agreement dated as of September 27, 1995 among Greystone Funding Corporation [Participant], Greystone Servicing Corporation, Inc. [Servicer], and First Tennessee Bank National Association, [Custodian], <u>pursuant to Servicing Agreement, of the same date.</u>

Gentlemen:

    In accordance with the provisions of Paragraph 2 of the above-referenced Custodial Agreement, the undersigned, as Custodian, hereby certifies that, except with respect to the documents described on Schedule One attached hereto, it has received a Custodian's Mortgage File with respect to the Mortgage Loans identified on the Project Summary.

FIRST TENNESSEE BANK
NATIONAL ASSOCIATION

By:_____
Name:
Title:

B-1

**EXHIBIT C**

**FINAL CERTIFICATION**

[date]

[participant]

Re:     Custodial Agreement dated as of September 27, 1995 among Greystone
        Funding Corporation [Participant], Greystone Servicing Corporation, Inc.
        [Servicer], and First Tennessee Bank National Association, [Custodian],
        pursuant to Pooling and Servicing Agreement, of the same date

Gentlemen:

        In accordance with the provisions of Paragraph 4 of the above-referenced
Custodial Agreement, the undersigned, as Custodian, hereby certifies that as to the Mortgage
Loans listed in the Project Summaries, it has reviewed the Custodian's Mortgage File and has
determined that, except with respect to the documents described on Schedule One attached
hereto, (i) all documents required to be delivered to it pursuant to the Custodial Agreement are
in its possession, (ii) such documents have been reviewed by it and appear regular on their face
and relate to the Mortgage Loans, (iii) based on its examination of such documents and only as
to such documents, the information set forth in the Project Summaries respecting the Mortgage
Loans is correct and (iv) the Mortgage Notes has been endorsed as provided in Paragraph 1 of
the Custodial Agreement.

        Capitalized terms used herein but not defined herein shall have the meanings
assigned to them in the captioned Custodial Agreement.

                        FIRST TENNESSEE BANK
                        NATIONAL ASSOCIATION


                        By:_____
                        Name:
                        Title:

C-1

## EXHIBIT D

## REQUEST FOR RELEASE OF DOCUMENTS

To:  First Tennessee Bank National Association

> Re:    Custodial Agreement dated as of September 27, 1995, among Greystone
> Funding Corporation [Participant], Greystone Servicing Corporation, Inc.
> [Servicer], and First Tennessee Bank National Association, [Custodian],
> pursuant to <u>Pooling and Servicing Agreement, of the same date</u>

        In connection with the administration of the Mortgage Loans held by you as Custodian for the Participant, we request the release, and acknowledge receipt, of the Custodian's Mortgage File for the Mortgage Loans described below, for the reason indicated.

<u>Mortgagor's Name, Address & Zip Code:</u>

<u>FHA Loan Number:</u>

<u>Reason for Requesting Documents:</u>

        Upon our return of all of the above documents to you as Custodian, please acknowledge your receipt by signing in the space indicated below, and returning this form.

GREYSTONE SERVICING CORPORATION, INC.

By:_____    Date:_____

Documents returned to Custodian:
FIRST TENNESSEE BANK NATIONAL ASSOCIATION

By:_____    Date:_____

cc:    All Participants under Servicing Agreement

## CUSTODIAL AGREEMENT

THIS AGREEMENT dated as of September 27, 1995, by and between **GREYSTONE FUNDING CORPORATION** a corporation organized and existing under the laws of Virginia having an address at 98 Alexandria Pike, 4th Floor, Warrenton, Virginia 22186 (the "Participant"), **FIRST TENNESSEE BANK NATIONAL ASSOCIATION**, a national banking association, having an address at 4385 Poplar Avenue, Memphis, Tennessee 38117 (the "Custodian") and **GREYSTONE SERVICING CORPORATION, INC.**, a Georgia corporation, having an address at 98 Alexandria Pike Building, 5th Floor, Warrenton, Virginia 22186 (the "Servicer").

## W I T N E S S E T H:

**WHEREAS**, the Participant (on behalf of itself and its successors, the "Participants") has agreed to purchase from the Servicer a Participation Certificate (the "Certificate") representing a 100% participation interest in a certain pool of project loans (the "Mortgage Loans") held and serviced by the Servicer, insured by the Federal Housing Administration ("FHA") and identified as Series Greystone 95-4, which Participation Certificate is issued pursuant to the terms and conditions of a Pooling and Servicing Agreement of even date herewith between the Participant and the Servicer (the "Servicing Agreement"); and

**WHEREAS**, the Custodian is a national banking association regulated by the Comptroller of the Currency; and

**WHEREAS**, the Participant desires to have the Custodian take possession of the Mortgage Notes for the Mortgage Loans, along with certain other documents specified herein, as the custodian for and bailee of the Participant, in accordance with the terms and conditions hereof;

**NOW, THEREFORE**, in consideration of the mutual undertakings herein expressed, the parties hereto hereby agree as follows:

1.     The Servicer has delivered and released to the Custodian the following documents pertaining to each of the Mortgage Loans identified in the Project Summaries (the "Project Summary") attached as Exhibit A hereto:

(a)     The original Mortgage Note containing the endorsement of FHA, and an allonge to such Mortgage Note being endorsed, in blank, "Pay to the order of _____, without recourse" and signed in the name of the Servicer by an authorized officer, with all intervening endorsements showing a complete chain of title from the originator to the Servicer, inclusive of original Notes.

(b)    The original recorded Mortgage (or if an original Mortgage is not yet available, a copy of such Mortgage) certified by the recorder's office to be a true and correct copy thereof.

(c)    An assignment of the Mortgage in recordable form, in blank;

(d)    The original policy of title insurance;

(e)    The original of each assumption, modification, written assurance or substitution agreement, if any;

(f)    Assignments of any collateral documents, in blank;

(g)    A copy of the Regulatory Agreement;

(h)    An original Security Agreement (or if an original is not available, a copy of the executed Security Agreement); and

(i)    All other documents as may be required by Participant with respect to the Mortgage Loan.

If the original Assignment of the Mortgage was not delivered pursuant to (b) above, the original title insurance policy endorsement was not delivered pursuant to (d) above or any other documents required and identified by Participant pursuant to (i) above, the Servicer shall deliver such originals or duplicate originals to the Custodian promptly upon the Servicer's receipt thereof. All Mortgage Loans documents held by the Custodian as to the Mortgage Loans are referred to herein as the "Custodian's Mortgage File".

2.    Upon the issuance of the initial certificate (as described below), the Custodian shall deliver to the Participant and the Servicer a certificate ("Initial Certification") in the form annexed hereto as Exhibit B to the effect that the Custodian has received the Custodian's Mortgage File containing all documents listed in Paragraph 1 hereof with respect to the Mortgage Loans. Any of the documents enumerated in Paragraph 1 hereof which have not been delivered to the Custodian by the Servicer shall be noted by the Custodian in the Initial Certification.

3.    With respect to the Custodian's Mortgage File, the Custodian is exclusively the custodian for and the bailee of the Participant; and provided, further, that the Custodian shall be the bailee of the Servicer to the extent required by, and this Custodial Agreement is subject to and subordinate to, the applicable rules and regulations of the FHA. The Custodian shall hold all documents constituting the Custodian's Mortgage File received by it for the exclusive use and benefit of the Participants, and shall make disposition thereof only in accordance with this Custodial Agreement and Servicing Agreement, or otherwise in accordance with instructions furnished by the a Majority of the Participants. Neither the Custodian nor the Servicer shall be

responsible or liable for any action taken by either of them in accordance with the written instructions of a Marjority of the Participants. Custodian shall segregate and maintain continuous custody of all documents constituting the Custodian's Mortgage File received by it in secure and fireproof facilities in accordance with customary standards for such custody. The Participants hereby agree whether or not any of the transactions contemplated in this Custodial Agreement shall be consummated, to assume liability for, and do hereby indemnify, protect, save and keep harmless the Custodian, in its individual capacity and as custodian, and its successors, assigns, agents, employees and servants, from and against any and all liability, obligation, losses, damages, penalties, taxes (excluding any taxes payable by the Custodian on or measured by any compensation received by the Custodian for its services under this Custodial Agreement), claims, actions, suits, costs, expenses or disbursements (including legal fees and expenses) of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Custodian, in its individual capacity or as custodian, (whether or not also agreed to be indemnified against by any other person under this Custodial Agreement or any other document) by any person in any way relating to or arising out of the action or inaction of the Participants, or their failure to perform any of their duties or obligations, under this Custodial Agreement, the Servicing Agreement, the Certificate or any other document contemplated in such documents. The indemnities set forth in this Paragraph 3 shall survive the termination of this Custodial Agreement.

4.    Within 10 days after the issuance of the initial Certificate, the Custodian shall ascertain that all documents required to be delivered to it pursuant to Paragraph 1 hereof are in its possession, and shall deliver to the Participants and the Servicer a certification ("Final Certification") of the Custodian in the form annexed hereto as Exhibit C to the effect that, as to the Mortgage Loans, (i) all documents required to be delivered to it pursuant to Paragraph 1 of this Custodial Agreement are in its possession, (ii) such documents have been reviewed by it and appear regular on their face and relate to the Mortgage Loans, (iii) based on its examination of such documents and only as to such documents, the information set forth in the Project Summary respecting the Mortgage Loans is correct and (iv) that the Mortgage Notes have been endorsed as provided in Paragraph 1. During the life of the Mortgage Loans, in the event the Custodian discovers any defect with respect to the Custodian's Mortgage File, the Custodian shall give written specification of such defect to the Servicer and the Participants.

5.    From time to time and as appropriate for the servicing of the Mortgage Loans, the Custodian is hereby authorized, upon written request and receipt of the Servicer in the form annexed hereto as Exhibit D, to release to the Servicer the Custodian's Mortgage File or the documents set forth in such receipt to the Servicer. All documents so released to the Servicer shall be held by it in trust for the benefit of the Participant. The Servicer shall return to the Custodian the Custodian's Mortgage File or such documents when the Servicer's need therefor in connection with such servicing no longer exists. The Participants shall be copied on any applicable correspondence from Servicer to Custodian in return of such documents.

6.    Upon the payment in full of the Mortgage Loans, and upon receipt by the Custodian of the Servicer's request for release, which request shall be accompanied by a request

3

in the form annexed hereto as Exhibit D and a certification to the effect that all amounts received or to be received by the Servicer in connection with such payment have been or will be credited to the Servicer's FHA custodial account maintained for the benefit of the Participants, the Custodian shall promptly release the Custodian's Mortgage File to the Servicer.

7.      It is understood that the Custodian will charge such fees for its services under this Custodial Agreement as are set forth in a separate agreement between the Custodian and the Servicer, the payment of which, together with the Custodian's expenses in connection herewith, shall be solely the obligation of the Servicer. Servicer hereby agrees, whether or not any of the transactions contemplated in this Custodial Agreement shall be consummated, to assume liability for, and does hereby indemnify, protect, save and keep harmless the Custodian, in its individual capacity and as custodian, and its successors, assigns, agents, employees and servants, from and against any and all liability, obligation, losses, damages, penalties, taxes (excluding any taxes payable by the Custodian on or measured by any compensation received by the Custodian for its services under this Custodial Agreement), claims, actions, suits, costs, expenses or disbursements (including legal fees and expenses) of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Custodian, in its individual capacity or as custodian, (whether or not also agreed to be indemnified against by any other person under this Custodial Agreement or any other document) by any person in any way relating to or arising out of the action or inaction of the Servicer, or its failure to perform any of its duties or obligations, under this Custodial Agreement, the Servicing Agreement, any Certificate or any other document contemplated in such documents. The indemnities set forth in this Paragraph 7 shall survive the termination of this Custodial Agreement.

8.      A Majority of the Participants, with or without cause, or following a resignation, removal or termination of the Servicer as servicer, or the occurrence of any event of default by Servicer as set forth in the Servicing Agreement, or upon a failure by the Custodian to perform or observe any term of this Custodial Agreement, may remove and discharge the Custodian from the performance of its duties under this Custodial Agreement by written notice to the Custodian, with a copy to Servicer. Having given notice of such removal, the Participant shall promptly appoint a successor Custodian to act on behalf of the Participants by written instrument, with a copy shall be delivered to the Servicer. In the event of any such removal, the Custodian shall promptly transfer to the successor Custodian, as directed, all of the Custodian's Mortgage File. The reasonable fees of any successor Custodian shall be paid by the Servicer if the Custodian is removed or discharged by the Participant with or without cause; provided, however, that if the Custodian is discharged without cause the Servicer shall not be obligated to pay fees to a successor Custodian in excess of the fees paid to the discharged Custodian.

9.      Upon reasonable prior written notice to the Custodian, the Servicer or the Participants will be permitted during normal business hours to examine the Custodian's Mortgage File, documents, records and other papers in possession of or under the control of Custodian relating to the Mortgage Loans.

4

10.    If the Custodian is furnished evidence satisfactory to it that the Servicing Agreement has been terminated, it shall upon written request of the Servicer or a Majority of the Participants and upon receipt of proof satisfactory to the Custodian of the ownership of the Mortgage Loans, release the Custodian's Mortgage File to such person and in such a manner as the requesting party shall designate.

11.    The Custodian shall, at its own expense, maintain at all times during the existence of this Agreement and keep in full force and effect, (1) fidelity insurance, (2) theft of documents insurance, (3) forgery insurance and (4) errors and omissions insurance. All such insurance shall be in amounts, with standard coverage and subject to deductibles, as are customary for insurance typically maintained by banks which act as custodian. A certificate of the respective insurer as to each such policy shall be furnished to the Participant, upon request, containing the insurer's statement or endorsement that such insurance shall not terminate prior to receipt by Participant, by registered mail, of 10 days notice thereof.

12.    This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed to be an original, and together such counterparts shall constitute and be one and the same instrument.

13.    This Agreement shall be construed in accordance with the laws of the State of Tennessee and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

14.    Upon the request of the Servicer or the Participant and at the cost and expense of the requesting party, Custodian shall provide such requesting party with copies of any documents in the Custodian's Mortgage File.

15.    By execution of this Agreement, the Custodian warrants that it currently holds and during the existence of this Agreement shall hold no adverse interest, by way of security or otherwise, in the Mortgage Loans and hereby waives and releases any such interest which it may have in the Mortgage Loans as of the date hereof.

16.    The Custodian may terminate its obligations under this Agreement upon at least 60 days notice to the Servicer and the Participants. In the event of such termination, the Servicer shall appoint a successor Custodian, subject to approval by a Majority of the Participants, which approval shall not be unreasonably withheld or delayed. The payment of such successor Custodian's fees and expenses shall be the sole responsibility of the Servicer. Upon such appointment, the Custodian shall promptly transfer to the successor Custodian, as directed by the Servicer, the Custodian's Mortgage File being administered under this Agreement. No such termination of the Custodian shall become effective until a successor custodian has assumed the rights and obligations of the Custodian under this Custodial.

17.    This Agreement shall terminate upon the final payment or other liquidation of the Mortgage Loans and the final remittance of all funds due the Participants under the

5

Servicing Agreement.  The Servicer shall provide to the Custodian a certification which shall state that the foregoing events have occurred.  In such event, and upon the Custodian's receipt of the foregoing certification, all documents remaining in the Custodian's Mortgage File shall be forwarded to the Servicer.

18.    All demands, notices and communications hereunder shall be in writing and shall be deemed to have been given if mailed, by registered or certified mail, return receipt requested, or, if by other means, when received by the other party at the address shown on the first page hereof, or such other address as may hereafter be furnished to the other party by like notice.  Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

19.    The Custodian and any of its agents, employees and servants may rely upon the genuineness of any notices, requests, consents, certificates, orders, telecopies, telexes or other papers or documents delivered to it pursuant to or as contemplated by this Agreement by authorized representatives of the Servicer or any Participant, as the case may be, without investigation as to the authenticity or legal effectiveness of such papers or documents.

20.    Capitalized terms not otherwise defined herein shall have the meanings given them in the Servicing Agreement.

6

IN WITNESS THEREOF, the Servicer, the Participant and the Custodian have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the date first written above.

**GREYSTONE FUNDING CORPORATION**
    Participant

By: _____
    Julie J. Delimba
    Vice President

**GREYSTONE SERVICING CORPORATION, INC.,**
    Servicer

By: _____
    Carole J. Jurney
    Vice President

**FIRST TENNESSEE BANK**
**NATIONAL ASSOCIATION,**
    Custodian

By: _____
Name:  Gail Wilson
Title:  Vice President

7

**EXHIBIT A**

**PROJECT SUMMARIES**

| | |
|---|---|
| Project Name: | Aldus Phase I |
| Project Location: | New York, New York |
| FHA Project No.: | 012-57295 |
| Section of Act: | 221(d)4 |
| Maturity Date: | March 1, 2024 |
| Number of Units: | 97 |
| Original Principal Balance: | $5,240,600.00 |
| Amortized Balance for September 27, 1995: | $5,144,470.51 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of Amortization: | April 1, 1984 |
| Date of Final Endorsement: | July 6, 1984 |
| Monthly Principal and Interest on Mortgage: | $58,163.85 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

A-1

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Malcolm X II Phase A |
| Project Location: | New York, New York |
| FHA Project No.: | 012-57216 |
| Section of Act: | 221(d)4 |
| Maturity Date: | May 1, 2024 |
| Number of Units: | 89 |
| Original Principal Balance: | $4,938,600.00 |
| Amortized Balance for September 27, 1995: | $4,852,535.39 |
| Note Interest Rate Modified: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.750% |
| Date of Commencement of Amortization Modified: | January 1, 1985 |
| Date of Final Endorsement: | February 28, 1985 |
| Monthly Principal and Interest Modified: | $54,834.67 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

A-2

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Mid Bronx Phase II Apartments |
| Project Location: | Bronx, New York |
| FHA Project No.: | 012-57253 |
| Section of Act: | 221(d)4 |
| Maturity Date: | March 1, 2024 |
| Number of Units: | 159 |
| Original Principal Balance: | $8,833,500.00 |
| Amortized Balance for September 27, 1995: | $8,671,467.56 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of Amortization: | April 1, 1984 |
| Date of Final Endorsement: | February 22, 1984 |
| Monthly Principal and Interest on Mortgage: | $98,040.37 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Paul Robeson Apartments |
| Project Location: | New York, New York |
| FHA Project No.: | 012-57291 |
| Section of Act: | 221(d)4 |
| Maturity Date: | June 1, 2024 |
| Number of Units: | 80 |
| Original Principal Balance: | $4,603,000.00 |
| Amortized Balance for September 27, 1995: | $4,522,074.71 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.750% |
| Date of Commencement of Amortization: | July 1, 1984 |
| Date of Final Endorsement: | May 14, 1984 |
| Monthly Principal and Interest on Mortgage: | $51,087.32 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

A-4

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Sebco IV Apartments |
| Project Location: | Bronx, New York |
| FHA Project No.: | 012-57213 |
| Section of Act: | 221(d)4 |
| Maturity Date: | February 1, 2024 |
| Number of Units: | 25 |
| Original Principal Balance: | $4,077,600.00 |
| Amortized Balance for September 27, 1995: | $4,001,743.86 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of Amortization: | March 1, 1984 |
| Date of Final Endorsement: | June 19, 1984 |
| Monthly Principal and Interest on Mortgage: | $45,256.60 |
| Section 8 Units: | 100% |

Prepayment Provisions:

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

A-5

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Southern Boulevard Apartments |
| Project Location: | New York, New York |
| FHA Project No.: | 012-57192 |
| Section of Act: | 221(d)4 |
| Maturity Date: | February 1, 2024 |
| Number of Units: | 90 |
| Original Principal Balance: | $4,999,200.00 |
| Amortized Balance<br> for September 27, 1995: | $4,906,201.80 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of<br> Amortization: | March 1, 1984 |
| Date of Final Endorsement: | March 12, 1984 |
| Monthly Principal and<br> Interest on Mortgage: | $55,484.62 |
| Section 8 Units: | 100% |
| Prepayment Provisions: | |

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

## PROJECT SUMMARIES

| | |
|---|---|
| Project Name: | Woodycrest Apartments |
| Project Location: | New York, New York |
| FHA Project No.: | 012-57279 |
| Section of Act: | 221(d)4 |
| Maturity Date: | April 1, 2024 |
| Number of Units: | 115 |
| Original Principal Balance: | $6,531,800.00 |
| Amortized Balance for September 27, 1995: | $6,413,663.14 |
| Note Interest Rate: | 13.25% |
| Servicing Fees: | .05% |
| Net Rate to Participant: | 13.20% |
| HUD Debenture Rate: | 12.875% |
| Date of Commencement of Amortization: | May 1, 1984 |
| Date of Final Endorsement: | November 7, 1984 |
| Monthly Principal and Interest on Mortgage: | $72,494.49 |
| Section 8 Units: | 100% |
| Prepayment Provisions: | |

| | |
|---|---|
| May 1, 1995 - April 30, 1996 | .50% |
| May 1, 1996 - thereafter | .00% |

A-7

**EXHIBIT B**

**INITIAL CERTIFICATION**

[date]

[participant]

Re:    Custodial Agreement dated as of September 27, 1995 among Greystone
       Funding Corporation [Participant], Greystone Servicing Corporation, Inc.
       [Servicer], and First Tennessee Bank National Association, [Custodian],
       pursuant to Servicing Agreement, of the same date.

Gentlemen:

      In accordance with the provisions of Paragraph 2 of the above-referenced
Custodial Agreement, the undersigned, as Custodian, hereby certifies that, except with respect
to the documents described on Schedule One attached hereto, it has received a Custodian's
Mortgage File with respect to the Mortgage Loans identified on the Project Summary.


      FIRST TENNESSEE BANK
      NATIONAL ASSOCIATION


      By:_____
      Name:
      Title:

**EXHIBIT C**

**FINAL CERTIFICATION**

[date]

[participant]

Re:     Custodial Agreement dated as of September 27, 1995 among Greystone
        Funding Corporation [Participant], Greystone Servicing Corporation, Inc.
        [Servicer], and First Tennessee Bank National Association, [Custodian],
        pursuant to Pooling and Servicing Agreement, of the same date

Gentlemen:

        In accordance with the provisions of Paragraph 4 of the above-referenced
Custodial Agreement, the undersigned, as Custodian, hereby certifies that as to the Mortgage
Loans listed in the Project Summaries, it has reviewed the Custodian's Mortgage File and has
determined that, except with respect to the documents described on Schedule One attached
hereto, (i) all documents required to be delivered to it pursuant to the Custodial Agreement are
in its possession, (ii) such documents have been reviewed by it and appear regular on their face
and relate to the Mortgage Loans, (iii) based on its examination of such documents and only as
to such documents, the information set forth in the Project Summaries respecting the Mortgage
Loans is correct and (iv) the Mortgage Notes has been endorsed as provided in Paragraph 1 of
the Custodial Agreement.

        Capitalized terms used herein but not defined herein shall have the meanings
assigned to them in the captioned Custodial Agreement.

                        FIRST TENNESSEE BANK
                        NATIONAL ASSOCIATION


                        By:_____
                        Name:
                        Title:

C-1

**EXHIBIT D**

**REQUEST FOR RELEASE OF DOCUMENTS**

To: First Tennessee Bank National Association

Re: Custodial Agreement dated as of September 27, 1995, among Greystone Funding Corporation [Participant], Greystone Servicing Corporation, Inc. [Servicer], and First Tennessee Bank National Association, [Custodian], pursuant to <u>Pooling and Servicing Agreement, of the same date</u>

_____

In connection with the administration of the Mortgage Loans held by you as Custodian for the Participant, we request the release, and acknowledge receipt, of the Custodian's Mortgage File for the Mortgage Loans described below, for the reason indicated.

<u>Mortgagor's Name, Address & Zip Code:</u>

<u>FHA Loan Number:</u>

<u>Reason for Requesting Documents:</u>

Upon our return of all of the above documents to you as Custodian, please acknowledge your receipt by signing in the space indicated below, and returning this form.

GREYSTONE SERVICING CORPORATION, INC.

By:_____        Date:_____

Documents returned to Custodian:
FIRST TENNESSEE BANK NATIONAL ASSOCIATION

By:_____        Date:_____

cc:    All Participants under Servicing Agreement

D-1

# EXHIBIT B

## TO DECLARATION OF JOSÉ A. ISASI, II IN SUPPORT OF DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS

POOLING AND SERVICING AGREEMENT

between

GREYSTONE SERVICING CORPORATION, INC.

and

GREYSTONE FUNDING CORPORATION

Dated as of February 1, 1996

# TABLE OF CONTENTS

Page

Parties ....................................................................................................  1
Recitals..................................................................................................  1
Section 1.    Definitions..................................................................  1
Section 2.    Receipt of Loan Documents.......................................  3
Section 3.    Retention of Loan Documents.....................................  3
Section 4.    Grant of Participation Interest....................................  4
Section 5.    Obligations of Other Parties.......................................  4
Section 6.    Representations of the Servicer...................................  4
Section 7.    Servicing of Mortgage Loans......................................  6
Section 8.    Collections Under the Mortgage Loans.......................  6
Section 9.    Remittances................................................................  7
Section 10.   Hazard Insurance........................................................  8
Section 11.   Inspections..................................................................  8
Section 12.   Escrows.......................................................................  8
Section 13.   Reports........................................................................  9
Section 14.   Defaults Under the Mortgage Loans............................  9
Section 15.   Compensation of Servicer; Reimbursement of Servicer.......................  10
Section 16.   Issuance, Assignment and Transfer of Participation Certificates............  11
Section 17.   Notices........................................................................  12
Section 18.   Assignment of the Mortgage Loans..............................  13
Section 19.   Servicer's Status as FHA-Approved Mortgagee..............................  13
Section 20.   Fidelity Bond; Errors and Omissions Insurance................................  13
Section 21.   Indemnification...........................................................  13
Section 22.   Termination by Participant............................................  14
Section 23.   Termination by Servicer; Delegation of Servicing Obligations..............  14
Section 24.   Amendment of Agreement.............................................  15
Section 25.   Participants' Rights to Examine Loan Documents and Servicer's Records.  16
Section 26.   Liability of Servicer.......................................................  16
Section 27.   Relationship Between Servicer and Participants................................  16
Section 28.   Miscellaneous...............................................................  17

Execution...............................................................................................  18

Exhibit A - Project Summary.................................................................  A-1
Exhibit B - Form of Participation Certificate..........................................  B-1
Exhibit C - Form of Assumption Agreement...........................................  C-1
Exhibit D - Form of Custodial Agreement..............................................  D-1

## POOLING AND SERVICING AGREEMENT
### respecting
### GREYSTONE POOL 96-1

This **POOLING AND SERVICING AGREEMENT** dated as of February 1, 1996 (the "Agreement") is made between **GREYSTONE SERVICING CORPORATION, INC.**, a Georgia corporation (the "Servicer"), having an office at 98 Alexandria Pike, 5th Floor, Warrenton, Virginia 22186 and **GREYSTONE FUNDING CORPORATION**, a Virginia corporation (as initial holder of the Participation Interests defined below, the "Participant"), having an office at 98 Alexandria Pike, 4th Floor, Warrenton, Virginia 22186.

## R E C I T A L S :

**WHEREAS**, the Servicer, as of the date hereof, is the mortgagee of record for each of the FHA-insured mortgage loans as identified on Exhibit A attached hereto (the "Mortgage Loans"); and

**WHEREAS**, Participant wishes to acquire an undivided 100% participation interest in the each of the Mortgage Loans under and pursuant to the terms of this Agreement.

**NOW, THEREFORE**, to set forth their respective rights and obligations with respect to the Mortgage Loan and the participation in the Mortgage Loans and in consideration of the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Servicer and the Participant hereby agree as follows:

1. **Definitions**.  Unless the context shall otherwise require, capitalized terms used in the foregoing recitals shall have the meanings specified therein, and the following words and terms shall have the meanings specified in this Section:

"**Borrower**" shall mean the owner of each Project and the obligor on the Mortgage and Mortgage Note respecting each Mortgage Loan.

"**Business Day**" shall mean any day which is not a Saturday or a Sunday or a day on which banks are required or authorized to be closed under the laws of the State of New York or in the city in which the principal offices of the Servicer are located.

"**Custodial Agreement**" shall mean the agreement, attached hereto as Exhibit D, dated as of February 1, 1996, executed and made a part of this Pooling and Servicing Agreement, by and between Servicer, Participant, and Custodian, and incorporated herein.

"**Custodian**" shall mean First Tennessee Bank National Association, a national banking association, and any successor Custodian which shall have assumed the duties of Custodian under the Custodial Agreement.

"**FHA Insurance Contract**" shall mean the contract of mortgage insurance with HUD respecting each of the Mortgage Loans.

**"FHA Insurance Proceeds"** shall mean all amounts received under any of the FHA Insurance Contracts.

**"HUD"** or **"FHA"** shall mean the United States Department of Housing and Urban Development, acting through the Federal Housing Commissioner.

**"Loan Documents"** shall mean, collectively, the Mortgage Note, the Mortgage, all intervening endorsements or assignments of the Mortgage Note or the Mortgage, the title insurance and hazard insurance policies related thereto, and the other documents evidencing, securing or otherwise relating to each of the Mortgage Loans.

**"Majority of Participants"** shall mean Participants holding more than 50% of all outstanding Participation Interests.

**"Mortgage"** shall mean, with respect to each Mortgage Loan, the insured first mortgage, deed of trust or other similar security instrument, from the Borrower and assigned to the Servicer, recorded in the land records of the jurisdiction in which the Project is located, and securing the obligation of the Borrower under the Mortgage Note for such Mortgage Loan, as such Mortgage is from time to time amended, supplemented and assigned.

**"Mortgage Note"** shall mean, with respect to each Mortgage Loan, the mortgage note issued by the Borrower and endorsed to the Servicer, which Mortgage Note is secured by the Mortgage for such Mortgage Loan, as such Mortgage Note is from time to time amended, supplemented and endorsed.

**"Participant"** and **"Participants"** shall mean GREYSTONE FUNDING CORPORATION as initial Participant, and any Transferee.

**"Participation Certificate"** shall mean any certificate, issued by the Servicer pursuant to Section 16 hereof, to evidence the Participation Interest of a Participant in the Mortgage Loans.

**"Participation Interest"** shall mean the undivided percentage of the entire beneficial ownership interest in all of the Mortgage Loans, in the Loan Documents and in all proceeds and profits therefrom (including, without limitation, any and all FHA Insurance Proceeds and other benefits received pursuant to any of the FHA Insurance Contracts) granted to the Participants collectively pursuant to Section 4 of this Agreement and evidenced by a Participation Certificate.

**"Project"** shall mean, with respect to each Mortgage Loan, the multifamily housing facility owned by the Borrower, financed by the Mortgage Loan and encumbered by the Mortgage.

**"Servicer"** shall mean Greystone Servicing Corporation, Inc., a Georgia corporation, and any successor which shall have assumed the duties of servicer of the Mortgage Loans in accordance with the terms of this Agreement.

**"Transfer"** shall mean the sale, transfer, pledge, assignment or other disposition of all or any portion of a Participant's interest in the Participation Interest.

2

"Transferee" shall mean each person, firm or entity to which a Participant transfers and assigns all or any portion of its interest in the Participation Interest, any Participation Certificate or this Agreement.

2.    **Receipt of Loan Documents.**  The Servicer represents that it has received all Loan Documents for each Mortgage Loan, and it has delivered to the Custodian with respect to each Mortgage Loan, the following Loan Documents:

i)    The original Mortgage Note, including all prior modifications, endorsements and allonges thereto, endorsed and payable to the Servicer;

ii)    An original or true copy of the Mortgage, including all prior modifications and assignments thereof, now assigned to and in the name of the Servicer as mortgagee;

iii)    An original policy of title insurance, insuring the Servicer as the holder a first priority lien on the Project pursuant to the Mortgage;

iv)    An original or true copy of the FHA Regulatory Agreement respecting the Mortgage Loan, including all prior modifications thereof; and

v)    Copies of any and all security agreements and related financing statements respecting a Mortgage Loan.

In addition, the Servicer represents that it has executed and delivered to the Custodian all other documents required to be delivered pursuant to the Custodial Agreement, including an endorsement of each Mortgage Note and an assignment of each Mortgage and other Loan Documents, complete in all respects except as the name of the assignee or transferee and (as applicable) in a form acceptable for recording in all appropriate public offices for real property records in the jurisdiction in which the mortgaged property recited in such assignment is situated.

3.    **Loan Documents to be Held by Custodian.**    (a)  Except as otherwise permitted by this Agreement and by the Custodial Agreement, Servicer will cause all Loan Documents to be held by the Custodian under the terms of the Custodial Agreement.  The Servicer acknowledges that all Loan Documents, whether held by the Custodian or by the Servicer, are held for the benefit of the Participants, and that any Loan Documents held by the Servicer are so held for the sole purpose of permitting the Servicer to perform its obligations hereunder.  Except as required by the Custodial Agreement or upon the written instructions of a Majority of Participants, or in connection with the performance of its obligations hereunder, the Servicer, will not sell, convey, pledge, mortgage or assign any interest in the Mortgage Loans or the Loan Documents, will not release the Loan Documents from its custody and will segregate the Loan Documents from the other books and records of the Servicer.

(b)  The Servicer will administer the Custodial Agreement for the benefit of the Participants and will pay all fees and expenses of the Custodian payable pursuant to the terms of the Custodial Agreement.

(c)    The Servicer shall not be liable, responsible or accountable for the Custodian's obligation to provide for and maintain fidelity insurance, theft of document insurance, forgery insurance, and/or errors and omissions insurance, as required by Section 11 of the Custodial Agreement. The Servicer shall not be responsible for any impairment of the FHA Insurance Contracts, any delay or diminution in the payment of benefits under the FHA Insurance Contracts or other loss or damage which any Participant may sustain as a result of any acts or omissions of the Custodian.

4.    **Grant of Participation Interest.**  The Servicer hereby grants, conveys, transfers, sells and assigns to the Participant, a 100% Participation Interest in each and all of the Mortgage Loans, constituting the entire beneficial ownership interest in the Mortgage Loans, in the Loan Documents and in all proceeds and profits therefrom (including, without limitation, any and all FHA Insurance Proceeds and other benefits received pursuant to the FHA Insurance Contract with respect to any Mortgage Loan), subject to the terms and conditions of this Agreement and evidenced by the issuance to the Participant of a Participation Certificate pursuant to Section 16 hereof.

5.    **Obligations of Other Parties.**  HUD shall have no obligation to recognize or deal with anyone other than the Servicer, in its capacity as mortgagee of record, with respect to the rights, benefits and obligations of the mortgagee under any of the FHA Insurance Contracts. The Borrowers shall have no obligation to recognize or do business with anyone other than the Servicer of the Mortgage Loans or its agents, in its capacity as mortgagee of record, with respect to the rights, benefits and obligations of the Borrowers or the mortgagee under the Mortgages.

6.    **Representations of the Servicer.**  The Servicer represents and covenants in favor of the Participants as follows:

(a)    The Servicer is duly organized, validly existing and in good standing under the laws of the State of Georgia, has all requisite power and authority to enter into this Agreement, to grant, convey, transfer, sell and assign the Participation Interest, to issue the Participation Certificates and to perform its obligations hereunder, and has duly authorized and validly executed and delivered this Agreement. The Servicer is qualified to do business in the state in which the mortgaged properties are located or is exempt from such qualification.

(b)    The Servicer is duly qualified and shall remain duly qualified as an FHA-approved mortgagee in good standing to hold and service mortgage loans. The Servicer shall comply with the provisions of the National Housing Act and all regulations issued thereunder in order that the benefits under the FHA Insurance Contracts are fully protected.

(c)    The Servicer holds, and shall continue to hold, legal and record title to the Loan Documents for the benefit of the Participants, free of any liens, charges, encumbrances, participation (other than the Participation Interests) or other interests (except as permitted hereunder or as consented to by a Majority of Participants).

(d)    As of the date hereof, the grant of the Participation Interest to non-FHA mortgagees as contemplated herein, is in compliance with the HUD regulations set

4

forth at 24 C.F.R. Section 207.261 or an applicable waiver thereof and with all other applicable HUD regulations.

(e)    All information shown in Exhibit A (including, without limitation, the principal amount of the Mortgage Loans) is true, correct and complete.

(f)    No advance or advances by the Servicer under any of the Mortgage Loans (other than the principal amount of the Mortgage Loans) are outstanding. The Mortgage Loans have all been fully disbursed.

(g)    The Servicer has received and holds all escrows for taxes, insurance, mortgage insurance premiums and replacement reserves required to be maintained for each of the Mortgage Loans pursuant to the Loan Documents respecting such Mortgage Loans and applicable HUD requirements.

(h)    The Mortgage Loans are not subject to any servicing or subservicing agreement or arrangement, except as permitted by Section 23(c) hereof, with any servicer other than the Servicer.

(i)    Each of the Mortgage Loans is insured by FHA under Section 236 of the National Housing Act, is not subject to any defect which would prevent recovery in full under the FHA Insurance Contract for such Mortgage Loan, and each FHA Insurance Contract is the valid and binding obligation of FHA, without offset, counterclaim or defense. FHA insurance proceeds, in the event of an insurance claim, are payable in cash, in debentures, or in a combination of both, as determined by the Mortgagee at the time of payment.

(j)    A valid and enforceable policy of title insurance or endorsement to title insurance has been issued in connection with the origination, reinstatement or assignment of each Mortgage Loan in an amount acceptable to HUD and such insurance is presently in full force and effect and is otherwise acceptable to HUD.

(k)    Each Mortgage is prior to any liens filed against the applicable Project, except as may be approved in writing by HUD.

(l)    Each building or other improvement located on the Projects covered by the Mortgage Loans is insured under customary property insurance policies against insurance risks and hazards as required by HUD and such insurance is in amounts which are not less than the amount necessary to meet FHA requirements and comply with any co-insurance provision of the policies, with all premiums for such policies having been paid as required under the FHA Insurance Contract.

(m)    As of the date hereof, none of the buildings or other improvements on any Project has been affected in any substantial manner or suffered any material loss as a result of any fire, explosion, accident, riot, war, or act of God or the public enemy.

5

7. **Servicing of Mortgage Loans**. (a) The Servicer, as independent contract servicer, shall service and administer the Mortgage Loans in accordance with customary mortgage servicing practices of prudent lending institutions and in compliance with the National Housing Act and all applicable rules and regulations thereunder, carrying out all obligations of the mortgagee under the Loan Documents and maintaining the FHA Insurance Contracts in full force and effect. Subject to the provisions of Section 14 hereof, the Servicer shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which it may deem necessary or desirable, including consent to any modification of the Mortgage Loans, provided that the Servicer may not, unless a Mortgage Loan is in default or such default is imminent and the Servicer shall have obtained the prior written consent of a Majority of the Participants, permit any modification of the Mortgage Loans that would change the interest rate, change the amount of the scheduled monthly principal and interest payment, reduce the outstanding principal amount (except for actual payment of principal) or extend the final maturity date of the Mortgage Loans, terminate or otherwise reduce the benefits of the FHA Insurance Contracts or waive any claim against the Borrowers and provided further, that the Servicer shall, prior to acting hereunder, be permitted to notify and request instructions from the Participants as to any matter of enforcement or otherwise that arises outside of the ordinary course of servicing the Mortgage Loans, and to rely on the instructions of a Majority of Participants.

(b) The Servicer shall not, without the prior approval of a Majority of Participants:

(i) waive, or consent to a postponement of, compliance on the part of any Borrower with any material term or provision of the Loan Documents or in any other manner grant a material indulgence to Borrower; or

(ii) grant to any Borrower any consents or approvals which the Borrower is required to obtain under the Loan Documents not described in paragraph (a) above, including consent to subordinate liens or transfer of the mortgaged property, provided that the Servicer may approve or disapprove the Borrower's request for approval if the approval of a Majority of Participants is not forthcoming within 30 days following written notification to Participants and provided further, that the Servicer may approve transfers of physical assets or other routine items approved by HUD.

(iii) accept or permit prepayments of the Mortgage Loans except as expressly permitted in the Loan Documents and then only if such prepayments include any applicable prepayment penalty or other premium.

8. **Collections Under the Mortgage Loans**. (a) The Servicer shall proceed diligently to collect all payments due under the Loan Documents as such payments come due. All payments collected by the Servicer under the Mortgage Loans shall be deposited by the Servicer and held in trust in a depository of the Servicer's choosing that satisfies the requirements of the Government National Mortgage Association for depositories of principal and interest accounts (including depositories with whom the Servicer or its affiliates may maintain banking relationships), whose accounts are fully insured by the Federal Deposit Insurance Corporation ("FDIC") in specifically designated accounts indicating the custodial nature thereof (such account or accounts referred to hereafter as the "Trust Account"). The Trust Account shall be held by the Servicer in compliance with any and all applicable HUD requirements. The

Servicer will maintain such records as are necessary to secure and obtain the maximum insurance for the beneficiary thereof in accordance with the rules and regulations of the FDIC. The Servicer will disburse such funds for the payment of charges due and accruing under the Mortgage Loans, for remittances to the Participant, or otherwise in accordance with this Agreement or the Loan Documents. Initially, the Trust Account shall be established by Servicer with NationsBank, N.A., and Servicer will provide prompt written notification to Participants stating the identification of any change in this depository institution.

(b)  The Servicer shall keep a complete and accurate account of all sums collected by the Servicer from each Borrower and applied to mortgage insurance premiums, ground rents, water rates, taxes, assessments and other public charges, insurance premiums for hazard insurance policies, servicing fees, principal, premiums and interest payments on the Mortgage Loans and any other escrows or funds required by HUD or the Loan Documents.

9.  **Remittances**.  (a) The Servicer shall remit to the Participants on the 25th day of each month (commencing March 25, 1996), or if such day is not a Business Day, the following Business Day, their respective proportionate shares of all payments of principal, prepayment premiums and interest (after deducting the amounts described in Section 15 hereof) on the Mortgage Loans, all permitted prepayments of principal, all proceeds of fire or other insurance or any award for condemnation (to the extent applied to prepay the principal of the Mortgage Loans) and all FHA Insurance Proceeds which the Servicer has received respecting any of the Mortgage Loans through the 20th day of such month (or if such day is not a Business Day, the next preceding Business Day) and which are not subject to collection on the date of distribution to the Participants. The first remittance due March 25, 1996, shall represent interest from February 1, 1996 through February 29, 1996. Each Participant shall be entitled to receive such remittances by wire transfer in immediately available funds, in accordance with written wiring instructions provided to the Servicer by such Participant.

(b)  With respect to any remittance made by the Servicer after the Business Day on which such payment was due, the Servicer shall pay to each affected Participant interest on any such late payment at an annual rate equal to the rate of interest as is publicly announced from time to time at its principal office by Chemical Bank, New York, New York, as its prime lending rate, adjusted as of the date of each change, plus three percentage points, but in no event greater than the maximum amount permitted by applicable law. Such interest shall be paid by the Servicer on the date such late payment is made and shall cover the period commencing with the Business Day on which such payment was due and ending with the Business Day on which such payment is made, both inclusive. The payment by the Servicer of any such interest shall not be deemed an extension of time for payment or a waiver of any event of default by the Servicer.

(c)  Upon making remittances, the Servicer will have no further obligation with respect to the application of such funds. The Servicer shall have no obligation to remit principal or interest payments or any other sums payable by any Borrower, HUD or any third party unless and until such payments or sums are received by the Servicer.

(d)  Any reasonable, customary and necessary advances by the Servicer of its own funds to cure defaults by any Borrower or to preserve or protect the Mortgage Loans or to enforce remedies, other than advances to pay the mortgage insurance premiums, taxes, assessments, water rates and other public charges, premiums on hazard insurance policies and

7

other similar payments required under the Loan Documents and/or the applicable HUD Regulations, shall be reimbursed by the Participants on demand following receipt by Participants from Servicer of an accounting detailing the reasons for and the amount of sums advanced. As a condition to making such advances, the Servicer may require that at least a Majority of Participants furnish indemnification or other evidence of ability to honor their reimbursement obligations hereunder on a timely basis, which is satisfactory to the Servicer. Nothing in this paragraph shall be deemed to imply an obligation on the Servicer's part to make such advances.

10.    **Hazard Insurance**.  The Servicer shall proceed diligently and take all reasonable actions to cause each Borrower to perform its covenants under the applicable Loan Documents to keep each Project insured against fire and other hazards, casualties, and contingencies as provided in the Loan Documents. All policies and renewals thereof shall be held by the Servicer in trust for the Participants and shall be issued by carriers that meet the rating requirements of the Federal National Mortgage Association for carriers of hazard insurance. Unless otherwise required by law, coverage shall be in amounts not less than those necessary to comply with the applicable co-insurance clause percentage, but in no event shall the amounts of coverage be less than the lesser of (i) eighty percent (80%) of the insurable value or (ii) the unpaid principal balance of the applicable Mortgage Loan. Such policies shall be endorsed with standard mortgagee clauses, with losses payable to the Servicer and FHA as their interests may appear. In the event that a Borrower fails to obtain insurance coverage as hereinbefore provided, the Servicer shall notify HUD and shall proceed as required in order to preserve the benefits of the FHA Insurance Contract.

11.    **Inspections**.  The Servicer shall, on an annual basis, cause each Project to be inspected and shall promptly notify each Participant of any material change in the condition of any Project and of any waste committed thereon or any failure on the part of a Borrower to keep its Project in good condition and repair, as disclosed by such inspection. The Servicer shall not be responsible for the management duties normally and customarily performed by Borrowers or their management agents. The Servicer's obligation to notify each Participant of adverse conditions discovered during the inspections performed hereunder shall not be deemed to include an obligation on the part of the Servicer to take any action to effect repairs and correct such conditions, except that the Servicer shall make such advances as are required to be made by FHA requirements as necessary to preserve the security of the mortgage or the FHA Insurance.

12.    **Escrows**.  (a) The Servicer shall hold and appropriately monitor any and all escrows required by HUD as required in Section 8(b). The Servicer shall not pay the Borrowers interest on escrowed funds except to the extent required by law, FHA or the Loan Documents.

(b)    The Servicer shall ascertain and estimate with due diligence annual taxes, assessments, water rates, fire and hazard insurance premiums, mortgage insurance premiums and all other similar charges of which the Servicer reasonably should have notice as provided in the Loan Documents, to the end that the monthly installments payable by the Borrowers on account of the foregoing will be sufficient to pay the foregoing as and when they become due and payable.

(c) From the funds held by it in escrow or other amounts provided by the Borrowers, the Servicer shall pay promptly to the proper parties when due the mortgage

insurance premiums, taxes, assessments, water rates and other public charges, premiums on hazard insurance policies and other similar payments required under the Loan Documents and/or the applicable HUD regulations respecting the Projects. In the event that sufficient funds for the payment of all amounts required to be paid under this Section are not available respecting any Project and to the extent that the lien of the applicable Mortgage provides security for advances to pay such amounts and such payments are reimbursable under the FHA Insurance Contract or necessary to maintain the FHA Insurance Contract, the Servicer shall (on behalf of the Participants) advance moneys for the payment of such amounts, and shall be entitled to reimbursement of such advances from any FHA Insurance Proceeds received.

13.    **Reports**.    (a)    On a monthly basis, the Servicer shall provide each Participant with a statement respecting the Mortgage Loans and such Participant's Participation Interest setting forth (i) the outstanding principal balance of the Mortgage Loans after recordation of the current month's financial activity, including itemization of principal, interest and any other payments collected thereunder, (ii) any delinquency in payments under the Loan Documents, (iii) any advances made by the Servicer, and (iv) amounts held by the Servicer and payable to the Participants.

(b)    The Servicer shall provide any Participant, at the written request of such Participant, with an annual certification respecting each Mortgage Loan as to the (i) status of payment of mortgage insurance premiums, taxes, assessments or other public charges and hazard insurance premiums; (ii) the escrow account balances with respect to mortgage insurance premiums, taxes, assessments, other public charges and hazard insurance premiums; (iii) any release from any reserve fund for replacements (and the purpose of such release); and (iv) the continuing effectiveness of all insurance policies respecting the mortgaged property or specify the action being taken by the Servicer to require the applicable Borrower to satisfy all HUD regulations regarding insurance policies.

(c)    If requested by any Participant in writing, the Servicer shall provide the requesting Participant within 120 days of the close of its fiscal year with a copy of its audited financial statements for the prior year.

(d)    The Servicer shall provide to each Participant an I.R.S. Form 1099 or such other information as may be required to enable the Participant to prepare its federal income tax return.

14. **Defaults under the Mortgage Loans**.  (a) In the event of a payment default under a Mortgage Loan which remains uncured for 30 days, or in the event the Servicer obtains actual knowledge of a default under a Mortgage Loan which is not a payment default, the Servicer shall file notice of such default with HUD as required by the FHA Insurance Contract within five (5) Business Days after obtaining knowledge of the default (with a copy to each Participant). Thereafter, the Servicer shall promptly give or serve all notices and otherwise act or refrain from acting as necessary or appropriate, in accordance with the National Housing Act and any and all applicable regulations and HUD requirements, in order that the insurance benefits under the FHA Insurance Contract shall be fully protected.

(b)    Following the delivery of the notice described in subparagraph (a) above, the Servicer shall confer with the Participants as to the most appropriate manner of either resolving any such default or making a claim for mortgage insurance benefits. At the option of,

and if requested by, a Majority of Participants, the Servicer shall immediately file a claim for mortgage insurance benefits, which benefits shall be paid to the Participants in cash or debentures, as directed by such Majority of Participants in accordance with FHA regulations. The Servicer may suggest to the Participants a work-out proposal for the curing of such default as an alternative to immediate filing of a claim for mortgage insurance benefits. If requested by a Majority of Participants, the Servicer shall diligently proceed with the work-out proposal (or a mutually acceptable modification thereof), subject to the reimbursement of costs pursuant to subparagraph (c) hereof. If, within five working days after receipt by the Participants of a written memorandum of such a work-out proposal, a Majority of Participants has not instructed the Servicer to proceed with the proposal (or a mutually acceptable modification thereof), the Servicer shall continue to service the applicable Mortgage Loan in accordance with the terms of this Agreement; provided, however, that if the Mortgage Loan is in default and the Participants have not instructed the Servicer to proceed otherwise, the Servicer shall assign the Mortgage Loan to HUD and (if the FHA Insurance Contract permits) request the payment of mortgage insurance benefits in cash. The Servicer shall promptly deliver to the Participants any debentures issued as payment of insurance benefits and the Participants shall reimburse the Servicer as provided in Section 12(c).

(c) The Servicer shall have no obligation to the Participants to advance its own funds to cure defaults under the Mortgage Loans, or to protect or preserve the mortgaged properties or to pay the costs of enforcing remedies (including reasonable attorneys' fees), or for any other purpose; provided, however, the preceding clause shall not apply to the normal and customary escrow advances identified in Section 12(c) hereof. In the event that, pursuant to paragraph (b) above, the Participants shall request the Servicer to take steps that will cause the Servicer to incur costs and expenses, the Servicer may require, as a precondition, that the Participants provide reasonable indemnification against such costs and expenses, including reasonable attorneys' fees. In any event, any costs or expenses incurred by the Servicer at the request of the Participants pursuant to paragraph (b) above, excluding ordinary and necessary expenses of customary servicing pursuant to Section 7 hereof, and which are paid by the Servicer from its own funds, will be reimbursed by the Participants on demand as provided in Section 9(d) hereof. The liability of each Participant for the indemnification and reimbursement obligations set forth above in this paragraph will be limited to such Participant's percentage Participation Interest as set forth in the Participation Certificate(s) registered in the name of such Participant.

15. **Compensation of Servicer; Reimbursement of Servicer**. (a) The Servicer shall retain as its servicing fee, from each monthly installment payment actually collected by the Servicer on each Mortgage Loan, 1/12th of a per annum amount equal to 0.05 of the principal amount upon which the monthly Mortgage Loans interest is computed, but only out of Mortgage Loan interest and only if and when sufficient Mortgage Loan interest has been paid by the Borrowers. This servicing fee is paid in addition to the other compensation of the Servicer set forth in this Agreement. The Servicer shall be responsible for the ordinary annual fees of the Custodian, and shall not be entitled to reimbursement for such fees.

(b) The Servicer shall be entitled to retain (i) any payments received from the Borrowers as late charges due and payable pursuant to the Loan Documents, (ii) fees for processing transfers of physical assets or secondary financing paid by the Borrowers and (iii) profits realized from the use of FHA debentures in connection with paying FHA mortgage insurance premiums.

10

16.    **Issuance, Assignment and Transfer of Participation Certificates**.  (a) In order to evidence the ownership of the Participation Interests by the Participants, the Servicer shall, upon the request of any Participant, issue to such Participant a Participation Certificate in substantially the form attached hereto as Exhibit B evidencing such Participant's proportionate share of the Mortgage Loans; provided that no Participation Certificate shall evidence a share equivalent to less than $1,000,000 of the original combined principal balance of the Mortgage Loans.

(b)    The Servicer shall maintain books for the registration and transfer of the Participation Certificates in accordance with the provisions of this Agreement.  Subject to the provisions of this Agreement, each Participant shall have the right to Transfer its Participation Certificate in whole, or in part, provided that no Transfer shall become effective for any purpose (including the right to receive remittances under Section 9 hereof) except upon the full satisfaction of the following conditions:

(1)    The Participation Certificate then held by the Participant and which is to be transferred must be presented to the Servicer, duly endorsed for transfer.

(2)    The Transferee must represent that it considers itself a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Participation Interest and the Participation Certificate.

(3)    The transferring Participant and the Transferee must execute, and the Servicer must receive, a written assumption agreement, in the form attached hereto as Exhibit C (each an "Assumption Agreement"), which shall notify the Servicer of the Transfer to the new Participant and shall include (i) the Transferee's representations, covenants and warranties as set forth in Exhibit C to this Agreement and (ii) the Transferee's acknowledgement and agreement that the Transferee assumes the duties and obligations of a Participant under this Agreement.

Upon compliance with each such condition, the Servicer shall execute and deliver to the Transferee a new Participation Certificate (of like tenor and in the amount transferred) registered in the name of the designated Transferee, and, if less than all of the Participant's interest in the Participation Certificate has been transferred, a new Participation Certificate (of like tenor and in the amount retained) registered in the name of the transferring Participant.  The Servicer shall not charge any fee as a condition to the issuance of any Participation Certificate or the registration of any transfer of a Participation Certificate.

(c)    If (i) any mutilated Participation Certificate is surrendered to the Servicer, or the Servicer receives evidence to its satisfaction of the destruction, loss or theft of any Participation Certificate, and (ii) there is delivered to the Servicer such security or indemnity as may be required by it to save it harmless, then, in the absence of notice to the Servicer that such Participation Certificate has been acquired by a bona fide purchaser, the Servicer shall execute and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Participation Certificate, a new Participation Certificate of like tenor and in the same amount.  Upon the issuance of any new Participation Certificate under this subsection, the Servicer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses connected therewith.  Any duplicate

11

Participation Certificate issued pursuant to this subsection shall constitute complete and indefeasible evidence of ownership in the Participation Interest, as if originally issued, whether or not the mutilated, destroyed, lost or stolen Participation Certificate shall be found at any time.

(d)    Prior to due presentation of a Participation Certificate for registration of transfer, the Servicer may treat the person or entity in whose name any Participation Certificate is registered as the owner of such Participation Certificate and the Participation Interest evidenced thereby for all purposes of this Agreement including receiving consents, approvals, notices or instructions from a Majority of Participants, distributing remittances pursuant to Section 9 hereof and giving notices pursuant to Section 17 hereof, and for all other purposes whatsoever, and the Servicer shall not be affected by any notice to the contrary.

(e)    The Servicer shall promptly notify the Custodian in writing as to the name, address and amount of Participation Interest of any new Participant.

17.    **Notices.**    Except as otherwise provided herein, all notices, demands, requests, instructions, certifications and any other form of communication required or permitted to be given hereunder in order to be binding on the recipient must be given in writing addressed as follows (or to such other address as any party hereto shall specify by notice to the other parties):

> If to the Servicer:
>
> > Greystone Servicing Corporation, Inc.
> > 98 Alexandria Pike, 5th Floor
> > Warrenton, Virginia 22186
> > Attention: Carole J. Jurney
>
> If to the initial Participant:
>
> > Greystone Funding Corporation
> > 98 Alexandria Pike, 4th Floor
> > Warrenton, Virginia 22186
> > Attention: Julie J. Delimba
>
> If to any other Participant:
>
> > To the address specified in the applicable Assumption Agreement.
>
> If to the Custodian:
>
> > First Tennessee Bank, National Association
> > Oak Court Center
> > 4385 Poplar Avenue
> > Memphis, TN 38117
> > Attention: Mr. Dennis Gillespie

12

18.  **Assignment of the Mortgage Loans.**  The Servicer hereby agrees and certifies that during the term of this Agreement, except as provided in this Agreement, it shall not assign, convey or otherwise transfer any beneficial interest in any of Mortgage Loans (or any portion thereof) and shall not issue any security backed by any of the Mortgage Loans (including, without limitation, any Project Loan Certificate guaranteed by the Government National Mortgage Association) at any time when the Participation Interest shall be outstanding.

19.  **Servicer's Status as FHA-Approved Mortgagee.**  If the Servicer shall be unable to maintain its status as an FHA-approved mortgagee, the Servicer shall, promptly after obtaining knowledge that it shall no longer be an FHA-approved mortgagee, notify the Participants and the Custodian of such status, and the Participants shall forthwith engage a replacement Servicer as provided in Section 23 hereof. The Servicer shall not be entitled to any termination fee as a result of the replacement of the Servicer pursuant to this Section.

20.  **Fidelity Bond; Errors and Omissions Insurance.**  The Servicer agrees to keep in full force and effect at all times, at no cost to the Participants, in such amounts (if any) as would be required by the Federal National Mortgage Association for approved seller-servicers, and shall make available for review by any Participant upon request:

> (a)  a fidelity bond of a surety company or association securing full protection and indemnity to the Participants against loss of any money or other property entrusted to the Servicer or the Servicer's officers, employees or agents or coming into their control, caused by any dishonest, fraudulent or criminal act, direct or indirect, of the Servicer or of its officers, employees or agents; and

> (b)  a policy of errors and omissions insurance.

The Servicer agrees to deliver to any Participant upon request (and at the cost of such Participant) a certificate executed by said insurers to the effect that there will be no cancellation of coverage under said policies without at least thirty (30) days' prior written notification to the Participant and agrees to provide copies of such policies to any Participant upon written request therefor. The Servicer may provide such fidelity and errors and omissions coverage by means of a blanket fidelity bond or a blanket errors and omissions insurance policy.

21.  **Indemnification.**  Each Participant, by the execution of this Agreement or its Assumption Agreement (as the case may be) and its acceptance of its Participation Certificate, agrees to indemnify and hold harmless the Servicer against loss or damage, including reasonable attorneys fees and costs, which the Servicer may sustain as a result of any claim by any immediate successor or Transferee of such Participant based in whole or in part on a violation by such Participant of any federal or state securities laws.

22.  **Termination by Participant.**

> (a)  A Majority of Participants shall have the right to terminate the Servicer's rights under this Agreement without payment of any premium, penalty or other amount, upon notice in writing to the Servicer, if the Servicer files a petition in bankruptcy or is adjudicated bankrupt in a court of competent jurisdiction, or if a receiver or trustee is appointed for the Servicer and is not discharged within 30 days, or should the Servicer become incapacitated by operation of law or otherwise under circumstances which would substantially impair its ability

to faithfully perform its duties under this Agreement, or should the Servicer fail to remit to any Participant any payment required to be made under the terms of this Agreement which continues unremedied for a period of five business days after the due date for any such remittance (provided such remittance shall have been received by the Servicer). This Agreement shall otherwise be terminable by a Majority of Participants if the Servicer has materially breached its duties and obligations under this Agreement and such breach has not been cured within 20 days of receipt by the Servicer from any Participant of a notice demanding such cure. In the event of any termination of the Servicer's rights hereunder, the Servicer will assign and deliver to an FHA-approved mortgagee designated by a Majority of Participants the Mortgage Loans and all documents relating thereto and shall account for and pay over to such mortgagee all monies held by it as mortgagee under the Mortgage Loans. In the event the Participants shall, pursuant to this Section 22(a), have the right to terminate the Servicer's rights under this Agreement, a Majority of Participants shall appoint a successor servicer selected by a Majority of Participants to succeed to the rights, duties and obligations of the Servicer hereunder and the Servicer shall execute such assignments of the Mortgage and collateral documents as well as such further documents as may be necessary to transfer title to the Mortgage Loans to such successor servicer.

(b)     The Participants shall also have the right to terminate the Servicer's rights and obligations under this Agreement at any time during the term of this Agreement without cause upon thirty (30) days' written notice, signed by a Majority of Participants, addressed to the Servicer, upon the payment to the Servicer of a sum equal to three percent (3%) of the then unpaid principal balance of the Mortgage Loans.

## 23. Termination by Servicer; Delegation of Servicing Obligations.

(a)     With the prior written consent of each Participant, which consent shall not be unreasonably withheld, the Servicer shall have the right to appoint a successor Servicer, and to assign and transfer its rights and obligations as Servicer and mortgagee under this Agreement, to another FHA-approved servicer and mortgagee provided that (i) the Participants shall have been given five (5) days' prior written notice identifying the successor Servicer, and (ii) the successor servicer shall execute and deliver to each Participant its written agreement to assume and comply with the obligations of the Servicer under this Agreement.

(b)     The Servicer shall have the right, with the prior written consent of each Participant, which consent shall not be unreasonably withheld, to pledge, hypothecate or assign its rights hereunder to secure borrowings of the Servicer. Notwithstanding any other provision of this Agreement, any lender holding pursuant to such consent a security interest in rights of the Servicer under this Agreement shall be entitled at any time, with the prior written consent of each Participant, which consent shall not be unreasonably withheld, in the exercise of its remedies to appoint a successor Servicer (which may be such lender or a related entity), whether or not there shall have occurred an event which would entitle the Participants under Section 22 to terminate the rights of the Servicer under this Agreement.

(c)     With the prior written consent of each Participant, which consent shall not be unreasonably withheld, the Servicer may perform its servicing obligations under this Agreement through such entity as it may designate (each a "Sub-Servicer"), provided that such entity, at the time it is so designated, is an established servicer of multi-family, FHA-insured mortgage loans. Notwithstanding the fact that the Servicer may perform its servicing obligations

14

under this Agreement through another entity, the Servicer shall at all times remain obligated and liable to the Participants without diminution by virtue of such servicing being performed by such other entity and to the same extent and under the same terms and conditions as if the Servicer alone were performing its obligations under this Agreement.

For purposes of this Agreement, the Servicer shall be deemed to have received payments on the Mortgage Loans when the Sub-Servicer has received such payments. The Servicer shall be entitled to enter into any agreement with a Sub-Servicer for indemnification of the Servicer by such Sub-Servicer and nothing contained in this Agreement shall be deemed to limit or modify such indemnification.

Any agreement between the Servicer and the Sub-Servicer (a "Sub-Servicing Agreement") that may be entered into and any transactions or services relating to the Mortgage Loans involving a Sub-Servicer in its capacity as such and not as an originator shall be deemed to be between the Sub-Servicer and the Servicer alone, and the Participants shall not be deemed parties thereto and shall have no claims, rights, obligations, duties or liabilities with respect to the Sub-Servicer except as set forth in this Section 23(c).

In the event the Servicer shall for any reason no longer be the master servicer (including by reason of an event pursuant to this Section 23), the Participants shall, at their sole option, thereupon assume all of the rights and obligations of the Servicer under the Sub-Servicing Agreement that the Servicer has entered into, provided, however, that a Majority of Participants may elect to require the Servicer, at the Servicer's cost and expense, to terminate the Sub-Servicing Agreement in lieu of such assumption. If they so elect, the Participants or the successor servicer for the Participants shall assume all of the Servicer's interest therein and replace the Servicer as a party to the Sub-Servicing Agreement to the same extent as if the Sub-Servicing Agreement had been assigned to the assuming party, except that the Servicer shall not thereby be relieved of any liability or obligations under the Sub-Servicing Agreement arising prior to the date of such assumption.

The Servicer at its expense shall, upon request of a Majority of Participants, deliver to the assuming party all documents and records relating to the Sub-Servicing Agreement and the Mortgage Loans then being serviced and an accounting of amounts collected and held by it and otherwise use its best efforts to effect the orderly and efficient transfer of the Sub-Servicing Agreement to the assuming party.

24. **Amendment of Agreement.** This Agreement may not be amended except by a written instrument duly executed by the Servicer and each Participant.

25. **Participants' Right to Examine Loan Documents and Servicer's Records.** Each Participant shall have the right, at all reasonable times and as often as reasonably required, to inspect all Loan Documents and examine and audit any and all books, records or other information of the Servicer, whether held by the Servicer or by another on behalf of the Servicer, which may be relevant to the performance or observance by the Servicer of the terms, covenants or conditions of this Agreement. The Servicer will provide copies of the Loan Documents in reasonable quantities at the request, and at the expense, of any Participant.

15

26.    **Liability of Servicer**.  The Servicer shall be liable to the Participants under this Agreement only to the extent of the obligations expressly imposed upon and undertaken by the Servicer pursuant to the provisions hereof.  Neither the Servicer nor any of the directors, officers, employees or agents of the Servicer shall be under any liability to the Participants for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement or the Custodial Agreement, or any instructions received from the Participants, or for errors in judgment; provided, however, that this provision shall not protect the Servicer or any such person against any breach of warranties or representations made herein or any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or negligence in the performance of duties or by reason of disregard of obligations and duties hereunder.  The Servicer and any director, officer, employee or agent of the Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any person or entity respecting any matters arising hereunder.

27.    **Relationship Between Servicer and Participants**.    Nothing herein contained shall be deemed or construed to create a copartnership or joint venture between the parties hereto and the services of the Servicer shall be rendered as an independent contractor and not as agent for the Participants.

28.    **Miscellaneous**.  This Agreement sets forth the entire agreement of the parties with respect to the subject matter hereof.  Except as otherwise provided herein, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective permitted successors and assigns.  Section headings in this Agreement are for convenience of reference only and shall not be used in interpreting this Agreement.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, GREYSTONE FUNDING CORPORATION and GREYSTONE SERVICING CORPORATION, INC. have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

GREYSTONE SERVICING CORPORATION, INC.

By

Carole P. Jurney
Vice President

GREYSTONE FUNDING CORPORATION

By: 

Julie J. Delimba
Vice President

17

# EXHIBIT A
# PROJECT SUMMARIES

|  | Sebco I<br>New York, NY | Sebco II<br>New York, NY |
|---|---|---|
| FHA Project No.: | 012-44149 | 012-44150 |
| Modified Maturity Date: | 10/01/2011* | 04/01/2018 |
| Number of Units: | 182 | 179 |
| Original Principal Balance: | $6,099,700.00 | $5,628,400.00 |
| Amortized Principal Balance as of 02/01/96: | $4,499,705.25 | $4,508,894.21 |
| Note Interest Rate: | 9.000% | 9.000% |
| Servicing Fees: | .05% | .05% |
| Net Rate to Participant: | 8.95% | 8.95% |
| HUD Debenture Rate: | 7.125% | 7.125% |
| Modified Date of Commencement of Amortization: | 06/01/78 | 05/01/78 |
| Date of Final Endorsement: | 04/05/78 | 03/24/78 |
| Modified Monthly Principal and Interest on Mortgage: | thru 05/01/98<br>$47,587.65 | thru 04/01/98<br>$44,339.54 |
| Modified Monthly Principal and Interest on Mortgage: | effective 06/01/98<br>$43,824.42 | effective 05/01/98<br>$37,861.51 |
| Section 8 Units: | 100% | 100% |
| Prepayment Provisions: | 02/06/96 to<br>02/05/97 .50%<br>declining by .125% per year | 02/06/96 to<br>02/05/97 .50%<br>declining by .125% per year |
| Notes: | *Note Maturity 05/01/2018<br>Actual Maturity 10/01/2011<br>Due to principal curtailment | |

## EXHIBIT B

## FORM OF PARTICIPATION CERTIFICATES

THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR UNDER THE SECURITIES LAWS OF ANY STATE. ANY RESALE OR TRANSFER OF THIS CERTIFICATE WITHOUT REGISTRATION THEREOF UNDER SUCH LAWS MAY ONLY BE MADE IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS AND IN ACCORDANCE WITH THE PROVISIONS OF SECTION 16 OF THE POOLING AND SERVICING AGREEMENT REFERRED TO HEREIN.

### PARTICIPATION CERTIFICATE

evidencing a proportionate interest in
the pool of project mortgage loans known as

### GREYSTONE POOL 96-1

insured by the Federal Housing Administration
and held and serviced by

GREYSTONE SERVICING CORPORATION, INC.

(not an interest in or obligation of
Greystone Servicing Corporation, Inc.)

-----------------------------------------------------------------------------------

THIS CERTIFIES THAT,

(the "Participant"), is the registered owner of an undivided _____ % participation interest in a pool of FHA-insured mortgage loans known as Greystone Pool 96-1, such loans more fully described on Schedule A hereto (the "Mortgage Loans") held by GREYSTONE SERVICING CORPORATION, INC. (the "Servicer") as mortgagee of record and servicer, pursuant to the Pooling and Servicing Agreement (the "Pooling Agreement") dated as of February 1, 1996 between GREYSTONE FUNDING CORPORATION as initial Participant, and the Servicer. This Certificate is issued under and is subject to the terms, provisions and conditions of the Pooling Agreement. This Certificate may not be assigned or transferred except in accordance with the Pooling Agreement, which provides that the transferring Participant and the Transferee must execute, and the Servicer must receive, a written assumption agreement, in the form attached to the Pooling Agreement, which shall notify the Servicer of the transfer to the new Participant. The terms of the Pooling Agreement are binding upon any Transferee or assignee who expressly assumes the rights and obligations of the Participant thereunder by an assignment or transfer hereof.

The Servicer shall distribute on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following, commencing on March 25, 1996 to the Participant in whose name this Certificate is registered at the close of business on the last day (or if such last day is not a Business Day, the Business Day immediately preceding such last day) of the month next preceding the month of such distribution, the amount required to be distributed pursuant to Section 9 of the Pooling Agreement.

Distributions on this Certificate will be made by the Servicer to the Participant entitled thereto as shall appear on the Servicer's books without the presentation or surrender of this Certificate or the making of any notation thereon.

This Certificate does not represent an obligation of, or an interest in, the Servicer and is not insured or guaranteed by the Federal Housing Administration, the Government National Mortgage Association or any other government agency. This Certificate is limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth in the Pooling Agreement.

**IN WITNESS WHEREOF**, the Servicer has caused this Certificate to be duly executed.

**GREYSTONE SERVICING CORPORATION, INC.**

Dated: _____          By: _____
                                      Authorized Officer

B-2

## SCHEDULE A
to Participation Certificate

|  | Sebco I<br>New York, NY | Sebco II<br>New York, NY |
|---|---|---|
| FHA Project No.: | 012-44149 | 012-44150 |
| Modified Maturity Date: | 10/01/2011* | 04/01/2018 |
| Number of Units: | 182 | 179 |
| Original Principal Balance: | $6,099,700.00 | $5,628,400.00 |
| Amortized Principal Balance as of 02/01/96: | $4,499,705.25 | $4,508,894.21 |
| Note Interest Rate: | 9.000% | 9.000% |
| Servicing Fees: | .05% | .05% |
| Net Rate to Participant: | 8.95% | 8.95% |
| HUD Debenture Rate: | 7.125% | 7.125% |
| Modified Date of Commencement of Amortization: | 06/01/78 | 05/01/78 |
| Date of Final Endorsement: | 04/05/78 | 03/24/78 |
| Modified Monthly Principal and Interest on Mortgage: | thru 05/01/98<br>$47,587.65 | thru 04/01/98<br>$44,339.54 |
| Modified Monthly Principal and Interest on Mortgage: | effective 06/01/98<br>$43,824.42 | effective 05/01/98<br>$37,861.51 |
| Section 8 Units: | 100% | 100% |
| Prepayment Provisions: | 02/06/96 to<br>02/05/97  .50%<br>declining by .125% per year | 02/06/96 to<br>02/05/97  .50%<br>declining by .125% per year |
| Notes: | *Note Maturity 05/01/2018<br>Actual Maturity 10/01/2011<br>Due to principal curtailment | |

## EXHIBIT C
## FORM OF ASSUMPTION AGREEMENT

[Date]

Greystone Servicing Corporation, Inc.
Alexandira Pike Building, 5th Floor
98 Alexandria Pike
Warrenton, Virginia   22186

**Greystone Pool 96-1**

Dear Sirs:

   You are Servicer under a Pooling and Servicing Agreement dated as of February 1, 1996 in respect of Greystone Pool 96-1 (the "Pooling Agreement") between yourself and Greystone Funding Corporation, as initial Participant.  All capitalized terms used but not otherwise defined in this Assumption Agreement shall have the meanings ascribed to them in the Pooling Agreement.

   1. _____ (the "Transferor") is the registered owner of the _____ % Participation Interest issued under the Pooling Agreement.  You are hereby notified that the Transferor has on this date assigned all of its right, title and interest in and to the  Participation Interest, including related rights in respect of the Mortgage Loans and proceeds thereof, to:

(the "Transferee").

   2. The Transferee hereby represents, covenants and warrants to the Servicer that:

   (a) the Transferee considers itself a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Participation Certificate and the Participation Interest;

   (b) the Transferee (i) has received from the Transferor (or the Servicer acting on behalf of the Transferor), and has reviewed to its satisfaction, a copy of the Pooling Agreement and all other information which may be material to its acquisition of an interest in the Mortgage Loans and the Participation Interest and (ii) has had a reasonable opportunity to ask questions of and receive answers from such parties as it considers to be knowledgeable in matters relating to the Mortgage Loans and the Participation Interest and the offer and sale thereof, and all such questions have been answered to its satisfaction;

(c)    the Transferee is duly organized and validly existing under the laws of the jurisdiction of its formation and has all requisite power and authority to execute and deliver this Assumption Agreement and comply with the duties and obligations of the Participant under the Pooling Agreement; and

(d)    the Transferee has duly authorized and validly executed and delivered this Assumption Agreement, and this Assumption Agreement (and, therefore, the obligations of the Participant under the Pooling Agreement) constitute the legal, valid and binding obligations of the Transferee, enforceable against the Transferee in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws in effect from time to time affecting the enforcement of creditor's rights generally.

3.    Pursuant to Section 16 of the Pooling Agreement, the Transferee hereby assumes all of the duties and obligations, and makes for itself all of the representations, warranties, agreements and covenants, of the Participant under the Pooling Agreement.

4.    The Transferor hereby surrenders to the Servicer the Participation Certificate evidencing the interest which it has transferred to the Transferee, and represents, covenants and warrants to the Servicer that:

(a)    immediately prior to its assignment to the Transferee, the Transferor was the registered holder of such Participation Certificate; and

(b)    the Transferor is under no current obligation to sell, transfer, assign or otherwise dispose of the Participation Certificate being transferred to the Transferee to any person other than the Transferee.

5.    The Servicer shall remit all proceeds which the Transferee is entitled to receive to the Transferee at:

[insert wire transfer or other payment instructions]

The Transferee's address for receipt of notices under the Pooling Agreement is as follows:

This Assumption Agreement shall be effective immediately upon its delivery to you, without acknowledgment or execution by you of any counterpart hereof.

C-2

**[TRANSFEROR]**

By:_____

**[TRANSFEREE]**

By: _____

TRANSFEREE'S TRUE AND CORRECT
TAXPAYER IDENTIFICATION NUMBER:

_____

**EXHIBIT D**
**FORM OF CUSTODIAL AGREEMENT**

## CUSTODIAL AGREEMENT

**THIS AGREEMENT** dated as of February 1, 1996, by and between **GREYSTONE FUNDING CORPORATION** a corporation organized and existing under the laws of Virginia having an address at 98 Alexandria Pike, 4th Floor, Warrenton, Virginia 22186 (the "Participant"), **FIRST TENNESSEE BANK NATIONAL ASSOCIATION**, a national banking association, having an address at 4385 Poplar Avenue, Memphis, Tennessee 38117 (the "Custodian") and **GREYSTONE SERVICING CORPORATION, INC.**, a Georgia corporation, having an address at 98 Alexandria Pike Building, 5th Floor, Warrenton, Virginia 22186 (the "Servicer").

## W I T N E S S E T H:

**WHEREAS**, the Participant (on behalf of itself and its successors, the "Participants") has agreed to purchase from the Servicer a Participation Certificate (the "Certificate") representing a 100% participation interest in a certain pool of project loans (the "Mortgage Loans") held and serviced by the Servicer, insured by the Federal Housing Administration ("FHA") and identified as Greystone Pool 96-1, which Participation Certificate is issued pursuant to the terms and conditions of a Pooling and Servicing Agreement of even date herewith between the Participant and the Servicer (the "Servicing Agreement"); and

**WHEREAS**, the Custodian is a national banking association regulated by the Comptroller of the Currency; and

**WHEREAS**, the Participant desires to have the Custodian take possession of the Mortgage Notes for the Mortgage Loans, along with certain other documents specified herein, as the custodian for and bailee of the Participant, in accordance with the terms and conditions hereof;

**NOW, THEREFORE**, in consideration of the mutual undertakings herein expressed, the parties hereto hereby agree as follows:

1.    The Servicer has delivered and released to the Custodian the following documents pertaining to each of the Mortgage Loans identified in the Project Summaries (the "Project Summary") attached as Exhibit A hereto:

    (a)    The original Mortgage Note containing the endorsement of FHA, and an allonge to such Mortgage Note being endorsed, in blank, "Pay to the order of _____, without recourse" and signed in the name of the Servicer by an authorized officer, with all intervening endorsements showing a complete chain of title from the originator to the Servicer, inclusive of original Notes.

(b)    The original recorded Mortgage (or if an original Mortgage is not yet available, a copy of such Mortgage) certified by the recorder's office to be a true and correct copy thereof.

(c)    An assignment of the Mortgage in recordable form, in blank;

(d)    The original policy of title insurance;

(e)    The original of each assumption, modification, written assurance or substitution agreement, if any;

(f)    Assignments of any collateral documents, in blank;

(g)    A copy of the Regulatory Agreement;

(h)    An original Security Agreement (or if an original is not available, a copy of the executed Security Agreement); and

(i)    All other documents as may be required by Participant with respect to the Mortgage Loan.

If the original Assignment of the Mortgage was not delivered pursuant to (b) above, the original title insurance policy endorsement was not delivered pursuant to (d) above or any other documents required and identified by Participant pursuant to (i) above, the Servicer shall deliver such originals or duplicate originals to the Custodian promptly upon the Servicer's receipt thereof. All Mortgage Loans documents held by the Custodian as to the Mortgage Loans are referred to herein as the "Custodian's Mortgage File".

2.    Upon the issuance of the initial certificate (as described below), the Custodian shall deliver to the Participant and the Servicer a certificate ("Initial Certification") in the form annexed hereto as Exhibit B to the effect that the Custodian has received the Custodian's Mortgage File containing all documents listed in Paragraph 1 hereof with respect to the Mortgage Loans. Any of the documents enumerated in Paragraph 1 hereof which have not been delivered to the Custodian by the Servicer shall be noted by the Custodian in the Initial Certification.

3.    With respect to the Custodian's Mortgage File, the Custodian is exclusively the custodian for and the bailee of the Participant; and provided, further, that the Custodian shall be the bailee of the Servicer to the extent required by, and this Custodial Agreement is subject to and subordinate to, the applicable rules and regulations of the FHA. The Custodian shall hold all documents constituting the Custodian's Mortgage File received by it for the exclusive use and benefit of the Participants, and shall make disposition thereof only in accordance with this Custodial Agreement and Servicing Agreement, or otherwise in accordance with instructions furnished by the a Majority of the Participants. Neither the Custodian nor the Servicer shall be

responsible or liable for any action taken by either of them in accordance with the written instructions of a Marjority of the Participants. Custodian shall segregate and maintain continuous custody of all documents constituting the Custodian's Mortgage File received by it in secure and fireproof facilities in accordance with customary standards for such custody. The Participants hereby agree whether or not any of the transactions contemplated in this Custodial Agreement shall be consummated, to assume liability for, and do hereby indemnify, protect, save and keep harmless the Custodian, in its individual capacity and as custodian, and its successors, assigns, agents, employees and servants, from and against any and all liability, obligation, losses, damages, penalties, taxes (excluding any taxes payable by the Custodian on or measured by any compensation received by the Custodian for its services under this Custodial Agreement), claims, actions, suits, costs, expenses or disbursements (including legal fees and expenses) of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Custodian, in its individual capacity or as custodian, (whether or not also agreed to be indemnified against by any other person under this Custodial Agreement or any other document) by any person in any way relating to or arising out of the action or inaction of the Participants, or their failure to perform any of their duties or obligations, under this Custodial Agreement, the Servicing Agreement, the Certificate or any other document contemplated in such documents. The indemnities set forth in this Paragraph 3 shall survive the termination of this Custodial Agreement.

4.    Within 10 days after the issuance of the initial Certificate, the Custodian shall ascertain that all documents required to be delivered to it pursuant to Paragraph 1 hereof are in its possession, and shall deliver to the Participants and the Servicer a certification ("Final Certification") of the Custodian in the form annexed hereto as Exhibit C to the effect that, as to the Mortgage Loans, (i) all documents required to be delivered to it pursuant to Paragraph 1 of this Custodial Agreement are in its possession, (ii) such documents have been reviewed by it and appear regular on their face and relate to the Mortgage Loans, (iii) based on its examination of such documents and only as to such documents, the information set forth in the Project Summary respecting the Mortgage Loans is correct and (iv) that the Mortgage Notes have been endorsed as provided in Paragraph 1. During the life of the Mortgage Loans, in the event the Custodian discovers any defect with respect to the Custodian's Mortgage File, the Custodian shall give written specification of such defect to the Servicer and the Participants.

5.    From time to time and as appropriate for the servicing of the Mortgage Loans, the Custodian is hereby authorized, upon written request and receipt of the Servicer in the form annexed hereto as Exhibit D, to release to the Servicer the Custodian's Mortgage File or the documents set forth in such receipt to the Servicer. All documents so released to the Servicer shall be held by it in trust for the benefit of the Participant. The Servicer shall return to the Custodian the Custodian's Mortgage File or such documents when the Servicer's need therefor in connection with such servicing no longer exists. The Participants shall be copied on any applicable correspondence from Servicer to Custodian in return of such documents.

6.    Upon the payment in full of the Mortgage Loans, and upon receipt by the Custodian of the Servicer's request for release, which request shall be accompanied by a request

3

in the form annexed hereto as Exhibit D and a certification to the effect that all amounts received or to be received by the Servicer in connection with such payment have been or will be credited to the Servicer's FHA custodial account maintained for the benefit of the Participants, the Custodian shall promptly release the Custodian's Mortgage File to the Servicer.

7.    It is understood that the Custodian will charge such fees for its services under this Custodial Agreement as are set forth in a separate agreement between the Custodian and the Servicer, the payment of which, together with the Custodian's expenses in connection herewith, shall be solely the obligation of the Servicer. Servicer hereby agrees, whether or not any of the transactions contemplated in this Custodial Agreement shall be consummated, to assume liability for, and does hereby indemnify, protect, save and keep harmless the Custodian, in its individual capacity and as custodian, and its successors, assigns, agents, employees and servants, from and against any and all liability, obligation, losses, damages, penalties, taxes (excluding any taxes payable by the Custodian on or measured by any compensation received by the Custodian for its services under this Custodial Agreement), claims, actions, suits, costs, expenses or disbursements (including legal fees and expenses) of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Custodian, in its individual capacity or as custodian, (whether or not also agreed to be indemnified against by any other person under this Custodial Agreement or any other document) by any person in any way relating to or arising out of the action or inaction of the Servicer, or its failure to perform any of its duties or obligations, under this Custodial Agreement, the Servicing Agreement, any Certificate or any other document contemplated in such documents. The indemnities set forth in this Paragraph 7 shall survive the termination of this Custodial Agreement.

8.    A Majority of the Participants, with or without cause, or following a resignation, removal or termination of the Servicer as servicer, or the occurrence of any event of default by Servicer as set forth in the Servicing Agreement, or upon a failure by the Custodian to perform or observe any term of this Custodial Agreement, may remove and discharge the Custodian from the performance of its duties under this Custodial Agreement by written notice to the Custodian, with a copy to Servicer. Having given notice of such removal, the Participant shall promptly appoint a successor Custodian to act on behalf of the Participants by written instrument, with a copy shall be delivered to the Servicer. In the event of any such removal, the Custodian shall promptly transfer to the successor Custodian, as directed, all of the Custodian's Mortgage File. The reasonable fees of any successor Custodian shall be paid by the Servicer if the Custodian is removed or discharged by the Participant with or without cause; provided, however, that if the Custodian is discharged without cause the Servicer shall not be obligated to pay fees to a successor Custodian in excess of the fees paid to the discharged Custodian.

9.    Upon reasonable prior written notice to the Custodian, the Servicer or the Participants will be permitted during normal business hours to examine the Custodian's Mortgage File, documents, records and other papers in possession of or under the control of Custodian relating to the Mortgage Loans.

4

10.    If the Custodian is furnished evidence satisfactory to it that the Servicing Agreement has been terminated, it shall upon written request of the Servicer or a Majority of the Participants and upon receipt of proof satisfactory to the Custodian of the ownership of the Mortgage Loans, release the Custodian's Mortgage File to such person and in such a manner as the requesting party shall designate.

11.    The Custodian shall, at its own expense, maintain at all times during the existence of this Agreement and keep in full force and effect, (1) fidelity insurance, (2) theft of documents insurance, (3) forgery insurance and (4) errors and omissions insurance. All such insurance shall be in amounts, with standard coverage and subject to deductibles, as are customary for insurance typically maintained by banks which act as custodian. A certificate of the respective insurer as to each such policy shall be furnished to the Participant, upon request, containing the insurer's statement or endorsement that such insurance shall not terminate prior to receipt by Participant, by registered mail, of 10 days notice thereof.

12.    This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed to be an original, and together such counterparts shall constitute and be one and the same instrument.

13.    This Agreement shall be construed in accordance with the laws of the State of Tennessee and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

14.    Upon the request of the Servicer or the Participant and at the cost and expense of the requesting party, Custodian shall provide such requesting party with copies of any documents in the Custodian's Mortgage File.

15.    By execution of this Agreement, the Custodian warrants that it currently holds and during the existence of this Agreement shall hold no adverse interest, by way of security or otherwise, in the Mortgage Loans and hereby waives and releases any such interest which it may have in the Mortgage Loans as of the date hereof.

16.    The Custodian may terminate its obligations under this Agreement upon at least 60 days notice to the Servicer and the Participants. In the event of such termination, the Servicer shall appoint a successor Custodian, subject to approval by a Majority of the Participants, which approval shall not be unreasonably withheld or delayed. The payment of such successor Custodian's fees and expenses shall be the sole responsibility of the Servicer. Upon such appointment, the Custodian shall promptly transfer to the successor Custodian, as directed by the Servicer, the Custodian's Mortgage File being administered under this Agreement. No such termination of the Custodian shall become effective until a successor custodian has assumed the rights and obligations of the Custodian under this Custodial.

17.    This Agreement shall terminate upon the final payment or other liquidation of the Mortgage Loans and the final remittance of all funds due the Participants under the

5

Servicing Agreement. The Servicer shall provide to the Custodian a certification which shall state that the foregoing events have occurred. In such event, and upon the Custodian's receipt of the foregoing certification, all documents remaining in the Custodian's Mortgage File shall be forwarded to the Servicer.

18.    All demands, notices and communications hereunder shall be in writing and shall be deemed to have been given if mailed, by registered or certified mail, return receipt requested, or, if by other means, when received by the other party at the address shown on the first page hereof, or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

19.    The Custodian and any of its agents, employees and servants may rely upon the genuineness of any notices, requests, consents, certificates, orders, telecopies, telexes or other papers or documents delivered to it pursuant to or as contemplated by this Agreement by authorized representatives of the Servicer or any Participant, as the case may be, without investigation as to the authenticity or legal effectiveness of such papers or documents.

20.    Capitalized terms not otherwise defined herein shall have the meanings given them in the Servicing Agreement.

**IN WITNESS THEREOF**, the Servicer, the Participant and the Custodian have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the date first written above.

**GREYSTONE FUNDING CORPORATION**
Participant

By:_____
      Julie J. Delimba
      Vice President

**GREYSTONE SERVICING CORPORATION, INC.,**
Servicer

By:_____
      Carole J. Jurney
      Vice President

**FIRST TENNESSEE BANK**
**NATIONAL ASSOCIATION,**
Custodian

By:_____
Name:
Title:

7

**EXHIBIT A**
**PROJECT SUMMARIES**

|  | Sebco I<br>New York, NY | Sebco II<br>New York, NY |
|---|---|---|
| FHA Project No.: | 012-44149 | 012-44150 |
| Modified Maturity Date: | 10/01/2011* | 04/01/2018 |
| Number of Units: | 182 | 179 |
| Original Principal Balance: | $6,099,700.00 | $5,628,400.00 |
| Amortized Principal Balance as of 02/01/96: | $4,499,705.25 | $4,508,894.21 |
| Note Interest Rate: | 9.000% | 9.000% |
| Servicing Fees: | .05% | .05% |
| Net Rate to Participant: | 8.95% | 8.95% |
| HUD Debenture Rate: | 7.125% | 7.125% |
| Modified Date of Commencement of Amortization: | 06/01/78 | 05/01/78 |
| Date of Final Endorsement: | 04/05/78 | 03/24/78 |
| Modified Monthly Principal and Interest on Mortgage: | thru 05/01/98<br>$47,587.65 | thru 04/01/98<br>$44,339.54 |
| Modified Monthly Principal and Interest on Mortgage: | effective 06/01/98<br>$43,824.42 | effective 05/01/98<br>$37,861.51 |
| Section 8 Units: | 100% | 100% |
| Prepayment Provisions: | 02/06/96 to<br>02/05/97  .50%<br>declining by .125% per year | 02/06/96 to<br>02/05/97  .50%<br>declining by .125% per year |
| Notes: | *Note Maturity 05/01/2018<br>Actual Maturity 10/01/2011<br>Due to principal curtailment | |

# EXHIBIT B

## INITIAL CERTIFICATION

[date]

[participant]

Re:   Custodial Agreement dated as of February 1, 1996 among Greystone Funding Corporation [Participant], Greystone Servicing Corporation, Inc. [Servicer], and First Tennessee Bank National Association, [Custodian], pursuant to Servicing Agreement, of the same date.

Gentlemen:

In accordance with the provisions of Paragraph 2 of the above-referenced Custodial Agreement, the undersigned, as Custodian, hereby certifies that, except with respect to the documents described on Schedule One attached hereto, it has received a Custodian's Mortgage File with respect to the Mortgage Loans identified on the Project Summary.

FIRST TENNESSEE BANK
NATIONAL ASSOCIATION

By:_____
Name:
Title:

B-1

## EXHIBIT C

## FINAL CERTIFICATION

[date]

[participant]

Re:    Custodial Agreement dated as of February 1, 1996 among Greystone Funding Corporation [Participant], Greystone Servicing Corporation, Inc. [Servicer], and First Tennessee Bank National Association, [Custodian], <u>pursuant to Pooling and Servicing Agreement, of the same date</u>

Gentlemen:

      In accordance with the provisions of Paragraph 4 of the above-referenced Custodial Agreement, the undersigned, as Custodian, hereby certifies that as to the Mortgage Loans listed in the Project Summaries, it has reviewed the Custodian's Mortgage File and has determined that, except with respect to the documents described on Schedule One attached hereto, (i) all documents required to be delivered to it pursuant to the Custodial Agreement are in its possession, (ii) such documents have been reviewed by it and appear regular on their face and relate to the Mortgage Loans, (iii) based on its examination of such documents and only as to such documents, the information set forth in the Project Summaries respecting the Mortgage Loans is correct and (iv) the Mortgage Notes has been endorsed as provided in Paragraph 1 of the Custodial Agreement.

      Capitalized terms used herein but not defined herein shall have the meanings assigned to them in the captioned Custodial Agreement.

FIRST TENNESSEE BANK NATIONAL ASSOCIATION

By:_____
Name:
Title:

C-1

## EXHIBIT D

## REQUEST FOR RELEASE OF DOCUMENTS

To: First Tennessee Bank National Association

Re: Custodial Agreement dated as of February 1, 1996, among Greystone Funding Corporation [Participant], Greystone Servicing Corporation, Inc. [Servicer], and First Tennessee Bank National Association, [Custodian], pursuant to Pooling and Servicing Agreement, of the same date

In connection with the administration of the Mortgage Loans held by you as Custodian for the Participant, we request the release, and acknowledge receipt, of the Custodian's Mortgage File for the Mortgage Loans described below, for the reason indicated.

Mortgagor's Name, Address & Zip Code:

FHA Loan Number:

Reason for Requesting Documents:

Upon our return of all of the above documents to you as Custodian, please acknowledge your receipt by signing in the space indicated below, and returning this form.

GREYSTONE SERVICING CORPORATION, INC.


By:_____     Date:_____


Documents returned to Custodian:
FIRST TENNESSEE BANK NATIONAL ASSOCIATION


By:_____     Date:_____


cc:    All Participants under Servicing Agreement

D-1

# EXHIBIT C

## TO DECLARATION OF JOSÉ A. ISASI, II IN SUPPORT OF DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS

## Part 1

Pool 96-6

---

POOLING AND SERVICING AGREEMENT

between

GREYSTONE SERVICING CORPORATION, INC.

and

GREYSTONE FUNDING CORPORATION

Dated as of November 26, 1996

---

# TABLE OF CONTENTS

Page

Parties ................................................................................... 1
Recitals................................................................................... 1
Section 1.    Definitions................................................................... 1
Section 2.    Receipt of Loan Documents................................................... 3
Section 3.    Retention of Loan Documents................................................ 3
Section 4.    Grant of Participation Interest................................................ 4
Section 5.    Obligations of Other Parties.................................................. 4
Section 6.    Representations of the Servicer............................................... 4
Section 7.    Servicing of Mortgage Loans................................................. 6
Section 8.    Collections Under the Mortgage Loans........................................ 6
Section 9.    Remittances.................................................................. 7
Section 10.   Hazard Insurance............................................................. 8
Section 11.   Inspections.................................................................. 8
Section 12.   Escrows..................................................................... 8
Section 13.   Reports..................................................................... 9
Section 14.   Defaults Under the Mortgage Loans........................................... 9
Section 15.   Compensation of Servicer; Reimbursement of Servicer....................... 10
Section 16.   Issuance, Assignment and Transfer of Participation Certificates............ 11
Section 17.   Notices..................................................................... 12
Section 18.   Assignment of the Mortgage Loans........................................... 13
Section 19.   Servicer's Status as FHA-Approved Mortgagee................................ 13
Section 20.   Fidelity Bond; Errors and Omissions Insurance.............................. 13
Section 21.   Indemnification............................................................. 13
Section 22.   Termination by Participant.................................................. 14
Section 23.   Termination by Servicer; Delegation of Servicing Obligations.............. 14
Section 24.   Amendment of Agreement..................................................... 15
Section 25.   Participants' Rights to Examine Loan Documents and Servicer's Records. 16
Section 26.   Liability of Servicer....................................................... 16
Section 27.   Relationship Between Servicer and Participants.............................. 16
Section 28.   Optional Assignment to HUD.................................................. 16
Section 29.   Miscellaneous............................................................... 17

Execution................................................................................ 18

Exhibit A - Project Summary.............................................................. A-1
Exhibit B - Form of Participation Certificate............................................ B-1
Exhibit C - Form of Assumption Agreement................................................. C-1
Exhibit D - Form of Custodial Agreement.................................................. D-1

### POOLING AND SERVICING AGREEMENT
### respecting
### SERIES GREYSTONE 96-6

This **POOLING AND SERVICING AGREEMENT** dated as of November 26, 1996 (the "Agreement") is made between **GREYSTONE SERVICING CORPORATION, INC.**, a Georgia corporation (the "Servicer"), having an office at 98 Alexandria Pike, 5th Floor, Warrenton, Virginia 20186 and **GREYSTONE FUNDING CORPORATION** a Virginia corporation (as initial holder of the Participation Interests defined below, the "Participant"), having an office at 98 Alexandria Pike, 4th Floor, Warrenton, Virginia 20186.

### R E C I T A L S :

**WHEREAS**, the Servicer, as of the date hereof, is the mortgagee of record for each of the FHA-insured mortgage loans as identified on Exhibit A attached hereto (the "Mortgage Loans"); and

**WHEREAS,** Participant wishes to acquire an undivided 100% participation interest in the each of the Mortgage Loans under and pursuant to the terms of this Agreement.

**NOW, THEREFORE**, to set forth their respective rights and obligations with respect to the Mortgage Loan and the participation in the Mortgage Loans and in consideration of the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Servicer and the Participant hereby agree as follows:

1. **Definitions**. Unless the context shall otherwise require, capitalized terms used in the foregoing recitals shall have the meanings specified therein, and the following words and terms shall have the meanings specified in this Section:

**"Borrower"** shall mean the owner of each Project and the obligor on the Mortgage and Mortgage Note respecting each Mortgage Loan.

**"Business Day"** shall mean any day which is not a Saturday or a Sunday or a day on which banks are required or authorized to be closed under the laws of the State of New York or in the city in which the principal offices of the Servicer are located.

**"Custodial Agreement"** shall mean the agreement, attached hereto as Exhibit D, dated as of November 26, 1996, executed and made a part of this Pooling and Servicing Agreement, by and between Servicer, Participant, and Custodian, and incorporated herein.

**"Custodian"** shall mean First Tennessee Bank National Association, a national banking association, and any successor Custodian which shall have assumed the duties of Custodian under the Custodial Agreement.

**"FHA Insurance Contract"** shall mean the contract of mortgage insurance with HUD respecting each of the Mortgage Loans.

"FHA Insurance Proceeds" shall mean all amounts received under any of the FHA Insurance Contracts.

"HUD" or "FHA" shall mean the United States Department of Housing and Urban Development, acting through the Federal Housing Commissioner.

"Loan Documents" shall mean, collectively, the Mortgage Note, the Mortgage, all intervening endorsements or assignments of the Mortgage Note or the Mortgage, the title insurance and hazard insurance policies related thereto, and the other documents evidencing, securing or otherwise relating to each of the Mortgage Loans.

"Majority of Participants" shall mean Participants holding more than 50% of all outstanding Participation Interests.

"Mortgage" shall mean, with respect to each Mortgage Loan, the insured first mortgage, deed of trust or other similar security instrument, from the Borrower and assigned to the Servicer, recorded in the land records of the jurisdiction in which the Project is located, and securing the obligation of the Borrower under the Mortgage Note for such Mortgage Loan, as such Mortgage is from time to time amended, supplemented and assigned.

"Mortgage Note" shall mean, with respect to each Mortgage Loan, the mortgage note issued by the Borrower and endorsed to the Servicer, which Mortgage Note is secured by the Mortgage for such Mortgage Loan, as such Mortgage Note is from time to time amended, supplemented and endorsed.

"Participant" and "Participants" shall mean GREYSTONE FUNDING CORPORATION as initial Participant, and any Transferee.

"Participation Certificate" shall mean any certificate, issued by the Servicer pursuant to Section 16 hereof, to evidence the Participation Interest of a Participant in the Mortgage Loans.

"Participation Interest" shall mean the undivided percentage of the entire beneficial ownership interest in all of the Mortgage Loans, in the Loan Documents and in all proceeds and profits therefrom (including, without limitation, any and all FHA Insurance Proceeds and other benefits received pursuant to any of the FHA Insurance Contracts) granted to the Participants collectively pursuant to Section 4 of this Agreement and evidenced by a Participation Certificate.

"Project" shall mean, with respect to each Mortgage Loan, the multifamily housing facility owned by the Borrower, financed by the Mortgage Loan and encumbered by the Mortgage.

"Servicer" shall mean Greystone Servicing Corporation, Inc., a Georgia corporation, and any successor which shall have assumed the duties of servicer of the Mortgage Loans in accordance with the terms of this Agreement.

"Transfer" shall mean the sale, transfer, pledge, assignment or other disposition of all or any portion of a Participant's interest in the Participation Interest.

2

"Transferee' shall mean each person, firm or entity to which a Participant transfers and assigns all or any portion of its interest in the Participation Interest, any Participation Certificate or this Agreement.

   2.   **Receipt of Loan Documents.** The Servicer represents that it has received all Loan Documents for each Mortgage Loan, and it has delivered to the Custodian with respect to each Mortgage Loan, the following Loan Documents:

        i)    The original Mortgage Note, including all prior modifications, endorsements and alonges thereto, endorsed and payable to the Servicer;

        ii)   An original or true copy of the Mortgage, including all prior modifications and assignments thereof, now assigned to and in the name of the Servicer as mortgagee;

        iii)  An original policy of title insurance, insuring the Servicer as the holder a first priority lien on the Project pursuant to the Mortgage;

        iv)   An original or true copy of the FHA Regulatory Agreement respecting the Mortgage Loan, including all prior modifications thereof; and

        v)    Copies of any and all security agreements and related financing statements respecting a Mortgage Loan.

In addition, the Servicer represents that it has executed and delivered to the Custodian all other documents required to be delivered pursuant to the Custodial Agreement, including an endorsement of each Mortgage Note and an assignment of each Mortgage and other Loan Documents, complete in all respects except as the name of the assignee or transferee and (as applicable) in a form acceptable for recording in all appropriate public offices for real property records in the jurisdiction in which the mortgaged property recited in such assignment is situated.

   3.   **Loan Documents to be Held by Custodian.**   (a)  Except as otherwise permitted by this Agreement and by the Custodial Agreement, Servicer will cause all Loan Documents to be held by the Custodian under the terms of the Custodial Agreement.   The Servicer acknowledges that all Loan Documents, whether held by the Custodian or by the Servicer, are held for the benefit of the Participants, and that any Loan Documents held by the Servicer are so held for the sole purpose of permitting the Servicer to perform its obligations hereunder.  Except as required by the Custodial Agreement or upon the written instructions of a Majority of Participants, or in connection with the performance of its obligations hereunder, the Servicer, will not sell, convey, pledge, mortgage or assign any interest in the Mortgage Loans or the Loan Documents, will not release the Loan Documents from its custody and will segregate the Loan Documents from the other books and records of the Servicer.

        (b)  The Servicer will administer the Custodial Agreement for the benefit of the Participants and will pay all fees and expenses of the Custodian payable pursuant to the terms of the Custodial Agreement.

(c)    The Servicer shall not be liable, responsible or accountable for the Custodian's obligation to provide for and maintain fidelity insurance, theft of document insurance, forgery insurance, and/or errors and omissions insurance, as required by Section 11 of the Custodial Agreement. The Servicer shall not be responsible for any impairment of the FHA Insurance Contracts, any delay or diminution in the payment of benefits under the FHA Insurance Contracts or other loss or damage which any Participant may sustain as a result of any acts or omissions of the Custodian.

4.    **Grant of Participation Interest.** The Servicer hereby grants, conveys, transfers, sells and assigns to the Participant, a 100% Participation Interest in each and all of the Mortgage Loans, constituting the entire beneficial ownership interest in the Mortgage Loans, in the Loan Documents and in all proceeds and profits therefrom (including, without limitation, any and all FHA Insurance Proceeds and other benefits received pursuant to the FHA Insurance Contract with respect to any Mortgage Loan), subject to the terms and conditions of this Agreement and evidenced by the issuance to the Participant of a Participation Certificate pursuant to Section 16 hereof.

5.    **Obligations of Other Parties.** HUD shall have no obligation to recognize or deal with anyone other than the Servicer, in its capacity as mortgagee of record, with respect to the rights, benefits and obligations of the mortgagee under any of the FHA Insurance Contracts. The Borrowers shall have no obligation to recognize or do business with anyone other than the Servicer of the Mortgage Loans or its agents, in its capacity as mortgagee of record, with respect to the rights, benefits and obligations of the Borrowers or the mortgagee under the Mortgages.

6.    **Representations of the Servicer.** The Servicer represents and covenants in favor of the Participants as follows:

(a)    The Servicer is duly organized, validly existing and in good standing under the laws of the State of Georgia, has all requisite power and authority to enter into this Agreement, to grant, convey, transfer, sell and assign the Participation Interest, to issue the Participation Certificates and to perform its obligations hereunder, and has duly authorized and validly executed and delivered this Agreement. The Servicer is qualified to do business in the state in which the mortgaged properties are located or is exempt from such qualification.

(b)    The Servicer is duly qualified and shall remain duly qualified as an FHA-approved mortgagee in good standing to hold and service mortgage loans. The Servicer shall comply with the provisions of the National Housing Act and all regulations issued thereunder in order that the benefits under the FHA Insurance Contracts are fully protected.

(c)    The Servicer holds, and shall continue to hold, legal and record title to the Loan Documents for the benefit of the Participants, free of any liens, charges, encumbrances, participation (other than the Participation Interests) or other interests (except as permitted hereunder or as consented to by a Majority of Participants).

(d)    As of the date hereof, the grant of the Participation Interest to non-FHA mortgagees as contemplated herein, is in compliance with the HUD regulations set

4

forth at 24 C.F.R. Section 207.261 or an applicable waiver thereof and with all other applicable HUD regulations.

(e)    All information shown in Exhibit A (including, without limitation, the principal amount of the Mortgage Loans) is true, correct and complete.

(f)    No advance or advances by the Servicer under any of the Mortgage Loans (other than the principal amount of the Mortgage Loans) are outstanding.  The Mortgage Loans have all been fully disbursed.

(g)    The Servicer has received and holds all escrows for taxes, insurance, mortgage insurance premiums and replacement reserves required to be maintained for each of the Mortgage Loans pursuant to the Loan Documents respecting such Mortgage Loans and applicable HUD requirements.

(h)    The Mortgage Loans are not subject to any servicing or subservicing agreement or arrangement, except as permitted by Section 23(c) hereof, with any servicer other than the Servicer.

(i)    Each of the Mortgage Loans is insured by FHA under Section 221(d)(4) of the National Housing Act, is not subject to any defect which would prevent recovery in full under the FHA Insurance Contract for such Mortgage Loan, and each FHA Insurance Contract is the valid and binding obligation of FHA, without offset, counterclaim or defense.  FHA insurance proceeds, in the event of an insurance claim, are payable in cash, in debentures, or in a combination of both, as determined by the Mortgagee at the time of payment.

(j)    A valid and enforceable policy of title insurance or endorsement to title insurance has been issued in connection with the origination, reinstatement or assignment of each Mortgage Loan in an amount acceptable to HUD and such insurance is presently in full force and effect and is otherwise acceptable to HUD.

(k)    Each Mortgage is prior to any liens filed against the applicable Project, except as may be approved in writing by HUD.

(l)    Each building or other improvement located on the Projects covered by the Mortgage Loans is insured under customary property insurance policies against insurance risks and hazards as required by HUD and such insurance is in amounts which are not less than the amount necessary to meet FHA requirements and comply with any co-insurance provision of the policies, with all premiums for such policies having been paid as required under the FHA Insurance Contract.

(m)    As of the date hereof, none of the buildings or other improvements on any Project has been affected in any substantial manner or suffered any material loss as a result of any fire, explosion, accident, riot, war, or act of God or the public enemy.

(n)    If current on the twentieth anniversary of the date of final endorsement specified in Exhibit A, each Mortgage Loan will be eligible for assignment under Section 221 (g) (4) of the National Housing Act.

5

7.    <u>Servicing of Mortgage Loans</u>. (a) The Servicer, as independent contract servicer, shall service and administer the Mortgage Loans in accordance with customary mortgage servicing practices of prudent lending institutions and in compliance with the National Housing Act and all applicable rules and regulations thereunder, carrying out all obligations of the mortgagee under the Loan Documents and maintaining the FHA Insurance Contracts in full force and effect. Subject to the provisions of Section 14 hereof, the Servicer shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which it may deem necessary or desirable, including consent to any modification of the Mortgage Loans, <u>provided</u> that the Servicer may not, unless a Mortgage Loan is in default or such default is imminent and the Servicer shall have obtained the prior written consent of a Majority of the Participants, permit any modification of the Mortgage Loans that would change the interest rate, change the amount of the scheduled monthly principal and interest payment, reduce the outstanding principal amount (except for actual payment of principal) or extend the final maturity date of the Mortgage Loans, terminate or otherwise reduce the benefits of the FHA Insurance Contracts or waive any claim against the Borrowers and <u>provided further</u>, that the Servicer shall, prior to acting hereunder, be permitted to notify and request instructions from the Participants as to any matter of enforcement or otherwise that arises outside of the ordinary course of servicing the Mortgage Loans, and to rely on the instructions of a Majority of Participants.

(b)    The Servicer shall not, without the prior approval of a Majority of Participants:

(i)    waive, or consent to a postponement of, compliance on the part of any Borrower with any material term or provision of the Loan Documents or in any other manner grant a material indulgence to Borrower; or

(ii)    grant to any Borrower any consents or approvals which the Borrower is required to obtain under the Loan Documents not described in paragraph (a) above, including consent to subordinate liens or transfer of the mortgaged property, <u>provided</u> that the Servicer may approve or disapprove the Borrower's request for approval if the approval of a Majority of Participants is not forthcoming within 30 days following written notification to Participants and <u>provided further</u>, that the Servicer may approve transfers of physical assets or other routine items approved by HUD.

(iii)    accept or permit prepayments of the Mortgage Loans except as expressly permitted in the Loan Documents and then only if such prepayments include any applicable prepayment penalty or other premium.

8.    <u>Collections Under the Mortgage Loans</u>. (a) The Servicer shall proceed diligently to collect all payments due under the Loan Documents as such payments come due. All payments collected by the Servicer under the Mortgage Loans shall be deposited by the Servicer and held in trust in a depository of the Servicer's choosing that satisfies the requirements of the Government National Mortgage Association for depositories of principal and interest accounts (including depositories with whom the Servicer or its affiliates may maintain banking relationships), whose accounts are fully insured by the Federal Deposit Insurance Corporation ("FDIC") in specifically designated accounts indicating the custodial nature thereof (such account or accounts referred to hereafter as the "Trust Account"). The Trust Account shall be held by the Servicer in compliance with any and all applicable HUD requirements. The

Servicer will maintain such records as are necessary to secure and obtain the maximum insurance for the beneficiary thereof in accordance with the rules and regulations of the FDIC. The Servicer will disburse such funds for the payment of charges due and accruing under the Mortgage Loans, for remittances to the Participant, or otherwise in accordance with this Agreement or the Loan Documents. Initially, the Trust Account shall be established by Servicer with NationsBank, N.A., and Servicer will provide prompt written notification to Participants stating the identification of any change in this depository institution.

(b) The Servicer shall keep a complete and accurate account of all sums collected by the Servicer from each Borrower and applied to mortgage insurance premiums, ground rents, water rates, taxes, assessments and other public charges, insurance premiums for hazard insurance policies, servicing fees, principal, premiums and interest payments on the Mortgage Loans and any other escrows or funds required by HUD or the Loan Documents.

9. **Remittances**. (a) The Servicer shall remit to the Participants on the 25th day of each month (commencing December 25, 1996), or if such day is not a Business Day, the following Business Day, their respective proportionate shares of all payments of principal, prepayment premiums and interest (after deducting the amounts described in Section 15 hereof) on the Mortgage Loans, all permitted prepayments of principal, all proceeds of fire or other insurance or any award for condemnation (to the extent applied to prepay the principal of the Mortgage Loans) and all FHA Insurance Proceeds which the Servicer has received respecting any of the Mortgage Loans through the 20th day of such month (or if such day is not a Business Day, the next preceding Business Day) and which are not subject to collection on the date of distribution to the Participants. The first remittance due December 25, 1996, shall represent interest from November 26, 1996 through November 30, 1996. Each Participant shall be entitled to receive such remittances by wire transfer in immediately available funds, in accordance with written wiring instructions provided to the Servicer by such Participant.

(b) With respect to any remittance made by the Servicer after the Business Day on which such payment was due, the Servicer shall pay to each affected Participant interest on any such late payment at an annual rate equal to the rate of interest as is publicly announced from time to time at its principal office by Chemical Bank, New York, New York, as its prime lending rate, adjusted as of the date of each change, plus three percentage points, but in no event greater than the maximum amount permitted by applicable law. Such interest shall be paid by the Servicer on the date such late payment is made and shall cover the period commencing with the Business Day on which such payment was due and ending with the Business Day on which such payment is made, both inclusive. The payment by the Servicer of any such interest shall not be deemed an extension of time for payment or a waiver of any event of default by the Servicer.

(c) Upon making remittances, the Servicer will have no further obligation with respect to the application of such funds. The Servicer shall have no obligation to remit principal or interest payments or any other sums payable by any Borrower, HUD or any third party unless and until such payments or sums are received by the Servicer.

(d) Any reasonable, customary and necessary advances by the Servicer of its own funds to cure defaults by any Borrower or to preserve or protect the Mortgage Loans or to enforce remedies, other than advances to pay the mortgage insurance premiums, taxes, assessments, water rates and other public charges, premiums on hazard insurance policies and

7

other similar payments required under the Loan Documents and/or the applicable HUD Regulations, shall be reimbursed by the Participants on demand following receipt by Participants from Servicer of an accounting detailing the reasons for and the amount of sums advanced. As a condition to making such advances, the Servicer may require that at least a Majority of Participants furnish indemnification or other evidence of ability to honor their reimbursement obligations hereunder on a timely basis, which is satisfactory to the Servicer. Nothing in this paragraph shall be deemed to imply an obligation on the Servicer's part to make such advances.

    **10.    Hazard Insurance.**    The Servicer shall proceed diligently and take all reasonable actions to cause each Borrower to perform its covenants under the applicable Loan Documents to keep each Project insured against fire and other hazards, casualties, and contingencies as provided in the Loan Documents. All policies and renewals thereof shall be held by the Servicer in trust for the Participants and shall be issued by carriers that meet the rating requirements of the Federal National Mortgage Association for carriers of hazard insurance. Unless otherwise required by law, coverage shall be in amounts not less than those necessary to comply with the applicable co-insurance clause percentage, but in no event shall the amounts of coverage be less than the lesser of (i) eighty percent (80%) of the insurable value or (ii) the unpaid principal balance of the applicable Mortgage Loan. Such policies shall be endorsed with standard mortgagee clauses, with losses payable to the Servicer and FHA as their interests may appear. In the event that a Borrower fails to obtain insurance coverage as hereinbefore provided, the Servicer shall notify HUD and shall proceed as required in order to preserve the benefits of the FHA Insurance Contract.

    **11.    Inspections.**    The Servicer shall, on an annual basis, cause each Project to be inspected and shall promptly notify each Participant of any material change in the condition of any Project and of any waste committed thereon or any failure on the part of a Borrower to keep its Project in good condition and repair, as disclosed by such inspection. The Servicer shall not be responsible for the management duties normally and customarily performed by Borrowers or their management agents. The Servicer's obligation to notify each Participant of adverse conditions discovered during the inspections performed hereunder shall not be deemed to include an obligation on the part of the Servicer to take any action to effect repairs and correct such conditions, except that the Servicer shall make such advances as are required to be made by FHA requirements as necessary to preserve the security of the mortgage or the FHA Insurance.

    **12.    Escrows.**    (a) The Servicer shall hold and appropriately monitor any and all escrows required by HUD as required in Section 8(b). The Servicer shall not pay the Borrowers interest on escrowed funds except to the extent required by law, FHA or the Loan Documents.

        (b)    The Servicer shall ascertain and estimate with due diligence annual taxes, assessments, water rates, fire and hazard insurance premiums, mortgage insurance premiums and all other similar charges of which the Servicer reasonably should have notice as provided in the Loan Documents, to the end that the monthly installments payable by the Borrowers on account of the foregoing will be sufficient to pay the foregoing as and when they become due and payable.

        (c)    From the funds held by it in escrow or other amounts provided by the Borrowers, the Servicer shall pay promptly to the proper parties when due the mortgage

insurance premiums, taxes, assessments, water rates and other public charges, premiums on hazard insurance policies and other similar payments required under the Loan Documents and/or the applicable HUD regulations respecting the Projects. In the event that sufficient funds for the payment of all amounts required to be paid under this Section are not available respecting any Project and to the extent that the lien of the applicable Mortgage provides security for advances to pay such amounts and such payments are reimbursable under the FHA Insurance Contract or necessary to maintain the FHA Insurance Contract, the Servicer shall (on behalf of the Participants) advance moneys for the payment of such amounts, and shall be entitled to reimbursement of such advances from any FHA Insurance Proceeds received.

13.    **Reports.**    (a)    On a monthly basis, the Servicer shall provide each Participant with a statement respecting the Mortgage Loans and such Participant's Participation Interest setting forth (i) the outstanding principal balance of the Mortgage Loans after recordation of the current month's financial activity, including itemization of principal, interest and any other payments collected thereunder, (ii) any delinquency in payments under the Loan Documents, (iii) any advances made by the Servicer, and (iv) amounts held by the Servicer and payable to the Participants.

(b)    The Servicer shall provide any Participant, at the written request of such Participant, with an annual certification respecting each Mortgage Loan as to the (i) status of payment of mortgage insurance premiums, taxes, assessments or other public charges and hazard insurance premiums; (ii) the escrow account balances with respect to mortgage insurance premiums, taxes, assessments, other public charges and hazard insurance premiums; (iii) any release from any reserve fund for replacements (and the purpose of such release); and (iv) the continuing effectiveness of all insurance policies respecting the mortgaged property or specify the action being taken by the Servicer to require the applicable Borrower to satisfy all HUD regulations regarding insurance policies.

(c)    If requested by any Participant in writing, the Servicer shall provide the requesting Participant within 120 days of the close of its fiscal year with a copy of its audited financial statements for the prior year.

(d)    The Servicer shall provide to each Participant an I.R.S. Form 1099 or such other information as may be required to enable the Participant to prepare its federal income tax return.

14.    **Defaults under the Mortgage Loans.**    (a) In the event of a payment default under a Mortgage Loan which remains uncured for 30 days, or in the event the Servicer obtains actual knowledge of a default under a Mortgage Loan which is not a payment default, the Servicer shall file notice of such default with HUD as required by the FHA Insurance Contract within five (5) Business Days after obtaining knowledge of the default (with a copy to each Participant). Thereafter, the Servicer shall promptly give or serve all notices and otherwise act or refrain from acting as necessary or appropriate, in accordance with the National Housing Act and any and all applicable regulations and HUD requirements, in order that the insurance benefits under the FHA Insurance Contract shall be fully protected.

(b)    Following the delivery of the notice described in subparagraph (a) above, the Servicer shall confer with the Participants as to the most appropriate manner of either resolving any such default or making a claim for mortgage insurance benefits. At the option of,

9

and if requested by, a Majority of Participants, the Servicer shall immediately file a claim for mortgage insurance benefits, which benefits shall be paid to the Participants in cash or debentures, as directed by such Majority of Participants in accordance with FHA regulations. The Servicer may suggest to the Participants a work-out proposal for the curing of such default as an alternative to immediate filing of a claim for mortgage insurance benefits. If requested by a Majority of Participants, the Servicer shall diligently proceed with the work-out proposal (or a mutually acceptable modification thereof), subject to the reimbursement of costs pursuant to subparagraph (c) hereof. If, within five working days after receipt by the Participants of a written memorandum of such a work-out proposal, a Majority of Participants has not instructed the Servicer to proceed with the proposal (or a mutually acceptable modification thereof), the Servicer shall continue to service the applicable Mortgage Loan in accordance with the terms of this Agreement; provided, however, that if the Mortgage Loan is in default and the Participants have not instructed the Servicer to proceed otherwise, the Servicer shall assign the Mortgage Loan to HUD and (if the FHA Insurance Contract permits) request the payment of mortgage insurance benefits in cash. The Servicer shall promptly deliver to the Participants any debentures issued as payment of insurance benefits and the Participants shall reimburse the Servicer as provided in Section 12(c).

(c)  The Servicer shall have no obligation to the Participants to advance its own funds to cure defaults under the Mortgage Loans, or to protect or preserve the mortgaged properties or to pay the costs of enforcing remedies (including reasonable attorneys' fees), or for any other purpose; provided, however, the preceding clause shall not apply to the normal and customary escrow advances identified in Section 12(c) hereof. In the event that, pursuant to paragraph (b) above, the Participants shall request the Servicer to take steps that will cause the Servicer to incur costs and expenses, the Servicer may require, as a precondition, that the Participants provide reasonable indemnification against such costs and expenses, including reasonable attorneys' fees. In any event, any costs or expenses incurred by the Servicer at the request of the Participants pursuant to paragraph (b) above, excluding ordinary and necessary expenses of customary servicing pursuant to Section 7 hereof, and which are paid by the Servicer from its own funds, will be reimbursed by the Participants on demand as provided in Section 9(d) hereof. The liability of each Participant for the indemnification and reimbursement obligations set forth above in this paragraph will be limited to such Participant's percentage Participation Interest as set forth in the Participation Certificate(s) registered in the name of such Participant.

**15.  Compensation of Servicer; Reimbursement of Servicer**.  (a) The Servicer shall retain as its servicing fee, from each monthly installment payment actually collected by the Servicer on each Mortgage Loan, 1/12th of a per annum amount equal to 0.05 of the principal amount upon which the monthly Mortgage Loans interest is computed, but only out of Mortgage Loan interest and only if and when sufficient Mortgage Loan interest has been paid by the Borrowers. This servicing fee is paid in addition to the other compensation of the Servicer set forth in this Agreement. The Servicer shall be responsible for the ordinary annual fees of the Custodian, and shall not be entitled to reimbursement for such fees.

(b)  The Servicer shall be entitled to retain (i) any payments received from the Borrowers as late charges due and payable pursuant to the Loan Documents, (ii) fees for processing transfers of physical assets or secondary financing paid by the Borrowers and (iii) profits realized from the use of FHA debentures in connection with paying FHA mortgage insurance premiums.

**16.    Issuance, Assignment and Transfer of Participation Certificates.**  (a) In order to evidence the ownership of the Participation Interests by the Participants, the Servicer shall, upon the request of any Participant, issue to such Participant a Participation Certificate in substantially the form attached hereto as Exhibit B evidencing such Participant's proportionate share of the Mortgage Loans; provided that no Participation Certificate shall evidence a share equivalent to less than $1,000,000 of the original combined principal balance of the Mortgage Loans.

(b)    The Servicer shall maintain books for the registration and transfer of the Participation Certificates in accordance with the provisions of this Agreement.  Subject to the provisions of this Agreement, each Participant shall have the right to Transfer its Participation Certificate in whole, or in part, provided that no Transfer shall become effective for any purpose (including the right to receive remittances under Section 9 hereof) except upon the full satisfaction of the following conditions:

(1)    The Participation Certificate then held by the Participant and which is to be transferred must be presented to the Servicer, duly endorsed for transfer.

(2)    The Transferee must represent that it considers itself a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Participation Interest and the Participation Certificate.

(3)    The transferring Participant and the Transferee must execute, and the Servicer must receive, a written assumption agreement, in the form attached hereto as Exhibit C (each an "Assumption Agreement"), which shall notify the Servicer of the Transfer to the new Participant and shall include (i) the Transferee's representations, covenants and warranties as set forth in Exhibit C to this Agreement and (ii) the Transferee's acknowledgement and agreement that the Transferee assumes the duties and obligations of a Participant under this Agreement.

(4)    No transfer, sale, pledge, or other disposition of the Participation Interest shall be made to an employee benefit plan that is subject to the Employee Retirement Income Security Act of 1974 ("ERISA") in violation thereof.  The proposed transferee of Participant shall certify that it is acquiring the Participation Interest with its general corporate assets and not directly with the plan assets (the "Plan Assets") of either an "employee benefit plan" within the meaning of Section 3(3) of ERISA, as amended, or a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), other than a "governmental plan" as defined in Section 414(d) of the Code, with respect to which it is a "party in interest" within the meaning of Section 3(14) of ERISA or 4975(e)(2) of the Code; or if any proposed transferee is purchasing the Participation Interest with such Plan Assets, Servicer may require such transferee to provide an opinion of counsel satisfactory to Servicer to the effect that (i) such transfer shall not cause Servicer to become a "fiduciary" with respect to such "employee benefit plan" or such Plan Assets for the purposes of Section 406(b) of ERISA or the rules or regulations issued thereunder and (ii) either:

(A)    that the purchase of the Participation Interest by such proposed transferee and the transactions contemplated by this Agreement would not (A) constitute a

11

prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or the rules or regulations issued thereunder and (B) would not cause Servicer to become a "fiduciary" with respect to such "employee benefit plan" or such Plan Assets for the purposes of Section 406(b) of ERISA or the rules or regulations issued thereunder; or

(B)     a statutory or administrative exemption from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code and the rules or regulations issued thereunder is applicable to the purchase of such Participation Interest by such proposed transferee.

Upon compliance with each such condition, the Servicer shall execute and deliver to the Transferee a new Participation Certificate (of like tenor and in the amount transferred) registered in the name of the designated Transferee, and, if less than all of the Participant's interest in the Participation Certificate has been transferred, a new Participation Certificate (of like tenor and in the amount retained) registered in the name of the transferring Participant. The Servicer shall not charge any fee as a condition to the issuance of any Participation Certificate or the registration of any transfer of a Participation Certificate.

(c)     If (i) any mutilated Participation Certificate is surrendered to the Servicer, or the Servicer receives evidence to its satisfaction of the destruction, loss or theft of any Participation Certificate, and (ii) there is delivered to the Servicer such security or indemnity as may be required by it to save it harmless, then, in the absence of notice to the Servicer that such Participation Certificate has been acquired by a bona fide purchaser, the Servicer shall execute and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Participation Certificate, a new Participation Certificate of like tenor and in the same amount. Upon the issuance of any new Participation Certificate under this subsection, the Servicer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses connected therewith. Any duplicate Participation Certificate issued pursuant to this subsection shall constitute complete and indefeasible evidence of ownership in the Participation Interest, as if originally issued, whether or not the mutilated, destroyed, lost or stolen Participation Certificate shall be found at any time.

(d)     Prior to due presentation of a Participation Certificate for registration of transfer, the Servicer may treat the person or entity in whose name any Participation Certificate is registered as the owner of such Participation Certificate and the Participation Interest evidenced thereby for all purposes of this Agreement including receiving consents, approvals, notices or instructions from a Majority of Participants, distributing remittances pursuant to Section 9 hereof and giving notices pursuant to Section 17 hereof, and for all other purposes whatsoever, and the Servicer shall not be affected by any notice to the contrary.

(e) The Servicer shall promptly notify the Custodian in writing as to the name, address and amount of Participation Interest of any new Participant.

17.     **Notices.**     Except as otherwise provided herein, all notices, demands, requests, instructions, certifications and any other form of communication required or permitted to be given hereunder in order to be binding on the recipient must be given in writing addressed

12

as follows (or to such other address as any party hereto shall specify by notice to the other parties):

> If to the Servicer:
>
>> Greystone Servicing Corporation, Inc.
>> 98 Alexandria Pike, 5th Floor
>> Warrenton, Virginia 20186
>> Attention: Carole J. Jurney
>
> If to the initial Participant:
>
>> Greystone Funding Corporation
>> 98 Alexandria Pike, 4th Floor
>> Warrenton, Virginia 20186
>> Attention: Julie J. Delimba
>
> If to any other Participant:
>
>> To the address specified in the applicable Assumption Agreement.
>
> If to the Custodian:
>
>> First Tennessee Bank, National Association
>> Oak Court Center
>> 4385 Poplar Avenue
>> Memphis, TN 38117
>> Attention: Mr. Dennis Gillespie

**18.    Assignment of the Mortgage Loans.** The Servicer hereby agrees and certifies that during the term of this Agreement, except as provided in this Agreement, it shall not assign, convey or otherwise transfer any beneficial interest in any of Mortgage Loans (or any portion thereof) and shall not issue any security backed by any of the Mortgage Loans (including, without limitation, any Project Loan Certificate guaranteed by the Government National Mortgage Association) at any time when the Participation Interest shall be outstanding.

**19.    Servicer's Status as FHA-Approved Mortgagee.** If the Servicer shall be unable to maintain its status as an FHA-approved mortgagee, the Servicer shall, promptly after obtaining knowledge that it shall no longer be an FHA-approved mortgagee, notify the Participants and the Custodian of such status, and the Participants shall forthwith engage a replacement Servicer as provided in Section 23 hereof. The Servicer shall not be entitled to any termination fee as a result of the replacement of the Servicer pursuant to this Section.

**20.    Fidelity Bond; Errors and Omissions Insurance.** The Servicer agrees to keep in full force and effect at all times, at no cost to the Participants, in such amounts (if any) as would be required by the Federal National Mortgage Association for approved seller-servicers, and shall make available for review by any Participant upon request:

(a)    a fidelity bond of a surety company or association securing full protection and indemnity to the Participants against loss of any money or other property entrusted to the Servicer or the Servicer's officers, employees or agents or coming into their control, caused by any dishonest, fraudulent or criminal act, direct or indirect, of the Servicer or of its officers, employees or agents; and

(b)    a policy of errors and omissions insurance.

The Servicer agrees to deliver to any Participant upon request (and at the cost of such Participant) a certificate executed by said insurers to the effect that there will be no cancellation of coverage under said policies without at least thirty (30) days' prior written notification to the Participant and agrees to provide copies of such policies to any Participant upon written request therefor. The Servicer may provide such fidelity and errors and omissions coverage by means of a blanket fidelity bond or a blanket errors and omissions insurance policy.

**21.    Indemnification.** Each Participant, by the execution of this Agreement or its Assumption Agreement (as the case may be) and its acceptance of its Participation Certificate, agrees to indemnify and hold harmless the Servicer against loss or damage, including reasonable attorneys fees and costs, which the Servicer may sustain as a result of any claim by any immediate successor or Transferee of such Participant based in whole or in part on a violation by such Participant of any federal or state securities laws.

**22.    Termination by Participant.**

(a)    A Majority of Participants shall have the right to terminate the Servicer's rights under this Agreement without payment of any premium, penalty or other amount, upon notice in writing to the Servicer, if the Servicer files a petition in bankruptcy or is adjudicated bankrupt in a court of competent jurisdiction, or if a receiver or trustee is appointed for the Servicer and is not discharged within 30 days, or should the Servicer become incapacitated by operation of law or otherwise under circumstances which would substantially impair its ability to faithfully perform its duties under this Agreement, or should the Servicer fail to remit to any Participant any payment required to be made under the terms of this Agreement which continues unremedied for a period of five business days after the due date for any such remittance (provided such remittance shall have been received by the Servicer). This Agreement shall otherwise be terminable by a Majority of Participants if the Servicer has materially breached its duties and obligations under this Agreement and such breach has not been cured within 20 days of receipt by the Servicer from any Participant of a notice demanding such cure. In the event of any termination of the Servicer's rights hereunder, the Servicer will assign and deliver to an FHA-approved mortgagee designated by a Majority of Participants the Mortgage Loans and all documents relating thereto and shall account for and pay over to such mortgagee all monies held by it as mortgagee under the Mortgage Loans. In the event the Participants shall, pursuant to this Section 22(a), have the right to terminate the Servicer's rights under this Agreement, a Majority of Participants shall appoint a successor servicer selected by a Majority of Participants to succeed to the rights, duties and obligations of the Servicer hereunder and the Servicer shall execute such assignments of the Mortgage and collateral documents as well as such further documents as may be necessary to transfer title to the Mortgage Loans to such successor servicer.

14

(b)    The Participants shall also have the right to terminate the Servicer's rights and obligations under this Agreement at any time during the term of this Agreement without cause upon thirty (30) days' written notice, signed by a Majority of Participants, addressed to the Servicer, upon the payment to the Servicer of a sum equal to three percent (3%) of the then unpaid principal balance of the Mortgage Loans.

### 23.    Termination by Servicer; Delegation of Servicing Obligations.

(a)    With the prior written consent of each Participant, which consent shall not be unreasonably withheld, the Servicer shall have the right to appoint a successor Servicer, and to assign and transfer its rights and obligations as Servicer and mortgagee under this Agreement, to another FHA-approved servicer and mortgagee provided that (i) the Participants shall have been given five (5) days' prior written notice identifying the successor Servicer, and (ii) the successor servicer shall execute and deliver to each Participant its written agreement to assume and comply with the obligations of the Servicer under this Agreement.

(b)    The Servicer shall have the right, with the prior written consent of each Participant, which consent shall not be unreasonably withheld, to pledge, hypothecate or assign its rights hereunder to secure borrowings of the Servicer. Notwithstanding any other provision of this Agreement, any lender holding pursuant to such consent a security interest in rights of the Servicer under this Agreement shall be entitled at any time, with the prior written consent of each Participant, which consent shall not be unreasonably withheld, in the exercise of its remedies to appoint a successor Servicer (which may be such lender or a related entity), whether or not there shall have occurred an event which would entitle the Participants under Section 22 to terminate the rights of the Servicer under this Agreement.

(c)    With the prior written consent of each Participant, which consent shall not be unreasonably withheld, the Servicer may perform its servicing obligations under this Agreement through such entity as it may designate (each a "Sub-Servicer"), provided that such entity, at the time it is so designated, is an established servicer of multi-family, FHA-insured mortgage loans. Notwithstanding the fact that the Servicer may perform its servicing obligations under this Agreement through another entity, the Servicer shall at all times remain obligated and liable to the Participants without diminution by virtue of such servicing being performed by such other entity and to the same extent and under the same terms and conditions as if the Servicer alone were performing its obligations under this Agreement.

For purposes of this Agreement, the Servicer shall be deemed to have received payments on the Mortgage Loans when the Sub-Servicer has received such payments. The Servicer shall be entitled to enter into any agreement with a Sub-Servicer for indemnification of the Servicer by such Sub-Servicer and nothing contained in this Agreement shall be deemed to limit or modify such indemnification.

Any agreement between the Servicer and the Sub-Servicer (a "Sub-Servicing Agreement") that may be entered into and any transactions or services relating to the Mortgage Loans involving a Sub-Servicer in its capacity as such and not as an originator shall be deemed to be between the Sub-Servicer and the Servicer alone, and the Participants shall not be deemed parties thereto and shall have no claims, rights, obligations, duties or liabilities with respect to the Sub-Servicer except as set forth in this Section 23(c).

15

In the event the Servicer shall for any reason no longer be the master servicer (including by reason of an event pursuant to this Section 23), the Participants shall, at their sole option, thereupon assume all of the rights and obligations of the Servicer under the Sub-Servicing Agreement that the Servicer has entered into, provided, however, that a Majority of Participants may elect to require the Servicer, at the Servicer's cost and expense, to terminate the Sub-Servicing Agreement in lieu of such assumption. If they so elect, the Participants or the successor servicer for the Participants shall assume all of the Servicer's interest therein and replace the Servicer as a party to the Sub-Servicing Agreement to the same extent as if the Sub-Servicing Agreement had been assigned to the assuming party, except that the Servicer shall not thereby be relieved of any liability or obligations under the Sub-Servicing Agreement arising prior to the date of such assumption.

The Servicer at its expense shall, upon request of a Majority of Participants, deliver to the assuming party all documents and records relating to the Sub-Servicing Agreement and the Mortgage Loans then being serviced and an accounting of amounts collected and held by it and otherwise use its best efforts to effect the orderly and efficient transfer of the Sub-Servicing Agreement to the assuming party.

24. **Amendment of Agreement**. This Agreement may not be amended except by a written instrument duly executed by the Servicer and each Participant.

25. **Participants' Right to Examine Loan Documents and Servicer's Records.** Each Participant shall have the right, at all reasonable times and as often as reasonably required, to inspect all Loan Documents and examine and audit any and all books, records or other information of the Servicer, whether held by the Servicer or by another on behalf of the Servicer, which may be relevant to the performance or observance by the Servicer of the terms, covenants or conditions of this Agreement. The Servicer will provide copies of the Loan Documents in reasonable quantities at the request, and at the expense, of any Participant.

26. **Liability of Servicer**. The Servicer shall be liable to the Participants under this Agreement only to the extent of the obligations expressly imposed upon and undertaken by the Servicer pursuant to the provisions hereof. Neither the Servicer nor any of the directors, officers, employees or agents of the Servicer shall be under any liability to the Participants for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement or the Custodial Agreement, or any instructions received from the Participants, or for errors in judgment; provided, however, that this provision shall not protect the Servicer or any such person against any breach of warranties or representations made herein or any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or negligence in the performance of duties or by reason of disregard of obligations and duties hereunder. The Servicer and any director, officer, employee or agent of the Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any person or entity respecting any matters arising hereunder.

27. **Relationship Between Servicer and Participants**. Nothing herein contained shall be deemed or construed to create a copartnership or joint venture between the parties hereto and the services of the Servicer shall be rendered as an independent contractor and not as agent for the Participants.

16

28. **Optional Assignment to HUD.** If a Mortgage Loan becomes eligible for assignment to HUD in exchange for debentures issued by HUD (the "FHA Debentures") in accordance with Section 221 (g) (4) of the National Housing Act and the regulations thereunder, then the Servicer shall, within three months after the Mortgage Loan becomes eligible, determine the principal amount of FHA Debentures into which the Mortgage Loan is convertible and the interest rate to be borne by such FHA Debentures. The Servicer will notify the Participants, in the next succeeding statement to the Participants pursuant to Section 13 of this Agreement, of the outstanding principal amount, of such Mortgage Loan, its interest rate, and the principal amount of FHA Debentures into which such Mortgage Loan is convertible, the interest rate on such FHA Debentures at the time of such notice and the estimated maturity date of such FHA Debentures. The Servicer will exchange the Mortgage Loan for FHA Debentures unless it receives, prior to the next succeeding statement, from a Majority of Participants, written notices requesting that such exchange should not be made. As promptly as possible after such statement, the Servicer will assign such Mortgage Loan to HUD in exchange for FHA Debentures. Upon receipt of such FHA Debentures, the Servicer will notify each Participant in the next succeeding statement to Participants pursuant to Section 13 that it will solicit bids for such FHA Debentures from at least three dealers in FHA Debentures and sell such FHA Debentures to the dealer submitting the highest bid or, at the option of the Servicer, to itself at such highest bid. The Servicer will remit to the Participants the proceeds received on such sale, less the reasonable fees and expenses of the Servicer (including reasonable attorneys' fees) in assigning the applicable Mortgage Loan and, as applicable, selling or distributing the FHA Debentures. In the event HUD elects, pursuant Section 221 (g) (4) as amended, to auction the Mortgage Loan for cash rather than accept assignment in exchange for FHA Debentures, the Servicer shall follow the same notice and voting procedures as set forth above (except those procedures relating to disposition of the FHA Debentures) and unless written notification is received from a Majority of Participants that the Mortgage Loan should not be auctioned, the Servicer shall so notify HUD and upon sale at auction assign such Mortgage Loan to the party designated by HUD. The Servicer shall remit to Participants the proceeds of any such sale, less the reasonable fees and expenses of the Servicer (including reasonable attorneys' fees). In the event the Mortgage Loan is not sold at auction the Servicer will so notify each Participant in the next succeeding statement to the Participants pursuant to Section 13 and will follow the procedures set forth above as nearly as possible taking care to assure that all required HUD deadlines for elections are adhered to.

29. **Miscellaneous.** This Agreement sets forth the entire agreement of the parties with respect to the subject matter hereof. Except as otherwise provided herein, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective permitted successors and assigns. Section headings in this Agreement are for convenience of reference only and shall not be used in interpreting this Agreement. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument. This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York.

17

IN WITNESS WHEREOF, GREYSTONE FUNDING CORPORATION and GREYSTONE SERVICING CORPORATION, INC. have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

GREYSTONE SERVICING CORPORATION, INC.

By: _____

Carole J. Jurney
Vice President

GREYSTONE FUNDING CORPORATION

By: _____

Julie J. Delimba
Vice President

18

## EXHIBIT A

## PROJECT SUMMARIES

|  | Macombs Village I New York, NY | Fairmont Place New York, NY |
|---|---|---|
| FHA Project No.: | 012-57304 | 012-57277 |
| Maturity Date: | 05/01/2024 | 06/01/2024 |
| Number of Units: | 173 | 28 |
| Original Principal Balance: | $10,075,600.00 | $1,586,400.00 |
| Outstanding Principal Balance for 11/26/96: | $9,857,420.69 | $1,552,511.63 |
| Note Interest Rate: | 13.250% | 13.250% |
| Servicing Fees: | .05% | .05% |
| Net Rate to Participant: | 13.20% | 13.20% |
| HUD Debenture Rate: | 12.75% | 12.875% |
| Date of Commencement of Amortization: | 06/01/84 | 07/01/84 |
| Date of Final Endorsement: | 10/31/84 | 12/19/85 |
| Monthly Principal and Interest on Mortgage: | $111,826.06 | $17,606.98 |
| Section 8 Units: | 100% | 100% |
| Prepayment Provisions: | N/A | 05/01/96 to 04/30/97 = 1.50% declining by .5% per year |
| Notes: | | |

## EXHIBIT B

## FORM OF PARTICIPATION CERTIFICATES

THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR UNDER THE SECURITIES LAWS OF ANY STATE. ANY RESALE OR TRANSFER OF THIS CERTIFICATE WITHOUT REGISTRATION THEREOF UNDER SUCH LAWS MAY ONLY BE MADE IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS AND IN ACCORDANCE WITH THE PROVISIONS OF SECTION 16 OF THE POOLING AND SERVICING AGREEMENT REFERRED TO HEREIN.

### PARTICIPATION CERTIFICATE

evidencing a proportionate interest in
the pool of project mortgage loans known as

### SERIES GREYSTONE 96-6

insured by the Federal Housing Administration
and held and serviced by

### GREYSTONE SERVICING CORPORATION, INC.

(not an interest in or obligation of
Greystone Servicing Corporation, Inc.)

---

THIS CERTIFIES THAT,

(the "Participant"), is the registered owner of an undivided _____ % participation interest in a pool of FHA-insured mortgage loans known as Series Greystone 96-6, such loans more fully described on Schedule A hereto (the "Mortgage Loans") held by GREYSTONE SERVICING CORPORATION, INC. (the "Servicer") as mortgagee of record and servicer, pursuant to the Pooling and Servicing Agreement (the "Pooling Agreement") dated as of November 26, 1996 between Greystone Funding Corporation as initial Participant, and the Servicer. This Certificate is issued under and is subject to the terms, provisions and conditions of the Pooling Agreement. This Certificate may not be assigned or transferred except in accordance with the Pooling Agreement, which provides that the transferring Participant and the Transferee must execute, and the Servicer must receive, a written assumption agreement, in the form attached to the Pooling Agreement, which shall notify the Servicer of the transfer to the new Participant. The terms of the Pooling Agreement are binding upon any Transferee or assignee who expressly assumes the rights and obligations of the Participant thereunder by an assignment or transfer hereof.

The Servicer shall distribute on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following, commencing on December 25, 1996 to the Participant in whose name this Certificate is registered at the close of business on the last day (or if such last day is not a Business Day, the Business Day immediately preceding such last day) of the month next preceding the month of such distribution, the amount required to be distributed pursuant to Section 9 of the Pooling Agreement.

Distributions on this Certificate will be made by the Servicer to the Participant entitled thereto as shall appear on the Servicer's books without the presentation or surrender of this Certificate or the making of any notation thereon.

This Certificate does not represent an obligation of, or an interest in, the Servicer and is not insured or guaranteed by the Federal Housing Administration, the Government National Mortgage Association or any other government agency. This Certificate is limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth in the Pooling Agreement.

**IN WITNESS WHEREOF**, the Servicer has caused this Certificate to be duly executed.

<div style="margin-left:40%;">

**GREYSTONE SERVICING CORPORATION, INC.**

</div>

Dated: _____          By:_____
                                        Authorized Officer

<div style="text-align:center;">B-2</div>

## SCHEDULE A

to Participation Certificate

|  | Macombs Village I New York, NY | Fairmont Place New York, NY |
|---|---|---|
| FHA Project No.: | 012-57304 | 012-57277 |
| Maturity Date: | 05/01/2024 | 06/01/2024 |
| Number of Units: | 173 | 28 |
| Original Principal Balance: | $10,075,600.00 | $1,586,400.00 |
| Outstanding Principal Balance for 11/26/96: | $9,857,420.69 | $1,552,511.63 |
| Note Interest Rate: | 13.250% | 13.250% |
| Servicing Fees: | .05% | .05% |
| Net Rate to Participant: | 13.20% | 13.20% |
| HUD Debenture Rate: | 12.75% | 12.875% |
| Date of Commencement of Amortization: | 06/01/84 | 07/01/84 |
| Date of Final Endorsement: | 10/31/84 | 12/19/85 |
| Monthly Principal and Interest on Mortgage: | $111,826.06 | $17,606.98 |
| Section 8 Units: | 100% | 100% |
| Prepayment Provisions: | N/A | 05/01/96 to 04/30/97 = 1.50% declining by .5% per year |
| Notes: |  |  |

B-3

**EXHIBIT C**
**FORM OF ASSUMPTION AGREEMENT**

[Date]

Greystone Servicing Corporation, Inc.
Alexandira Pike Building, 5th Floor
98 Alexandria Pike
Warrenton, Virginia   20186

**Series Greystone 96-6**

Dear Sirs:

You are Servicer under a Pooling and Servicing Agreement dated as of November 26, 1996 in respect of Series Greystone 96-6 (the "Pooling Agreement") between yourself and Greystone Funding Corporation, as initial Participant. All capitalized terms used but not otherwise defined in this Assumption Agreement shall have the meanings ascribed to them in the Pooling Agreement.

1.   _____ (the "Transferor") is the registered owner of the _____ % Participation Interest issued under the Pooling Agreement. You are hereby notified that the Transferor has on this date assigned all of its right, title and interest in and to the  Participation Interest, including related rights in respect of the Mortgage Loans and proceeds thereof, to:

(the "Transferee").

2.   The Transferee hereby represents, covenants and warrants to the Servicer that:

(a)   the Transferee considers itself a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Participation Certificate and the Participation Interest;

(b)   the Transferee (i) has received from the Transferor (or the Servicer acting on behalf of the Transferor), and has reviewed to its satisfaction, a copy of the Pooling Agreement and all other information which may be material to its acquisition of an interest in the Mortgage Loans and the Participation Interest and (ii) has had a reasonable opportunity to ask questions of and receive answers from such parties as it considers to be knowledgeable in matters relating to the Mortgage Loans and the Participation Interest and the offer and sale thereof, and all such questions have been answered to its satisfaction;

C-1

(c)    the Transferee is duly organized and validly existing under the laws of the jurisdiction of its formation and has all requisite power and authority to execute and deliver this Assumption Agreement and comply with the duties and obligations of the Participant under the Pooling Agreement; and

(d)    the Transferee has duly authorized and validly executed and delivered this Assumption Agreement, and this Assumption Agreement (and, therefore, the obligations of the Participant under the Pooling Agreement) constitute the legal, valid and binding obligations of the Transferee, enforceable against the Transferee in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws in effect from time to time affecting the enforcement of creditor's rights generally.

(e)    Transferee is not an employee benefit plan subject to Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and is acquiring the Participation Interest with its general corporate assets and not directly or indirectly with the plan assets of either an "employee benefit plan" within the meaning of Section 3(3) of ERISA, as amended, or a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), other than a "governmental plan" as defined in Section 414(d) of the Code with respect to which it is a "party in interest" within the meaning or Section 3(14) of ERISA or 4975(e)(2) of the Code.

3.    Pursuant to Section 16 of the Pooling Agreement, the Transferee hereby assumes all of the duties and obligations, and makes for itself all of the representations, warranties, agreements and covenants, of the Participant under the Pooling Agreement.

4.    The Transferor hereby surrenders to the Servicer the Participation Certificate evidencing the interest which it has transferred to the Transferee, and represents, covenants and warrants to the Servicer that:

(a)    immediately prior to its assignment to the Transferee, the Transferor was the registered holder of such Participation Certificate; and

(b)    the Transferor is under no current obligation to sell, transfer, assign or otherwise dispose of the Participation Certificate being transferred to the Transferee to any person other than the Transferee.

5.    The Servicer shall remit all proceeds which the Transferee is entitled to receive to the Transferee at:

[insert wire transfer or other payment instructions]

The Transferee's address for receipt of notices under the Pooling Agreement is as follows:

C-2

This Assumption Agreement shall be effective immediately upon its delivery to you, without acknowledgment or execution by you of any counterpart hereof.

**[TRANSFEROR]**

By:_____

**[TRANSFEREE]**

By: _____

TRANSFEREE'S TRUE AND CORRECT
TAXPAYER IDENTIFICATION NUMBER:

_____

# EXHIBIT C

## TO DECLARATION OF JOSÉ A. ISASI, II IN SUPPORT OF DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS

## Part 2

**EXHIBIT D**
**FORM OF CUSTODIAL AGREEMENT**

## CUSTODIAL AGREEMENT

**THIS AGREEMENT** dated as of November 26, 1996, by and between **GREYSTONE FUNDING CORPORATION** a corporation organized and existing under the laws of Virginia having an address at 98 Alexandria Pike, 4th Floor, Warrenton, Virginia 20186 (the "Participant"), **FIRST TENNESSEE BANK NATIONAL ASSOCIATION,** a national banking association, having an address at 4385 Poplar Avenue, Memphis, Tennessee 38117 (the "Custodian") and **GREYSTONE SERVICING CORPORATION, INC.,** a Georgia corporation, having an address at 98 Alexandria Pike Building, 5th Floor, Warrenton, Virginia 20186 (the "Servicer").

### W I T N E S S E T H:

**WHEREAS**, the Participant (on behalf of itself and its successors, the "Participants") has agreed to purchase from the Servicer a Participation Certificate (the "Certificate") representing a 100% participation interest in a certain pool of project loans (the "Mortgage Loans") held and serviced by the Servicer, insured by the Federal Housing Administration ("FHA") and identified as Series Greystone 96-6, which Participation Certificate is issued pursuant to the terms and conditions of a Pooling and Servicing Agreement of even date herewith between the Participant and the Servicer (the "Servicing Agreement"); and

**WHEREAS**, the Custodian is a national banking association regulated by the Comptroller of the Currency; and

**WHEREAS**, the Participant desires to have the Custodian take possession of the Mortgage Notes for the Mortgage Loans, along with certain other documents specified herein, as the custodian for and bailee of the Participant, in accordance with the terms and conditions hereof;

**NOW, THEREFORE**, in consideration of the mutual undertakings herein expressed, the parties hereto hereby agree as follows:

1.      The Servicer has delivered and released to the Custodian the following documents pertaining to each of the Mortgage Loans identified in the Project Summaries (the "Project Summary") attached as Exhibit A hereto:

(a)     The original Mortgage Note containing the endorsement of FHA, and an allonge to such Mortgage Note being endorsed, in blank, "Pay to the order of _____, without recourse" and signed in the name of the Servicer by an authorized officer, with all intervening endorsements showing a complete chain of title from the originator to the Servicer, inclusive of original Notes.

(b)     The original recorded Mortgage (or if an original Mortgage is not yet available, a copy of such Mortgage) certified by the recorder's office to be a true and correct copy thereof.

(c)     An assignment of the Mortgage in recordable form, in blank;

(d)     The original policy of title insurance;

(e)     The original of each assumption, modification, written assurance or substitution agreement, if any;

(f)     Assignments of any collateral documents, in blank;

(g)     A copy of the Regulatory Agreement;

(h)     An original Security Agreement (or if an original is not available, a copy of the executed Security Agreement); and

(i)     All other documents as may be required by Participant with respect to the Mortgage Loan.

If the original Assignment of the Mortgage was not delivered pursuant to (b) above, the original title insurance policy endorsement was not delivered pursuant to (d) above or any other documents required and identified by Participant pursuant to (i) above, the Servicer shall deliver such originals or duplicate originals to the Custodian promptly upon the Servicer's receipt thereof. All Mortgage Loans documents held by the Custodian as to the Mortgage Loans are referred to herein as the "Custodian's Mortgage File".

2.     Upon the issuance of the initial certificate (as described below), the Custodian shall deliver to the Participant and the Servicer a certificate ("Initial Certification") in the form annexed hereto as Exhibit B to the effect that the Custodian has received the Custodian's Mortgage File containing all documents listed in Paragraph 1 hereof with respect to the Mortgage Loans. Any of the documents enumerated in Paragraph 1 hereof which have not been delivered to the Custodian by the Servicer shall be noted by the Custodian in the Initial Certification.

3.     With respect to the Custodian's Mortgage File, the Custodian is exclusively the custodian for and the bailee of the Participant; and provided, further, that the Custodian shall be the bailee of the Servicer to the extent required by, and this Custodial Agreement is subject to and subordinate to, the applicable rules and regulations of the FHA. The Custodian shall hold all documents constituting the Custodian's Mortgage File received by it for the exclusive use and benefit of the Participants, and shall make disposition thereof only in accordance with this Custodial Agreement and Servicing Agreement, or otherwise in accordance with instructions furnished by the a Majority of the Participants. Neither the Custodian nor the Servicer shall be

2

responsible or liable for any action taken by either of them in accordance with the written instructions of a Marjority of the Participants.  Custodian shall segregate and maintain continuous custody of all documents constituting the Custodian's Mortgage File received by it in secure and fireproof facilities in accordance with customary standards for such custody.  The Participants hereby agree whether or not any of the transactions contemplated in this Custodial Agreement shall be consummated, to assume liability for, and do hereby indemnify, protect, save and keep harmless the Custodian, in its individual capacity and as custodian, and its successors, assigns, agents, employees and servants, from and against any and all liability, obligation, losses, damages, penalties, taxes (excluding any taxes payable by the Custodian on or measured by any compensation received by the Custodian for its services under this Custodial Agreement), claims, actions, suits, costs, expenses or disbursements (including legal fees and expenses) of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Custodian, in its individual capacity or as custodian, (whether or not also agreed to be indemnified against by any other person under this Custodial Agreement or any other document) by any person in any way relating to or arising out of the action or inaction of the Participants, or their failure to perform any of their duties or obligations, under this Custodial Agreement, the Servicing Agreement, the Certificate or any other document contemplated in such documents.  The indemnities set forth in this Paragraph 3 shall survive the termination of this Custodial Agreement.

4.      Within 10 days after the issuance of the initial Certificate, the Custodian shall ascertain that all documents required to be delivered to it pursuant to Paragraph 1 hereof are in its possession, and shall deliver to the Participants and the Servicer a certification ("Final Certification") of the Custodian in the form annexed hereto as Exhibit C to the effect that, as to the Mortgage Loans, (i) all documents required to be delivered to it pursuant to Paragraph 1 of this Custodial Agreement are in its possession, (ii) such documents have been reviewed by it and appear regular on their face and relate to the Mortgage Loans, (iii) based on its examination of such documents and only as to such documents, the information set forth in the Project Summary respecting the Mortgage Loans is correct and (iv) that the Mortgage Notes have been endorsed as provided in Paragraph 1. During the life of the Mortgage Loans, in the event the Custodian discovers any defect with respect to the Custodian's Mortgage File, the Custodian shall give written specification of such defect to the Servicer and the Participants.

5.      From time to time and as appropriate for the servicing of the Mortgage Loans, the Custodian is hereby authorized, upon written request and receipt of the Servicer in the form annexed hereto as Exhibit D, to release to the Servicer the Custodian's Mortgage File or the documents set forth in such receipt to the Servicer.  All documents so released to the Servicer shall be held by it in trust for the benefit of the Participant.  The Servicer shall return to the Custodian the Custodian's Mortgage File or such documents when the Servicer's need therefor in connection with such servicing no longer exists.  The Participants shall be copied on any applicable correspondence from Servicer to Custodian in return of such documents.

6.      Upon the payment in full of the Mortgage Loans, and upon receipt by the Custodian of the Servicer's request for release, which request shall be accompanied by a request

3

in the form annexed hereto as Exhibit D and a certification to the effect that all amounts received or to be received by the Servicer in connection with such payment have been or will be credited to the Servicer's FHA custodial account maintained for the benefit of the Participants, the Custodian shall promptly release the Custodian's Mortgage File to the Servicer.

7.    It is understood that the Custodian will charge such fees for its services under this Custodial Agreement as are set forth in a separate agreement between the Custodian and the Servicer, the payment of which, together with the Custodian's expenses in connection herewith, shall be solely the obligation of the Servicer. Servicer hereby agrees, whether or not any of the transactions contemplated in this Custodial Agreement shall be consummated, to assume liability for, and does hereby indemnify, protect, save and keep harmless the Custodian, in its individual capacity and as custodian, and its successors, assigns, agents, employees and servants, from and against any and all liability, obligation, losses, damages, penalties, taxes (excluding any taxes payable by the Custodian on or measured by any compensation received by the Custodian for its services under this Custodial Agreement), claims, actions, suits, costs, expenses or disbursements (including legal fees and expenses) of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Custodian, in its individual capacity or as custodian, (whether or not also agreed to be indemnified against by any other person under this Custodial Agreement or any other document) by any person in any way relating to or arising out of the action or inaction of the Servicer, or its failure to perform any of its duties or obligations, under this Custodial Agreement, the Servicing Agreement, any Certificate or any other document contemplated in such documents. The indemnities set forth in this Paragraph 7 shall survive the termination of this Custodial Agreement.

8.    A Majority of the Participants, with or without cause, or following a resignation, removal or termination of the Servicer as servicer, or the occurrence of any event of default by Servicer as set forth in the Servicing Agreement, or upon a failure by the Custodian to perform or observe any term of this Custodial Agreement, may remove and discharge the Custodian from the performance of its duties under this Custodial Agreement by written notice to the Custodian, with a copy to Servicer. Having given notice of such removal, the Participant shall promptly appoint a successor Custodian to act on behalf of the Participants by written instrument, with a copy shall be delivered to the Servicer. In the event of any such removal, the Custodian shall promptly transfer to the successor Custodian, as directed, all of the Custodian's Mortgage File. The reasonable fees of any successor Custodian shall be paid by the Servicer if the Custodian is removed or discharged by the Participant with or without cause; provided, however, that if the Custodian is discharged without cause the Servicer shall not be obligated to pay fees to a successor Custodian in excess of the fees paid to the discharged Custodian.

9.    Upon reasonable prior written notice to the Custodian, the Servicer or the Participants will be permitted during normal business hours to examine the Custodian's Mortgage File, documents, records and other papers in possession of or under the control of Custodian relating to the Mortgage Loans.

4

10.    If the Custodian is furnished evidence satisfactory to it that the Servicing Agreement has been terminated, it shall upon written request of the Servicer or a Majority of the Participants and upon receipt of proof satisfactory to the Custodian of the ownership of the Mortgage Loans, release the Custodian's Mortgage File to such person and in such a manner as the requesting party shall designate.

11.    The Custodian shall, at its own expense, maintain at all times during the existence of this Agreement and keep in full force and effect, (1) fidelity insurance, (2) theft of documents insurance, (3) forgery insurance and (4) errors and omissions insurance. All such insurance shall be in amounts, with standard coverage and subject to deductibles, as are customary for insurance typically maintained by banks which act as custodian. A certificate of the respective insurer as to each such policy shall be furnished to the Participant, upon request, containing the insurer's statement or endorsement that such insurance shall not terminate prior to receipt by Participant, by registered mail, of 10 days notice thereof.

12.    This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed to be an original, and together such counterparts shall constitute and be one and the same instrument.

13.    This Agreement shall be construed in accordance with the laws of the State of Tennessee and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

14.    Upon the request of the Servicer or the Participant and at the cost and expense of the requesting party, Custodian shall provide such requesting party with copies of any documents in the Custodian's Mortgage File.

15.    By execution of this Agreement, the Custodian warrants that it currently holds and during the existence of this Agreement shall hold no adverse interest, by way of security or otherwise, in the Mortgage Loans and hereby waives and releases any such interest which it may have in the Mortgage Loans as of the date hereof.

16.    The Custodian may terminate its obligations under this Agreement upon at least 60 days notice to the Servicer and the Participants. In the event of such termination, the Servicer shall appoint a successor Custodian, subject to approval by a Majority of the Participants, which approval shall not be unreasonably withheld or delayed. The payment of such successor Custodian's fees and expenses shall be the sole responsibility of the Servicer. Upon such appointment, the Custodian shall promptly transfer to the successor Custodian, as directed by the Servicer, the Custodian's Mortgage File being administered under this Agreement. No such termination of the Custodian shall become effective until a successor custodian has assumed the rights and obligations of the Custodian under this Custodial.

17.    This Agreement shall terminate upon the final payment or other liquidation of the Mortgage Loans and the final remittance of all funds due the Participants under the

5

Servicing Agreement.  The Servicer shall provide to the Custodian a certification which shall state that the foregoing events have occurred.  In such event, and upon the Custodian's receipt of the foregoing certification, all documents remaining in the Custodian's Mortgage File shall be forwarded to the Servicer.

18.    All demands, notices and communications hereunder shall be in writing and shall be deemed to have been given if mailed, by registered or certified mail, return receipt requested, or, if by other means, when received by the other party at the address shown on the first page hereof, or such other address as may hereafter be furnished to the other party by like notice.  Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

19.    The Custodian and any of its agents, employees and servants may rely upon the genuineness of any notices, requests, consents, certificates, orders, telecopies, telexes or other papers or documents delivered to it pursuant to or as contemplated by this Agreement by authorized representatives of the Servicer or any Participant, as the case may be, without investigation as to the authenticity or legal effectiveness of such papers or documents.

20.    Capitalized terms not otherwise defined herein shall have the meanings given them in the Servicing Agreement.

IN WITNESS THEREOF, the Servicer, the Participant and the Custodian have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the date first written above.

GREYSTONE FUNDING CORPORATION
Participant

By:_____
        Julie J. Delimba
        Vice President

GREYSTONE SERVICING CORPORATION, INC.,
Servicer

By:_____
        Carole J. Jurney
        Vice President

FIRST TENNESSEE BANK
NATIONAL ASSOCIATION,
Custodian

By:_____
Name:
Title:

7

# EXHIBIT A

## PROJECT SUMMARIES

|  | Macombs Village I New York, NY | Fairmont Place New York, NY |
|---|---|---|
| FHA Project No.: | 012-57304 | 012-57277 |
| Maturity Date: | 05/01/2024 | 06/01/2024 |
| Number of Units: | 173 | 28 |
| Original Principal Balance: | $10,075,600.00 | $1,586,400.00 |
| Outstanding Principal Balance for 11/26/96: | $9,857,420.69 | $1,552,511.63 |
| Note Interest Rate: | 13.250% | 13.250% |
| Servicing Fees: | .05% | .05% |
| Net Rate to Participant: | 13.20% | 13.20% |
| HUD Debenture Rate: | 12.75% | 12.875% |
| Date of Commencement of Amortization: | 06/01/84 | 07/01/84 |
| Date of Final Endorsement: | 10/31/84 | 12/19/85 |
| Monthly Principal and Interest on Mortgage: | $111,826.06 | $17,606.98 |
| Section 8 Units: | 100% | 100% |
| Prepayment Provisions: | N/A | 05/01/96 to 04/30/97 = 1.50% declining by .5% per year |
| Notes: |  |  |

A-1

## EXHIBIT B

## INITIAL CERTIFICATION

[date]

[participant]

Re:    Custodial Agreement dated as of November 26, 1996 among Greystone Funding Corporation [Participant], Greystone Servicing Corporation, Inc. [Servicer], and First Tennessee Bank National Association, [Custodian], <u>pursuant to Servicing Agreement, of the same date.</u>

Gentlemen:

        In accordance with the provisions of Paragraph 2 of the above-referenced Custodial Agreement, the undersigned, as Custodian, hereby certifies that, except with respect to the documents described on Schedule One attached hereto, it has received a Custodian's Mortgage File with respect to the Mortgage Loans identified on the Project Summary.

        FIRST TENNESSEE BANK
NATIONAL ASSOCIATION

By:_____
Name:
Title:

B-1

**EXHIBIT C**

**FINAL CERTIFICATION**

[date]

[participant]

Re:   Custodial Agreement dated as of November 26, 1996 among Greystone
      Funding Corporation [Participant], Greystone Servicing Corporation, Inc.
      [Servicer], and First Tennessee Bank National Association, [Custodian],
      pursuant to Pooling and Servicing Agreement, of the same date

Gentlemen:

        In accordance with the provisions of Paragraph 4 of the above-referenced
Custodial Agreement, the undersigned, as Custodian, hereby certifies that as to the Mortgage
Loans listed in the Project Summaries, it has reviewed the Custodian's Mortgage File and has
determined that, except with respect to the documents described on Schedule One attached
hereto, (i) all documents required to be delivered to it pursuant to the Custodial Agreement are
in its possession, (ii) such documents have been reviewed by it and appear regular on their face
and relate to the Mortgage Loans, (iii) based on its examination of such documents and only as
to such documents, the information set forth in the Project Summaries respecting the Mortgage
Loans is correct and (iv) the Mortgage Notes has been endorsed as provided in Paragraph 1 of
the Custodial Agreement.

        Capitalized terms used herein but not defined herein shall have the meanings
assigned to them in the captioned Custodial Agreement.

                              FIRST TENNESSEE BANK
                              NATIONAL ASSOCIATION


                              By:_____
                              Name:
                              Title:

C-1

## EXHIBIT D

## REQUEST FOR RELEASE OF DOCUMENTS

To: First Tennessee Bank National Association

        Re:    Custodial Agreement dated as of November 26, 1996, among Greystone Funding Corporation [Participant], Greystone Servicing Corporation, Inc. [Servicer], and First Tennessee Bank National Association, [Custodian], pursuant to <u>Pooling and Servicing Agreement, of the same date</u>

        In connection with the administration of the Mortgage Loans held by you as Custodian for the Participant, we request the release, and acknowledge receipt, of the Custodian's Mortgage File for the Mortgage Loans described below, for the reason indicated.

<u>Mortgagor's Name, Address & Zip Code:</u>

<u>FHA Loan Number:</u>

<u>Reason for Requesting Documents:</u>

        Upon our return of all of the above documents to you as Custodian, please acknowledge your receipt by signing in the space indicated below, and returning this form.

GREYSTONE SERVICING CORPORATION, INC.

By:_____        Date:_____

Documents returned to Custodian:
FIRST TENNESSEE BANK NATIONAL ASSOCIATION

By:_____        Date:_____

cc:    All Participants under Servicing Agreement

## CUSTODIAL AGREEMENT

THIS AGREEMENT dated as of November 26, 1996, by and between **GREYSTONE FUNDING CORPORATION** a corporation organized and existing under the laws of Virginia having an address at 98 Alexandria Pike, 4th Floor, Warrenton, Virginia 20186 (the "Participant"), **FIRST TENNESSEE BANK NATIONAL ASSOCIATION**, a national banking association, having an address at 4385 Poplar Avenue, Memphis, Tennessee 38117 (the "Custodian") and **GREYSTONE SERVICING CORPORATION, INC.**, a Georgia corporation, having an address at 98 Alexandria Pike Building, 5th Floor, Warrenton, Virginia 20186 (the "Servicer").

## W I T N E S S E T H:

WHEREAS, the Participant (on behalf of itself and its successors, the "Participants") has agreed to purchase from the Servicer a Participation Certificate (the "Certificate") representing a 100% participation interest in a certain pool of project loans (the "Mortgage Loans") held and serviced by the Servicer, insured by the Federal Housing Administration ("FHA") and identified as Series Greystone 96-6, which Participation Certificate is issued pursuant to the terms and conditions of a Pooling and Servicing Agreement of even date herewith between the Participant and the Servicer (the "Servicing Agreement"); and

WHEREAS, the Custodian is a national banking association regulated by the Comptroller of the Currency; and

WHEREAS, the Participant desires to have the Custodian take possession of the Mortgage Notes for the Mortgage Loans, along with certain other documents specified herein, as the custodian for and bailee of the Participant, in accordance with the terms and conditions hereof;

NOW, THEREFORE, in consideration of the mutual undertakings herein expressed, the parties hereto hereby agree as follows:

  1. The Servicer has delivered and released to the Custodian the following documents pertaining to each of the Mortgage Loans identified in the Project Summaries (the "Project Summary") attached as Exhibit A hereto:

    (a) The original Mortgage Note containing the endorsement of FHA, and an allonge to such Mortgage Note being endorsed, in blank, "Pay to the order of _____, without recourse" and signed in the name of the Servicer by an authorized officer, with all intervening endorsements showing a complete chain of title from the originator to the Servicer, inclusive of original Notes.

(b) The original recorded Mortgage (or if an original Mortgage is not yet available, a copy of such Mortgage) certified by the recorder's office to be a true and correct copy thereof.

(c) An assignment of the Mortgage in recordable form, in blank;

(d) The original policy of title insurance;

(e) The original of each assumption, modification, written assurance or substitution agreement, if any;

(f) Assignments of any collateral documents, in blank;

(g) A copy of the Regulatory Agreement;

(h) An original Security Agreement (or if an original is not available, a copy of the executed Security Agreement); and

(i) All other documents as may be required by Participant with respect to the Mortgage Loan.

If the original Assignment of the Mortgage was not delivered pursuant to (b) above, the original title insurance policy endorsement was not delivered pursuant to (d) above or any other documents required and identified by Participant pursuant to (i) above, the Servicer shall deliver such originals or duplicate originals to the Custodian promptly upon the Servicer's receipt thereof. All Mortgage Loans documents held by the Custodian as to the Mortgage Loans are referred to herein as the "Custodian's Mortgage File".

2. Upon the issuance of the initial certificate (as described below), the Custodian shall deliver to the Participant and the Servicer a certificate ("Initial Certification") in the form annexed hereto as Exhibit B to the effect that the Custodian has received the Custodian's Mortgage File containing all documents listed in Paragraph 1 hereof with respect to the Mortgage Loans. Any of the documents enumerated in Paragraph 1 hereof which have not been delivered to the Custodian by the Servicer shall be noted by the Custodian in the Initial Certification.

3. With respect to the Custodian's Mortgage File, the Custodian is exclusively the custodian for and the bailee of the Participant; and provided, further, that the Custodian shall be the bailee of the Servicer to the extent required by, and this Custodial Agreement is subject to and subordinate to, the applicable rules and regulations of the FHA. The Custodian shall hold all documents constituting the Custodian's Mortgage File received by it for the exclusive use and benefit of the Participants, and shall make disposition thereof only in accordance with this Custodial Agreement and Servicing Agreement, or otherwise in accordance with instructions furnished by the a Majority of the Participants. Neither the Custodian nor the Servicer shall be

2

responsible or liable for any action taken by either of them in accordance with the written instructions of a Majority of the Participants.  Custodian shall segregate and maintain continuous custody of all documents constituting the Custodian's Mortgage File received by it in secure and fireproof facilities in accordance with customary standards for such custody.  The Participants hereby agree whether or not any of the transactions contemplated in this Custodial Agreement shall be consummated, to assume liability for, and do hereby indemnify, protect, save and keep harmless the Custodian, in its individual capacity and as custodian, and its successors, assigns, agents, employees and servants, from and against any and all liability, obligation, losses, damages, penalties, taxes (excluding any taxes payable by the Custodian on or measured by any compensation received by the Custodian for its services under this Custodial Agreement), claims, actions, suits, costs, expenses or disbursements (including legal fees and expenses) of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Custodian, in its individual capacity or as custodian, (whether or not also agreed to be indemnified against by any other person under this Custodial Agreement or any other document) by any person in any way relating to or arising out of the action or inaction of the Participants, or their failure to perform any of their duties or obligations, under this Custodial Agreement, the Servicing Agreement, the Certificate or any other document contemplated in such documents.  The indemnities set forth in this Paragraph 3 shall survive the termination of this Custodial Agreement.

4.    Within 10 days after the issuance of the initial Certificate, the Custodian shall ascertain that all documents required to be delivered to it pursuant to Paragraph 1 hereof are in its possession, and shall deliver to the Participants and the Servicer a certification ("Final Certification") of the Custodian in the form annexed hereto as Exhibit C to the effect that, as to the Mortgage Loans, (i) all documents required to be delivered to it pursuant to Paragraph 1 of this Custodial Agreement are in its possession, (ii) such documents have been reviewed by it and appear regular on their face and relate to the Mortgage Loans, (iii) based on its examination of such documents and only as to such documents, the information set forth in the Project Summary respecting the Mortgage Loans is correct and (iv) that the Mortgage Notes have been endorsed as provided in Paragraph 1.  During the life of the Mortgage Loans, in the event the Custodian discovers any defect with respect to the Custodian's Mortgage File, the Custodian shall give written specification of such defect to the Servicer and the Participants.

5.    From time to time and as appropriate for the servicing of the Mortgage Loans, the Custodian is hereby authorized, upon written request and receipt of the Servicer in the form annexed hereto as Exhibit D, to release to the Servicer the Custodian's Mortgage File or the documents set forth in such receipt to the Servicer.  All documents so released to the Servicer shall be held by it in trust for the benefit of the Participant.  The Servicer shall return to the Custodian the Custodian's Mortgage File or such documents when the Servicer's need therefor in connection with such servicing no longer exists.  The Participants shall be copied on any applicable correspondence from Servicer to Custodian in return of such documents.

6.    Upon the payment in full of the Mortgage Loans, and upon receipt by the Custodian of the Servicer's request for release, which request shall be accompanied by a request

3

in the form annexed hereto as Exhibit D and a certification to the effect that all amounts received or to be received by the Servicer in connection with such payment have been or will be credited to the Servicer's FHA custodial account maintained for the benefit of the Participants, the Custodian shall promptly release the Custodian's Mortgage File to the Servicer.

7.    It is understood that the Custodian will charge such fees for its services under this Custodial Agreement as are set forth in a separate agreement between the Custodian and the Servicer, the payment of which, together with the Custodian's expenses in connection herewith, shall be solely the obligation of the Servicer. Servicer hereby agrees, whether or not any of the transactions contemplated in this Custodial Agreement shall be consummated, to assume liability for, and does hereby indemnify, protect, save and keep harmless the Custodian, in its individual capacity and as custodian, and its successors, assigns, agents, employees and servants, from and against any and all liability, obligation, losses, damages, penalties, taxes (excluding any taxes payable by the Custodian on or measured by any compensation received by the Custodian for its services under this Custodial Agreement), claims, actions, suits, costs, expenses or disbursements (including legal fees and expenses) of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Custodian, in its individual capacity or as custodian, (whether or not also agreed to be indemnified against by any other person under this Custodial Agreement or any other document) by any person in any way relating to or arising out of the action or inaction of the Servicer, or its failure to perform any of its duties or obligations, under this Custodial Agreement, the Servicing Agreement, any Certificate or any other document contemplated in such documents. The indemnities set forth in this Paragraph 7 shall survive the termination of this Custodial Agreement.

8.    A Majority of the Participants, with or without cause, or following a resignation, removal or termination of the Servicer as servicer, or the occurrence of any event of default by Servicer as set forth in the Servicing Agreement, or upon a failure by the Custodian to perform or observe any term of this Custodial Agreement, may remove and discharge the Custodian from the performance of its duties under this Custodial Agreement by written notice to the Custodian, with a copy to Servicer. Having given notice of such removal, the Participant shall promptly appoint a successor Custodian to act on behalf of the Participants by written instrument, with a copy shall be delivered to the Servicer. In the event of any such removal, the Custodian shall promptly transfer to the successor Custodian, as directed, all of the Custodian's Mortgage File. The reasonable fees of any successor Custodian shall be paid by the Servicer if the Custodian is removed or discharged by the Participant with or without cause; provided, however, that if the Custodian is discharged without cause the Servicer shall not be obligated to pay fees to a successor Custodian in excess of the fees paid to the discharged Custodian.

9.    Upon reasonable prior written notice to the Custodian, the Servicer or the Participants will be permitted during normal business hours to examine the Custodian's Mortgage File, documents, records and other papers in possession of or under the control of Custodian relating to the Mortgage Loans.

4

10.    If the Custodian is furnished evidence satisfactory to it that the Servicing Agreement has been terminated, it shall upon written request of the Servicer or a Majority of the Participants and upon receipt of proof satisfactory to the Custodian of the ownership of the Mortgage Loans, release the Custodian's Mortgage File to such person and in such a manner as the requesting party shall designate.

11.    The Custodian shall, at its own expense, maintain at all times during the existence of this Agreement and keep in full force and effect, (1) fidelity insurance, (2) theft of documents insurance, (3) forgery insurance and (4) errors and omissions insurance. All such insurance shall be in amounts, with standard coverage and subject to deductibles, as are customary for insurance typically maintained by banks which act as custodian. A certificate of the respective insurer as to each such policy shall be furnished to the Participant, upon request, containing the insurer's statement or endorsement that such insurance shall not terminate prior to receipt by Participant, by registered mail, of 10 days notice thereof.

12.    This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed to be an original, and together such counterparts shall constitute and be one and the same instrument.

13.    This Agreement shall be construed in accordance with the laws of the State of Tennessee and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

14.    Upon the request of the Servicer or the Participant and at the cost and expense of the requesting party, Custodian shall provide such requesting party with copies of any documents in the Custodian's Mortgage File.

15.    By execution of this Agreement, the Custodian warrants that it currently holds and during the existence of this Agreement shall hold no adverse interest, by way of security or otherwise, in the Mortgage Loans and hereby waives and releases any such interest which it may have in the Mortgage Loans as of the date hereof.

16.    The Custodian may terminate its obligations under this Agreement upon at least 60 days notice to the Servicer and the Participants. In the event of such termination, the Servicer shall appoint a successor Custodian, subject to approval by a Majority of the Participants, which approval shall not be unreasonably withheld or delayed. The payment of such successor Custodian's fees and expenses shall be the sole responsibility of the Servicer. Upon such appointment, the Custodian shall promptly transfer to the successor Custodian, as directed by the Servicer, the Custodian's Mortgage File being administered under this Agreement. No such termination of the Custodian shall become effective until a successor custodian has assumed the rights and obligations of the Custodian under this Custodial.

17.    This Agreement shall terminate upon the final payment or other liquidation of the Mortgage Loans and the final remittance of all funds due the Participants under the

5

Servicing Agreement. The Servicer shall provide to the Custodian a certification which shall state that the foregoing events have occurred. In such event, and upon the Custodian's receipt of the foregoing certification, all documents remaining in the Custodian's Mortgage File shall be forwarded to the Servicer.

18.     All demands, notices and communications hereunder shall be in writing and shall be deemed to have been given if mailed, by registered or certified mail, return receipt requested, or, if by other means, when received by the other party at the address shown on the first page hereof, or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

19.     The Custodian and any of its agents, employees and servants may rely upon the genuineness of any notices, requests, consents, certificates, orders, telecopies, telexes or other papers or documents delivered to it pursuant to or as contemplated by this Agreement by authorized representatives of the Servicer or any Participant, as the case may be, without investigation as to the authenticity or legal effectiveness of such papers or documents.

20.     Capitalized terms not otherwise defined herein shall have the meanings given them in the Servicing Agreement.

6

IN WITNESS THEREOF, the Servicer, the Participant and the Custodian have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the date first written above.

**GREYSTONE FUNDING CORPORATION**
Participant

By: _____
Julie J. Idelimba
Vice President

**GREYSTONE SERVICING CORPORATION, INC.,**
Servicer

By: _____
Carole J. Jurney
Vice President

**FIRST TENNESSEE BANK**
**NATIONAL ASSOCIATION,**
Custodian

By: _____
Name: GAIL WILSON
Title: VICE PRESIDENT

7

## EXHIBIT A

## PROJECT SUMMARIES

|  | Macombs Village I New York, NY | Fairmont Place New York, NY |
|---|---|---|
| FHA Project No.: | 012-57304 | 012-57277 |
| Maturity Date: | 05/01/2024 | 06/01/2024 |
| Number of Units: | 173 | 28 |
| Original Principal Balance: | $10,075,600.00 | $1,586,400.00 |
| Outstanding Principal Balance for 11/26/96: | $9,857,420.69 | $1,552,511.63 |
| Note Interest Rate: | 13.250% | 13.250% |
| Servicing Fees: | .05% | .05% |
| Net Rate to Participant: | 13.20% | 13.20% |
| HUD Debenture Rate: | 12.75% | 12.875% |
| Date of Commencement of Amortization: | 06/01/84 | 07/01/84 |
| Date of Final Endorsement: | 10/31/84 | 12/19/85 |
| Monthly Principal and Interest on Mortgage: | $111,826.06 | $17,606.98 |
| Section 8 Units: | 100% | 100% |
| Prepayment Provisions: | N/A | 05/01/96 to 04/30/97 = 1.50% declining by .5% per year |
| Notes: |  |  |

A-1

## EXHIBIT B

### INITIAL CERTIFICATION

[date]

[participant]

Re:    Custodial Agreement dated as of November 26, 1996 among Greystone
       Funding Corporation [Participant], Greystone Servicing Corporation, Inc.
       [Servicer], and First Tennessee Bank National Association, [Custodian],
       pursuant to Servicing Agreement, of the same date.

Gentlemen:

        In accordance with the provisions of Paragraph 2 of the above-referenced
Custodial Agreement, the undersigned, as Custodian, hereby certifies that, except with respect
to the documents described on Schedule One attached hereto, it has received a Custodian's
Mortgage File with respect to the Mortgage Loans identified on the Project Summary.


            FIRST TENNESSEE BANK
            NATIONAL ASSOCIATION


            By:_____
            Name:
            Title:

B-1

**EXHIBIT C**

**FINAL CERTIFICATION**

[date]

[participant]

> Re:    Custodial Agreement dated as of November 26, 1996 among Greystone
> Funding Corporation [Participant], Greystone Servicing Corporation, Inc.
> [Servicer], and First Tennessee Bank National Association, [Custodian],
> <u>pursuant to Pooling and Servicing Agreement, of the same date</u>

Gentlemen:

In accordance with the provisions of Paragraph 4 of the above-referenced Custodial Agreement, the undersigned, as Custodian, hereby certifies that as to the Mortgage Loans listed in the Project Summaries, it has reviewed the Custodian's Mortgage File and has determined that, except with respect to the documents described on Schedule One attached hereto, (i) all documents required to be delivered to it pursuant to the Custodial Agreement are in its possession, (ii) such documents have been reviewed by it and appear regular on their face and relate to the Mortgage Loans, (iii) based on its examination of such documents and only as to such documents, the information set forth in the Project Summaries respecting the Mortgage Loans is correct and (iv) the Mortgage Notes has been endorsed as provided in Paragraph 1 of the Custodial Agreement.

Capitalized terms used herein but not defined herein shall have the meanings assigned to them in the captioned Custodial Agreement.

FIRST TENNESSEE BANK
NATIONAL ASSOCIATION

By:_____
Name:
Title:

C-1

## EXHIBIT D

## REQUEST FOR RELEASE OF DOCUMENTS

To:  First Tennessee Bank National Association

Re:    Custodial Agreement dated as of November 26, 1996, among Greystone Funding Corporation [Participant], Greystone Servicing Corporation, Inc. [Servicer], and First Tennessee Bank National Association, [Custodian], pursuant to Pooling and Servicing Agreement, of the same date

In connection with the administration of the Mortgage Loans held by you as Custodian for the Participant, we request the release, and acknowledge receipt, of the Custodian's Mortgage File for the Mortgage Loans described below, for the reason indicated.

Mortgagor's Name, Address & Zip Code:

FHA Loan Number:

Reason for Requesting Documents:

Upon our return of all of the above documents to you as Custodian, please acknowledge your receipt by signing in the space indicated below, and returning this form.

GREYSTONE SERVICING CORPORATION, INC.

By:_____          Date:_____

Documents returned to Custodian:
FIRST TENNESSEE BANK NATIONAL ASSOCIATION

By:_____          Date:_____

cc:    All Participants under Servicing Agreement

D-1

# EXHIBIT D

## TO DECLARATION OF JOSÉ A. ISASI, II IN SUPPORT OF DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS

# BRIEF CARMEN & KLEIMAN, LLP

ATTORNEYS AT LAW
805 THIRD AVENUE
NEW YORK, NEW YORK 10022

MATTHEW J. BRIEF
RICHARD E. CARMEN
IRA KLEIMAN*

ADRIA DE LANDRI
OF COUNSEL
* ALSO ADMITTED IN THE DISTRICT OF COLUMBIA

TELEPHONE
(212) 758-6160
(212) 832-5570

FACSIMILE
(212) 832-1747
(212) 832-7221

www.briefjustice.com

January 22, 2008

The Honorable Naomi R. Buchwald                              **VIA FACSIMILE**
United States District Judge
United States Courthouse
500 Pearl Street, Room 2270
New York, NY 10007

Re:  *Physicians Mutual Insurance Company, et al. v. Greystone Servicing Corporation*, et al., CA
     No. 07 CV 10490 (NRB)

Dear Judge Buchwald:

Physicians Mutual Insurance Company and Physicians Life Insurance Company (collectively "Physicians") provide this letter in response to Defendants' January 11, 2008, letter to the Court.

Initially, Defendants misdirect the Court's attention to a prior lawsuit Physicians filed in the U.S. District Court for the Northern District of Illinois ("the Illinois lawsuit").[1] The Illinois lawsuit, against Physicians' former investment advisor, Asset Allocation and Management Co., LLC ("AAM"), is predicated on misrepresentations which led to the acquisition of the loan participation interests in the Greystone Loan Pools. Physicians alleged that AAM negligently and/or fraudulently misrepresented that Physicians interests in the underlying mortgage loans were protected from prepayment prior to maturity. (Complaint, ¶19.) As a result of AAM's misrepresentation, Physicians paid a substantial premium over and above the par value for its loan participation interests. In the Illinois lawsuit, Physicians seeks to recover the amount that it overpaid for the loan participation interests. In contrast, Physicians' claims here are predicated on Greystone's unlawful *redemption* of Physicians' participation interests. Greystone's unlawful redemption occurred years after AAM rendered its investment advice. The two cases do not share the same factual basis for the claims asserted, or even similar legal issues. Regardless of any decision in the Illinois lawsuit, there would be no collateral estoppel effect here. Thus, there are no grounds to support a motion to stay.

## RESPONSE TO GROUNDS IDENTIFIED BY DEFENDANTS FOR MOTION TO DISMISS

**Counts I and II – Breach of Contract/Implied Covenant of Good Faith and Fair Dealing.** Defendants urge dismissal because the Complaint allegedly does not adequately identify a contract. The Complaint satisfies the pleading requirements of Federal Rule of Civil Procedure 8(d) and this Court's requirements. *Window Headquarters, Inc. v. MAI Basic Four, Inc.*, 1993 WL 312899 (S.D.N.Y. 1993), does not help Defendants. *Window Headquarters* makes clear that "a plaintiff is not required to attach a copy of the contract or plead its terms verbatim." *Id.* at *3. A plaintiff need only "set forth the terms of the agreement upon which liability is predicated." *Id.* Plaintiffs have done so. The Complaint alleges that for each Loan Pool "Greystone executed a Pooling and Servicing Agreement ('Servicing Agreement')." (Complaint, ¶22.) The Complaint also alleges that Physicians was a "party to the Servicing Agreements and beneficial owner of the mortgage loans within the Loan Pools." (Complaint, ¶22.) The Complaint goes on to identify the provisions of the Servicing Agreement which were breached. (Complaint, ¶22.)

Defendants also contend that Count II, breach of the covenant of good faith and fair dealing, duplicates the breach of contract count. Not so. The Federal Rules explicitly permit a party to plead causes of action in the alternative, 'regardless of consistency.'" Here, the Complaint describes how, separately from the alleged breach, Defendants engaged in conduct designed to deprive Physicians of the benefits of their contracts. (*See* Complaint, ¶¶18, 29, 20, 22-28, Attachment A.)[2]

---

[1]  The *AAM* lawsuit is currently on appeal to the Seventh Circuit Court of Appeals. However, a factual issue impacting subject matter jurisdiction has arisen, and the matter may be dismissed for lack of subject matter jurisdiction, depending on the outcome of matters relating to the citizenship of certain limited partnerships that own AAM.

[2]  *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp.2d 258, 272 (S.D.N.Y. 2004) (denying motion to dismiss breach of good faith and fair dealing claim where breach of contract also pled; plaintiff is "free to litigate both"); *see also M-101 LLC v. iN Demand LLC*, 2007 WL 4258191 (S.D.N.Y. 2007) (denying motion to dismiss breach of good faith and fair dealing claim because breach of contract claim might be subject to technical defenses which would fail to defeat the alternative claim).

s:\rec\litig\physiciansmutvvsd3pgltr012208.doc

## BRIEF CARMEN & KLEIMAN, LLP
### ATTORNEYS AT LAW

The Honorable Naomi R. Buchwald
January 22, 2008
Page 2

**Counts III and IV – Breach of Fiduciary Duty/Aiding and Abetting Breach of Fiduciary Duty.** Physicians has plead facts sufficient to impose a fiduciary duty. The Complaint alleges that Greystone Servicing Corporation, as "the mortgagee of record and Servicer for the loan pools," was responsible "for collecting payments due pursuant to the underlying mortgage notes and remitting the appropriate share to the owners of participation interests" and otherwise protecting Physicians' loan participation interests. (Complaint, ¶22.) As mortgagee of record and holder of funds for the beneficial owners of the participation interests, Greystone Servicing owed a fiduciary duty of trust to holders of loan participation interests within the Loan Pools, such as Physicians. (Complaint ¶¶43, 44.) In other words, Greystone Servicing held legal title to the underlying mortgages in trust for the benefit of certificate holders. Physicians alleges that Greystone Servicing abused that trust and unlawfully misappropriated the participation interests for its own benefit.[3] The remaining Defendants are liable for breach of fiduciary duty as alter-egos of Greystone Servicing or as aiders and abettors. (Complaint ¶¶8, 10 and 49.)

**Count V – Conversion.** Defendants contend that the Complaint does not identify which asset Defendants converted. The Complaint could not be more specific: "Defendants exercised unauthorized control and wrongfully converted Physicians' loan participation interests in each of the Loan Pools." (Complaint, ¶54, emphasis added.)[4] The Complaint also specifies that "All Defendants" are subject to the allegations of Count V. (Complaint, p. 14.) The loan participation interests at issue here are specifically identifiable as the certificates received by Physicians. Physicians were the beneficial owners of the loan participation interests. Greystone Servicing held legal title to the underlying mortgagees for the benefit of Physicians and other certificate holders and was responsible for protection of Physicians' interests in the underlying mortgage loans. (Complaint, ¶22.) Instead, Greystone Servicing, acting with the other Defendants, orchestrated a scheme to convert the participation interests for their own gain. That scheme and the role of each Defendant is detailed in Physicians Complaint at Paragraphs 23-30.[5]

**Count VI – Fraud.** Defendants contend that the allegations of Count VI of the Complaint fail to satisfy the specificity required by Fed. R. Civ. P. 9(b). Defendants cite *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986), to support their claim that specific defendants are not identified. But *Luce* involved over five defendants, only two of whom were alleged to be alter egos. When the plaintiff in *Luce* referred to "defendants," the court could not determine the defendant allegedly at fault. Here, *all* Defendants are alleged to be alter egos of one another. *All* Defendants are alleged to be part of the fraudulent scheme.

The Complaint satisfies the particularity requirement of Rule 9(b). The Complaint sets forth specific facts that identify the fraudulent practices engaged in by Defendants to implement the unlawful scheme: (1) in connection with each of the three redemptions, Greystone prepared and delivered a "remittance statement" falsely representing that the loans "paid off" and concealed the true facts underlying the redemptions, (Complaint, ¶28); (2) Richard Heyman, a Greystone representative, made false representations orally and by email on or about May 16, 2003 to Physicians' investment advisor that the loans prepaid in connection with restructurings under HUD's Mark to Market Program (Complaint, ¶29); (3) Physicians alleged the manner in which Defendants engaged in "circular transaction" with USGI to make it appear as if the borrowers had refinanced their mortgage loans in order to unlawfully redeem and misappropriate Physicians' loan participation interests. (Complaint ¶¶23-27.) Exhibit "A" to the Complaint identifies by date, author, recipient, subject matter and instrumentality the documents prepared and utilized to implement the fraudulent scheme. Physicians has alleged that, in the Illinois lawsuit, testimony was adduced that the individual Defendants were the "decision makers" behind the scheme to defraud. (Complaint ¶24.)

Defendants argue that damages sought by Plaintiffs are not recoverable, relying on *Three Crown Ltd. Partnership v. Salomon Bros.*, 906 F. Supp. 876 (S.D.N.Y. 1995). *Three Crown* was decided on summary judgment and based on antitrust and securities fraud, specifically, Rule 10b-5. *Three Crown* does not apply here. Physicians is not required to plead a damages theory. At this stage of the pleadings, Physicians is required only to allege that it has sustained damages as a result of Defendants' unlawful conduct. It has done so.

**Count VII – Constructive Trust.** Plaintiffs seek monetary *and* equitable damages in the form of an accounting, making a constructive trust appropriate. (Complaint, pp. 17-18.) An accounting is appropriate

---

[3] *See Standard Fed. Bank v. Healy*, 7 A.D.3d 610, 777 N.Y.S.2d 499 (2d Dept. 2004) (escrow holder of funds may be held liable on a theory of breach of fiduciary duty).

[4] *See Thyroff v. Nationwide Mut. Ins.*, 8 N.Y.3d 283 (Ct. App. 2007) (intangible property rights are subject to claims for conversion).

[5] *See Moses v. Martin*, 360 F. Supp.2d 533, 541 (S.D.N.Y. 2004).

BRIEF CARMEN & KLEIMAN, LLP
ATTORNEYS AT LAW

The Honorable Naomi R. Buchwald
January 22, 2008
Page 3

here because Defendants wrongfully took the proceeds from Physicians' loan participation interests for their own, thus profiting at Physicians' expense. Physicians is entitled to an accounting of the ill-gotten gains Defendants wrongfully acquired. There is no basis for a motion to dismiss.[6]

Count VII – RICO. Defendants contend, incorrectly, that Physicians' RICO claim violates the particularity requirement of Rule 9(b) as well as RICO's "distinctness" requirement. As with Count VI – Fraud (above), the Complaint and Attachment A thereof detail Defendants' predicate acts and the manner in which Defendants carried out their scheme.

Physicians have pled both an alter ego theory and a RICO violation. That fact does not vitiate Physicians' RICO claim. At the pleading stage, "a plaintiff may plead two or more statements of a claim, even within the same count, regardless of consistency."[7] Any other result would gut Rule 8(d)(3), which provides: "Inconsistent Claim or Defenses. A party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(2). Indeed, the Second Circuit has held that a party can "properly submit a case on alternative theories" whether the inconsistency lies in the facts or legal theories.[8]

Statute of Limitations – Counts III, IV, V, and VI. Defendants err in their analysis of the applicable statutes of limitations. Counts III and IV, breach of fiduciary duty and aiding and abetting breach of fiduciary duty, are subject to a six (6) year limitations period where, as here, equitable is relief is sought or where actual fraud is the basis for the breach.[9] Here, the Complaint alleges both. Defendants hold Physicians' participation interests with respect to which they owe Plaintiffs a duty of accounting. (Complaint, pp.17-18.) Plaintiffs also allege Defendants actions were based on fraud, which the Complaint and Attachment A set forth with proper specificity. In any event, the breach of fiduciary duty claim is subject to a discovery rule;[10] it was not until May 4, 2007, when Physicians took the deposition of a Greystone representative in the Illinois lawsuit, that Physicians learned of Defendants' wrongful conduct. (Complaint, ¶30.)

Count V - Conversion, is generally subject to a three (3) year statute of limitations. "While 'accrual [normally] runs from the date the conversion takes place * * * and not from discovery or the exercise of diligence to discover' * * *, where the original possession is lawful, conversion does not occur until after a demand and refusal to return the property."[11] Here, Physicians knew there had been redemptions but Defendants concealed their wrongdoing, making it impossible for Physicians to know that the redemptions were wrongful until the May 4, 2007 deposition of Greystone's representative in the Illinois lawsuit.

Finally, Count VIII - RICO, is subject to a four year statute of limitations.[12] The period does not begin to run, however, until "the plaintiff discovers or should have discovered the RICO injury."[13] Physicians did not know and could not have known of Greystone's wrongful activities until the May 4, 2007 deposition of a Greystone representative in the Illinois lawsuit. The RICO count was timely filed.

The detailed allegations of the Complaint and the acts laid out in Attachment A satisfy the pleading requirements of the Federal Rules. Plaintiffs' Complaint was timely filed and raises serious issues of fraud, misconduct and breach of contract by Defendants. A motion to dismiss the Complaint is not warranted.

Respectfully,

Richard E. Carmen, Esq.

cc:   Stephen L. Saxl, Esq.
      William A. Wergo, Esq.
      José A. Isasi, II, Esq.

[6]   See Maric Piping, Inc. v. Maric, 271 A.D.2d 507, 705 N.Y.S.2d 684 (2d Dept. 2000).
[7]   Moses, supra at 547-48 (allowing plaintiff to plead that two entities were alter egos or, alternatively, legally distinct entities for purposes of RICO claim).
[8]   See Henry v. Daytop Village, Inc., 42 F.3d 89, 95 (2d Cir. 1994).
[9]   Goldberg v. Schuman, 289 A.D.2d 8, 733 N.Y.S.2d 156 (1st Dept. 2001); Leongard v. Santa Fe Indus., Inc., 70 N.Y.2d 262, 267 (Ct. App. 1987).
[10]  Whitney Holdings, Ltd. v. Givitovsky, 988 F. Supp. 732, 744 (S.D.N.Y. 1997).
[11]  D'Amico v. First Union Nat'l Bank, 285 A.D.2d 166, 728 N.Y.S.2d 146 (1st Dept. 2001) (citations omitted).
[12]  Klehr v. A.O. Smith Corp., 521 U.S. 179, 188-89 (1997).
[13]  In re Merrill Lynch Ltd. Partnerships Litig., 154 F.3d 56, 58 (2d Cir. 1998).